**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NEW CENTURY MORTGAGE CORP., | ) | |
| | ) | CASE NO.  05C2370 |
| Plaintiff, | ) | |
| | ) | Judge Coar |
| v. | ) | |
| | ) | **PLAINTIFF'S POINTS AND** |
| GREAT NORTHERN INSURANCE | ) | **AUTHORITIES IN SUPPORT OF** |
| COMPANY, FEDERAL INSURANCE | ) | **MOTION FOR SUMMARY** |
| COMPANY, | ) | **JUDGMENT** |
| | ) | |
| Defendants. | ) | |
| | ) | |

# TABLE OF CONTENTS

Page

I.　SUMMARY OF ARGUMENT ............................................................................ 1

II.　STATEMENT OF FACTS ................................................................................. 1

　　A.　The Chubb Policies ............................................................................... 1

　　B.　The *Bernstein* Action ........................................................................... 2

　　C.　The Tender by NCMC to Chubb ........................................................... 2

　　D.　Chubb's Breach of Its Duty to Settle .................................................... 3

III.　THE POLICIES' "VOLUNTARY PAYMENTS" PROVISIONS DO *NOT* EXCUSE CHUBB'S BREACH OF ITS DUTY TO SETTLE ................................. 4

　　A.　Because Chubb Reserved Its Rights, NCMC Was Entitled to Enter a Reasonable Settlement Without Chubb's Consent ............................... 4

　　B.　Because Chubb Consented to the Settlement, the "Voluntary Payments" Provisions Do Not Excuse Chubb's Breach of Its Duty to Settle ...................................................................................................... 5

IV.　ILLINOIS' TWO-PART TEST ESTABLISHES CHUBB'S DUTY TO REIMBURSE NCMC'S SETTLEMENT OF THE *BERNSTEIN* ACTION ............. 5

　　A.　The Two-Part Totality of Circumstances Test ....................................... 5

　　B.　The Decision to Settle Was Reasonable ............................................... 6

　　C.　The Settlement Amount Was Reasonable .............................................. 8

　　D.　NCMC Settled a Claim Covered Under the Policies ........................... 10

　　　　1.　The Two-Part Test Does Not Require the Insured to Prove Actually Covered Damages to Recoup Settlement Expenditures – Just that the Insured Settled a Potentially Covered *Claim* .............. 10

　　　　2.　NCMC's Settlement Payment Is for Covered "Advertising Injury" ........................................................................................... 10

　　　　3.　NCMC's Settlement Payment Is for Covered "Property Damage" ........................................................................................ 12

V.　NO EXCLUSIONS EXCUSE CHUBB'S DUTIES UNDER THE POLICIES ......... 13

　　A.　Chubb Bears the Burden of Proving the Applicability of Exclusions ........... 13

　　B.　Expected or Intended Injury .................................................................. 13

     **C.**     **Willful Violations of a Penal Statute or Ordinance Exclusion** ....................... **14**

     **D.**     **The "Prior Publication" Exclusion Does Not Excuse Chubb's Defense Duty** ................................................................................................................ **15**

**VI.**    **CONCLUSION** .......................................................................................................... **15**

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*American States Ins. Co. v. Capital Associates of Jackson County, Inc.*,
    392 F.3d 939 (7th Cir. 2004) ............................................................................................11

*Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.*,
    73 F.3d 150 (7th Cir. 1996) ...............................................................................................9

*In re HA 2003, Inc.*,
    310 B.R. 710 (Bankr. N.D. Ill. 2004) .................................................................................4

*Knoll Pharm. Co. v. Automobile Ins. Co.*,
    210 F. Supp. 2d 1017 (N.D. Ill. 2002) ...............................................................................9

*Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*,
    200 F.3d 518 (7th Cir. 1999) ..............................................................................................9

*Park University Enters. v. American Cas. Co.*,
    314 F. Supp. 2d 1094 (D. Kan. 2004) ...............................................................................14

*Taco Bell Corp. v. Continental Cas. Co.*,
    388 F.3d 1069 (7th Cir. 2004) ............................................................................................9

*Western Rim Inv. Advisors, Inc. v. Gulf Ins. Co.*,
    269 F. Supp. 2d 836 (N.D. Tex. 2003) .............................................................................14

## STATE CASES

*Blue Ridge Ins. Co. v. Jacobsen*,
    25 Cal. 4th 489 (2001) ......................................................................................................10

*Commonwealth Edison Co. v. National Union Fire Ins. Co. of Pittsburgh, PA*,
    323 Ill. App. 3d 970 (2001) ................................................................................................4

*Guillen v. Potomac Ins. Co. of Ill.*,
    203 Ill. 2d 141 (2003) ...........................................................................................5, 6, 8, 9

*Johnson Press of America, Inc. v. Northern Insurance Co. of New York*,
    339 Ill. App. 3d 864 (1st Dist. 2003) ...............................................................................13

*Lyons v. State Farm Fire and Casualty Co.*,
    349 Ill. App. 3d 404 (5th Dist. 2004) ...............................................................................13

*Outboard Marine Corp. v. Liberty Mutual Ins. Co.*,
154 Ill. 2d 90 (1992) ...................................................................................11

### DOCKETED CASES

*Flodine v. State Farm Ins. Co.*,
No. 99 C 7466, 2003 WL 1394977 (N.D. Ill. Mar. 18, 2003) .......................................5, 10

*Valley Forge Ins. Co. v. Swiderski Electronics, Inc.*,
No. 2-04-0910, __ N.E.2d __, 2005 WL 2045639 (Ill. App. Ct. (2d Dist.)
Aug. 17, 2005) ...................................................................................10, 11, 12

### FEDERAL STATUTES

47 U.S.C. § 227 (Telephone Consumer Protection Act)............................................1, 2

47 U.S.C. § 227(b)(1)(C) .................................................................................6

47 U.S.C. § 227(b)(3) .....................................................................................8

47 U.S.C. § 227(b)(3)(B) ...............................................................................13

### STATE STATUTES

815 ILCS 505/2 (Illinois Consumer Fraud Act) ...................................................1, 2

New Century Mortgage Corporation ("NCMC") hereby moves this Court for summary judgment ("Motion") against Defendants Great Northern Insurance Company ("Great Northern") and Federal Insurance Company ("Federal").[1]  NCMC respectfully submits this Memorandum in support of its Motion against Chubb.

