KK2/tdw/#279203

2246-42

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NEW CENTURY MORTGAGE CORP., | ) ) ) | Case No.: 05C2370 |
| Plaintiff, | ) ) | Judge: Coar |
| v. | ) ) ) | **DEFENDANTS' L.R. 56.1(b)(3)(A) RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS** |
| GREAT NORTHERN INSURANCE COMPANY, FEDERAL INSURANCE COMPANY, | ) ) ) ) | |
| Defendants. | ) ) | |

Defendants, Great Northern Insurance Company ("Great Northern") and Federal

Insurance Company ("Federal"), by and through their attorneys, Tressler, Soderstrom, Maloney

& Priess, and in Response to New Century's Statement of Uncontested Facts pursuant to Local

Rule 56.1(b)(3)(A), states as follows:

### DESCRIPTION OF THE PARTIES

1.     New Century is a California corporation with its offices in Irvine, California. New Century's Complaint, ¶ 1.

**RESPONSE:**     Undisputed.

2.     Great Northern is a Minnesota corporation with its headquarters in Warren, New Jersey. New Century's Complaint, ¶ 2; Answer, ¶ 2.

**RESPONSE:**     Undisputed.

3.     Federal is an Indiana corporation with its headquarters in Warren, New Jersey. New Century's Complaint, ¶ 3; Answer, ¶ 3.

**RESPONSE:**     Undisputed.

## VENUE AND JURISDICTION

4.    Jurisdiction of this Court is pursuant to 28 U.S.C. § 1332(a) (diversity of citizenship). Chubb's March 23, 2005 Notice of Removal, ¶¶ 1-8.

**RESPONSE:**    Undisputed.

5.    Venue in this Court is pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events and omissions giving rise to the claims herein occurred in this district. Chubb's March 23, 2005 Notice of Removal, ¶ 9. (The underlying lawsuit was pending in the Circuit Court of Cook County, Illinois.)

**RESPONSE:**    Undisputed.

## UNDISPUTED FACTS

6.    On April 5, 2002, Paul Bernstein filed a civil class action in the Circuit Court of Cook County, Illinois County Department, Chancery Division against NCMC entitled *Paul Bernstein v, New Century Mortgage Corporation*, Civil Action No. 02CH 06907 (the "*Bernstein* Action"). **[McCarthy Declaration ("Decl.) ¶ 5, Exhibit "A"]**

**RESPONSE:**    Undisputed.

7.    The *Bernstein* Action alleged claims for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") and the Illinois Consumer Fraud Act, 815 ILCS 505/2 ("ICFA"). **[McCarthy Decl. ¶¶ 5-6, Exhibit "A," pp. 2-3, 5]**

**RESPONSE:**    Undisputed.

8.    On or about September 30, 2003, Bernstein filed a second amended complaint. **[McCarthy Decl. ¶ 7, Exhibit "B"]**

**RESPONSE:**    Undisputed.

9.    Bernstein brought the action on behalf of a class "14. . . . consisting of (a) all persons with Illinois fax numbers (b) who, on or after a date four years prior to filing of this action, (c) were sent advertising faxes by defendant . . . 15. The class is so numerous that joinder of all members is impractical." **[McCarthy Decl. ¶ 7, Exhibit "B," p. 5]**

**RESPONSE:**    Undisputed.

10.    In addition to the TCPA and IFCA claims alleged in the Complaint, Bernstein also alleged a more specific claim for "Property Damage" based, *inter alia*, upon plaintiff's and class members' loss of use of the paper, toner and ink used to print the allegedly infringing faxes. **[McCarthy Decl. ¶ 7, Exhibit "B," pp. 11-12]**

**RESPONSE:**     Undisputed.  However, this cause of action was eventually dismissed without

prejudice in all of the consolidated TCPA cases in Cook County, including the *Bernstein* action.

See Exhibit A, page 19.

11.     Great Northern issued Commercial General Liability ("CGL") insurance policy,
No. 3539-77-36 LAO, effective February 3, 2002 through February 3, 2003, naming NCMC as
an insured by way of endorsement.  **[McCarthy Dec. ¶ 11, Exhibit "D"]**

**RESPONSE:**     Undisputed.

12.     Federal issued Commercial Umbrella Policy, No. 7977-03-85, effective February
3, 2002 through February 3, 2003, naming NCMC as an insured by way of endorsement.
**[McCarthy Decl. ¶ 12, Exhibit "E"]**

**RESPONSE:**     Undisputed.

13.     The policies provide coverage for "advertising injury" and "property damage."
The "advertising injury" coverage provides that Chubb will pay damages for "invasion of a
person's right of privacy" in the course of advertising.  **[McCarthy Decl. ¶ 11, Exhibit "D," p.
21; ¶ 12, Exhibit "E," p. 11]**

**RESPONSE:**     Disputed.   The word "invasion" is not included in the definition of

"advertising injury."

14.     The "property damage" coverage states that Chubb will pay damages because of
"property damage" which is pertinently defined as "loss of use of tangible property that is not
physically injured."  **[McCarthy Decl. ¶ 11, Exhibit "D," p. 27; McCarthy Decl. ¶ 12, Exhibit
"E," p. 15]**

**RESPONSE:**     Undisputed.

15.     The "no voluntary payment" provision in the Chubb policies states, "No **insureds**
will, except at that **insured's** own cost, make a payment [or] assume any obligation . . . without
our consent." **[McCarthy Decl. ¶ 11, Exhibit "D," p. 17; McCarthy Decl. ¶ 12, Exhibit "E,"
p. 17]**

**RESPONSE:**     Undisputed.

16.     NCMC had contracted with Fax.com to transmit faxes. That contract states,

[NCMC] acknowledges that [NCMC] is aware that [Fax.com's] faxing of
[NCMC's] commercial messages/advertisements on behalf of [NCMC] presents
significant legal issues and risks. ... [NCMC] has had the opportunity to consult

with its own legal counsel with respect to the federal Telephone Consumer Protection Act and applicable state law regarding transmissions by fax of **unsolicited** commercial messages/advertisements and the risks attended thereto.

**[McCarthy Decl. ¶ 8, Exhibit "C," p.2]**

**RESPONSE:**    Undisputed.

17.    NCMC had no way to disprove it sent the faxes. **McCarthy Decl. ¶ 9.**

**RESPONSE:**    Disputed. NCMC has offered no proof for this assertion and defendants are not aware of any admissible evidence addressing this issue.

18.    Fax.com had gone out of business and kept no records whether it sent the faxes NCMC contracted for it to send. **[McCarthy Decl. ¶ 9]**

**RESPONSE:**    Disputed. NCMC has presented no evidence that Fax.com kept no records, and defendants are not aware of any evidence confirming the lack of records.

19.    NCMC has reason to believe Fax.com went out of business, in part, because it was sending unsolicited faxes on behalf of its customers, despite Fax.com's representations to NCMC it would only send faxes to welcomed recipients. **[McCarthy Decl. ¶ 10]**

**RESPONSE:**    Disputed. See Defendants Motion to Strike Paragraph 10 of the Affidavit of Monica McCarthy. Ms. McCarthy was not involved in the transactions with Fax.com and can have no personal knowledge supporting the assertion that "NCMC was told by Fax.com that it would send only faxes to welcomed recipients." NCMC has not provided any evidence that that this statement was in fact made and the deposition of Frank Nese confirms that NCMC was aware that not all recipients would welcome receipt of the unsolicited fax. See Deposition of Frank Nese, attached hereto as Exhibit B, pages 53 to 55. Mr. Nese also testified that he does not recall Ms. McCarthy participating in the relevant events and that he never spoke to her about his intentions in arranging for the fax advertising. (Nese Depo. At pages 77 and 78.)

20.    On August 15, 2003, NCMC provided notice of the *Bernstein* Action to Chubb with a copy of the Complaint. **[McCarthy Decl. ¶ 13, Exhibit "F"]**

**RESPONSE:**     Undisputed.

21.    Chubb acknowledged receipt of the notice by letter dated January 7, 2004. **[McCarthy Decl. ¶ 14, Exhibit "G"]**

**RESPONSE:**     Undisputed.

22.    Chubb agreed to defend NCMC subject to a reservation of rights.    **[McCarthy Decl. ¶ 14, Exhibit "G," p. 2]**

**RESPONSE:**     Undisputed.

23.    Chubb claimed the allegations in the Bernstein Complaint may not fall within the insuring agreement and may not meet any of the coverage definitions.    **[McCarthy Decl. ¶ 14, Exhibit "G," p. 3]**

**RESPONSE:**     Undisputed.

24.    Chubb stated the allegations did not satisfy the definition of "Property Damage," even though there was a claim for loss of use of toner, ink and paper.    **[McCarthy Decl. ¶ 14, Exhibit "G," p. 3]**

**RESPONSE:**     Undisputed.

25.    Chubb also claimed there was no "Occurrence," since transmission of the fax was purportedly not an accident.    **[McCarthy Decl. ¶ 14, Exhibit "G," p. 3]**

**RESPONSE:**     Undisputed.

26.    Chubb also acknowledged the allegations might include a claim within the "Advertising Injury" or "Personal Injury" coverage for publication of material that invades a person's right of privacy. **[McCarthy Decl. ¶ 14, Exhibit "G," p. 3]**

**RESPONSE:**     Disputed.  The letter speaks for itself and Chubb clearly stated that the claim

might not fall within the policies' coverage.

27.    Chubb also asserted the Willful Violations Exclusion and the Expected or Intended Injury Exclusion. **[McCarthy Decl. ¶ 14, Exhibit "G," pp. 2-3]**

**RESPONSE:**     Undisputed.

28.    The "Expected or Intended Injury" Exclusion. states:

the insurance does not apply to . . . property damage which results from an act that:

- is intended by the insured; or

- can be expected from the standpoint of a reasonable person to cause . . . **property damage**, even if the injury or damage is of a different degree or type than actually intended or expected.

**[McCarthy Decl. ¶ 11, Exhibit "D," p. 11]**

**RESPONSE:**        Undisputed.

29.    The Willful Violations Exclusion states:

This insurance does not apply to **advertising injury** or **personal injury** arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the **insured**.

**[McCarthy Decl. ¶ 11, Exhibit "D," p. 13]**

**RESPONSE:**        Undisputed.

30.    Chubb agreed that Coverage A of the Commercial Umbrella Policy was implicated and agreed the claim would be handled under the same reservation of rights as set forth under the primary policy.  **[McCarthy Decl. ¶ 14, Exhibit "G," p. 4]**

**RESPONSE:**        Chubb does not dispute that it agreed to defend the claim.

31.    On March 25, 2004 NCMC transmitted a spreadsheet of all its post-tender defense costs to Chubb.  **[McCarthy Decl. ¶ 15, Exhibit "H"]**

**RESPONSE:**        Undisputed.  Defendants note that the letter did not include actual invoices.

32.    NCMC had spent in excess of $89,000 through January 2004.  **[McCarthy Decl. ¶ 16, Exhibit "H"]**

**RESPONSE:**        Undisputed.

33.    On April 9, 2004, Chubb sent a letter to NCMC agreeing to reimburse New Century's reasonable and necessary defense costs from August 27, 2003.  **[McCarthy Decl. ¶ 17, Exhibit "I"]**

**RESPONSE:**        Undisputed.

34.    During May 2004, discussions ensued between NCMC and Chubb regarding attendance at a mediation.  **[McCarthy Decl. ¶ 18]**

**RESPONSE:**        Undisputed.

35.    On June 14, 2004, NCMC received a settlement demand from Bernstein in the amount of $6 million. **[McCarthy Decl. ¶ 19, Exhibit "J"]**

**RESPONSE:**    Undisputed.

36.    On June 17, 2004, defense counsel for NCMC forwarded a copy of a settlement demand of $6 million received from counsel for Bernstein.  **[McCarthy Decl. ¶ 20, Exhibit "K"]**

**RESPONSE:**    Undisputed.

37.    NCMC also advised Chubb that Bernstein was seeking class certification by way of motion, with a hearing scheduled in early August 2004.  **[McCarthy Decl. ¶ 21, Exhibit "K"]**

**RESPONSE:**    Undisputed.

38.    On June 22, 2004, coverage counsel for Chubb advised defense counsel for NCMC that Chubb would continue to defend NCMC, but denied any duty to indemnify and refused to participate in a mediation then anticipated to take place on June 23, 2004. **[McCarthy Decl. ¶ 22, Exhibit "L"]**

**RESPONSE:**    Undisputed.

39.    Chubb stated that its duties to NCMC were excused because NCMC purportedly faxed a similar advertisement prior to Chubb's policy inception.  **[McCarthy Decl. ¶ 22, Exhibit "L," p. 3]**

**RESPONSE:**    Undisputed, but Chubb also identified additional coverage defenses in its position letters.

40.    On June 30, 2004 New Century transmitted a letter to Chubb advising Chubb that it is obligated to fund the entire settlement and enclosing the attorney's fee and cost bills incurred by NCMC as of the letter's date. **[Lowe Decl. ¶ 3, Exhibit "M"]**

**RESPONSE:**    Defendants do not dispute that plaintiffs sent the letter but dispute that the letter contained the referenced enclosures.  See Exhibit N to Plaintiffs SUF, which indicates that the invoices were not enclosed with the letter.

41.    New Century also advised Chubb that "New Century faces significant exposure, well beyond the policy limits . . . should plaintiff succeed in having a class certified . . . ." and NCMC's litigation costs would have skyrocketed as is typical in class actions. **[Lowe Decl. ¶ 3, Exhibit "M," p. 2]**

**RESPONSE:**        Undisputed.

42.    By July 7, 2004 letter, Chubb stated, "You have asked that Great Northern Insurance Company and Federal Insurance Company `consent to any settlement that is reached between New Century and plaintiff.' To the extent that your client deems it appropriate to settle uncovered claims for $6 million . . . or less our clients will not stand in their way." **[Lowe Decl. ¶ 4, Exhibit "N," p. 2]**

**RESPONSE:**        Undisputed, but the letter also included additional comments.

43.    On August 5 and 6, 2004, NCMC and Bernstein participated in mediation. **[McCarthy Decl. ¶ 23]**

**RESPONSE:**        Undisputed.

44.    Chubb again refused to contribute any amount toward settlement of the Bernstein Action. **[Lowe Decl. ¶ 5, Exhibit "O"]**

**RESPONSE:**        Undisputed.

45.    On August 10, 2004, NCMC again requested Chubb agree to contribute to a settlement with Bernstein for an amount within the policy limits of the Chubb policies. **[Lowe Decl. ¶ 6, Exhibit "P"]**

**RESPONSE:**        Undisputed.

46.    On August 10, 2004, Bernstein and NCMC reached an agreement to settle the Bernstein Action for $1.95 million**. [McCarthy Decl. ¶ 24]**

**RESPONSE:**        Undisputed.

47.    The settlement amount NCMC paid was $1.95 million. **[McCarthy Decl. ¶ 25, Exhibit "Q"]**

**RESPONSE:**        Undisputed.

48.    NCMC's Senior Vice President and General Counsel who oversaw the *Bernstein* Action felt that the $1.95 million settlement amount was eminently reasonable. **[McCarthy Decl. ¶ 26]**

**RESPONSE:**        Undisputed.

49.    NCMC paid in settlement $500 per class claimant- the precise TCPA statutory damage amount. **[McCarthy Decl. ¶ 25, Exhibit "Q"]**

**RESPONSE:**    Undisputed as to the amount paid to each of the claimants.    However,

defendants dispute that settlement agreement links the $500 payment solely to resolution of the

TCPA claim.  See Exhibit Q to Plaintiff's SUF

50.    On August 16, 2004, a Third Amended Complaint was filed in the *Bernstein*
Action to reflect the claims being settled by NCMC and Bernstein.  **[McCarthy Decl. ¶ 27,
Exhibit "R"]**

**RESPONSE:**    Undisputed that the Third Amended Complaint was filed after the settlement.

Disputed as to why that complaint was filed as defendants cannot speculate as to the underlying

plaintiff's intent.

51.    Chubb made payments of $3,935.30 and $26,084.03 on September 13, 2004.
**[McCarthy Decl. ¶ 28, Exhibit "S"]**

**RESPONSE:**    Undisputed, but Chubb also made substantial additional payments of defense

costs.