## I.    SUMMARY OF ARGUMENT

Chubb must fund the settlement in the *Bernstein* Action with NCMC because:

(1)    Chubb conceded in writing, in January 2004, that it owed a duty to defend the *Bernstein* Action.

(2)    The *Bernstein* Complaint alleges claims for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") and the Illinois Consumer Fraud Act, 815 ILCS 505/2 ("ICFA").

(3)    The allegations of the Bernstein complaint trigger both the "property damage" coverage for "loss of use," and "advertising injury" coverage for the offense of "violation of rights of privacy" as a number of courts have found, triggering a defense obligation.

(4)    Chubb admittedly had a duty to defend the *Bernstein* Action, including as of the date of settlement.

(5)    Chubb conceded through its counsel that a settlement of less than $6 million would be reasonable, and the amount of the settlement, $1.95 million, was well below this amount.

(6)    Chubb refused to pay any portion of the settlement, to participate in the settlement negotiations, or to pay the settlement amount when settlement was negotiated or thereafter.

(7)    NCMC agreed to the settlement to avoid damages exposure, which arose from covered claims for the "advertising injury" offense of "violation of rights of privacy" and/or "property damage," for statutory damages of $500.00 per each facsimile which created damage exposure in excess of $300 million, so that in light of the potential exposure the sum agreed was eminently reasonable.

## II.    STATEMENT OF FACTS

### A.    The Chubb Policies

In order to obtain the broadest possible coverage, NCMC procured a commercial general

---

[1]Great Northern and Federal are collectively referred to as "Chubb" since they are members of the Chubb Group of Insurance Companies and communicated with NCMC on Chubb letterhead.

liability insurance policy from Great Northern and an umbrella and excess policy from Federal. Great Northern issued a Commercial General Liability ("CGL") insurance policy, No. 3539-77-36 LAO, effective February 3, 2002 through February 3, 2003, naming NCMC as an insured by way of endorsement. **[Statement of Undisputed Facts ("SUF") ¶ 11, Declaration of Monika McCarthy in Support of Plaintiff's Motion for Summary Judgment ("McCarthy Decl.") ¶ 11 (Ex. "D")]** Federal issued Commercial Umbrella Policy, No. 7977-03-85, effective February 3, 2002 through February 3, 2003, naming NCMC as an insured by way of endorsement. **[SUF ¶ 12, McCarthy Decl. ¶ 12 (Ex. "E")]** The primary and umbrella policies are collectively referred to as the "policies."

The policies provide coverage for "advertising injury" and "property damage." The "advertising injury" coverage provides that Chubb will pay damages for "invasion of a person's right of privacy" in the course of advertising. The "property damage" coverage states that Chubb will pay damages because of "property damage" which is pertinently defined as "loss of use of tangible property that is not physically injured." NCMC paid damages because of both "advertising injury" and "property damage."

## B.    The *Bernstein* Action

On April 5, 2002, Paul Bernstein filed a civil class action in the Circuit Court of Cook County, Illinois County Department, Chancery Division against NCMC entitled *Paul Bernstein v. New Century Mortgage Corporation*, Civil Action No. 02CH 06907 (the *"Bernstein* Action"), alleging claims for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") and the Illinois Consumer Fraud Act, 815 ILCS 505/2 ("ICFA"). **[SUF ¶¶ 6, 7, McCarthy Decl. ¶¶ 5-6 (Ex. "A")]**

On or about September 30, 2003, Bernstein filed a second amended complaint. In addition to the TCPA and IFCA claims alleged in the Complaint, Bernstein also alleged a more specific claim for "Property Damage" based, *inter alia*, upon plaintiff's and class members' loss of use of the paper, toner and ink used to print the allegedly wrongful faxes. **[SUF ¶ 8, McCarthy Decl. ¶ 7 (Ex. "B")]**

## C.    The Tender by NCMC to Chubb

On August 15, 2003, NCMC provided notice of the *Bernstein* Action to Chubb with a copy of the Complaint. **[SUF ¶ 20, McCarthy Decl. ¶ 13 (Ex. "F")]** Chubb acknowledged receipt of the notice by letter dated January 7, 2004. **[SUF ¶ 21, McCarthy Decl. ¶ 14 (Ex.**

"G")]  Chubb agreed to defend NCMC subject to a reservation of rights.  (*Id.*)  Chubb claimed the allegations in the Bernstein Complaint may not fall within the insuring agreement and may not meet any of the coverage definitions.  (*Id.*)

Chubb stated the allegations did not satisfy the definition of "Property Damage," even though there was a claim for loss of use of toner, ink and paper.  Chubb also claimed there was no "Occurrence," since transmission of the fax was purportedly not an accident.  (*Id.*)  Chubb's arguments are erroneous.