GREAT NORTHERN INSURANCE COMPANY


By: /s/ *Daniel J. Cunningham*

One of Its Attorneys

Daniel J. Cunningham
Kathy Karaboyas Malamis
TRESSLER, SODERSTROM, MALONEY & PRIESS
Sears Tower, 22nd Floor
233 South Wacker Drive
Chicago, Illinois  60606-6399
(312) 627-4000

KK2/ds370469                                                                                    2246-42

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NEW CENTURY MORTGAGE CORP., | ) ) ) | Case No.: 05C2370 |
| Plaintiff, | ) ) | Judge: Coar |
| v. | ) ) ) | **DEFENDANTS' L.R. 56.1(b)(3)(A) RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS** |
| GREAT NORTHERN INSURANCE COMPANY, FEDERAL INSURANCE COMPANY, | ) ) ) ) | |
| Defendants. | ) ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2005, I electronically filed Defendants' L.R. 56.1(b)(3)(A) Response To Plaintiff's Statement Of Undisputed Facts with the Clerk of the Court using CM/ECF System which will send notification of such filing(s) to the following:

Bart T. Murphy
Wildman, Harrold, Allen & Dixon
2300 Cabot Drive – Suite 455
Lisle, IL 60532
(630) 955-5555
**Fax:** (630) 955-0662

David A. Gauntlett
Eric R. Little
Gauntlett & Associates
18400 Von Karman – Suite 300
Irvine, CA 92612
(949) 553-1010
**Fax:** (949) 553-2050

GREAT NORTHERN INSURANCE COMPANY

By: /s/ *Daniel J. Cunningham*

One of Its Attorneys

Daniel J. Cunningham
Kathy Karaboyas Malamis
TRESSLER, SODERSTROM, MALONEY & PRIESS
Sears Tower, 22nd Floor
233 South Wacker Drive
Chicago, Illinois 60606-6399
(312) 627-4000

**EXHIBIT**

tabbies

A

EXHIBIT B
## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| WHITING CORPORATION, | ) | |
| | ) | |
| Plaintiff | ) | No. 02 CH 6332 |
| | ) | |
| v. | ) | Judge Patrick E. McGann |
| | ) | |
| MSI MARKETING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| INSPE ASSOCIATES, LTD., | ) | |
| | ) | 03 CH 10965 |
| Plaintiff, | ) | and related cases as indicated on |
| | ) | Exhibit "A" attached |
| v. | ) | |
| | ) | |
| CHARTER ONE BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes on for hearing on the Motion of Charter One Bank to dismiss the amended complaint of Inspe Associates, Ltd. seeking relief for alleged violations of the Telephone Consumers Protection Act of 1991, 47 USC 227 ("TCPA"); the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/2 ("ICFA"); common law conversion and property damage.    This case is one of a number, now exceeding seventy, of related cases assigned to this Calendar by the Presiding Judge of the Chancery Division of this Court.  This motion has been joined in by the parties in the cases listed in Exhibit "A" attached hereto as the motion raises issues that are common to those parties. This Court has allowed all Defendants who have participated in this motion to present motions that raise individual legal defenses to the claim of their respective Plaintiff. This Court has or will issue rulings on each of those individual motions.

Charter One Bank ("Charter One" or "the Bank") seeks to dismiss Count I seeking relief for violation of the TCPA by asserting affirmative matter that seeks to

avoid the legal effect of or defeating the claim. 735 ILCS 5/2-619. The Bank asserts that the statutory scheme envisioned by the Congress in enacting the TCPA requires a state to create, by affirmative legislative action, a state cause of action for violation of the TCPA. As an alternative position, Charter One suggests that legislative conduct subsequent to the passage of the TCPA clearly shows that Illinois has opted out of the TCPA's private right of action scheme.

The Bank also argues that the $500.00 per fax statutory penalty is so radically disproportionate to the actual damage suffered by a recipient of an unsolicited telephone facsimile message that it violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

Finally, Charter One posits that the TCPA's total ban on commercial fax advertising discriminates against speech based on its content when a less restrictive approach would satisfy the governmental interest sought to be protected by the regulation. Hence, the TCPA violates the freedom of speech rights guaranteed by the First Amendment to the United States Constitution.

As to the remaining counts, the Bank contests the legal sufficiency of each claim. 735 ILCS 5/2-615. The conversion claim must fail, it argues, because the Plaintiff does not assert that the mere fact of sending a telephone facsimile message is illegal. Hence, the Plaintiff can claim no greater interest in the paper and toner consumed by the message than the sender.

Charter One posits that the ICFA claim must fail because it fails to enumerate a violation of the Illinois statute prohibiting commercial telephone facsimile messages[1] as a per se ICFA violation. In addition, the Defendant argues that the mere sending of a commercial telephone facsimile message does not rise to the level of an unfair or deceptive act as defined by Illinois law.

Finally, the Bank suggests that, because the paper and toner consumed by the message has no residual value, a claim for property damage will not lie.

## I.    LEGAL STANDARD

### A.    2-619 MOTION

Section 2-619 affords a means of obtaining a summary disposition of issues of law

---

[1] 720 ILCS 5/23-3

or easily proven issues of fact. Subsection (a)(9) permits dismissal where "the claim asserted is barred by other affirmative matter avoiding the legal effect of or defeating a claim."

The phrase affirmative matter encompasses any defense other than a negation of the essential allegations of the plaintiff's cause of action. For that reason, it is recognized that a 2-619(a)(9) motion to dismiss admits the legal sufficiency of the plaintiff's cause of action much in the same way that a 2-615 motion to dismiss admits a complaint's well-pleaded facts. Kedzie & 103rd Currency Exchange v. Hodge, 156 Ill. 2d 112, 115 (1993).

In making that last statement, the Illinois Supreme Court cited with approval the discussion of this issue in Barber-Coleman v. A & K Midwest Insurance Co., 236 Ill. App. 3d 1065 (1993). There, the court reasoned that affidavits in support of a 2-619 (a)(9) motion cannot be used to attack the factual sufficiency of a claim because the defendant admitted, for the purpose of the motion, those facts which are necessary to the plaintiff's claim.

A 2-619(a)(9) motion contrasts with a summary judgment motion in that the latter allows the movant to contest by affidavit the truth of the allegations made. In other words, by the use of affidavits the opposing party states that the material facts alleged in support of the claim or defense are not true. To the contrary, a 2-619(a)(9) motion asserts there exists other affirmative matter avoiding the legal effect or defeating the claim. Hence, a 2-619(a)(9) motion admits all well pled facts that are essential to the claim, but not any of the facts that may touch on the affirmative matters raised in the motion.

## B.    2-615 MOTION

A section 2-615 motion attacks the legal sufficiency of the Plaintiff's claim. The motion does not raise affirmative factual defenses, but rather alleges defects only on the face of the complaint. The question presented by a section 2-615 motion to dismiss is whether the allegations of the complaint, when viewed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. A cause of action will not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved which will entitle the plaintiff to recover. Vernon v. Schuster, 179 Ill. 2d 338, 344 (1997); Bryson v. News America Publications, Inc., 174 Ill. 2d 77, 86-87 (1996).

## II.    DISCUSSION

The facts alleged in the Amended Complaint are rather straightforward and will be discussed in the context of the analysis of the Defendant's grounds for dismissal.

### A.    COUNT I – TCPA

### 1.  NECESSITY OF STATE ACTION

The initial argument raised by Charter One involves a discussion of the legislative intent expressed by the United States Congress in the language used in the TCPA as well as the intent of the legislators who debated or discussed the bill during the deliberative process leading to its passage.

The TCPA, in pertinent part, prohibits the transmission of an unsolicited advertisement to a telephone facsimile machine.[2] An unsolicited advertisement is defined in the statute as any material advertising the commercial availability or quality of any property, goods or services...[3] The statute also states that "any person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State...an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater..."[4] It is the language, "if otherwise permitted by the laws or rules of court of a State," that is the focus of the Bank's first argument

This text, it suggests, requires an affirmative authorization by a state before such private litigation may be brought in state court.  No other conclusion, the Defendant asserts, can be culled from this language.  Hence, in the Bank's view, a State must opt in before its courts may entertain a TCPA action.

This position is also buttressed, the Bank posits, by statements made by Senator Ernest Hollings, one of the TCPA's sponsors.  On November 7, 1991, Senator Hollings discussion of the Bill's creation of a private right of action is quoted in the Congressional Record.  After stating that the bill allows a private right of action in state courts, he recognizes the federal principle of state sovereignty by recognizing that the Federal Government cannot, because of constitutional restraints, dictate to the States "which court in each State shall be the proper <u>venue</u> for such an action. Nevertheless, it is my

---

[2] 47 U.S.C. 227 (6)(1)(c)
[3] 47 U.S.C. 227 (a)(4)
[4] 47 U.S.C. 227 (6)(3)(B)

hope that States will make it as easy as possible for consumers to bring such actions, preferably in small claims courts...["][5] The Senator then suggests these matters should not involve attorneys and the neutral fairness of the amount of damages allowed. Finally, he stated: "I thus expect that the States will act reasonably in permitting their citizens to go to court to enforce this bill."[6]

Finally, Charter One points to the decision of the Court of Appeals in International Science & Technology Institute, Inc. v. Inacom Communications, Inc., 106 F.3d 1146 (4th Cir. 1997). It argues that many courts have misinterpreted the Court's reasoning. The Bank suggests that the opening paragraph of the opinion states the true result of the ruling. Judge Niemeyer, writing for the Court, stated "[Today this Court decides] that states have been given, subject to their consent, exclusive subject matter jurisdiction over private actions authorized by the [TCPA]."[7]

In order to determine Congress' intent in any law or statute, Court's must first analyze the text of the Act. New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Insurance Co., 514 U.S. 645, 656 (1995). Only if the intent cannot be determined by the language of the Act should a court move on to analyze the structure and purpose of the Act in which it occurs. Id.

The language of the TCPA statute "if otherwise permitted" seemingly supports Charter One's argument that Congress envisioned a series of positive actions by state governments incorporating this new regulatory remedy into state law. However, such a reading ignores the context of the federal/state relationship created by the United States Constitution as well as the essential distinction between federal and state courts. When these factors are considered, it is clear that Congress created a remedy for a wrong, but recognized the rights of the several states to apportion their limited resources to address issues deemed important by the local electorate.

In 1944, Alfred Testa purchased an automobile in Providence, Rhode Island, for $210 above the ceiling price set under the then existing Emergency Price Control Act. After learning of the auto dealer's misfeasance, he filed suit in state court to recover "penal" damages for this wrong. Congress had, in creating the law, conferred concurrent

---

[5] 137 Cong. Rec. 516205-06 (emphasis added)
[6] Id.
[7] 106 F3d 1150

jurisdiction on federal and state courts for claims arising from any alleged violation. The Rhode Island Supreme Court reversed the award of damages obtained by Mr. Testa on the basis that, absent Rhode Island's consent, the Congress could not require its courts to entertain such claims. The Supreme Court unanimously reversed the Rhode Island Court. Testa v. Katt, 330 U.S. 386 (1947). The Court noted that Article VI, Section 2 of the Constitution provides:

> "This Constitution, and the Laws of the United States which shall
> be made in Pursuance thereof; and all Treaties made, or which
> shall be made, under the Authority of the United States, shall be
> the supreme Law of the Land; and the Judges in every State
> shall be bound thereby, and anything in the Constitution or Law
> of any State to the Contrary not withstanding." (capitalization in original)

This "supremacy clause" has, since the first Congress convened, thereafter been interpreted as conferring jurisdiction on state courts to enforce federal civil laws. Subsequent Congresses expanded such jurisdiction to federal crimes and actions for penalties and forfeitures. Testa, 330 U.S. at 390-391. The Court went on to observe that this view was the subject of much controversy, some violent, until the end of the Civil War. Indeed, since Claflin v. Houseman, 93 U.S. 130 (1876), a principle of constitutional law has been that wherever Congress creates a remedy there is no valid reason why it should not be enforced in a proper action in state court. Id. at 137. Hence, in this Court's judgment, not only were private claims under the TCPA permitted in all states, but all states from the date of enactment are required, except as discussed below, to entertain such claims. This principle may also explain Senator Hollings' precise use of the word venue instead of jurisdiction.

This view is also supported by the distinction between the federal district courts and the trial courts of Illinois. The former are created by Acts of Congress which has the authority to limit the jurisdiction of such courts in accordance with Article III of the United States Constitution. As observed by the Court in International Science, the Congress has used this power to direct certain justiciable matters to the Federal Court of Claims, Court of International Trade or to strip district courts of original jurisdiction. International Science, 106 F.3d at 1155-1156.

The trial courts of Illinois are constitutional courts vested with jurisdiction over all justiciable matters. Article 6 Sections 1 and 9 of the Constitution of 1970. The only exception is the constitutionally recognized right of the legislature to create administrative bodies. Hence, under our federal system, the trial courts of Illinois, in accordance with the supremacy clause of the United States Constitution, have original jurisdiction to hear claims seeking a remedy granted by the laws of the United States.

In addition, one issue not discussed by the parties is the disjunctive language used by the Congress. The words selected are "permitted by the laws or rules of court." Courts do not have the authority to limit by rule their jurisdiction over cases that are properly brought before them. Admittedly, in some circumstances, Courts for good reason may decline to exercise jurisdiction over a particular case; e.g. interstate *forum non conviens*. Rules of Court are used to prescribe procedures or determine assignment of cases properly before the Court. This disjunctive language also suggests that the Congress was attempting to facilitate the prosecution of these claims while, as will be discussed, acknowledging the sovereignty of the individual state. This determination is borne by the comments of Senator Hollings who strongly urged these matters be handled efficiently, without the participation of lawyers, in a small claims court. As discussed during argument, the distinguished gentleman form South Carolina probably never envisioned the use of class action procedures in an effort to remedy what appears to have been perceived by the Congress as a pervasive, but highly individualized, issue adversely affecting commerce.

It is important to observe that the Court in Testa v. Katt, *supra*, did not discuss the implication of the 10th amendment to the United States Constitution. That amendment reserves to the states all power not delegated to the United States by the Constitution or prohibited to the states by that compact. While one could argue that the supremacy clause resolves any issue in favor of the constitutionality of the TCPA, recent court decisions cast some doubt upon that perspective. *See* e.g. New York v. United States, 505 U.S.144 (1992). A more modern approach to this issue is found in the court's reasoning in International Science. Congress cannot, consistent with the 10th Amendment, invade the province of state sovereignty. Thus, unless a state has affirmatively enacted a similar regulatory scheme, Congress cannot direct a state to enforce a federal claim. Here,

7

Congress did not so act.  The Congress, in choosing the language of the TCPA, encouraged the several states to enforce a national and uniform policy on this issue but gave each state the unfettered right to direct its judicial resources in response to the needs of its electorate by refusing to allow private claims under the TCPA.  As stated by the Court in International Science:

> "Congress enacted the TCPA to assist states where they lacked jurisdiction; it empowered states themselves to enforce the TCPA in federal court; it authorized private enforcement exclusively in state courts; and it recognized state power to reject Congress' authorization." 106 F.3d at 1159. (emphasis added)

Hence, this Court concludes that the TCPA created an "opt out" scheme which allows claims for the federally created remedy absent affirmative legislative action limiting or eliminating said claim.

This rationale is also consistent with the constitutional principle that states have great latitude in establishing the structure and jurisdiction of their own courts.  Howlett ex rel. Howlett v. Rose, 496 U.S. 356, 372 (1990).  Thus, states are under no obligation to create special courts or change procedural rules to facilitate prosecution of claims arising under federal law.  However, consistent with the supremacy clause and absent any explicit state statutory directive, an unmistakable implication from legislative history, or by a clear incompatibility between state court jurisdiction and federal interests, there is a presumption of state court jurisdiction over federal claims.  Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 478 (1981).

This determination also resolves the second issue raised by Charter One.  The Bank suggests the failure of the legislature to include a private state right of action for the transmission of a commercial fax in 2000, when it created such a claim for unsolicited telephone advertising, [8] evidences an intent to reject Congress' authorization or "opt out" of the TCPA private right of action regulatory scheme.  This intent, it is urged, can also be determined from the legislature's rejection, on two occasions, of attempts to include a TCPA type violation as part of consumer protection laws under ICFA.

Although Gulf Offshore Co., *supra.*, dealt with the question of concurrent jurisdiction over a federal claim, in the absence of contrary authority, its analysis, with a

---

[8] 815 ILCS 413/25

8

slight modification, of this issue is most helpful. There, the Court held that a legislative body's intent to limit a court's jurisdiction over a claim could be determined by an explicit statutory directive, unmistakable implication from legislative history or by a clear incompatibility between state court jurisdiction and federal interests. Gulf Offshore Co., 453 U.S. at 478.