Chubb also acknowledged the allegations might include a claim within the "Advertising Injury" or "Personal Injury" coverage for publication of material that invades a person's right of privacy.  This is the basis upon which Chubb agreed to provide a defense.  (*Id.*)

Chubb also asserted the Willful Violations Exclusion and the Expected or Intended Injury Exclusion as a further basis upon which it reserved its right to deny indemnity for any uncovered claim.  Chubb agreed that Coverage A of the Commercial Umbrella Policy was implicated and agreed the claim would be handled under the same reservation of rights as set forth under the primary policy.  (*Id.*)

Chubb delayed acknowledging its defense duty until January 7, 2004, almost five months after tender (*id.*), and Chubb's first payment of defense costs was in September 2004, more than a year after tender.  **[SUF ¶ 51, McCarthy Decl. ¶ 28 (Ex. "S")]**

**D.    Chubb's Breach of Its Duty to Settle**

During May 2004, discussions ensued between NCMC and Chubb regarding attendance at a mediation.  **[SUF ¶ 34, McCarthy Decl. ¶ 18]**  NCMC advised Chubb that Bernstein was seeking class certification by way of motion, with a hearing scheduled in early August 2004.  NCMC advised Chubb that it was imperative that all necessary steps be taken to settle with Bernstein before a class was certified, in order to avoid exposing NCMC to damages in excess of $300 million.  **[SUF ¶ 37, McCarthy Decl. ¶ 21 (Ex. "K"); and SUF ¶ 40, Lowe Decl. ¶ 3 (Ex. "M")]**

On June 17, 2004, defense counsel for NCMC forwarded a copy of a settlement demand received from counsel for Bernstein on June 14, 2004.  **[SUF ¶ 35, McCarthy Decl. ¶ 19 (Ex. "J") and SUF ¶ 36, McCarthy Decl. ¶ 20 (Ex. "K")]**  On June 22, 2004, coverage counsel for Chubb advised defense counsel for NCMC that Chubb would continue to defend NCMC, but denied any duty to indemnify and refused to participate in a mediation then anticipated to take

place on June 23, 2004, even though there had been no adjudication of NCMC's liability.  **[SUF ¶ 38, McCarthy Decl. ¶ 22 (Ex. "L")]**

By July 7, 2004 letter, Chubb acknowledged that settlement for $6 million or less is reasonable and prudent.  Chubb also acknowledged that payment of the settlement by NCMC is not in violation of any provision of the Chubb policies.  **[SUF ¶ 42, Declaration of James A. Lowe in Support of Plaintiff's Motion for Summary Judgment ("Lowe Decl.") ¶ 4 (Ex. "N")]**  Chubb has never contended that the allegedly uncovered risk is the sole cause of damages.

On August 5 and 6, 2004, NCMC and Bernstein participated in mediation.  **[SUF ¶ 43, McCarthy Decl. ¶ 23]**  On August 10, 2004, NCMC again requested Chubb agree to contribute to a settlement with Bernstein for an amount within the policy limits of the Chubb policies.  **[SUF ¶ 45, Lowe Decl. ¶ 6 (Ex. "P")]**  Chubb refused to contribute any amount toward settlement of the *Bernstein* Action.  **[SUF ¶ 44, Lowe Decl. ¶ 5 (Ex. "O")]**  As a result, Chubb had a duty to, and breached its duty to, fully fund the settlement of the *Bernstein* Action.

### III.   THE POLICIES' "VOLUNTARY PAYMENTS" PROVISIONS DO *NOT* EXCUSE CHUBB'S BREACH OF ITS DUTY TO SETTLE

#### A.   Because Chubb Reserved Its Rights, NCMC Was Entitled to Enter a Reasonable Settlement Without Chubb's Consent

A policyholder is not required to obtain insurer consent to enter into a reasonable settlement of a potentially covered lawsuit where the insurer has reserved its rights to deny coverage.  Under these circumstances the insurer has a conflict with its insured and thus no right to control the litigation, nor to rely on the "voluntary payment" provision in its policy to annul its duty to reimburse a settlement.  *See In re HA 2003, Inc.,* 310 B.R. 710, 725 (Bankr. N.D. Ill. 2004) ("Illinois courts, along with a majority of courts in other jurisdictions, hold that when an insurer reserves its right to deny coverage, an insured may enter into a reasonable settlement without the insurer's consent and without losing coverage."); and *Commonwealth Edison Co. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 323 Ill. App. 3d 970, 984-85 (2001) (refusing to apply the "voluntary payments" provision of a policy to deny insured settlement reimbursement – despite insurer's lack of consent to settlement and even though the insurer had not breached its defense duties – because insurer reserved its rights to deny coverage, agreed to independent defense counsel due to conflict of interest and had notice of insured's intent to settle).

Here, Chubb reserved its rights to deny coverage **[SUF ¶ 21, McCarthy Decl. ¶ 14 (Ex.**

"G")], agreed to defend NCMC through independent defense counsel of NCMC's choice given Chubb's reservation of rights and resulting conflict of interest with NCMC (*id.*), and had notice of NCMC's intent to settle the *Bernstein* Action **[SUF ¶ 36, McCarthy Decl. ¶ 20 (Ex. "K")]**, yet refused to participate in mediation or contribute to a settlement **[SUF ¶ 38, McCarthy Decl. ¶ 22 (Ex. "L"), and SUF ¶ 45, Lowe Decl. ¶ 5 (Ex. "O")]**.  So, just as the policyholders in *HA 2003* and *Commonwealth Edison*, NCMC was entitled to enter into a reasonable settlement without Chubb's consent and to then seek reimbursement from Chubb for that settlement.