There is no explicit action by the state legislature declining to accept jurisdiction over these claims. The third Gulf Offshore factor should best be modified to determine if there is any incompatibility between state interests and this federal remedy. The answer again is in the negative. Indeed, one of the central purposes of the TCPA was to enable states to have jurisdiction over an issue that largely affected interstate commerce.

The final issue to be resolved under this analysis is the implications found in the actions of the state legislature. The failure to include a remedy for TCPA prohibited conduct can hardly be conclusive evidence of the legislature's intent to reject Congress' authorization for such claims. First, the remedy of attorney's fees found under ICFA is not available under the TCPA. The legislature could have determined that such a remedy exceeded the congressional authorization to assist in the regulation of interstate commerce by expanding what was designed to be a *pro se* claim into a much more complex and expensive litigation process.

The second argument by the Bank is the failure to include a private right of action in state court for unsolicited telephone facsimiles in the Telephone Solicitations Act. First of all, the statute had a specific focus, regulating telephone solicitations. There is nothing in this Court's or the legislative record that telephone facsimile advertising was even considered in the Bill or any proposed amendments. The lack of such historical information would result not in an unmistakable understanding of legislative action but guess and conjecture as to legislative intent.

Finally on this point, the Bank asserts that the failure of the legislature to amend the Illinois penal statute relating to the transmission of unsolicited telephone facsimile messages[9] which predate the TCPA expresses a legislative decision to reject the Congressional authorization of private rights of action. In support of their position they cite to R.A. Ponte Architects Ltd. v. Investor's Alert, Inc., 815 A.2d 816 (C.S.A. MD.

---

[9] 720 ILCS 5/26-3

2003), *cert grtd* 822 A.2d 1224 (2003). There, the Maryland Special Court of Appeals found that the failure of the Maryland legislature to amend its pre-TCPA statute to grant a private cause of action for money damages, and the failure to enact three bills dealing with issues somewhat related to the use of facsimile machines demonstrated an intent to prohibit a private cause of action in state court for violation of state or comparable federal law. 815 A.2d at 828.

Initially, it must be noted that this decision has been found to express a minority position on the issue. Condon v. Office Depot, Inc., 855 So.2d 644, 648 (Fla. Dist. Ct. App. 2003). A clear reading of the decision indicates that contrary to its pronouncement that Court adopted the "opt in" position rejected by this Court. Finally, it appears the Ponte Court failed to use the proper standard in reaching its conclusion that the failure of the Maryland legislature to create a cause of action it never considered or to so act when it considered other issues meant there was no private right of action. Thus, the decision in R. A. Ponte is not persuasive.

## 2. DUE PROCESS CLAUSE VIOLATION

Charter One urges this Court to conclude that the statutory penalty of $500 or $1,500 (if knowing or willful) per fax for a violation of the TCPA (47 U.S.C. 227 (b)(3)) constitutes an unconstitutional taking of property without due process of law. This conclusion is easily reached, the Bank asserts, when one considers that the damage to the consumer is but a few pennies but the remedy in the context of this class action could result in an award in the tens of millions of dollars. They suggest by example that a class may consist of a defendant who has sent 100,000 facsimile messages in violation of the statute. This may have cost consumers $10,000. The penalty for such conduct is $50 million with a potential multiplier to reach $150 million. This gross disproportionality violates the due process clause and must be struck down. The Bank points to the recent decision of the United States Supreme Court in State Farm Mutual Automobile Insurance Co. v. Campbell, 123 S.Ct. 1513 (2003), as the most recent pronouncement by the Court on this issue.

In State Farm, its insured, Mr. Campbell, attempted to pass six vehicles on a two laned road; his judgment in this regard proved to be poor and resulted in the death of one person and the total permanent disability of another. Mr. Campbell was sued for

damages by the injured parties. The Plaintiffs offered to settle the matter for the $50,000 policy, but State Farm declined. Despite strong counsel to the contrary, State Farm took the case to trial assuring Mr. Campbell his assets were secure. The jury found that he was 100% at fault and awarded damages in the amount of $185,849. State Farm refused to pay this amount, filed an appeal bond and advised Mr. Campbell to place his home for sale to satisfy the amount of the claim. Ultimately, State Farm paid the judgment after the Utah Supreme Court affirmed the jury's verdict.

Mr. Campbell and the injured parties joined forces to bring a bad faith action against State Farm. During discovery it was learned that State Farm had a national policy to cap losses that Mr. Campbell claimed, and apparently the jury agreed, were tortious. A verdict of $145 million in punitive damages was returned against State Farm.

In reversing the judgment of the Utah Supreme Court, the Court acknowledged the legal principle that the Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. State Farm, 123 S. Ct. 1520-1521. This concern, the Court noted, dates back to the Magna Carta. The common law procedure for imposition of punitive damages, the Court believes, poses an acute danger of the arbitrary deprivation of property. The reason is that elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also the severity of the penalty that a state may impose. BMW of North America v. Gore, 517 U.S. 558, 574 (1996). The State Farm Court found that the defendant was impermissibly called to answer for unrelated incidents in states other than Utah. The Court reasoned, in part, that conduct lawful in one State cannot be used to aggravate a penalty in a State where such conduct is illegal. This defeats the Due Process requirement of notice. Here, the TCPA claim is a statutory remedy that clearly announces the proscribed conduct and defines the potential penalties. Moreover, the TCPA regulations existed for many years before the allegations of wrongdoing made by the Plaintiff herein. The decisions of the Supreme Court in State Farm and its rather recent ancestors, see State Farm, 123 S. Ct. 1528 (Ginsburg, J. dissenting), simply have no application to the matter before the Court.

As suggested by this Court in its earlier decision rejecting a similar argument, the standard to be applied here is found in St. Louis Iron Mountain and Southern Railway v. Williams, 251 U.S. 63 (1919). In Williams, the Court was called upon to determine the constitutionality of an Arkansas statute which created a private right of action for railroad passengers who were charged more than the rate set by regulation. An aggrieved passenger was entitled to recover a penalty of "not less than fifty dollars nor more than three hundred dollars" for each offense as well as costs of suit and attorneys fees. Williams recovered a seventy-five dollar penalty and twenty-five dollars in attorney's fees after successfully prosecuting such a claim. The standard to be applied is whether the penalty is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." Williams, 251 U.S. at 67. This determination of validity is not to be made merely by contrasting the penalty with the possible overcharge in an individual case. The court must consider the interest of the public, the numberless opportunities for committing the offense and the need for securing uniform adherence to the law. Williams, 251 U.S. at 68. The focus of the Court at this point in the proceedings is to determine the facial constitutionality of the TCPA remedy. In doing so, there must be given recognition to the wide latitude a government is given in protecting public interest. This Court should not be anxious to substitute its judgment for that of the Congress. As suggested in this Court's prior decision in Whiting Corporation v. MSI Marketing, Inc., 02 CH 6332, this decision as to the constitutionality of the remedy as applied may best be resolved once a class is certified. Subsequent research by the Court indicates this issue may impact on the very issue of class certification. See Foreman v. Data Transfer, Inc., 164 F.R.D. 400 (E.D. Pa. 1995) and Kenro v. Fax Daily, Inc., 962 F. Supp 1162 (S.D. Ind. 1997).

The Court cannot conclude that the remedy provided by Congress in the TCPA is an unconstitutional deprivation of property without Due Process of Law on this record.

### 3. FIRST AMENDMENT ISSUES

The Defendant asserts that the TCPA scheme unconstitutionally impacts on its right of free speech in the commercial setting of advertising. The main thrust of its argument is that the statute fails to withstand scrutiny under the test set out in Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557 (1980). The

Bank posits that the content based restriction on commercial speech is not based upon a constitutionally sufficient rationale; to wit, that assuming a governmental interest is present, the prohibitions set out in the TCPA do not directly advance that interest. The Defendant also urges this Court to conclude that less restrictive alternatives could satisfy any interest identified by the Congress.

Prior to analyzing the arguments of Charter One, it is important to note that there are no allegations that any of the "unsolicited advertisements" were false, misleading or promoted illegal conduct. Hence, analysis under the <u>Central Hudson</u> test is proper.

Charter One's brief suggests there are two prongs to determining whether there is sufficient rationale to justify this Congressional restriction on speech. The first prong is a determination that the governmental restriction is substantial. The burden falls upon the Government to establish this factor. <u>Edenfield v. Fane</u>, 507 U.S. 761 (1993).

Charter One contends the legislative record consists of such anecdotal evidence that, in reality, no governmental interest was identified by the Congress. The Defendant acknowledges that the TCPA scheme was designed to prohibit the cost shifting effect of commercial advertising by telephone facsimile messages as well as the time and expense incurred when a fax machine is being used to accept and print these unsolicited transmissions. However, the Bank argues that there was insufficient evidence in the record to allow Congress to make that determination.

In support of their position, the Defendant points to <u>Turner Broadcasting, Inc. v. FCC</u>, 520 U.S. 180 (1997). However, it appears to this Court that a careful reading of <u>Turner</u> actually supports the Congressional determination of the policy espoused by the TCPA. In that decision, the Court upheld the "must carry" commercial non-cable broadcast provisions of statutes regulating the cable television industry. There, the Court analyzed the materials submitted to Congress and its determinations. The Court noted that the question to be answered by a court in making a determination of constitutionality is not an objective determination of whether the legislative policy was the correct approach to the issue. Rather, the Court stated, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record. <u>Turner</u>, 520 U.S. at 212. The Court will now turn to a discussion of the Congressional deliberations.

13

During the deliberations on the TCPA legislation, the Congress entertained testimony from many sources.   In addition, Members related personal as well as constituent experiences and complaints concerning this practice.  For example, as to the cost shifting issue, the Congress heard testimony that, in 1989, California's consumers lost between $250,000-375,000 per year in printing these unsolicited materials.  Hearing before the Subcomittee on Telecomm. And Fina. Of the House Committee on Energy and Commerce, 101st Cong., 56 (1989) (statement of Prof. Ellis).  This testimony also related that one company engaged in this activity had by that time assembled a database of 500,000 fax numbers and was routinely sending out 60,000 fax messages per week.

The Congress also heard testimony that this industry would steadily increase its technological capabilities and its attendant ability to transmit massive volumes of fax messages.  The intervenor's brief cites to a website of a defendant in another related case to support the Congress' predictive judgment.  It boasts, in 2004, of being one of more than 400 entities engaged in transmitting facsimile advertisements.  The site claims that its sponsor personally sends more than one million such messages per week.  (Int. Br. pp 16-17).

Finally, the Congress heard significant testimony on the disruption of business by the "seizure" effect such messages have on telephone lines and facsimile machines.

In contrast, Charter One advances no evidence as to the accuracy of the information presented to the Congressional subcommittee and presented to the Congress. Given the substantial deference that Courts must give to the predictive judgments of Congress, indeed the Court's role is limited to assuring that, in formulating its policy, Congress has drawn reasonable inferences based on substantial evidence.  Turner Broadcasting Systems, Inc. v. FCC, 512 U.S. 622, 666 (1994), this Court can reach no other conclusion but that unsolicited telephone facsimile messages disrupt business by interrupting its orderly flow and unfairly shifts advertising costs from the merchant to the consumer.  These are substantial interests that Congress in its constitutional responsibility to regulate commerce can protect.  Moreover, the material submitted by the Intervenor validates Congress' predictive judgment.

The Defendant next posits that, assuming protectable interests exists, the total ban of unsolicited facsimile advertisements does not directly advance the government interest

asserted. <u>Rubin v. Coors Brewing Co.</u>, 514 U.S. 476 (1995). The Bank acknowledges that Congress need not make progress on every front before it can make progress on any front. <u>United States v. Edge Broadcasting Co.</u>, 509 U.S. 418 (1993). Nevertheless, Charter One posits there is not the reasonable fit required between the TCPA total ban on unsolicited telephone facsimile advertising and the interests advanced. The main thrust of their position focuses on the failure of Congress to ban facsimile messages that contain political, "junk" or charitable messages. These messages consume the same amount of paper and ink as the banned messages. This permitted form of speech also disrupts business by "seizing" control of the recipients business equipment.

To support its position, the Defendant cites to cases in this area such as <u>Edenfield v. Fane</u>, *supra.*, and <u>City of Cincinnati v. Discovery Network, Inc.</u>, 507 U.S. 410 (1993). In <u>Edenfield</u>, the Court struck down as violative of the First Amendment Florida's total ban on client solicitation by Certified Public Accountants. The Court began its analysis by acknowledging that "solicitation is a recognized form of speech protected by the First Amendment." <u>International Society for Krishnar Consciousness v. Lee</u>, 501 U.S. 672, 677 (1992). It then examined the two asserted interests the regulation was designed to protect; *i.e.* eliminating fraud or overreaching by CPA'S and maintaining the independence of the audit process. Each, the governing board advanced, would be compromised as competitors would be increasingly called upon to cut prices or be more compliant to a client's needs to obtain or retain business. The Court acknowledged the substantial nature of the governmental interest.

However, the Court found that a total ban on such solicitation did not directly advance the interests involved. In making that determination, the Court noted that 21 States place no restrictions on solicitations by CPA's, only three States besides Florida have enacted a total ban. The Court also observed the ban was enacted without any evidence, study or even anecdotes to suggest the stated interest would be served by the ban. <u>Edenfield</u>, 507 U.S. at 772. Indeed, the Court found the one report proferred in support of the ban actually undermined the regulator's position. *Id.* at 772-773. Nor could the ban, the Court found, be justified as prophylactic in nature. In rejecting the position that the setting of such solicitations, *i.e.*, private offices or conversations were prone to abuse and difficult to regulate, the Court emphasized the training of members of

the accounting profession, and the absence of any threat of overreaching due to the emotional status of the party being solicited. The Court noted that decisions to hire an accountant are deliberate in nature and any potential for harm is minimal. This, the Court found was different from the partial ban approved on lawyer solicitations of accident victims. Ohralik v. Ohio State Bar Assn., 436 U.S. 447 (1978). In the later situation the Court acknowledges a prophylactic ban was appropriate because the harm sought to be avoided would have occurred at the outset of the solicitation. Id. at 777.

In Discovery Network, the Court struck down the application of an existing ordinance prohibiting the distribution of handbills to limit the placement of dispensing racks to distribute the defendant's commercial paper. In making this determination, the Court noted that the ordinance had long been in existence before the City determined that it was a potential tool to ease the perceived blight and promote traffic safety. The Court also observed that only 62 of the offending racks were being removed while between 1, 500 and 2,000 remained in place unaffected by enforcement efforts. These racks were used to distribute "newspapers," a category not defined by the ordinance but by executive fiat. It was significant, the Court observed, what is patent to anyone who peruses our daily "newspapers," that 70% of their content is devoted to advertising the availability of goods or services. Discovery Network, 507 U.S. at 420 (fn.16). This fact, the Court determined, eliminated any distinction between the publications that were banned or permitted. In its opinion, the Court reminded the litigants that speech proposing a commercial transaction was entitled to lesser protection than other constitutionally protected expression. See Ohralik v.Ohio State Bar Assn., 436 at, 455-456. Thus, the Court recognized that a distinction has historically been drawn between commercial and non-commercial speech, but found that on the record there was no appreciable difference in content between the Defendant Discovery Network's publication and those classified as "newspapers." The Court reasoned that as a result the distinction drawn by Cincinnati bore no appreciable relationship to the restrictions imposed. The Court specifically declined to determine whether, given certain facts and under certain circumstances, differential treatment of commercial and non-commercial speech is justified. Discovery Network, 507 U.S. at 429.

16

It is clear to the Court that the definition of "unsolicited advertisement" found in the TCPA is consistent with the definition of a commercial transaction as defined by the Supreme Court; *i.e.*, proposal for a commercial transaction. <u>Board of Trustees of the State University of N.Y. v. Fox</u>, 492 U.S. 469, 473-474 (1989). The TCPA's ban on commercial speech does have a prophylactic effect on unsolicited telephone facsimile advertising. This can be justified under <u>Ohralik</u>, *supra*., because the harm sought to be prevented occurs at the time the transmission is made. In addition, unlike the total ban on solicitation in <u>Edenfield</u>, Congress recognized a significant negative impact on commerce and enacted a closely tailored statute. In contrast to the glaring absence at the state level of regulation of solicitation by CPA's, the Congress received evidence that efforts by an increasing number of states to regulate in this area were thwarted by the interstate nature of the telephone facsimile issue. Hence, this Court finds that the restriction directly advances the valid regulatory concerns identified by Congress.