> **B.    Because Chubb Consented to the Settlement, the "Voluntary Payments" Provisions Do Not Excuse Chubb's Breach of Its Duty to Settle**

After NCMC gave Chubb notice of its intent to settle, Chubb consented to NCMC settling the *Bernstein* Action for $6 million or less.  **[SUF ¶ 36, McCarthy Decl. ¶ 20 (Ex. "K"), and SUF ¶ 42, Lowe Decl. ¶ 4 (Ex. "N")]**  While Chubb refused to fund such a settlement, it acknowledged NCMC's right to settle for this amount.  Therefore, Chubb's "voluntary payment" provisions – which state, "No **insureds** will, except at that **insured's** own cost, make a payment [or] assume any obligation . . . without our consent." – do not excuse Chubb's duty to settle.  **[SUF ¶ 15, McCarthy Decl. ¶ 11 (Ex. "D"), and ¶ 12 (Ex. "E")]**

# IV.    ILLINOIS' TWO-PART TEST ESTABLISHES CHUBB'S DUTY TO REIMBURSE NCMC'S SETTLEMENT OF THE *BERNSTEIN* ACTION

> **A.    The Two-Part Totality of Circumstances Test**

The Illinois Supreme Court recently set out a two-part test to obtain insurer reimbursement of a settlement in circumstances where a policyholder settles without the insurer's consent.  **First**, it is necessary to establish the **decision to settle** was reasonable (as opposed to not settling a case).  The policyholder must prove under "the totality of the circumstances" that a "prudent *uninsured*" would have settled.  *Guillen v. Potomac Ins. Co. of Ill.,* 203 Ill. 2d 141, 163 (2003) (italics in original).  Put another way, the policyholder cannot act as a "mere volunteer," settling simply because the insurance company is expected to pay but, rather, because the policyholder "was responding to a reasonable anticipation of personal liability."  *Flodine v. State Farm Ins. Co.,* No. 99 C 7466, 2003 WL 1394977, at *9 (N.D. Ill. Mar. 18, 2003).  Still, "[a]n insured who settles without notice to the insurer need not prove that it was **in fact** liable in the principal action . . . ."  *Id.* (emphasis added).  **Second**, it is necessary to show that the settlement **amount** is " 'what a reasonably prudent person in the position of the [insured] would have settled for on the merits of plaintiff's claim' " (*id.* at *10) using "a

commonsense consideration of the totality of 'facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial.' " *Guillen*, 203 Ill. 2d at 163. So the **first** part of the test is overall reasonableness of settling given potential liability. The **second** part is reasonableness of the settlement amount given a commonsense evaluation of (a) liability, (b) damages and (c) the risks of going to trial.

### B.    The Decision to Settle Was Reasonable

When NCMC settled the *Bernstein* Action, it was indisputably responding to a "reasonable anticipation of liability" and acting as a "prudent uninsured" would have acted based on the totality of the circumstances. First and foremost, prior to the mediation and ensuing settlement, Chubb conceded that any decision to settle for less than $6 million would be reasonable. **[SUF ¶ 42, Lowe Decl. ¶ 4 (Ex. "N")]** This is not surprising in that NCMC faced a real threat of liability under the TCPA.[2] Bernstein had evidence NCMC faxed him an allegedly unsolicited advertisement on February 26, 2002. He included allegations of such and attached a copy of the actual fax advertisement to his complaint, which advertisement bears a February 26, 2002 facsimile date stamp. **[SUF ¶ 6, McCarthy Decl. ¶ 5 (Ex. "A")]** NCMC believed a trier of fact might conclude the advertisement was unsolicited because there was evidence that NCMC contracted with Fax.com to transmit 200,000 faxes of the same type Bernstein allegedly received during this same time frame – i.e., late February 2002. **[SUF ¶ 16, McCarthy Decl. ¶ 8 (Ex. "C")]** That contract states,

> [NCMC] acknowledges that [NCMC] is aware that [Fax.com's] faxing of [NCMC's] commercial messages/advertisements on behalf of [NCMC] presents significant legal issues and risks. . . . [NCMC] has had the opportunity to consult with its own legal counsel with respect to the federal Telephone Consumer Protection Act and applicable state law regarding transmissions by fax of **unsolicited** commercial messages/advertisements and the risks attended thereto.

This language could lead the fact finder to infer NCMC sent **unsolicited** faxes, particularly because NCMC contracted to send mass faxes, i.e., 200,000. **[SUF ¶ 16, McCarthy Decl. ¶ 8 (Ex. "C")]** NCMC also concluded, based on this evidence, that a fact finder may find NCMC's willful infringement of the TCPA. Under these circumstances, NCMC had solid reasons to believe Bernstein and the class (when certified) could establish a *prima facie* case that NCMC violated the TCPA and, perhaps, willfully violated the statute.

---

[2]The TCPA makes it unlawful "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement . . . ." 47 U.S.C. § 227(b)(1)(C).

Equally important, NCMC had no way to disprove it sent the faxes.  **[SUF ¶ 17, McCarthy Decl. ¶ 9]**  Fax.com had gone out of business and, in any event, kept no records whether it sent the faxes NCMC contracted for it to send.[3]  **[SUF ¶ 18, McCarthy Decl. ¶ 9]** Faced with a real possibility Bernstein would prevail and no way to defend itself, NCMC did what any prudent uninsured would have done.  It settled the case.