Moreover, there is a clear relationship between banning commercial speech and allowing charitable and political use of this medium of communication. First, Congress received evidence that only a small number of unsolicited messages were non-commercial. In addition, the public had no serious objection to receiving such information. The Congress, as noted above, pointed to the actual damage to business owners by way of additional costs of doing business as a result of receiving commercial messages. In addition, evidence suggested the additional burdens, not easily calculable, imposed by a lack of timely access to necessary business equipment during the increasingly frequent times the unsolicited commercial telephone facsimiles are sent was adversely affecting commerce.

The cases relied on by the Defendant have for the most part, in subsequent proceedings, followed the Eighth Circuit Court of Appeals decision in <u>Missouri ex.rel. Nixon v. American Blast Fax, Inc.</u>, 323 F3d 649 (C.A. 8th 2003), *cert. den.* 124 S.Ct. 1043 (2004). *See* <u>Rudgayzner & Grath v. Enine, Inc.</u>, 204 N.Y. Misc. Lexis 420 (4/14/04).

Finally, the restriction chosen by the Congress is not more extensive than necessary to advance the interest at stake. The Bank recognizes that there must be a reasonable "fit" between the regulation and the interest sought to be protected. <u>Board of</u>

Trustees v. Fox, *supra.* Charter One argues that at least two alternatives are less restrictive and hence a better "fit." First, the Defendant points to the California "opt out" scheme. This allows the sender of the message to furnish the recipient with a toll free number which will prevent the recipient from receiving further facsimiles. The second is a national "do not fax" list. Anyone who does not desire to receive this type message can sign up and be placed on a list and will not receive these communications. The Defendant suggests this would better identify those individuals who welcome this information and separate those persons from consumers who desire to receive only certain types of unsolicited messages or no messages at all.

The analysis of this issue does not permit the Court to substitute its judgment for that of the Congress. Rather, the Court must examine the existing regulations on their own merit and determine whether they achieve a reasonable fit. Rubin v. Coors Brewing Co., 514 U.S. 476 (1995). The TCPA scheme does act to prevent the cost shifting goal set forth by the Congress. Moreover, the Defendant suggests an affirmative duty should be imposed upon businesses and private persons in order to protect their property and be free to conduct their businesses. Those persons who desire to enter into commercial transactions have numerous and cost effective ways of reaching customers. They can conduct direct mailings, purchase advertising in "newspapers" or other media. Indeed, they can create low cost websites that can be easily "googled." There is no reason to suggest the TCPA fails to pass muster on the fourth prong of the Central Hudson test.

Hence, the Court can find no First Amendment infirmities in the TCPA regulatory scheme.

### 4. COUNT II – CONVERSION

The Defendant correctly sets out the elements of the tort of conversion. The gist of the Bank's argument appears to be that, by placing paper in a fax machine, an owner is parting with control, dominion or ownership of that property. By analogy, the Court surmises, if one were to leave their bicycle on the front porch for friends to see and the newspaper delivery person decided that it would be handy and takes it, there would be no theft. The Bank's argument ignores the plain fact that the sending of unsolicited advertisements is illegal. Everyone has the right to rely on others obeying the law. Hence, the Plaintiff has made out a claim.

5.    **COUNT III ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT (ICFA)**

In Count three of the Plaintiff's complaint, it is alleged that the sending of one telephone facsimile message is a violation of the Illinois Consumer Fraud and Deceptive Practices Act. In <u>Whiting Corporation v. MSI Marketing</u>, 02 CH 6332, this Court extensively analyzed the requirements for a valid complaint under the Act. As the ICFA does not list a violation of the Illinois fax statute as a *per se* violation, the Plaintiff must satisfy the requirements set forth in <u>Robinson v. Toyota Motor Credit Corporation</u>, 201 Ill. 2d 403 (2002). A plain reading of the Plaintiff's complaint yields that the Count alleging a violation of the ICFA is legally insufficient. However, as indicated in the Whiting opinion, the Plaintiff may be able to set out a valid claim in individual cases. Finally, the Plaintiff should analyze this issue in terms of the right of Congress to regulate interstate commerce.   Therefore, the Plaintiff is given leave to file amended Counts alleging an ICFA violation in those Class B and C category cases that are subject to the ruling entered today.

6.    **COUNT IV – PROPERTY DAMAGE**

Property damage is to this Court's understanding an element of a form of intentional or negligent tortius conduct.  It is not an independent tort.  This Count will be dismissed with prejudice.

**IV.    ORDER**

A. The Defendant's Motion to Dismiss Counts I & II are denied;

B. The Defendant's Motion to Dismiss Counts III & IV are granted, the Plaintiff is given leave to file amended complaints alleging violations of ICFA consistent with this Memorandum of Opinion and Order against any individual defendant;

C. The Class A and B cases are set for case management on July 13, 2004 at 1:00 P.M;

D. Any discovery stay order in Class B cases is hereby lifted.

ENTER:    _____

Judge                                    1510

19

**EXHIBIT A**

| | |
|---|---|
| 03 CH 10966 | INSPE v. CBSK |
| 03 CH 9912 | Trout Grouse, LLC v. CBSK |
| 03 CH 10844 | Rawson v. Levin |
| 03 CH 10667 | Damas & Block v. Erogtron |
| 03 CH 12538 | Travel 100 v. Mediterranean Shping Co. |
| 03 CH 0955 | Novak v. Hotels.com |
| 03 CH 1540 | Travel 100 Grp v. Oceania Cruises, Inc. |
| 03 CH 8921 | Rawson v. McLeod USA |
| 03 CH 8477 | Telecommunications v. McLeod USA |
| 03 CH 10967 | Jos. Younes v. Impact Networking |
| 03 CH 10725 | Flexicorps v. Impact Networking |
| 03 CH 11321 | Flexicorps v. Bridge 21 |
| 03 CH 11650 | Kaufman v. Bridge 21 |
| 03 CH 10818 | Block v. Advanced Environmental Systems, Inc. |
| 03 CH 11297 | Catherine Elliott-Dunne v. Tracy's Treasures, Inc. |
| 03 CH 7666 | Brill v. Aramak Services |
| 03 CH 10667 | Damas v. Ergotron |
| 03 CH 13062 | Rawson v. Brin |
| 03 CH 14511 | Travel 100 Grp v. Bebon Office Machines |
| 03 CH 11114 | Lustig v. First Priority Funding |
| 03 CH 12434 | Creative Fun v. Systems Management |



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

NEW CENTURY MORTGAGE CORP., )
                            )
        Plaintiff,          )
                            )
vs.                         )        No. 05C2370
                            )
GREAT NORTHERN INSURANCE    )
COMPANY, FEDERAL INSURANCE  )
COMPANY,                    )
                            )
        Defendants.         )
_____)

DEPOSITION OF FRANK NESE
Irvine, California
Wednesday, September 21, 2005
Volume

Reported by:
GREGORY F. BENSON
CSR No. 7793
JOB No. 631908

Page 1

---

1        UNITED STATES DISTRICT COURT
2   NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
3
4   NEW CENTURY MORTGAGE CORP., )
                               )
5        Plaintiff,    )
                       )
6   vs.                )        No. 05C2370
                       )
7   GREAT NORTHERN INSURANCE   )
    COMPANY, FEDERAL INSURANCE )
8   COMPANY,           )
                       )
9        Defendants.   )
    _____)
10
11
12        Deposition of FRANK NESE, Volume 1,
13   taken on behalf of Defendants, at 18400
14   Von Karman, Suite 300, Irvine, California,
15   beginning at 1:08 p.m. and ending at
16   2:58 p.m. on Wednesday, September 21, 2005,
17   before GREGORY F. BENSON, Certified
18   Shorthand Reporter No. 7793.
19
20
21
22
23
24
25
                        Page 2

---

1   APPEARANCES:
2
    For Plaintiff New Century Mortgage Corp.:
3
    GAUNTLETT & ASSOCIATES
4   BY: ERIC ROBERT LITTLE
    Attorney at Law
5   18400 Von Karman, Suite 300
    Irvine, California  92612
6   (949) 553-1010
7   NEW CENTURY MORTGAGE CORPORATION
    BY: MARK M. MALOVOS
8   Attorney at Law
    18400 Von Karman Avenue, Suite 1000
9   Irvine, California  92612
    (949) 225-7861
10
11  For Defendants:
12  TRESSLER, SODERSTROM, MALONEY & PRIESS
    BY:  DANIEL J. CUNNINGHAM
13  Attorney at Law
    233 South Wacker Drive
14  Chicago, Illinois  60606-6308
    (312) 627-4026
15
16
17
18
19
20
21
22
23
24
25
                        Page 3

---

1                    INDEX
2   WITNESS              EXAMINATION
    FRANK NESE
3   Volume 1
4
5      BY MR. CUNNINGHAM           6
6
7
8                   EXHIBITS
9   DEFENDANT                    PAGE
    1   Photocopy of fax memo dated 3/14/02 with   25
10      attachment
11  2   Photocopy of document entitled, "Fax       31
        Broadcasting Sales Order"
12
    3   Photocopy of document entitled, "Accounts  42
13      Payable Check Request"
14  4   Photocopy of document entitled,            56
        "Artwork/Layout Approval"
15
    5   Photocopy of document entitled, "Fax       59
16      Broadcasting Sales Order"
17  6   Photocopy of document entitled, "Total Fax  59
        No.'s Available: 1,251,487"
18
    7   Photocopy of document entitled, "New       61
19      Century's Responses to Plaintiff's
        Additional (12/17/03) Requests for Document
20      Production" with attached documents
21  8   Photocopy of letter, undated, with         62
        attachment
22
    9   Photocopy of letter dated 7/1/2002, with   67
23      attachments
24  10  Photocopy of letter, undated              68
25
                        Page 4

1 (Pages 1 to 4)

1  INDEX - continued
2  11  Photocopy of letter dated 8/13/2002  74
3  12  Photocopy of letter dated 9/29/2003  75

Page 5

---

1    Irvine, California, Wednesday, September 21, 2005
2          1:08 p.m. - 2:58 p.m.
3
4          FRANK NESE,
5  having been first duly sworn, was examined and testified
6  as follows:
7
8          EXAMINATION
9  BY MR. CUNNINGHAM:
10    Q  Good afternoon, Mr. Nese. My name is Dan
11  Cunningham, and I represent the Federal Insurance Company
12  and the Great Northern Insurance Company in a lawsuit
13  brought by what I understand is your former employer.
14      Let me first start by asking you if you've ever
15  given a deposition before.
16    A  Yes.
17    Q  How many times have you done this?
18    A  Twice.
19    Q  Okay. So I take it you're generally familiar
20  with the ground rules of a deposition?
21    A  Yes.
22    Q  I'll remind you of the most important ones.
23      It's important that we both not talk at the same
24  time, because the court reporter might have some
25  difficulty recording the testimony accurately.

Page 6

---

1      So I will promise not to talk while you're
2  talking if you promise not to talk while I'm talking.
3      Is that okay with you?
4    A  I promise.
5    Q  If at any time you don't understand my question,
6  just let me know and I will try to rephrase it.
7      Is that okay with you?
8    A  Yes.
9    Q  And if at any time you need a break, just let me
10  know and we'll be happy to accommodate you.
11      Are you represented by counsel here today?
12    A  Yes.
13    Q  And is that Mr. Little sitting to your right?
14    A  Yes.
15    Q  When was the most recent deposition that you
16  gave prior to today?
17    A  I believe it was a couple of years ago.
18    Q  What was the nature of that case?
19    A  It was a dispute with a software vendor.
20    Q  Did that dispute have anything to do with fax
21  advertisement?
22    A  No.
23    Q  Did it have anything to do with insurance
24  coverage issues?
25    A  No.

Page 7

---

1    Q  Tell me about the other depositions that you
2  have previously given. What was the nature of the case?
3    A  A software vendor was suing New Century.
4    Q  Is it true that both prior depositions involved
5  a software vendor?
6    A  Yes, they were related to the same matter.
7    Q  So neither prior case dealt with fax advertising
8  or with insurance coverage issues?
9    A  No.
10    Q  Good. That shortcuts that discussion.
11      What did you do to prepare for today's
12  deposition, if anything?
13    A  I met with Mr. Little and Mr. Malovos.
14    Q  When was that?
15    A  On Monday.
16    Q  And for how long did you meet?
17    A  I would say it was an hour to an hour and a
18  half.
19    Q  Was that the only meeting that you had to
20  prepare for today?
21    A  Yes.
22    Q  Did you look at any documents during that
23  meeting?
24    A  Yes.
25    Q  Can you describe for me the documents that you

Page 8

---

2 (Pages 5 to 8)

1  looked at.
2       MR. LITTLE: I can actually shortcut this, if you'd
3  like.
4       MR. CUNNINGHAM: Feel free.
5       MR. LITTLE: I collected the documents that you had
6  identified in your discovery responses, put them into a
7  notebook, and this is the notebook.
8       MR. CUNNINGHAM: Terrific. Thank you. I'll look at
9  those when we take a break.
10      MR. LITTLE: Okay. I think his notice of depo was
11  in there also.
12      MR. CUNNINGHAM: Okay.
13      Q  Mr. Nese, who is your current employer?
14      A  ECC Capital Corporation.
15      Q  What do you do for that company?
16      A  I'm a director.
17      Q  When did you begin working for that company?
18      A  June 8th of this year.
19      Q  Is ECC Capital affiliated in any way with New
20  Century Financial Corporation?
21      A  No.
22      Q  With whom were you employed before June 8, 2005?
23      A  New Century Mortgage Corporation.
24      Q  When did you begin working for New Century
25  Mortgage?

Page 9

1       A  Countrywide Home Loans.
2       Q  What did you do for Countrywide?
3       A  I started as an account executive and was
4  steadily promoted, and my final position was vice
5  president, in-call center manager.
6       Q  When did you begin working for that company?
7       A  February 1993.
8       Q  What did you do before February of 1993?
9       A  I worked for a mortgage broker.
10      Q  Which mortgage broker?
11      A  Valley Heights Mortgage.
12      Q  When did you start working with that company?
13      A  I want to say around September of 1989.
14      Q  And what did you do before that?
15      A  I worked at -- I sold artwork wholesale.
16      Q  What did you do before that?
17      A  I was enlisted in the army.
18      Q  During what years did you serve in the army?
19      A  From 19 -- I was enlisted from 1984 to 1987, and
20  served for a total of 21 years between active duty and
21  guard and reserve.
22      Q  I see. Did you have any full-time employment
23  before joining the army in 1984?
24      A  Oh, none worth describing.
25      Q  Okay. Did you attend college?

Page 11

1       A  June of 2000.
2       Q  Where did you work before joining New Century
3  Mortgage?
4       A  WMC Mortgage Corporation.
5       Q  What did you do for that company?
6       A  I was senior vice president responsible for
7  E-commerce.
8       Q  Is that company affiliated in any fashion with
9  New Century Financial?
10      A  No.
11      Q  When did you begin working for that company?
12      A  That was in June of 1999.
13      Q  With whom did you work before that?
14      A  First Plus Financial.
15      Q  What did you do for First Plus Financial?
16      A  Director of telesales.
17      Q  Is that company affiliated with New Century
18  Mortgage?
19      A  No. May I say that none of my previous
20  employers have or are currently affiliated with New
21  Century Mortgage.
22      Q  Thank you. When did you begin working with that
23  company?
24      A  In September of 1996.
25      Q  Where were you before that?

Page 10

1       A  Yes.
2       Q  Where did you go to college?
3       A  Century University.
4       Q  And I take it you graduated?
5       A  Yes.
6       Q  What year did you graduate?
7       A  Well, I completed it over a period of time, so
8  2002.
9       Q  Okay. What was the nature of your degree?
10      A  Business administration.
11      Q  Okay. Now that you have gone through your
12  entire resume in response to my questions, I'd like to
13  drill down and focus on the time when you were with New
14  Century Mortgage which I think you told us began in
15  roughly June of 2000; is that right?
16      A  Correct.
17      Q  And continued on through June 8 of 2005?
18      A  Actually, my final day of employment was May
19  31st.
20      Q  Okay. What was the first title that you held at
21  New Century Mortgage?
22      A  Senior vice president, director of central
23  operations.
24      Q  And during what years did you serve in that
25  capacity?