That NCMC's decision to settle was reasonable is also evidenced by the following additional facts:  NCMC faced in excess of $300 million in exposure had the case proceeded to trial following class certification; Bernstein's motion for class certification was set for hearing on August 10, 2004 – immediately following the August 5 and 6, 2004 mediation – and Bernstein's counsel indicated they would likely not settle if they obtained class certification **[SUF ¶ 35, McCarthy Decl. ¶ 19 (Ex. "J"), and SUF ¶ 40, Lowe Decl. ¶ 3 (Ex. "M")]**; indeed, if Bernstein obtained class certification, it would have been exceedingly more difficult to reach any settlement simply by virtue of the large number of plaintiffs **[SUF ¶9 , McCarthy Decl. ¶ 7 (Ex. "B")]**; further, NCMC's litigation costs would have skyrocketed as is typical in class actions **[SUF ¶ 40, Lowe Decl. ¶ 3 (Ex. "M")]**; despite NCMC's August 15, 2003 tender of the *Bernstein* Action, Chubb's January 7, 2004 agreement to defend NCMC and NCMC's March 25, 2004 transmission of all its post-tender defense cost invoices to Chubb, Chubb did not pay a dime of NCMC's defense costs until well after the August 10, 2004 settlement and, by that time, NCMC had already spent in excess of $89,000.00 (just in *post-tender* costs through January 2004) defending the case **[SUF ¶ 32, McCarthy Decl. ¶ 16 (Ex. "H")]**; NCMC did not want to continue paying litigation expenses which, again, were on the verge of exponentially increasing given the imminent class certification; and NCMC committed its own money to resolve the suit as Chubb had refused to participate in mediation or contribute to a settlement – the reasonable inference is that a prudent insured would not do this absent good reason **[SUF ¶ 47, McCarthy Decl. ¶ 25 (Ex. "Q")]**.

---

[3]NCMC has reason to believe Fax.com went out of business, in part, because it was sending unsolicited faxes on behalf of its customers, despite Fax.com's representations to NCMC it would only send faxes to welcoming recipients.  **[SUF ¶ 19, McCarthy Decl. ¶ 10]**  Therefore, although NCMC believed at the time Fax.com was only transmitting NCMC's fax advertisements to welcoming recipients, NCMC had to consider the reason Fax.com went out of business in reaching its decision to settle.  NCMC concluded that a fact finder may very well find NCMC violated the TCPA by sending unsolicited faxes, given Fax.com's predicament, not to mention the Fax.com contract language referred to above.  (***Id.***)

Finally, had the case come before a jury, it would have pitted consumers and homeowners against a large mortgage corporation accused of sending out bothersome, unsolicited "telemarketing" type facsimile advertisements. Simply, NCMC acted prudently and in reasonable anticipation of liability by settling.

### C.    The Settlement Amount Was Reasonable

The settlement amount NCMC paid – $1.95 million (*id.*) – is "what a reasonably prudent person in the position of the insured would have settled for on the merits of plaintiff's claim" using "a commonsense consideration of the totality of facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial." *Guillen,* 203 Ill. 2d at 163. First and foremost, NCMC faced $300 million in damage exposure – on Bernstein's TCPA claims alone – if the case had proceeded to trial following class certification. **[SUF ¶ 40, Lowe Decl. ¶ 3 (Ex. "M")]** The basis for this staggering exposure is that Fax.com may have transmitted 200,000 fax advertisements on NCMC's behalf, including to Bernstein, in late February 2002. Further, Congress set the damages for each such TCPA violation by statute, at $500, with treble damages for willful infringement.[4]  Multiplying 200,000 faxes by $500 per violation comes to $100 million, or $300 million with trebling.[5]

This debilitating **damage** exposure alone warranted the settlement amount, even with a slight probability of **liability**. But as discussed above, there was a substantial probability the fact finder would find NCMC liable under the TCPA. Still, even if NCMC faced only a .66% (less than 1%) chance of liability at trial – which borders on the absurd in light of the evidence – the $1.95 million settlement amount is reasonable given NCMC's $300 million damage exposure ($300 million in damages multiplied by .0066 liability probability equals $1.98 million verdict).

---

[4]The TCPA, at 47 U.S.C. § 227(b)(3), states in pertinent part as follows:

> A person or entity may . . . bring . . . (B) an action to recover for actual monetary loss from such a [unsolicited fax advertisement] violation, or to receive $500 in damages for each such violation, whichever is greater . . . .
>
> If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

[5]Although NCMC was informed by Fax.com and believed that all fax transmissions were to willing recipients **[SUF ¶ 19, McCarthy Decl. ¶ 10]**, NCMC rightfully considered the evidence from which a fact finder might very well conclude NCMC violated the TCPA and did so willfully, in assessing the reasonable settlement amount. Regardless, irrespective of the probability of NCMC's **liability** under the TCPA, the **damage** exposure was $300 million.

From another angle, even if Bernstein could only prove Fax.com sent 3,900 of the 200,000 contracted for fax advertisements, and that Bernstein could not prove willful infringement, Bernstein would have obtained a $1.95 million judgment against NCMC, in light of the $500 per violation statutory damage amount.  Because NCMC's potential trial exposure (even using the above-noted absurdly low liability percentages) was greater than the sum for which it settled, and because that exposure does not even factor in NCMC's ongoing litigation costs – which would have exponentially increased with the imminent class certification – the settlement amount is eminently reasonable.