Page 12

3 (Pages 9 to 12)

1    A  It was only a period of a matter of a few months
2  as we were reorganizing the company, and I would say
3  after three months or so I became the director of
4  marketing for central operations.
5    Q  Okay.  Before you became the director of
6  marketing, what were your duties and responsibilities
7  just in general terms?
8    A  Basically reorganizing three of the businesses
9  that were currently in operation at the time.
10    Q  What were the three businesses?
11    A  The ones that I was involved with were Any
12  Loan.com, New Century Mortgage Corporation.  Their retail
13  division, branch division, and a recent acquisition of
14  New Century, which was Prime West Funding, which later
15  became central operations.
16    Q  And then you told us that after roughly three
17  months you became the director of marketing.
18       How did your duties and responsibilities change,
19  if at all?
20    A  They changed from primarily a reorganization
21  sort of restructuring role to responsibility for
22  generating leads for the central operations group.
23    Q  When you say leads, what do you mean?
24    A  Customers, potential customers.
25    Q  Okay.  Did your title change at all during the

Page 13

1    Q  Okay.  Do you currently own stock in New Century
2  Financial Corp.?
3    A  Yes.
4    Q  Do you currently own stock options in that
5  corporation?
6    A  No.
7    Q  Are you expecting to receive a pension from that
8  corporation?
9    A  No.
10    Q  Mr. Nese, have you heard of a company called
11  fax.com?
12    A  Yes.
13    Q  When was the first time that you heard of
14  fax.com?
15    A  You know, my recollection is a little fuzzy, but
16  I would say maybe it was December of 2000 or some time --
17  it was December 2000 or 2001.  I don't recall.
18    Q  And that would have been if we look at the time
19  line of your employment while you were working at New
20  Century; is that correct?
21    A  Yes.
22    Q  So you didn't have any prior experience with
23  fax.com before you came to New Century?
24    A  No.
25    Q  How is it that you first came to encounter

Page 15

1  remaining tenure with New Century?
2    A  Yes.
3    Q  When did it change?
4    A  It changed in, I believe January of 2001 -- I'm
5  sorry.  January of 2002.
6    Q  And how did it change?
7    A  I became chief marketing officer of the retail
8  division.
9    Q  How did your duties change?
10    A  Responsible for lead generation for the entire
11  retail organization.
12    Q  How long did you serve in that capacity?
13    A  Until January of -- I'm trying.  I want to be
14  accurate -- until January 2003.
15    Q  And what happened at that point?
16    A  I moved over to the production side.  That's the
17  actual origination of loans.
18    Q  Okay.
19    A  And I served as group vice president until my
20  departure.
21    Q  Okay.  In May of 2005?
22    A  Yes, May 31st.
23    Q  At any time did you serve as an officer of the
24  corporation?
25    A  During my entire tenure.

Page 14

1  fax.com?
2    A  They were referred to me by a gentleman that --
3  who had worked for me in the past and now had his own
4  company.
5    Q  Who was that gentleman?
6    A  Mike Harrel.
7    Q  What did Mike Harrel --
8    A  H-a-r-r-e-l.
9    Q  What did Mr. Harrel say about fax.com?
10    A  He said that he was utilizing them for lead
11  generation efforts.
12    Q  What company was Mr. Harrel with?
13    A  His company has changed names.  I believe at the
14  time it was called Union Trust Mortgage, something to
15  that nature.
16    Q  Did he tell you anything else about fax.com?
17    A  He just said that it was an effective way for --
18  that he was generating leads.
19    Q  And after he made this referral to you, what did
20  you do, if anything?
21    A  I didn't do anything.
22    Q  How was it that you again encountered fax.com?
23    A  I was contacted by a sales person in the
24  organization.
25    Q  When was that?

Page 16

4 (Pages 13 to 16)

1      A   I don't recall.
2      Q   Do you recall what position you were working in
3   at the time that you were contacted?
4      A   Director of marketing.
5      Q   Do you recall the name of the salesperson that
6   contacted you?
7      A   Yes.
8      Q   What was that person's name?
9      A   Frank Frapier, the last name spelled
10  F-r-a-p-i-e-r.
11     Q   Did he contact you by telephone?
12     A   Yes.
13     Q   What did he say to you?
14     A   He said that he was referred to me by Mike
15  Harrel.
16     Q   Did he say anything else?
17     A   He wanted to give a presentation on what he
18  thought he could do as it relates to lead generation.
19     Q   Did he, in fact, give you that presentation?
20     A   Verbally.
21     Q   How long did that take?
22     A   I don't recall.
23     Q   Did that take place in that very same telephone
24  conversation when he first contacted you?
25     A   I think it was a later telephone call.

Page 17

1      Q   Was anybody else involved in that telephone
2   call?
3      A   No.
4      Q   Did you ask any questions of Mr. Frapier in the
5   course of that telephone call?
6      A   I'm sure I did.
7      Q   Do you recall what you asked him?
8      A   No.
9      Q   Had he sent you any documentation in advance of
10  that telephone call?
11     A   No.
12     Q   Had you sent him any documentation?
13     A   No.
14     Q   Do you recall if you made any written memo or
15  note about the content of that conversation?
16     A   I don't recall.
17     Q   I take it that there was, then, a time after
18  that when you again encountered fax.com; is that correct?
19     A   Yes.
20     Q   When did that occur?
21     A   I don't recall the date specifically. And I'm
22  not trying to be obscure or evasive, I just don't really
23  recall.
24     Q   Were you still serving as director of marketing?
25     A   Yes. And maybe -- during my -- during the time

Page 18

1   with which I contacted or spoke with fax.com I served in
2   a marketing capacity.
3      Q   Okay. Did fax.com contact you or did you
4   contact fax.com?
5      A   I believe they contacted me.
6      Q   Why did they contact you?
7      MR. LITTLE:  Objection. Calls for speculation. You
8   can answer, if you know.
9      THE WITNESS:  Well, to sell their services.
10  BY MR. CUNNINGHAM:
11     Q   Okay. Did you talk to Mr. Frapier?
12     A   Yes.
13     Q   Did you talk to anybody else at that time at
14  fax.com?
15     A   Not at that time.
16     Q   Did he describe that? You said they offered
17  their services?
18     A   Yes.
19     Q   And at that time did you agree to engage their
20  services?
21     A   I agreed to try it.
22     Q   Okay. What was it that they offered you during
23  that telephone call?
24     A   Basically it was services related to lead
25  generation or customer acquisition. And they would send

Page 19

1   faxes out and customers would call.
2      Q   By that time had they sent you any written
3   documentation about the nature of the services that they
4   provided?
5      A   I don't recall.
6      Q   And had you sent them anything by that time?
7      A   I don't think I would have sent them anything.
8      Q   Up until this point in time is Mr. Frapier the
9   only fax.com employee that you had dealt with?
10     A   Yes.
11     Q   And after you told them that you were willing to
12  try them, what happened next?
13     A   I believe he asked me about areas that we were
14  interested in doing business, and I provided him some of
15  those areas.
16     Q   What were those areas?
17     A   I don't recall.
18     Q   Can you recall generally?
19     A   Well, New Century lends in all 50 states. And,
20  you know, I can't recall with any specificity. But it
21  was probably a list of, you know, a great number of
22  states.
23     Q   Okay. Would you have provided him a written
24  list of the states that you were interested in?
25     A   No, I don't think so. I believe we just had a

Page 20

5 (Pages 17 to 20)

1    telephone discussion.
2        Q   And what happened next?
3        A   I believe he came back with something as to, you
4    know, the numbers in certain states that he recommended.
5        Q   Did he do that in writing or by telephone?
6        A   I don't recall.
7        Q   What happened next?
8        A   We -- you know, we had, you know, various
9    discussions, and this is over some time.  And I think
10   it's important to put this into perspective.  This was a
11   dot in, you know -- I mean a pinhead on a map.  It was
12   just that small of a campaign.
13       So it's not something that we, you know,
14   primarily did.  I was focused on many other things at the
15   time.
16       Q   And eventually we're going to get into the
17   documents.  And I think that will help focus your memory
18   towards specific dates and specific issues.
19       But before I do that, I just want to get a
20   general time line from you as to how the relationship
21   with fax.com developed.
22       You've told us that they contacted you.  There
23   was some discussion of geographic areas.  They got back
24   to you about some numbers.
25       What happened next?

Page 21

1        A   That was about it up until such time -- you
2    know, I believe they sent over an order or contract.
3        Q   Okay.  Did you conduct any investigation as to
4    fax.com?
5        A   When you say investigation, I'm not sure what
6    you mean there.
7        Q   Fair enough.  You told us that you had
8    previously received a referral from a colleague of yours.
9        A   Yes.
10       Q   Did you ask anybody else about fax.com?
11       A   No.
12       Q   Did you check out their website, if they had a
13   website?
14       A   No.
15       Q   Did you ask within the organization about
16   fax.com?
17       A   Within New Century?
18       Q   Correct.
19       A   No.
20       Q   Prior to this time had you ever engaged the
21   services of a fax broadcasting company?
22       A   No.
23       Q   Prior to this time had New Century, on its own,
24   engaged in fax broadcasting?
25       A   No.

Page 22

1        Q   When you elected to try fax.com's services, did
2    you have to get authority from anyone else to do that?
3        A   Yes.
4        Q   Who did you have to get authority from?
5        A   Kirk Redding.
6        Q   Can you spell his last name?
7        A   R-e-d-d-i-n-g.
8        Q   What was Mr. Redding's position?
9        A   President of central operations.
10       Q   What did you tell Mr. Redding about fax.com?
11       A   I basically described their services, and the
12   experience that Mr. Harrel had with them.
13       Q   What did Mr. Redding say to you, if anything,
14   about fax.com?
15       A   You know, I don't recall.
16       Q   Do you recall if you provided him with anything
17   in writing before discussing this issue?
18       A   At the time?  I'm sorry.
19       Q   You said you had to go to Mr. Redding to get
20   authority to engage fax.com's services.
21       A   Yes.
22       Q   Did you do this in writing?
23       A   No.
24       Q   It was simply a conversation?
25       A   Yes.

Page 23

1        Q   Was it in person or over the telephone?
2        A   In person.
3        Q   Was anyone else involved in that conversation?
4        A   No.
5        Q   And after that meeting I take it you received
6    authorization to engage fax.com?
7        A   I believe we received a contract.
8        Q   But Mr. Redding authorized you to engage
9    fax.com; is that correct?
10       A   Yes.
11       Q   Did he do so in writing?
12       A   No.
13       Q   Again, it was simply an in-person conversation?
14       A   Correct.
15       Q   And after that meeting did you document the
16   nature of that meeting in any fashion?
17       A   No.
18       Q   Do you know if he did?
19       A   I don't know.
20       Q   After you got authorization from Mr. Redding,
21   what happened next?
22       A   I believe they sent over a contract.
23       Q   Fair enough.
24       Mr. Nese, I'm going to hand to the court
25   reporter what will be marked as Exhibit number 1.  And I

Page 24

6 (Pages 21 to 24)

| | |
|---|---|
| 1  will let the reporter mark that, and then I'll identify | 1   A   Yes. |
| 2  it on the record. | 2   Q   What is that notation? |
| 3       (Defendant Exhibit 1 was marked for | 3   A   My initials. |
| 4       identification by the court reporter.) | 4   Q   On the second page there is another notation |
| 5  BY MR. CUNNINGHAM: | 5  which is identified as paragraph 14. Do you see that? |
| 6   Q   Mr. Nese, I'm going to hand you a document that | 6   A   Yes. |
| 7  has been marked as Exhibit number 1. This is a | 7   Q   Again is that your handwriting? |
| 8  three-page document. The first page bears the date March | 8   A   Yes. |
| 9  14, 2002. And it appears to be a fax cover sheet from | 9   Q   And are those your initials at the end? |
| 10  fax.com to Frank Nese, and the next two pages consist of | 10   A   Yes. |
| 11  an attachment that bears the title Fax Broadcasting | 11   Q   Is this the only fax broadcasting agreement that |
| 12  Agreement. | 12  you ever executed with fax.com? |
| 13       Why don't you take a minute to look at that. | 13   A   Yes, that I'm aware of. |
| 14  You don't need to read through the contract unless you | 14   Q   Okay. You told us that at some point they sent |
| 15  want to or unless your counsel wants you to. | 15  a contract over to you; is that right? |
| 16   A   Well, if you're going ask me about a specific | 16   A   Yes. |
| 17  portion, I'll read through it. | 17   Q   Is this, in fact, that contract? |
| 18   Q   How about I start with the general questions, | 18   A   It could be. |
| 19  and if, in fact, you feel the need to read a specific | 19   Q   Do you know that it is? |
| 20  provision, by all means you're welcome to. | 20   A   I would assume so. |
| 21   A   Very good. | 21   Q   Okay. The handwritten notations reflect changes |
| 22   Q   Let's start with the attachment. You would | 22  to the agreement that you proposed; is that correct? |
| 23  agree that the title on that document is Fax Broadcasting | 23   A   Yes. |
| 24  Agreement? | 24   Q   And is it your understanding that fax.com agreed |
| 25   A   That's what it says. | 25  to your proposed changes? |
| Page 25 | Page 27 |

| | |
|---|---|
| 1   Q   And the date provided in the first sentence is | 1   A   Yes. |
| 2  June 7, 2001; is that right? | 2   Q   With whom were you discussing this contract with |
| 3   A   Yes. | 3  at fax.com? |
| 4   Q   Sitting here today, do you recall this document? | 4   A   Mr. Frapier. |
| 5   A   Do I recall seeing it? | 5   Q   Were you discussing this with anyone else? |
| 6   Q   Yes. | 6   A   Mr. Redding. |
| 7   A   Vaguely. | 7   Q   Anyone else? |
| 8   Q   Okay. On the second page there is a signature | 8   A   No. |
| 9  at the bottom. Do you see that? | 9   Q   In June of 2001 did New Century have a legal |
| 10   A   Yes. | 10  department? |
| 11   Q   Is that your signature? | 11   A   I'm sure they did. |
| 12   A   Yes. | 12   Q   Did you consult the legal department -- I'm |
| 13   Q   And on both pages there appears to be some | 13  sorry. In June of 2001 did you consult the legal |
| 14  handwriting. Do you see that? | 14  department about this contract? |
| 15   A   I do. | 15   A   No. |
| 16   Q   Why don't we focus on the handwriting on the | 16   MR. LITTLE: That's a yes-or-no question. |
| 17  first page of the attachment, which bears the Bates | 17   THE WITNESS: No. |
| 18  number NCMC00023. | 18  BY MR. CUNNINGHAM: |
| 19       Do you see the handwritten words or other terms | 19   Q   Who is Jeffrey Dupree? |
| 20  as agreed? | 20   A   I don't know. |
| 21   A   Yes. | 21   Q   I'd like to direct your attention to paragraph |
| 22   Q   Is that your handwriting? | 22  number 3. The heading of that paragraph is "Use of the |
| 23   A   Yes. | 23  Services with Seller's Fax Data." |
| 24   Q   And there's a notation of the word "agreed." Do | 24       Do you see that? |
| 25  you see that? | 25   A   Yes. |
| Page 26 | Page 28 |

1    Q  Do you recall if you used fax.com's fax data?
2    A  Yes.
3    Q  It's true, then, that you didn't provide fax
4  numbers to fax.com?
5    A  No, we did not.
6    Q  Okay.  You did not provide customer lists to
7  fax.com?
8    A  No.
9    Q  That was a poorly phrased question.
10    Is it true that you did not provide customer
11  lists to fax.com?
12    A  I thought that's what you asked me.  But we did
13  not provide customer lists to fax.com.
14    Q  Thank you.  Do you recall if anyone from fax.com
15  ever signed this agreement?
16    A  I don't recall.
17    Q  But it appears that you ultimately engaged
18  fax.com's services; is that correct?
19    A  Yes.
20    MR. LITTLE:  Just so we're clear.  Did Century
21  engage fax.com's services?
22    MR. CUNNINGHAM:  Correct.  That's what I meant.
23    Q  Let's look at the cover page of Exhibit number
24  1.  It's dated March 14 of 2002, correct?
25    A  Yes.