That NCMC's settlement is reasonable in amount is also evidenced by the following additional facts:  prior to the mediation and ensuing settlement, Chubb conceded that any settlement amount for less than $6 million would be reasonable **[SUF ¶ 42, Lowe Decl. ¶ 4 (Ex. "N")]**; NCMC committed its own money to resolve the suit without any assurance it would be reimbursed by Chubb, which had refused to participate in mediation or contribute to a settlement **[SUF ¶ 47, McCarthy Decl. ¶ 25 (Ex. "Q")]**;[6] Bernstein made a $6 million demand to NCMC **[SUF ¶ 35, McCarthy Decl. ¶ 19 (Ex. "J")]**; the $1.95 million settlement is well within Chubb's policy limits **[SUF ¶ 11, McCarthy Decl. ¶ 11 (Ex. "D")]**;[7] and NCMC's Senior Vice President and General Counsel who oversaw the *Bernstein* Action felt that the $1.95 million settlement amount was eminently reasonable given the $300 million potential exposure.  **[SUF ¶ 48, McCarthy Decl. ¶ 26]**

For all of the above reasons, and particularly because NCMC indisputably risked an award of damages far beyond the amount of the settlement had it proceeded to trial, NCMC's $1.95 million settlement is eminently reasonable.  No reasonable jury could conclude otherwise.

---

[6]Therefore, under Illinois law, the settlement amount is reasonable as a matter of law because NCMC had market incentives to economize – for it might not be reimbursed. *See Taco Bell Corp. v. Continental Cas. Co.*, 388 F.3d 1069, 1075 (7th Cir. 2004) (In advertising injury coverage litigation, stating "Because of the resulting uncertainty about reimbursement [of its underlying defense expenses from its insurer], Taco Bell had an incentive to minimize its legal expenses (for it might not be able to shift them); and where there are market incentives to economize, there is no occasion for a painstaking judicial review."); *Knoll Pharm. Co. v. Automobile Ins. Co.*, 210 F. Supp. 2d 1017, 1024-1026 (N.D. Ill. 2002) (holding all of insured's $39 million in defense expenses recoverable and reasonable as a matter of law, most importantly, because the insured paid them when ultimate recovery of the expenses was uncertain); *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 200 F.3d 518, 520 (7th Cir. 1999); *Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.*, 73 F.3d 150, 153 (7th Cir. 1996).

[7]Although settling within policy limits does not, "by itself," establish the settlement amount is reasonable, it is persuasive evidence of reasonableness.  *Guillen*, 203 Ill. 2d at 164-65.

### D.    NCMC Settled a Claim Covered Under the Policies

#### 1.    The Two-Part Test Does Not Require the Insured to Prove Actually Covered Damages to Recoup Settlement Expenditures – Just that the Insured Settled a Potentially Covered *Claim*

*Flodine* characterizes the first prong of Illinois' two-part settlement reimbursement test as simply requiring the insured to prove " 'by settling, he was responding to a reasonable **anticipation** of personal liability . . . .' "  *Flodine,* 2003 WL 1394977, at *9 (emphasis added). "An insured who settles without notice to the insurer need not prove that it was **in fact liable** in the principal action . . . ."  *Id.* (emphasis added).  **This is not an indemnity standard but, rather, relies on the potential for liability.**  The *Flodine* court clarified this by holding the insurer had a duty to reimburse the insured for its settlement – not because the insured proved it settled what would have amounted to **actually covered damages** had the matter proceeded to trial – but because the insured proved it settled **potentially covered claims**:

> In light of the potential liability facing Flodine, the court believes that the settlement entered into by Flodine and NAA was intended to settle an actual (and still viable) dispute between them.  Because the court has **already determined** that the non-IACA **claims**, which were viable claims against Flodine at the time of her settlement, also **fell within coverage for "advertising injury"** [by virtue of granting the insured's **prior** motion for summary judgment on the **duty to defend**,] State Farm had a duty to indemnify Flodine for the settlement of those claims even though State Farm was unaware of the settlement.[8]

This is not surprising in that proving actually covered damages (as opposed to potentially covered claims) following a settlement is impossible.  There would never be a judgment or adjudication of the insured's wrongdoing nor the underlying plaintiff's damages.

#### 2.    NCMC's Settlement Payment Is for Covered "Advertising Injury"

Chubb agreed to pay damages because of "advertising injury" pertinently defined as "violation of a person's right of privacy."  **[SUF ¶ 13, McCarthy Decl. ¶¶ 11, 12 (Exs. "D" and "E")]**  An Illinois appellate court recently addressed whether this language covers a claimed TCPA violation applying Illinois coverage law.[9]  The appellate court found that, while federal courts are not in agreement as to whether such claims are covered under the advertising injury provisions of a CGL policy, "insurance- policy construction in Illinois compels us to find a duty

---

[8]*Id.* at *7 (emphasis added).  Other jurisdictions are in accord.  *See Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal. 4th 489, 498 (2001) (applying California law) (An insurer must accept any reasonable offer to settle a **potentially covered suit** against its insured.).

[9]*Valley Forge Ins. Co. v. Swiderski Electronics, Inc.*, No. 2-04-0910, __ N.E.2d __, 2005 WL 2045639 (Ill. App. Ct. (2d Dist.) Aug. 17, 2005).

to defend in this case." *Swiderski*, 2005 WL 2045639, at \*8. The appellate court construed the language of the policy, which language is identical to that in the Chubb policies at issue here. The court found that the terms "publication" and "privacy" must be given their plain, ordinary and popular meanings which would reasonably be understood to include the alleged transmission of an unsolicited fax advertisement in violation of the TCPA. *Id.* at \*9.