Page 29

1    Q  It's from Keri Valliere.  Do you recall who that
2  person is?
3    A  No.
4    Q  The text of the first and only paragraph says,
5  "Frank, I misunderstood what contract Frank was talking
6  about.  Here is the correct information please disregard
7  the previous fax."
8    Do you see that?
9    A  Yes.
10    Q  Do you recall what the previous fax was?
11    A  No.
12    Q  Do you recall why in March of 2002 you were
13  asking for the Fax Broadcasting Agreement that you
14  apparently had signed in June of 2001?
15    A  Possibly we didn't have a copy of it.  I don't
16  recall.
17    Q  Do you recall what you did with the contract
18  after you signed it?
19    A  I gave it to my assistant.
20    Q  And what was your assistant's name?
21    A  At that time it was Denny Bira.
22    Q  And what did Denny do with the agreement, if you
23  know?
24    A  I don't know.
25    Q  Do you know if you ever asked your assistant to

Page 30

1  set up a separate file to contain documents regarding
2  fax.com?
3    A  I don't recall.
4    MR. CUNNINGHAM:  Number 2, please.
5    (Defendant Exhibit 2 was marked for
6    identification by the court reporter.)
7  BY MR. CUNNINGHAM:
8    Q  Mr. Nese, I have handed you a document that has
9  been marked as Exhibit number 2.  This is a two-page
10  document bearing the Bates numbers NCMC00030 through 31.
11  And I would ask you to take a second to look at that.
12    Have you had a chance to look at Exhibit number
13  2?
14    A  Yes.
15    Q  Do you recall ever having seen Exhibit number 2
16  before?
17    A  No.
18    Q  Do you recall that this is the type of document
19  that you would have received in conjunction with your
20  interaction with fax.com?
21    A  Yes.
22    Q  And is this a document that you would have
23  received on or around June 7, 2001?
24    MR. LITTLE:  Calls for speculation.
25    THE WITNESS:  I don't know.

Page 31

1  BY MR. CUNNINGHAM:
2    Q  Do you see the date in the bottom right-hand
3  corner of the document?
4    A  Yes,
5    Q  What is the date there?
6    A  June 7th, 2001.
7    Q  Do you have any reason to doubt that you
8  received this document, Exhibit number 2, on or about
9  June 7, 2001?
10    A  Yes.
11    Q  And what is the reason for that doubt?
12    A  I just don't recall.  I don't recall receiving
13  it on that specific day.
14    Q  Okay.  You're not affirmatively saying you
15  didn't get it, you're saying you don't know?  If that's
16  not correct, tell me that I'm wrong.
17    A  I don't know whether I received this or not.
18    Q  Fair enough.  In the table in the upper half of
19  Exhibit number 1 under the heading "special information,"
20  there is a reference to the "week of 6/11."  Do you see
21  that?
22    A  Yes.
23    Q  Do you believe that this was the first time that
24  you had engaged fax.com's services on behalf of New
25  Century?

Page 32

8 (Pages 29 to 32)

1    MR. LITTLE: Objection. That assumes facts not in
2    evidence. He's already testified he doesn't recall
3    receiving the document.
4        You can go ahead and answer the question if you
5    understand it.
6        THE WITNESS: I'm sorry. Can you say that again?
7    BY MR. CUNNINGHAM:
8        Q    I think you indicated that you generally
9    recalled receiving Exhibit number 1?
10       A    I don't recall receiving the exhibit. I recall
11   this looking like a document that fax.com would use to
12   engage its services.
13       Q    And when you say yes, you're referring to
14   Exhibit number 2; is that right?
15       A    No, I'm referring to -- oh, yeah, Exhibit 2,
16   page 1.
17       Q    And a moment ago when we were talking about the
18   first exhibit that I showed you, I think you said that
19   you generally recognized Exhibit number 1, which is the
20   Fax Broadcasting Agreement; is that right?
21       A    Yes.
22       Q    And the date of that is June of 2001; is that
23   right?
24       A    Yes.
25       Q    What I'm trying to confirm is that you would not

Page 33

1    have retained fax.com's services on behalf of New Century
2    before the dates reflected in these documents?
3        A    That's fair to say.
4        Q    Okay. Getting back to the table in Exhibit
5    number 2, do you see the reference to 200,000 block
6    units?
7        A    Yes.
8        Q    Do you know what that refers to?
9        A    I believe it's the number of faxes that they
10   would send.
11       Q    Who suggested 200,000?
12       A    It was probably Mr. Rapier. And just to correct
13   something. I misspelled his name. It's actually,
14   F-r-a-p-p-i-e-r.
15       Q    Thank you. The table also includes some
16   references to rates. Do you see those?
17       A    Yes.
18       Q    Was there any negotiation of the rates to be
19   charged for fax.com's services?
20       A    Yes.
21       Q    Were you involved in those negotiations?
22       A    Yes.
23       Q    What do you remember about those negotiations?
24       A    I got the price much lower.
25       Q    How much lower?

Page 34

1        A    I don't recall.
2        MR. LITTLE: Good job.
3        THE WITNESS: That's your job as the marketing guy
4    to get the best price for the company.
5    BY MR. CUNNINGHAM:
6        Q    Certainly. And it looks like the price that you
7    got here was $15,000 for the first batch of faxes; is
8    that correct?
9        MR. LITTLE: Assumes facts not in evidence.
10       THE WITNESS: This is reflecting -- well, it says
11   that.
12   BY MR. CUNNINGHAM:
13       Q    It says $15,000?
14       A    Yes.
15       Q    Do you recall that $15,000 is roughly the amount
16   that you paid for the first batch of faxes?
17       MR. LITTLE: Assume facts not in evidence. It
18   assumes that there was money paid for -- it assumes there
19   was a first batch of faxes, and it assumes that there was
20   money paid.
21   BY MR. CUNNINGHAM:
22       Q    Sure. I'm sorry. Did you answer?
23       MR. LITTLE: Counsel, why don't rephrase your
24   question.
25   BY MR. CUNNINGHAM:

Page 35

1        Q    Okay. Do you recall that $15,000 was the amount
2    that you paid for the fax broadcasting services reflected
3    in Exhibit number 2?
4        A    No.
5        Q    What do you recall about the price that you
6    paid?
7        MR. LITTLE: Again, assumes facts not in evidence.
8    It presumes that there was money paid.
9    BY MR. CUNNINGHAM:
10       Q    You can answer.
11       A    I don't recall the $15,000 number. As I recall,
12   I was negotiating the rate per unit.
13       Q    Do you remember anything about the total price?
14       A    No.
15       Q    Did you have to get authority regarding price
16   from Mr. Redding?
17       A    Yes.
18       Q    Did that require a second conversation with
19   Mr. Redding?
20       A    Mr. Redding. And I reported to him. And we
21   were in the same building. And we had multiple
22   conversations. I don't recall if there was a second and
23   there was a third or how many.
24       Q    You had told us about your initial conversation
25   with Mr. Redding regarding fax.com in which he authorized

Page 36

Esquire Deposition Services
949.440.7000

1  you to engage their services.
2      With regard to price, was price discussed in
3  that initial conversation, or was it at a subsequent
4  time?
5      A  I don't recall.
6      Q  Turning to the next page of Exhibit number 2,
7  have you seen that page before?
8      A  Yes.
9      Q  Is that the fax that you, in fact, engaged
10 fax.com to transmit?
11     A  Yes.
12     Q  And is this the fax that you engaged them to
13 transmit in June of 2001?
14     MR. LITTLE:  Objection.  Assume facts not in
15 evidence.  He hasn't testified that anything was faxed in
16 June 2001.
17     MR. CUNNINGHAM:  That's what I'm asking you, is this
18 the fax.
19     MR. LITTLE:  No.  You haven't ask him whether
20 anything was faxed in 2001.
21 BY MR. CUNNINGHAM:
22     Q  Was this the contract -- I'm sorry.  Was this
23 the fax that you engaged fax.com to transmit in 2001?
24     MR. LITTLE:  Again, assumes facts not in evidence.
25 BY MR. CUNNINGHAM:

Page 37

1      Q  You can answer.
2      A  I'm sorry.  Maybe we can just go back.
3      Q  Certainly.  You entered into a contract with
4  fax.com in 2001.  We've established that.
5      A  Yes.
6      Q  Is this the facsimile that you asked them to
7  transmit on your behalf?
8      A  This is a copy of what they prepared.
9      Q  Okay.  And is this what they prepared in 2001?
10     A  I don't recall.
11     MR. LITTLE:  Objection.  Calls for speculation.
12 BY MR. CUNNINGHAM:
13     Q  Do you know when this page was prepared?
14     A  No.
15     Q  What role, if any, did you play in the
16 preparation of this document?
17     A  Providing copy points and information related to
18 customer base.
19     Q  Did you provide the words that are reflected in
20 this page?
21     A  No.
22     Q  Who provided the words?
23     A  Fax.com.
24     Q  Who at fax.com did that?
25     A  I don't know.

Page 38

1      Q  Did you have to sign off on the words that they
2  eventually provided to you?
3      A  I don't recall.
4      Q  Who provided the images that are reflected on
5  this document?  And by images, I'm distinguishing the
6  words.
7      A  The graphics you're referring to?
8      Q  Exactly.
9      A  Fax.com.
10     Q  Did you have to approve the graphics that are on
11 this page?
12     A  I'm sorry.
13     Q  I think you just told us that the graphics were
14 provided by fax.com; is that correct?
15     A  Yes.
16     Q  Did you have to consent to the use of those
17 graphics?
18     A  Yes.
19     Q  Did you have to get Mr. Redding's approval for
20 the words and graphics contained on this page?
21     A  Yes.
22     Q  And did he, in fact, sign off on the use of
23 these words and graphics?
24     A  He approved them.
25     Q  Do you know if any written documentation was

Page 39

1  made reflecting that approval?
2      A  I don't know.
3      Q  At the bottom of the page there's some
4  handwriting that says New Century Mortgage and then
5  there's a date.
6      A  Yes.
7      Q  Is that your handwriting?
8      A  No.
9      Q  Do you know whose handwriting that is?
10     A  No.
11     Q  Mr. Nese, do you recall that shortly after you
12 signed the contract with fax.com that they, in fact,
13 provided you with fax broadcasting services?
14     A  No.
15     Q  What do you recall about when fax.com first
16 provided New Century Mortgage with fax broadcasting
17 services?
18     A  I would say it was -- I mean the only fax
19 services I recall are the ones that happened in February.
20     Q  Okay.  The document that we've been looking at
21 purports to suggest -- or strike that.
22     The document that we've been looking at is dated
23 June of 2001; is that right?
24     A  Yes.
25     Q  And the contract that you signed was July of

Page 40

10 (Pages 37 to 40)

1  2001; is that correct?
2      A  Yes.
3      Q  Is it your testimony that there was some delay
4  in time before fax transmission services were actually
5  engaged?
6      A  Yes.
7      Q  And why did that delay occur?
8      A  Well, again, this was very, very -- this was
9  very small in the context of, you know, operating a
10 marketing department.  And, you know, usually the reason
11 for the delays are just because you don't have people to
12 get everything lined up.  We were working on other things
13 at the time.
14     And you're right about, you know, about seeing
15 the document, because as you can see here, this says
16 6/11.
17     Q  Right.
18     A  And then down below it says 6/13, so, you know,
19 there's a difference.  So possibly, you know, they were
20 going back and forth about --
21     MR. LITTLE:  Okay.  We're not going to ask you to
22 speculate.
23     THE WITNESS:  I don't know.
24 BY MR. CUNNINGHAM:
25     Q  Mr. Nese, you agree that the first page

Page 41

1  indicates the week of 6/11; is that correct?
2      A  Yes.
3      Q  And the handwriting at the bottom refers to a
4  more specific date which is 6/13; is that correct?
5      A  Yes.
6      Q  And you would agree that June 13th is during the
7  week of June 11th?
8      A  Yes, but I didn't sign the document.
9      Q  I understand that.  We're going to move on
10 temporarily to Exhibit number 3.
11     (Defendant Exhibit 3 was marked for
12     identification by the court reporter.)
13 BY MR. CUNNINGHAM:
14     Q  Exhibit number 3 is a one-page document bearing
15 the title "Accounts Payable Check Request."  And the
16 Bates number is NCMC00029.
17     Please take a look at that.
18     Have you had a chance to look at this document?
19     A  Yes.
20     Q  And you would agree that it's an accounts
21 payable check request?
22     A  Yes.
23     Q  Is this the type of document that you completed
24 in the regular course of business at New Century
25 Mortgage?

Page 42

1      A  Yes.
2      Q  It was your job to fill out documents like this?
3      A  No.
4      Q  But you did it nonetheless?
5      A  I didn't fill the document out.
6      Q  Okay.  Who filled out the document?
7      A  Jo Beth Montoya.
8      Q  And do you know who that is?
9      A  Yes.
10     Q  Who is Joe Beth Montoya?
11     A  Joe Beth Montoya reported to Kirk.
12     Q  Tell us Kirk's last name?
13     A  Redding.
14     Q  Okay.  What was Joe Beth Montoya's position?
15     A  She did a number of things.  But managing
16 accounts payable and HR were her primary
17 responsibilities.
18     Q  Does this document bear your signature?
19     A  Yes.
20     Q  And it says that at the time that you signed
21 this you were the senior vice president; is that right?
22     A  Yes.
23     Q  And what's the date of this document?
24     A  6/8/01.
25     Q  June 8th of 2001?

Page 43

1      A  Yes.
2      Q  In this document you were asking -- you were
3  asking your company to issue a check in the amount of
4  $15,000 to fax.com; is that correct?
5      A  Yes.
6      Q  Why was it that on June 8th of 2001 you asked
7  your company to issue a check for $15,000 to fax.com?
8      A  As I recall, they had to be paid in advance.
9      Q  For what?
10     A  For their services.
11     Q  So you paid them in June?
12     A  I don't know.
13     Q  I'm sorry.  You paid them in June of 2001 for
14 their fax broadcasting services?
15     A  I don't know.
16     Q  Why then would you have been issuing a document
17 such as this?
18     A  Well, we may have prepared the document and not
19 elected to proceed with their services, so --
20     Q  Are you saying that that is, in fact, what
21 happened?
22     A  I don't know.
23     Q  You don't know if they were paid in June of
24 2001?
25     A  I don't know.

Page 44

11 (Pages 41 to 44)

1    Q   You don't know if they performed fax services in
2 June of 2001?
3    A   I don't know.
4    Q   Okay.  Do you know if they performed fax
5 services at any point in 2001?
6    A   I don't know.
7    Q   Do you see that the document indicates that the
8 check was needed by June 11th, 2001?
9    A   Yes.
10    Q   Do you recall why the check was needed by June
11 11th, 2001?
12    A   I don't recall.
13    Q   You agree that $15,000 is the amount that was
14 previously indicated in Exhibit number 2; is that
15 correct?
16    A   Yes.
17    Q   Getting back to Exhibit number 2, we were
18 talking about the words and graphics on the fax.
19       In the middle of the document it indicates a
20 telephone number, which is 800 205-9422.
21       Do you see that?
22    A   Yes.
23    Q   Is that a phone number that you provided to
24 fax.com?
25    A   I don't know.

Page 45

1    Q   Do you know who provided that to fax.com, if
2 anyone?
3    A   I don't know.
4    Q   Do you recall if that is a phone number
5 established by New Century Mortgage Corporation?
6    A   I don't know.
7    Q   Is it possible that it wasn't a New Century
8 number?
9    A   I don't think so.
10    Q   Okay.  Was this facsimile sent in conjunction
11 with a larger advertising campaign?
12    MR. LITTLE:  Objection.  Assumes facts not in
13 evidence.  Assumes that this was sent.
14    THE WITNESS:  I don't know.
15 BY MR. CUNNINGHAM:
16    Q   Do you recall if you ever engaged other types of
17 advertising which reflects the services advertised in
18 this fax?  That was a bad question.  Let me start that
19 over.
20    A   Okay.
21    Q   In the course of advertising your company's
22 products or services, is there ever an occasion when you
23 engage different media at the same time to advertise the
24 same service or product?
25    A   Yes.