The appellate court refused to follow a recent decision by the Seventh Circuit Court of Appeals that held there was no potential for coverage for the normal consequences of facsimile advertising under a similar CGL policy.[10] The Seventh Circuit found that the term "privacy" has many connotations, which means it has numerous reasonable meanings. *Id.* at 941. Instead of applying Illinois coverage law to this finding, which would mean the term is ambiguous,[11] the Seventh Circuit decided it was in the best position to decide what the term means in the policy. *Capital Associates*, 392 F.3d at 942. The Seventh Circuit decided that the seclusion interest that is one of the reasonable meanings of "privacy" did not apply in that case because the corporation plaintiff did not have an interest in seclusion. *Id.* The court explained that corporate managers have interests in seclusion but less so at their place of business because they anticipate receiving business phone calls and faxes. *Id.*

Here, Mr. Bernstein and the class plaintiffs are individuals who allegedly received unsolicited fax advertisements from NCMC. **[SUF ¶ 6, McCarthy Decl. ¶ 5 (Ex. "A")]** The reasoning of the Seventh Circuit does not apply to the circumstances of this matter based upon the admitted interest an individual has in seclusion, which is a reasonable meaning of "privacy." It is further undisputed that the TCPA seeks to protect the privacy interests of telephone consumers, the very people making claims against NCMC. Thus, even under the analysis of the Seventh Circuit, Bernstein's allegations include "violation of a person's right of privacy."

The policy also requires that the "violation of a person's right of privacy" include publication. The Seventh Circuit found that publication was irrelevant to seclusion because a person's seclusion interest may be violated without a publication. *Capital Associates*, 392 F.3d

---

[10]*American States Ins. Co. v. Capital Associates of Jackson County, Inc.*, 392 F.3d 939, 943 (7th Cir. 2004).

[11]*Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill. 2d 90, 119 (1992) ("If a term in the policy is subject to more than one reasonable interpretation within the context in which it appears, it is ambiguous. Ambiguous terms are construed strictly against the drafter of the policy and in favor of coverage." (citation omitted)).

at 942. This determination, however, begs the question. For purposes of coverage, a seclusion violation is not covered unless there is a publication that violates the right of privacy. Thus, the seclusion violations that the Seventh Circuit found needed no publication would simply not be covered under the insurance policy. In fact, the court stated, "Perhaps automated faxes to hundreds of recipients could be deemed a form of publication . . . ." *Id.* at 943. This is the very situation in which NCMC found itself; thus it allegedly violated the rights of privacy of the class plaintiffs through a publication.

The Illinois appellate court, in *Swiderski*, found that the term " 'publication' would not convey to the average, ordinary, normal, reasonable person an intention to include only communications sent to a third party." *Swiderski*, 2005 WL 2045639, at *10. Finding reasonable competing meanings to the term, the appellate court found "publication" is ambiguous and the court was not in a position to choose which interpretation to follow, as doing so is contrary to Illinois coverage law. *Id.* Since the Seventh Circuit agreed that the sending of faxes to numerous recipients could be a form of publication and an Illinois appellate court has so held, the sending of 200,000 faxes by NCMC satisfies the publication requirement.

### 3. NCMC's Settlement Payment Is for Covered "Property Damage"

NCMC paid $1.95 million to settle the *Bernstein* Action. **[SUF ¶ 47, McCarthy Decl. ¶ 25 (Ex. "Q")]** That payment was to settle NCMC's alleged TCPA violations, which is a covered claim under the "advertising injury" provision of the Chubb policies. **[SUF ¶¶ 11, 12, McCarthy Decl. ¶¶ 11, 12 (Exs. "D" and "E")]** Specifically, and not coincidentally, NCMC paid in settlement $500 per class claimant **[SUF ¶ 49, McCarthy Decl. ¶ 25 (Ex. "Q")]** – the precise TCPA statutory damage amount.[12] Bernstein claimed to have lost the use of paper and toner as a result of his receipt of the allegedly unsolicited fax advertisement, a damage contemplated by the TCPA. The class plaintiffs claimed loss of use of tangible property that was not physically injured – a definition of "property damage." **[SUF ¶¶ 6, 14, McCarthy Decl. ¶ 5 (Ex. "A"), ¶¶ 11, 12 (Exs. "D" and "E")]**

The "property damage" must be caused by an "occurrence" which as pertinently defined includes an accident. **[SUF ¶¶ 11, 12, McCarthy Decl. ¶ 11, 12 (Exs. "D" and "E")]** Under applicable Illinois law, "[t]he focus of the inquiry in determining whether an occurrence is an accident is whether the *injury* is expected or intended by the insured, not whether the *acts* were

performed intentionally." *Lyons v. State Farm Fire and Casualty Co.*, 349 Ill. App. 3d 404, 409 (5th Dist. 2004). Here, NCMC believed the advertisement was being transmitted to persons who were willing recipients. **[SUF ¶¶ 19, McCarthy Decl. ¶ 10]** Thus, NCMC believed that the loss of use of paper and toner had been agreed to by the class plaintiffs and that no injury was likely to occur. Pursuant to Illinois law, NCMC did not expect or intend the injury alleged by the plaintiffs; thus the loss of use of tangible property was caused by an occurrence and is covered under the terms of the Chubb policies.

## V.     NO EXCLUSIONS EXCUSE CHUBB'S DUTIES UNDER THE POLICIES

### A.     Chubb Bears the Burden of Proving the Applicability of Exclusions

It is well settled law in Illinois that an insurer attempting to eliminate its contractual obligations through application of exclusionary terms bears the burden of proof.[13] Chubb has the burden of proving whether any exclusion eliminates the duty to defend or absolves Chubb of its duty to settle the *Bernstein* Action.

### B.     Expected or Intended Injury

Pursuant to the express exclusions applicable only to property damage coverage, Chubb urges that

the insurance does not apply to ... property damage which results from an act that:

- • is intended by the insured; or

- • can be expected from the standpoint of a reasonable person to cause . . . **property damage**, even if the injury or damage is of a different degree or type than actually intended or expected. **[SUF ¶ 28, McCarthy Decl. ¶ 11 (Ex. "D")]**

Simply, the *Bernstein* Action alleges "property damage" which results from an act that was "wrongful and without authorization." **[SUF ¶ 6, McCarthy Decl. ¶ 5 (Ex. "A")]** Thus, a finding of intentional property damage or harm that "can be expected from the standpoint of a reasonable person to cause . . . property damage" was not a required element of Bernstein's TCPA claim. Moreover, this exclusion does not apply to "advertising injury" coverage.