Page 46

1    Q   And was there ever a time when you utilized fax
2 advertising along with advertising on some other medium?
3    A   Doing them in conjunction with one another?
4    Q   Correct.
5    A   No.
6    Q   Okay.  So this would not have been done in
7 conjunction with, for example, a newspaper advertisement?
8    A   It would not have been.
9    Q   Or a television advertisement?
10    A   It would not have been.
11    Q   Or a direct mail advertisement?
12    A   It would not have been.
13    Q   And you seem certain that it would not have
14 been.  Why is that?
15    A   Because it was so small, and we were just
16 testing.
17    Q   Okay.  In order -- strike that.
18       Was it your responsibility to make sure that
19 there was somebody available to answer this phone number
20 if anybody called?
21    A   Yes.
22    Q   And how did you go about fulfilling that
23 responsibility?
24    A   Well, we had a group of customer service
25 representatives that answered all calls from all

Page 47

1 marketing channels.
2    Q   Where were they located?
3    A   At 340 Commerce Center, Irvine.
4    Q   And this is a telephone number that would have
5 directed the caller to that center; is that correct?
6    A   It should have.
7    Q   Is this the only phone number that would have
8 directed the caller to that center?
9    A   No.
10    Q   Did New Century have many different telephone
11 numbers?
12    A   Yes.
13    Q   And did it have many different 800 telephone
14 numbers?
15    A   Yes.
16    Q   Why was that?
17    A   So you could track the results of a particular
18 campaign and know the reason why the customer was
19 calling.
20    Q   Why would you want to track the results of a
21 particular campaign?
22    A   To determine if it worked or not.
23    Q   Is this a phone number that was used only in
24 conjunction with facsimile advertising?
25    A   I don't know.

Page 48

12 (Pages 45 to 48)

1    Q   Who would know that?
2    A   I don't know. Because at the time we had many
3    800 numbers, and we would frequently recycle them. And I
4    just don't know.
5        MR. LITTLE: If you don't know, you don't know. You
6    don't have to explain it.
7    BY MR. CUNNINGHAM:
8    Q   Would you ever get a report reflecting the
9    number of calls made to a particular 800 number?
10   A   No. I may have. But I look at our calls in
11   aggregate.
12   Q   How would you go about doing that?
13   A   Looking on the phone system.
14   Q   This is something you were able to do by
15   computer; is that correct?
16   A   Yes.
17   Q   And if you had wanted to, would you have been
18   able to determine how many telephone calls were made to
19   this phone number?
20   A   If I wanted to.
21   Q   And would you also have been able to determine
22   the date that those calls were made?
23   A   Yes.
24   Q   What else could you determine?
25   A   Average talk time. There's a variety of call

Page 49

1    aggregate, not necessarily on, you know, a particular 800
2    number.
3    Q   How would you go about judging the effectiveness
4    of a particular advertising campaign?
5    A   Take the amount of money that we spent for the
6    campaign, divide it by the number of calls produced by
7    that source.
8    Q   Do you know if that type of analysis was ever
9    conducted with regard to a fax advertising campaign?
10   A   I don't know. I don't know.
11   Q   If I wanted to determine if such an analysis had
12   been made, how would you go about doing that?
13   A   Well, again, you know, at the time the marketing
14   department was, you know, quite immature. We weren't
15   sophisticated as you might think.
16       So when I say I looked at the calls in
17   aggregate, I would just look at the total amount of money
18   that we spent divided by the amount of marketing calls
19   generated and that gets you a cost per call.
20       And if it's acceptable, great. If it's not,
21   then that's why you test various different things.
22   Q   Okay. Was there a particular audience that you
23   were attempting to target with this facsimile?
24   A   Homeowners.
25   Q   And was your target audience any more specific

Page 51

1    center statistics, and I'll be happy to go through them.
2    Q   Please do.
3    A   Number of calls, agents answered, average time
4    of call, number of rings before answered, number of rings
5    no answer is when it rings to an agent and they don't
6    pick it up. Number of extended calls, the number of
7    telephone calls directly to that person's direct line.
8    Number of outbound calls made. Those are generally the
9    sort of things I would look at.
10   Q   Fair enough.
11   A   Oh, number of abandoned calls. That's the most
12   important one.
13   Q   What is an abandoned call?
14   A   That is when a caller, they're on hold, and they
15   hang up before speaking to an agent.
16   Q   Okay. And you just gave us a list of different
17   types of information that you could obtain.
18       Could you obtain that information for each 800
19   number that New Century Mortgage maintained?
20   A   We didn't have the system set up that way.
21   Q   Okay. How was the system set up?
22   A   The system was set up to route from a variety of
23   800 numbers to a group of agents that would answer the
24   telephone. And then, you know, it just reviews
25   operations. It would look at our statistics in

Page 50

1    than that?
2    A   People -- New Century's customers typically have
3    credit blemishes. So people with credit blemishes,
4    homeowners with credit blemishes.
5    Q   Okay. Did you tell fax.com that that is the
6    target audience that you wanted to receive the fax?
7    A   Yes.
8    Q   What else did you tell them about the target
9    audience?
10   A   I didn't have to tell him very much more because
11   he was familiar with the mortgage business.
12   Q   Okay. But was there anything else that you told
13   him?
14   A   I don't recall.
15   Q   How was it that he was familiar with the
16   mortgage business?
17   A   He didn't work for Mr. Harrel. He referred him
18   to me.
19   Q   I see. And you're referring to Mr. Frappier?
20   A   Frappier, yes.
21   Q   Okay. Is it true that you were not trying to
22   target just your prior customers with this advertisement?
23   A   That's true.
24   Q   Did Mr. Frappier tell you how he would go about
25   targeting homeowners with credit blemishes?

Page 52

13 (Pages 49 to 52)

1    A  I don't recall.

2    Q  Did you ask him how he knew what numbers to fax
3  this advertisement to?

4    A  No.

5    Q  Did you ask him how many fax numbers he was
6  capable of transmitting to?

7    A  Yes.

8    Q  What did you ask him about that issue?

9    A  I asked him that exact question.

10    Q  And what did he say?

11    A  Tens of millions.  I don't recall the exact
12  number.  But it was in the tens of millions.

13    Q  And did he offer you any explanation as to how
14  he could narrow the tens of millions down to the people
15  who are homeowners who have credit blemishes?

16    A  No.

17    Q  Did you say anything to him about the types of
18  people that you would like not to receive this facsimile?

19    A  I don't recall.

20    Q  Towards the bottom of the page there's a
21  sentence that says "To have your number removed from our
22  database, please call our automated toll-free center at
23  800-443-6728."

24      Do you see that reference?

25    A  Yes.

Page 53

1    Q  Is that phone number a New Century Mortgage
2  phone number?

3    A  No.

4    Q  Is that a fax.com phone number?

5    A  I believe so.

6    Q  Why do you believe that?

7    A  Because the number, if someone wanted to opt out
8  of fax.com's database, they had to call fax.com.

9    Q  Why was this sentence included in the fax?

10    A  So if people didn't want to, if people didn't
11  want to receive them, they could opt out.

12    Q  Did you have an understanding at the time that
13  the advertisement was faxed that people might not want to
14  receive them?

15    A  I don't know.

16    Q  Did you understand at the time that that's why
17  that sentence was included in your advertisement?

18    A  I assume so.

19    Q  Okay.  Why is it that someone might not have
20  wanted to receive a facsimile like this?

21    A  For the same reasons that people opt out of, you
22  know, being telemarketed.  They don't want a
23  solicitation.  They don't want a call at dinner time.

24    Q  You understood that at the time that you were
25  engaging fax.com to perform services for you; is that

Page 54

1  correct?

2    A  I'm sorry.  I'm just not sure where we're going.
3  I understand some people don't want to receive certain
4  types of advertising.

5    Q  And you understood that at the time that you
6  were engaging fax.com; is that correct?

7    A  Yes.

8    Q  You understood that some people might not want
9  to receive an advertisement over their facsimile machine;
10  is that correct?

11    A  As I understand some people don't want to
12  receive a piece of mail in their mailbox.

13    Q  Does that mean yes?

14    A  Yes.

15    Q  Okay.  Do you know if you made any revisions to
16  the fax advertisement in question?

17    A  I don't recall.

18    Q  Was anybody else involved in approving the words
19  and images reflected here?

20    A  Myself and Mr. Redding.

21    Q  Anybody else?

22    A  No.

23    Q  Do you recall what input, if any, Mr. Redding
24  offered?

25    A  I don't recall specifically.

Page 55

1    Q  Did you discuss this document -- strike that.

2    MR. CUNNINGHAM:  Number 4.

3      (Defendant Exhibit 4 was marked for
4      identification by the court reporter.)

5  BY MR. CUNNINGHAM:

6    Q  Mr. Nese, I've handed you what has been marked
7  as Exhibit number 4, which is a document bearing the
8  title, "Artwork Layout Approval."  And I would ask you to
9  take a look at that.

10    A  Okay.

11    Q  Have you seen this document before?

12    A  I don't recall.

13    Q  Does this document bear your signature?

14    A  Yes.

15    Q  And the signature is next to the date, February
16  15 of 2002; is that right?

17    A  Yes.

18    Q  Next to the word "artwork description," someone
19  has written in "same ad."  Do you see that?

20    A  Yes.

21    Q  Is that your handwriting?

22    A  No.

23    Q  Whose handwriting is that?

24    A  I don't know.

25    Q  And that notation is also dated February 15 of

Page 56

14 (Pages 53 to 56)

1  2002; is that right?
2     A  Yes.
3     Q  Do you know what the reference to "same ad"
4  meant in March of 2002?
5     A  I have no idea.
6     Q  Below that there is a handwritten notation,
7  "Approved subject to 800 number being operational."
8        Do you see that?
9     A  Yes.
10    Q  Is that your handwriting?
11    A  Yes.
12    Q  That's your handwriting, but you don't think the
13  handwriting above that is yours?
14    A  The handwriting above it is definitely not.  I
15  print in all capitals.
16    Q  Okay.  What does "Approved subject to 800 number
17  being operational" mean?
18    A  That means we would have had to test the 800
19  number to make sure that the calls would come through to
20  the call center.
21    Q  And this was the 800 number that you were
22  setting up; is that right?
23    A  I wasn't setting it up.
24    Q  Your company was?
25    A  Yes.

Page 57

1     Q  At the top of the document it indicate that it's
2  from Anthony.
3     A  It does.
4     Q  Do you know who Anthony was?
5     A  No.
6     Q  In February of 2002, how did fax.com know what
7  advertisement to fax on your behalf?
8     A  I don't know.
9     Q  Is it possible that they had already received a
10 fax advertisement from you by then?
11    A  No.  I think it's possible that --
12    MR. LITTLE:  It's a yes-or-no question.
13    THE WITNESS:  I'm sorry.  Ask it again.
14    MR. CUNNINGHAM:  Can you read that back, please?
15    (Record read.)
16    THE WITNESS:  I don't know.
17    MR. LITTLE:  Counsel, can we go off the record for a
18 second?
19    MR. CUNNINGHAM:  You bet.
20    (Discussion off the record.)
21    (Recess taken.)
22    MR. CUNNINGHAM:  Back on the record.
23    MR. CUNNINGHAM:  Mr. Nese, I've handed you Exhibit
24 number 5, which is a document bearing the title, "Fax
25 Broadcasting Sales Order."  And I would ask you to

Page 58

1  briefly take a look at that.
2     A  Okay.
3        (Defendant Exhibit 5 was marked for
4        identification by the court reporter.)
5  BY MR. CUNNINGHMAM:
6     Q  My only question about this one is is that your
7  signature?
8     A  Yes.
9     Q  Thank you.
10       (Defendant Exhibit 6 was marked for
11       identification by the court reporter.)
12 BY MR. CUNNINGHAM:
13    Q  Now, I'm handing you Exhibit number 6.  This is
14 a one-page document bearing the Bates number NCMC00025,
15 and I would ask you to take a look at that.
16    A  Okay.
17    Q  Have you ever seen that document before?
18    A  I don't recall.
19    Q  Is there anything unique about the cities
20 identified in the left-hand column that would allow you
21 to tell us what this document was used for?
22    A  The only unique thing is that all the cities are
23 in California.
24    Q  Was there a times when you engaged in an
25 advertising campaign that focused only on cities in

Page 59

1  California?
2     A  At all time we try to generate business from
3  California as a state in whole, not a particular city.
4     Q  So you never would have -- strike that.
5        Would you ever focus specifically only on
6  California?
7     A  No.
8     Q  Okay.  There are some numbers written on the
9  right-hand side.  Is that your handwriting?
10    A  Yes.
11    Q  Do you know what those numbers represent?
12    A  No.
13    Q  Do you know what MSA stands for?
14    A  That is a Metropolitan Statistical Area.
15    Q  Do MSAs have any particular importance in the
16 marketing business?
17    A  Yes.
18    Q  What is that importance?
19    A  An MSA description is just a designator for a
20 particular area.
21       From a marketing perspective the country is
22 divvied up into these MSAs.  And some of which you see
23 there.
24    Q  Okay.
25    //

Page 60

15 (Pages 57 to 60)

1    (Defendant Exhibit 7 was marked for
2    identification by the court reporter.)
3    BY MR. CUNNINGHAM:
4    Q   Mr. Nese, Exhibit Number 7 is a multi-page
5    exhibit. The first page has the caption from the case
6    Paul Bernstein versus New Century Mortgage Corporation in
7    Cook County, Illinois.
8        You're welcome to page through it, but I'm going
9    to ask you a specific question about something on page 3.
10   A   Okay.
11   Q   Just by way of background, Mr. Nese, I'll inform
12   you that this is a document that New Century's attorneys
13   submitted in a related litigation in Cook County,
14   Illinois.
15       In this type of document your company was
16   answering questions posed by the opposing party. And
17   there's a reference at the bottom of the page, where the
18   document says, "Without waiving this objection, New
19   Century produces copies of the front of the checks it
20   issued to pay for two of the orders it placed with
21   Fax.com and investigation continues as to the check
22   issued to pay for the first order."
23       Do you see that reference?
24   A   Yes.
25   Q   Were you involved in the investigation for the

Page 61

1    And, for the record, I'll state that the
2    attachment to this is a letter from the office of the
3    attorney general from the state of Florida to New Century
4    Mortgage Company.
5        Have you seen either of these two documents
6    before?
7    A   I don't recall.
8    Q   Do you recall ever being told that the office of
9    the attorney general of the state of Florida had asserted
10   a complaint about fax advertising activities?
11   A   No.
12   Q   Is it true that on the first page you are
13   indicated as a cc recipient of this document?
14   A   Yes.
15   Q   Do you know you were included as a cc recipient?
16   MR. LITTLE: Objection. Calls for speculation.
17   THE WITNESS: I don't know.
18   BY MR. CUNNINGHAM:
19   Q   Who was Joseph Waltuch?
20   A   One of our attorneys, one of New Century's
21   attorneys.
22   Q   Did you ever talk to Joseph Waltuch about fax
23   advertising?
24   MR. LITTLE: This is a yes-or-no question.
25   THE WITNESS: I don't recall.

Page 63

1    check used for the first order?
2    A   I don't recall.
3    Q   Do you recall who was involved in that
4    investigation?
5    A   No. It would probably be someone in accounts
6    payable.
7    Q   Okay. Do you recall if the check for the first
8    order was ever found?
9    A   I don't even know that there was a first order.
10   I don't know.
11   Q   Have you seen this document before?
12   A   I don't recall.
13   Q   Okay. The document says there was a first
14   order, right?
15   MR. LITTLE: The document speaks for itself. This
16   is a discovery response in another action.
17       Mr. Nese has already testified that he hasn't
18   seen the document before.
19       (Defendant Exhibit 8 was marked for
20   identification by the court reporter.)
21   BY MR. CUNNINGHAM:
22   Q   Exhibit number 8 is a two-page exhibit. The
23   first page of which is a letter from Joseph Waltuch,
24   W-a-l-t-u-c-h of New Century Mortgage, to Robert Buchner,
25   B-u-c-h-n-e-r.

Page 62

1    BY MR. CUNNINGHAM:
2    Q   Okay. Were you ever involved in any
3    communication with the attorney general of the state of
4    Florida regarding fax advertising?
5    A   No.
6    Q   Did anybody ever ask you if New Century Mortgage
7    faxed advertisement within the state of Florida?
8    A   I don't recall.
9    Q   The cover letter is not dated. The attachment
10   is May 29 of 2002.
11   A   That's what it says.
12   Q   I'm curious as to when the first time was that
13   you heard of a complaint asserted against New Century
14   Mortgage Company regarding the receipt of a fax
15   advertisement.
16   MR. LITTLE: Assumes facts not in evidence. Assumes
17   he's heard of any complaint.
18   THE WITNESS: I don't recall.
19   BY MR. CUNNINGHAM:
20   Q   Have you ever heard of a complaint asserted
21   against New Century regarding fax advertising?
22   A   Yes.
23   Q   When was the first time that you heard of that?
24   A   Well, with the Bernstein case.
25   Q   The filing of the Paul Bernstein action?