---

[12]*See* 47 U.S.C. § 227(b)(3)(B).

[13]*Johnson Press of America, Inc. v. Northern Insurance Co. of New York*, 339 Ill. App. 3d 864, 871-72 (1st Dist. 2003) (Burden rests with insurer to demonstrate applicability of exclusion; courts will liberally construe any doubt as to coverage in favor of insured and against insurance company, especially when company seeks to avoid coverage based on alleged exclusion in policy.).

Bernstein's failure to allege expected or intended injury as a necessary element of the TCPA claim is consistent with substantive law. Liability for violation of the TCPA attaches regardless of whether the damage results from an act that was expected or intended by the insured to cause injury. For example, the TCPA does not require that the defendant intend or knowingly transmit the fax to a recipient who has not welcomed or solicited the facsimile.

### C.    Willful Violations of a Penal Statute or Ordinance Exclusion

There are express "advertising injury"/"personal injury" exclusions in Chubb's policy. They include "willful violations," which provides:

> This insurance does not apply to **advertising injury** or **personal injury** arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the **insured**. **[SUF ¶ 29, McCarthy Decl. ¶ 11 (Ex. "D")]**

One court has determined that the exclusion does not apply to claims alleging violation of the TCPA. In *Western Rim Inv. Advisors, Inc. v. Gulf Ins. Co*., 269 F. Supp. 2d 836, 848-49 (N.D. Tex. 2003), the District Court analyzed Gulf's assertion of the "willful violations" exclusion by comparing the definition of penal statute in relation to claims made under the TCPA and the Texas Fax Law at issue there. The court found:

> Gulf claims that this exclusion clearly applies because "[t]he underlying petition clearly alleges that Western Rim 'willfully and knowingly' violated the TCPA." (Gulf's Br. at 21.) Even assuming that that is true, the determinative issue is whether the TCPA is a penal statute or ordinance. . . . In light of the definition of a penal statute, **the Court concludes that the Texas Fax Law is a penal statute, but that the TCPA is not**. [Emphasis added.]

Similarly, Chubb's willful violations exclusion does not apply to the TCPA claims against NCMC in the *Bernstein* Action because it is not a penal statute or ordinance. This exclusion is much like that for criminal acts addressed and rejected as a grounds for denial of a defense in *Park University*.[14] There, the exclusion provided for "advertising injury" that " 'aris[es] out of a criminal act committed by or at the direction of any insured.' " *Park University*, 314 F. Supp. 2d at 1110. Rejecting the applicability of that exclusion to the TCPA violation, the court reasoned:

> Again, American faces the same problem as with all of its arguments assuming that Park intentionally targeted people who did not solicit its advertisements. 720 ILCS § 5/26-3(b) only prohibits *knowingly* using a facsimile machine to send unsolicited advertising. The complaint in the underlying state court action does

---

[14]*Park University Enters. v. American Cas. Co.*, 314 F. Supp. 2d 1094 (D. Kan. 2004).

not allege only that Park *knew* that the facsimile was unsolicited; the complaint also alleges that Park *should have known* that the facsimile was unsolicited. Moreover, the complaint does not allege a criminal act under 720 ILCS § 5/26-3. For these reasons, the court cannot conclude that there is no possibility of coverage under the policy.

*Id.* at 1110. Thus, the "willful violation of a penal statute or ordinance" exclusion does not apply to NCMC's alleged violation of the TCPA.

>    **D.    The "Prior Publication" Exclusion Does Not Excuse Chubb's Defense Duty**

In response to NCMC's request that Chubb honor its duty to settle, Chubb argued that its duties to NCMC were excused because, Chubb contends, NCMC faxed a similar advertisement prior to Chubb's policy inception.  **[SUF ¶ 39, McCarthy Decl. ¶ 22 (Ex. "L")]**  Chubb's assertion ignores the fact that none of the complaints in the *Bernstein* Action allege NCMC transmitted a fax advertisement prior to Chubb's policies' inception, let alone an injurious fax advertisement prior to Chubb's policies' inception.  **[SUF ¶¶ 6, 8, McCarthy Decl. ¶¶ 5, 7 (Exs. "A" and "B")]**  To the contrary, Mr. Bernstein, the class representative, only alleges receipt of an injurious fax advertisement during Chubb's policies and no evidence was presented to the contrary. (***Id.***)

**VI.    CONCLUSION**

NCMC respectfully moves this Court to grant NCMC's Motion for Summary Judgment and order Chubb to reimburse NCMC for its $1.95 million settlement payment to the underlying class plaintiffs.

Dated:    September 28, 2005           **NEW CENTURY MORTGAGE CORPORATION**


                                       By:    s/Bart T. Murphy_____
                                              One of Their Attorneys

Bart T. Murphy, Esq. (IL Bar 6181178)       David A. Gauntlett, Esq.
WILDMAN, HARROLD, ALLEN                     Eric R. Little, Esq.
& DIXON LLP                                 James A. Lowe, Esq.
2300 Cabot Dr., Ste. 455                    GAUNTLETT & ASSOCIATES
Lisle, IL  60532                            18400 Von Karman, Suite 300
Tel/Fax  (630) 955-6392/(630)955-0662       Irvine, CA  92612
                                            Tel/Fax  (949) 553-1010/(949) 553-2050

                       Attorneys for Plaintiffs