Page 64

16 (Pages 61 to 64)

1    A  Yes.
2    Q  Before the Bernstein action, had you heard of
3  any complaints asserted by recipients of fax
4  advertisements?
5    A  I don't recall.
6    Q  In the second paragraph of the letter the author
7  indicates the particular facsimile in question was
8  erroneously sent to that company, and we have taken
9  measures to correct this situation so that it will not
10  occur again.
11      Do you see that reference?
12    A  Yes.
13    Q  Do you know how New Century Mortgage Corporation
14  determined that the fax in question was erroneously sent?
15    A  No.
16    Q  Do you know who made that determination?
17    A  I don't.
18    Q  And it wasn't you; is that correct?
19    A  I don't know.
20    Q  The sentence also says, "We have taken measures
21  to correct this situation."  Do you see that?
22    A  Yes.
23    Q  Do you recall what those measures were?
24    A  No, I didn't prepare this.
25    Q  Recognizing that you didn't prepare the letter,

Page 65

1    A  Yes.
2    Q  How did you know it wasn't working?
3    A  We didn't have any loans from it.
4    Q  How do you know you didn't have any loans from
5  it?
6    A  Well, we'd have a report that would show
7  where -- which sources various loans came from.  You
8  know, unlike other businesses, you know, the mortgage
9  business, the sales cycle is 30 to 60 days.  So we don't
10  know for some time whether something has worked or not.
11    Q  Okay.  But you had access to some data which
12  would allow you, if your contact was created by virtue of
13  fax advertising?
14    A  Yes.
15    Q  Do you know at what point it was that you
16  concluded that this fax advertising was not working?
17    A  I don't recall.
18    Q  Do you know if New Century sold any loans at all
19  as a result of the fax advertising campaign?
20    A  I don't recall.
21      (Defendant Exhibit 9 was marked for
22      identification by the court reporter.)
23  BY MR. CUNNINGHAM:
24    Q  Exhibit number 9 is a multi-page exhibit.  The
25  first page of which is a letter dated July 1, 2002 from

Page 67

1  did there come a time when New Century Mortgage
2  Corporation took measures to correct the transmission of
3  fax advertisements?
4    A  I'm sorry.  Maybe I'm just not getting it.  I
5  don't know if they did or if they didn't.  I have no
6  idea.
7    Q  Okay.  There never came a time when you received
8  a directive from above telling you to cease and desist
9  all fax advertising activities?
10    A  As I recall, I mean we just didn't do it because
11  it didn't work very well.  At some later time I think a
12  directive did come down that did say that, but by that
13  time we weren't doing it.
14    Q  Do you know when that directive came down?
15    A  I don't recall.
16    Q  Do you know from whom that directive came?
17    A  I don't recall.
18    Q  Did that directive come in writing?
19    A  I don't recall, because we weren't doing it.  So
20  that's why, you know, a lot of this stuff -- again, this
21  was so small.
22    Q  Did you ever discuss that directive with anyone?
23    A  I don't recall.
24    Q  You said that the fax advertising wasn't
25  working; is that correct?

Page 66

1  Andrew L. Quiat, Q-u-i-a-t, to New Century Mortgage
2  Corporation.
3      Have you ever seen Exhibit number 9 before?
4    A  I don't recall.
5    Q  Did you ever come to learn that an attorney by
6  the name of Andrew L. Quiat had asserted a complaint
7  against New Century Mortgage Corporation?
8    A  No.
9    Q  Do you recall ever hearing that someone in
10  Colorado had asserted a complaint against New Century
11  Mortgage Corporation regarding fax advertising?
12    A  No.
13      (Defendant Exhibit 10 was marked for
14      identification by the court reporter.)
15  BY MR. CUNNINGHAM:
16    Q  The next exhibit is Exhibit number 10, which is
17  a letter from Joseph L. Waltuch of New Century to Andrew
18  L. Quiat.
19    A  Would you like me to read it?  Or if you're
20  going to ask me something about it, then I'll read it.
21    Q  You are indicated on the second page as being a
22  bcc.  And I'm going to ask you if you know why you were
23  indicated as a bcc?
24    A  I don't know.
25    Q  Do you recall ever discussing the claim asserted

Page 68

17 (Pages 65 to 68)

1  by Andrew Quiat with Joseph L. Waltuch?
2      A  No.
3      Q  Do you ever recall discussing any fax blasting
4  claims with Joseph L. Waltuch?
5      A  I don't recall.
6      Q  There is a paragraph in the document that starts
7  with the words, "I am sure." That has to do with the
8  constitutionality of the Telephone Consumer Protection
9  Act."
10         First of all, just by way of foundation, let me
11  ask you, have you ever heard of the Telephone Consumer
12  Protection Act?
13      A  Yes, I've heard of it.
14      Q  You are not an attorney; is that correct?
15      A  That's correct.
16      Q  You have never been to law school; is that
17  correct?
18      A  That's correct.
19      Q  When did you first hear of the Telephone
20  Consumer Protection Act?
21      A  I don't recall when it first was.
22      Q  Was it when you were working at New Century
23  Mortgage Company?
24      A  I don't recall.  It may well have been before
25  that, I don't recall.

Page 69

1  involved in that discussion?
2      A  I don't recall.
3      Q  And you said Mr. Frappier was involved in that
4  discussion?
5      A  Yes.
6      Q  Was there anyone else from New Century involved
7  in that discussion?
8      A  No.
9      Q  After having that discussion did you make any
10  written documentation of the substance of the discussion?
11      A  No.  But I remember him bringing something like
12  that up.
13      Q  Which of the two gentlemen?
14      MR. LITTLE:  Let the record indicate he's pointing
15  to Exhibit 10, and the paragraph that you're referring to
16  about unconstitutional.  He used the indefinite pronoun.
17      MR. CUNNINGHAM:  Thank you.
18      Q  Which of the two gentlemen on the other end of
19  the phone call brought up this issue of
20  constitutionality?
21      A  It was Mr. Frappier, and then the other two
22  gentlemen sort of confirmed it.
23      Q  After hearing that information did you contact
24  the legal department at New Century Mortgage to ask them
25  about that issue?

Page 71

1      Q  Did you ever come to learn that someone at New
2  Century Mortgage Company was interested in the
3  constitutionality of the Telephone Consumer Protection
4  Act?
5      A  Well, it's funny that you mention that.  Because
6  I do recall this.  Because in discussions with
7  Mr. Frappier, you know, I asked him about this.  And as a
8  matter of fact, we were on one occasion, we were on a
9  call with an attorney from his company, and somebody
10  represented themselves as being a compliance officer.
11  And I asked them about this.
12      MR. LITTLE:  Let him ask the question.
13      THE WITNESS:  Okay.  I'm sorry.
14  BY MR. CUNNINGHAM:
15      Q  What did you ask them about this?
16      MR. LITTLE:  See, that's what happens when you go
17  on.
18      THE WITNESS:  Well, actually, I didn't ask him.  You
19  know, he basically assured us that this was, you know --
20  you know, this was okay to do.
21  BY MR. CUNNINGHAM:
22      Q  Was this before or after you signed the contract
23  with fax.com?
24      A  Before.
25      Q  What was the name of the attorney that was

Page 70

1      A  No.  Because they, fax.com, told us if we had
2  anybody complaining, if we had any complaints, just to
3  refer them to fax.com.
4      Q  When did they tell you that?
5      A  I don't recall the specific date.
6      Q  Did they tell you that in writing or verbally?
7      A  Verbally.
8      Q  Who was it that told you that?
9      A  Mr. Frappier.
10      Q  Was anyone else involved in the discussion in
11  which they told you that?
12      A  I don't recall.
13      Q  After hearing of that comment, did you make any
14  written documentation reflecting that comment?
15      A  No.  I just kept it in the back of my mind.
16      Q  Was that the only time that that comment was
17  made to you?
18      A  I don't recall.  You know, I mean they had made
19  that representation on several occasions.
20      MR. LITTLE:  Since you're using the indefinite
21  pronoun, tell him what the representation is.  That
22  representation, I don't know what it is.
23      THE WITNESS:  I'm sorry.  That if we had -- that if
24  there was ever a problem with a customer or somebody
25  complained, to refer them to fax.com.

Page 72

18 (Pages 69 to 72)

| | |
|---|---|
| 1   BY MR. CUNNINGHAM:<br>2      Q   And did there come a time when you, in fact,<br>3   referred a customer to fax.com?<br>4      A   I did not.<br>5      Q   Did anyone?<br>6      A   I don't know.<br>7      Q   I'd like you to refer back to Exhibit number 1.<br>8   The attachment is the Fax Broadcasting Agreement; is that<br>9   right?<br>10      I'm sorry.  Can you please turn to the<br>11   attachment to Exhibit number 1 which is this Fax<br>12   Broadcasting Agreement, and can you turn to paragraph<br>13   number 11.  Do you see that?<br>14      A   Yes.<br>15      Q   The heading for paragraph number 11 is "Legal<br>16   Issues re Fax Broadcasting."  Do you see that?<br>17      A   Yes.<br>18      Q   And the first sentence says, "Buyer acknowledges<br>19   that Buyer is aware that Seller's faxing of Buyer's<br>20   commercial messages," and then there's a space,<br>21   "advertisements on behalf of Buyer presents significant<br>22   legal issues and risks."  Do you see that sentence?<br>23      A   Yes.<br>24      Q   And the next sentence says, "Buyer acknowledges<br>25   that Seller has made no representations, promises or<br><br>Page 73 | 1   you absolutely want to.<br>2      My first question is going to be:  Have you ever<br>3   seen this document before?<br>4      A   No.<br>5      Q   Did you ever come to learn that the Federal<br>6   Communications Commission had issued a citation and a<br>7   letter of inquiry to New Century Mortgage Corporation?<br>8      A   No, I don't recall.<br>9      Q   Did you ever come to learn that the FCC was<br>10   looking into New Century's fax advertising activities?<br>11      A   I don't recall.<br>12      Q   Did you ever see any internal memoranda<br>13   discussing the investigation by the FCC?<br>14      A   I don't recall.<br>15      (Defendant Exhibit 12 was marked for<br>16      identification by the court reporter.)<br>17   BY MR. CUNNINGHAM:<br>18      Q   Number 12 is a multi-page exhibit from the law<br>19   firm of Morrison & Foerster to Kirk Schroeder,<br>20   S-c-h-r-o-e-d-e-r of the Federal Communications<br>21   Commission.<br>22      Mr. Nese, my question for you is going to be:<br>23   Have you ever seen this document before?<br>24      A   I don't recall -- oh, I have.<br>25      Q   Okay.  Did you see this document when you were<br><br>Page 75 |
| 1   assurances to Buyer in this regard."  Do you see that<br>2   clause in the sentence?<br>3      A   Yes.<br>4      Q   And the next sentence says, "And Buyer has had<br>5   the opportunity to consult with its own legal counsel<br>6   with respect to the federal Telephone Consumer Protection<br>7   Act and applicable state law regarding transmissions by<br>8   fax of unsolicited commercial messages/advertisements and<br>9   the risks attended thereto."<br>10      Do you see that?<br>11      A   Yes.<br>12      Q   And you were an officer of the company at the<br>13   time that you signed this document; is that correct?<br>14      A   Yes.<br>15      Q   Okay.  Did you, in fact, consult with your own<br>16   legal counsel at the time that you signed this document?<br>17      A   No.<br>18      (Defendant Exhibit 11 was marked for<br>19      identification by the court reporter.)<br>20   BY MR. CUNNINGHAM:<br>21      Q   Exhibit number 11 is a multi-page document<br>22   bearing the date August 13, 2002.  It's a letter from the<br>23   Federal Communications Commission to New Century Mortgage<br>24   Corporation.<br>25      You don't have to read the whole thing unless<br><br>Page 74 | 1   preparing for this deposition?<br>2      A   Yes.<br>3      Q   Before that, did you have a recollection of ever<br>4   having seen this document before?<br>5      A   No.<br>6      Q   Do you recall ever dealing with the attorney of<br>7   Morrison & Foerster personally?<br>8      A   What's his name?<br>9      Q   His name is Chalres H. Kennedy according to the<br>10   last page of the document.<br>11      A   No, I don't even know who that is.<br>12      Q   Okay.  Mr. Nese, do you know someone by the name<br>13   of Monica McCarthy?<br>14      A   Yes.<br>15      Q   When was the first the time that you met Monica<br>16   McCarthy?<br>17      A   I don't recall the first time.<br>18      Q   Was she an employee of New Century Mortgage<br>19   Corporation?<br>20      A   Yes.<br>21      Q   What position did she hold when you first met<br>22   her?<br>23      A   She was one of our attorneys in the legal<br>24   department.<br>25      Q   Do you know when she started with the company?<br><br>Page 76 |

19 (Pages 73 to 76)

Page 77:

```
 1     A  No.
 2     Q  Was she there when you began with the company?
 3     A  I don't recall.  It was in a different location.
 4     Q  Okay.  Did you ever go to her while you were
 5  negotiating with fax.com to talk to her about fax
 6  advertising activities?
 7     A  No.
 8     Q  At any time during your interaction with
 9  fax.com, was Monica McCarthy involved?
10     A  I don't know.
11     Q  Did she ever participate in a telephone call
12  with you and fax.com?
13     A  I don't recall.
14     Q  Did she ever participate in a meeting with you
15  and fax.com?
16     A  No.
17     Q  Did she ever approve any correspondence with
18  fax.com?
19     MR. LITTLE:  Objection.  Calls for speculation.
20  BY MR. CUNNINGHAM:
21     Q  That you know of?
22     A  I don't know.
23     Q  Did you ever go to her to approve of a
24  particular advertisement transmitted by fax.com?
25     A  No.
```

Page 78:

```
 1     Q  Did you ever talk to her about your intentions
 2  in arranging for fax advertising?
 3     A  No.
 4     MR. CUNNINGHAM:  That's it for the documents.
 5     Give me one second just to review my notes.  I
 6  think we're about to wrap up.
 7     Mr. Nese, earlier we talked about the phone
 8  number at the bottom of the advertisement that a
 9  recipient could call to get their name taken off the
10  list.
11     A  Yes.
12     Q  Do you know if anybody, in fact, called in to be
13  taken off the list of fax numbers?
14     A  I don't know.
15     MR. CUNNINGHAM:  Mr. Nese, that's all I have for
16  you.
17     Thank you very much.  Your counsel may have
18  questions.
19     MR. LITTLE:  No.
20     MR. CUNNINGHAM:  I think we're done.
21     Thank you.
22     (There was a discussion off the
23  record whereby it was agreed that the
24  original deposition would be sent to
25  Mr. Little, and that counsel for Tressler
```

Page 79:

```
 1  Soderstrom, Maloney & Priess would be
 2  requesting an expedited receipt of the
 3  transcript by Monday, September 26, 2005.)
 4  //
 5  //
```

Page 80:

```
10     I, FRANK NESE, do hereby declare under
11  penalty of perjury that I have read the foregoing
12  transcript of my deposition; that I have made such
13  corrections as noted herein, in ink, initialed by me, or
14  attached hereto; that my testimony as contained herein,
15  as corrected, is true and correct.
16  EXECUTED this _____ day of _____,
17  20_____, at _____ _____
                     (City)          (State)
18
19
20     _____
       FRANK NESE
       Volume 1
```

```
1    STATE OF CALIFORNIA        )
                                  :ss
2    COUNTY OF LOS ANGELES       )
3
4           I, the undersigned, a Certified Shorthand
5    Reporter of the State of California, do hereby certify:
6           That the foregoing proceedings were taken
7    before me at the time and place herein set forth; that
8    any witnesses in the foregoing proceedings, prior to
9    testifying, were placed under oath; that a verbatim
10   record of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under my
12   direction; further, that the foregoing is an accurate
13   transcription thereof.
14          I further certify that I am neither
15   financially interested in the action nor a relative or
16   employee of any attorney of any of the parties.
17          IN WITNESS WHEREOF, I have this date
18   subscribed my name.
19
20   Dated: _____
21
22
23         _____
           GREGORY F. BENSON
24         CSR No. 7793
25

                    Page 81
```

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                    Page 82
```

21 (Pages 81 to 82)