KK2/tdw/#370432

2246-42

## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| NEW CENTURY MORTGAGE CORP., | ) ) | Case No.: 05C2370 |
| | ) | |
| Plaintiff, | ) ) | Judge: Coar |
| | ) | |
| v. | ) ) | **DEFENDANTS' MOTION TO STRIKE ¶¶ 6 AND 10 OF THE AFFIDAVIT OF MONICA McCARTHY** |
| GREAT NORTHERN INSURANCE COMPANY, FEDERAL INSURANCE COMPANY, | ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

Defendants, Great Northern Insurance Company ("Great Northern") and Federal Insurance Company ("Federal"), by and through their attorneys, Tressler, Soderstrom, Maloney & Priess, and in support of their motion to strike paragraphs 6 and 10 of the Affidavit of Monica McCarthy pursuant Federal Rule of Civil Procedure 56(e), state as follows:

1.      Attached hereto as Exhibit A is the Declaration of Monika McCarthy in Support of Plaintiff's Motion for Summary Judgment.

2.      In paragraph 6, Ms. McCarthy states "NCMC believed that the facsimile transmissions were welcome or authorized under applicable law, including the TCPA." In paragraph 10,  Ms. McCarthy states, "NCMC was told by Fax.com that it would only send faxes to welcomed recipients."

3.      These assertions should be stricken because they are not based upon Ms. McCarthy's personal knowledge.  While personal knowledge includes inferences and opinions, those inferences and opinions must be grounded in observation or other first-hand personal

experience. *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir. 1989).

Ms. McCarthy does not allege that she was involved in any fashion in the discussions with

Fax.com or in NCMC's decision to send unsolicited facsimiles and she has provided no factual

support qualifying her to make the assertions at issue.

      4.      The NCMC officer involved in the fax transmissions was Director of Marketing

Frank Nese.  Mr. Nese testified in deposition that he does not recall Ms. McCarthy participating

in the relevant events and that he never spoke to her about his intentions in arranging for fax

advertising.  (Nese Depo. Page 77 and 78, attached hereto as Exhibit B.)  Consequently,

NCMC's own witness confirms that Ms. McCarthy did not participate in or observe the events in

question.

      WHEREFORE, because Ms. McCarthy's assertions are not based upon personal

knowledge, defendants respectfully request that this Court strike paragraphs 6 and 10 of the

affidavit.

                            GREAT NORTHERN INSURANCE COMPANY


                            By: /s/  *Daniel J. Cunningham*

                            One of Its Attorneys

Daniel J. Cunningham
Kathy Karaboyas Malamis
TRESSLER, SODERSTROM, MALONEY & PRIESS
Sears Tower, 22nd Floor
233 South Wacker Drive
Chicago, Illinois  60606-6399
(312) 627-4000

KK2/ds/370471                                                                    2246-42

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NEW CENTURY MORTGAGE CORP., | ) ) ) | Case No.: 05C2370 |
| Plaintiff, | ) ) | Judge: Coar |
| v. | ) ) ) | **DEFENDANTS' MOTION TO STRIKE ¶¶ 6 AND 10 OF THE AFFIDAVIT OF MONICA McCARTHY** |
| GREAT NORTHERN INSURANCE COMPANY, FEDERAL INSURANCE COMPANY, | ) ) ) ) | |
| Defendants. | ) ) ) | |

### CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2005, I electronically filed Defendants' Motion To Strike **¶¶ 6 And 10 Of The Affidavit Of Monica McCarthy** with the Clerk of the Court using CM/ECF System which will send notification of such filing(s) to the following:

| | |
|---|---|
| Bart T. Murphy | David A. Gauntlett |
| Wildman, Harrold, Allen & Dixon | Eric R. Little |
| 2300 Cabot Drive – Suite 455 | Gauntlett & Associates |
| Lisle, IL  60532 | 18400 Von Karman – Suite 300 |
| (630) 955-0555 | Irvine, CA  92612 |
| **Fax:** (630) 955-0662 | (949) 553-1010 |
| | **Fax:** (949) 553-2050 |

GREAT NORTHERN INSURANCE COMPANY


By: /s/ *Daniel J. Cunningham*
_____
One of Its Attorneys


Daniel J. Cunningham
Kathy Karaboyas Malamis
TRESSLER, SODERSTROM, MALONEY & PRIESS
Sears Tower, 22nd Floor
233 South Wacker Drive
Chicago, Illinois  60606-6399
(312) 627-4000



**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NEW CENTURY MORTGAGE CORP., | ) | |
| | ) | CASE NO.  05C2370 |
| Plaintiff, | ) | |
| | ) | Judge Coar |
| v. | ) | |
| | ) | **DECLARATION OF MONIKA** |
| GREAT NORTHERN INSURANCE | ) | **McCARTHY IN SUPPORT OF** |
| COMPANY, FEDERAL INSURANCE | ) | **PLAINTIFF'S MOTION FOR** |
| COMPANY, | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Defendants. | ) | |
| ──────────────────────── | ) | |

## DECLARATION OF MONIKA L. McCARTHY

I, MONIKA L. McCARTHY, declare as follows:

1.      I am Senior Vice President and General Counsel for New Century Mortgage Corporation ("NCMC"). I am personally familiar with the facts set forth herein - except those matters I have attested to on information and belief - and if called upon to testify could and would do so competently.

2.      In my role as General Counsel, I supervise and manage litigation involving NCMC through retention and use of outside counsel and our in house legal department.

3.      I am familiar with the insurance coverage obtained for NCMC and all other related entities.

4.      In 2003, I was responsible for providing notice of lawsuits to insurance companies that insured NCMC.

5.      On April 5, 2002, Paul Bernstein filed a civil class action in the Circuit Court of Cook County, Illinois County Department, Chancery Division against NCMC entitled *Paul Bernstein v. New Century Mortgage Corporation*, Civil Action No. 02CH 06907 (the *"Bernstein Action"*). A true and correct copy of the April 5, 2002 Complaint in the *Bernstein* Action is attached to the concurrently filed Appendix of Exhibits ("AOE") as **Exhibit "A."**

6.      Bernstein sought damages resulting from his receipt of an unsolicited fax on February 26, 2002 allegedly in violation of the Telephone Consumer Protection Act ("TCPA"). NCMC believed that the facsimile transmissions were welcome or authorized under applicable law, including the TCPA.

7.      On or about September 30, 2003, Bernstein filed a Second Amended Complaint. A true and correct copy of the September 30, 2003 Second Amended Complaint in the *Bernstein* Action is attached to the AOE as **Exhibit "B."**

8.      NCMC had contracted with Fax.com to transmit faxes. A true and correct copy of NCMC's contract with Fax.com is attached to the AOE as **Exhibit "C."**

9. Based on information and belief, NCMC had no way to disprove Fax.com sent the faxes since Fax.com had filed for bankruptcy and had gone out of business and kept no records or logs of the faxes it sent on behalf of its clients, including NCMC.

10. Based on information and belief, NCMC had reason to believe that Fax.com filed for bankruptcy and went out of business, in part, because of numerous lawsuits alleging it was sending unsolicited faxes on behalf of its customers, despite Fax.com's representations to the contrary. NCMC was told by Fax.com that it would only send faxes to welcomed recipients.

11. Great Northern Insurance Company issued Commercial General Liability policy no. 3539-77-36LAO to New Century Financial Corporation ("NCFC") effective February 3, 2002 through February 3, 2003, naming NCMC as an insured by way of endorsement. A true and correct copy of policy no. 3539-77-36LAO is attached to the AOE as **Exhibit "D."**

12. Federal Insurance Company issued Commercial Umbrella Policy No. 7977-01-85 to NCFC effective February 3, 2002 through February 3, 2003, naming NCMC as an insured by way of endorsement. A true and correct copy of policy no. 7977-01085 is attached to the AOE as **Exhibit "E."**

13. On August 15, 2003, NCMC sent notice of the *Bernstein* Action to Chubb through financial Guarantee Insurance Brokers. A true and correct copy of the August 15, 2003 notice letter from NCMC to Chubb is attached to the AOE as **Exhibit "F."**

14. Chubb acknowledged receipt of the notice and agreed to defend NCMC subject to a reservation of rights. A true and correct copy of the January 7, 2004 letter is attached to the AOE as **Exhibit "G."**

15. On March 25, 2004, NCMC sent a letter to Chubb enclosing a spreadsheet of NCMC's attorney's fees and costs in the *Bernstein* Action and requesting payment of those fees and costs. A true and correct copy of the March 25, 2004 letter is attached to the AOE as **Exhibit "H."**

16. NCMC had spent in excess of $89,000 from date of tender through January 2004.

17. On April 9, 2004, Chubb sent a letter to NCMC agreeing to reimburse New

Century's reasonable and necessary defense costs from August 27, 2003. A true and correct copy of Chubb's April 9, 2004 letter is attached to the AOE as **Exhibit "I."**

18.     During May 2004, discussions ensued between NCMC and Chubb regarding attendance at a mediation.

19.     On June 14, 2004, NCMC received a settlement demand from Bernstein in the amount of $6 million. A true and correct copy of the June 14, 2004 settlement demand from Bernstein is attached to the AOE as **Exhibit "J."**

20.     On June 17, 2004 NCMC sent a letter to Chubb enclosing Bernstein's $6 million demand and requesting that Chubb fund the settlement. A true and correct copy of NCMC's June 17, 2004 letter to Chubb is attached to the AOE as **Exhibit "K."**

21.     NCMC's counsel also advised Chubb that Bernstein was seeking class certification by way of motion, with a hearing scheduled in early August 2004. A true and correct copy of NCMC's June 17, 2004 letter to Chubb is attached to the AOE as **Exhibit "K."**

22.     On June 22, 2004, Chubb sent a letter to NCMC advising of their intent to continue to defend NCMC but refusing to indemnify, and refusing to participate in the mediation anticipated to take place on June 23, 2004. A true and correct copy of Chubb's June 22, 2004 letter is attached to the AOE as **Exhibit "L."**

23.     On August 5 and 6, 2004, NCMC and Bernstein participated in mediation in an attempt to resolve the claims made by Bernstein.

24.     On August 10, 2004, Bernstein and NCMC reached an agreement to settle the *Bernstein* Action for $1.95 million.

25.     The parties negotiated and entered into a Settlement Agreement, pursuant to whose terms New Century agreed to pay plaintiff's $1.95 million to settle the *Bernstein* Action, which amounted to $500 per class claimant. A true and correct copy of the Settlement Agreement is attached to the AOE as **Exhibit "Q."**

26.     As NCMC's Senior Vice President and General Counsel I believed the settlement of $1.95 million was eminently reasonable and prudent, especially as NCMC's potential liability

exposure, if the case had proceeded to trial following class certification, was calculated at $300 - $900 million.

27.    On August 16, 2004, a Third Amended Complaint was filed in the *Bernstein* Action to reflect the claims being settled by NCMC and Bernstein. A true and correct copy of the Third Amended Complaint is attached to the AOE as **Exhibit "R."**

28.    On September 13, 2004, Chubb issued checks in the amount of $3,935.30 and $26,084.03 to NCMC for reimbursement of defense expenses. True and correct copies of the checks dated September 13, 2004 are attached to the AOE as **Exhibit "S."**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of September 2005, at Irvine, California.

s/Monika L. McCarthy
MONIKA L. McCARTHY



## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

NEW CENTURY MORTGAGE CORP., )
　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　)
　　　　　　　　　　　　　　　　)
　　　　vs.　　　　　　)　　No. 05C2370
　　　　　　　　　　　　　　　　)
GREAT NORTHERN INSURANCE　　)
COMPANY, FEDERAL INSURANCE　)
COMPANY,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　Defendants.　　)
_____)


DEPOSITION OF FRANK NESE
Irvine, California
Wednesday, September 21, 2005
Volume


Reported by:
GREGORY F. BENSON
CSR No. 7793
JOB No. 631908

Page 1

## Page 2

1　　　　UNITED STATES DISTRICT COURT
2　　NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
3
4　NEW CENTURY MORTGAGE CORP., )
5　　　　　Plaintiff,　　　)
6　　　　vs.　　　　　　)　　No. 05C2370
7　GREAT NORTHERN INSURANCE　　)
8　COMPANY, FEDERAL INSURANCE　)
　　COMPANY,　　　　　　　)
9　　　　　Defendants.　　)
　_____)
10
11
12　　　　Deposition of FRANK NESE, Volume 1,
13　taken on behalf of Defendants, at 18400
14　Von Karman, Suite 300, Irvine, California,
15　beginning at 1:08 p.m. and ending at
16　2:58 p.m. on Wednesday, September 21, 2005,
17　before GREGORY F. BENSON, Certified
18　Shorthand Reporter No. 7793.
19
20
21
22
23
24
25

Page 2

## Page 3

1　APPEARANCES:
2
3　For Plaintiff New Century Mortgage Corp.:
4　　GAUNTLETT & ASSOCIATES
　　BY:  ERIC ROBERT LITTLE
5　　Attorney at Law
　　18400 Von Karman, Suite 300
　　Irvine, California  92612
6　　(949) 553-1010
7　　NEW CENTURY MORTGAGE CORPORATION
　　BY:  MARK M. MALOVOS
8　　Attorney at Law
　　18400 Von Karman Avenue, Suite 1000
9　　Irvine, California  92612
　　(949) 225-7861
10
11　For Defendants:
12　　TRESSLER, SODERSTROM, MALONEY & PRIESS
　　BY:  DANIEL J. CUNNINGHAM
　　Attorney at Law
13　　233 South Wacker Drive
　　Chicago, Illinois  60606-6308
14　　(312) 627-4026
15
16
17
18
19
20
21
22
23
24
25

Page 3

## Page 4

1　　　　　　　INDEX
2　WITNESS　　　　　EXAMINATION
　FRANK NESE
3　Volume 1
4
5　　　BY MR. CUNNINGHAM　　　　　6
6
7
8　　　　　　EXHIBITS
9
　DEFENDANT　　　　　　　PAGE
10
11　1　Photocopy of fax memo dated 3/14/02 with　25
　　attachment
11　2　Photocopy of document entitled, "Fax　　31
　　Broadcasting Sales Order"
12
13　3　Photocopy of document entitled, "Accounts　42
　　Payable Check Request"
14　4　Photocopy of document entitled,　　56
　　"Artwork/Layout Approval"
15
16　5　Photocopy of document entitled, "Fax　　59
　　Broadcasting Sales Order"
17　6　Photocopy of document entitled, "Total Fax　59
　　No.'s Available: 1,251,487"
18
19　7　Photocopy of document entitled, "New　　61
　　Century's Responses to Plaintiff's
　　Additional (12/17/03) Requests for Document
20　　Production" with attached documents
21　8　Photocopy of letter, undated, with　　62
　　attachment
22
23　9　Photocopy of letter dated 7/1/2002, with　67
　　attachments
24　10　Photocopy of letter, undated　　68
25

Page 4

1 (Pages 1 to 4)

1  INDEX - continued
2  11  Photocopy of letter dated 8/13/2002        74
3  12  Photocopy of letter dated 9/29/2003        75
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1   So I will promise not to talk while you're
2   talking if you promise not to talk while I'm talking.
3       Is that okay with you?
4       A  I promise.
5       Q  If at any time you don't understand my question,
6   just let me know and I will try to rephrase it.
7       Is that okay with you?
8       A  Yes.
9       Q  And if at any time you need a break, just let me
10  know and we'll be happy to accommodate you.
11      Are you represented by counsel here today?
12      A  Yes.
13      Q  And is that Mr. Little sitting to your right?
14      A  Yes.
15      Q  When was the most recent deposition that you
16  gave prior to today?
17      A  I believe it was a couple of years ago.
18      Q  What was the nature of that case?
19      A  It was a dispute with a software vendor.
20      Q  Did that dispute have anything to do with fax
21  advertisement?
22      A  No.
23      Q  Did it have anything to do with insurance
24  coverage issues?
25      A  No.

Page 7

1       Irvine, California, Wednesday, September 21, 2005
2           1:08 p.m. - 2:58 p.m.
3
4           FRANK NESE,
5   having been first duly sworn, was examined and testified
6   as follows:
7
8           EXAMINATION
9   BY MR. CUNNINGHAM:
10      Q  Good afternoon, Mr. Nese.  My name is Dan
11  Cunningham, and I represent the Federal Insurance Company
12  and the Great Northern Insurance Company in a lawsuit
13  brought by what I understand is your former employer.
14      Let me first start by asking you if you've ever
15  given a deposition before.
16      A  Yes.
17      Q  How many times have you done this?
18      A  Twice.
19      Q  Okay.  So I take it you're generally familiar
20  with the ground rules of a deposition?
21      A  Yes.
22      Q  I'll remind you of the most important ones.
23      It's important that we both not talk at the same
24  time, because the court reporter might have some
25  difficulty recording the testimony accurately.

Page 6

1       Q  Tell me about the other depositions that you
2   have previously given.  What was the nature of the case?
3       A  A software vendor was suing New Century.
4       Q  Is it true that both prior depositions involved
5   a software vendor?
6       A  Yes, they were related to the same matter.
7       Q  So neither prior case dealt with fax advertising
8   or with insurance coverage issues?
9       A  No.
10      Q  Good.  That shortcuts that discussion.
11      What did you do to prepare for today's
12  deposition, if anything?
13      A  I met with Mr. Little and Mr. Malovos.
14      Q  When was that?
15      A  On Monday.
16      Q  And for how long did you meet?
17      A  I would say it was an hour to an hour and a
18  half.
19      Q  Was that the only meeting that you had to
20  prepare for today?
21      A  Yes.
22      Q  Did you look at any documents during that
23  meeting?
24      A  Yes.
25      Q  Can you describe for me the documents that you

Page 8

2 (Pages 5 to 8)

Esquire Deposition Services
949.440.7000

| | |
|---|---|
| 1 looked at. | 1 A Countrywide Home Loans. |
| 2 MR. LITTLE: I can actually shortcut this, if you'd | 2 Q What did you do for Countrywide? |
| 3 like. | 3 A I started as an account executive and was |
| 4 MR. CUNNINGHAM: Feel free. | 4 steadily promoted, and my final position was vice |
| 5 MR. LITTLE: I collected the documents that you had | 5 president, in-call center manager. |
| 6 identified in your discovery responses, put them into a | 6 Q When did you begin working for that company? |
| 7 notebook, and this is the notebook. | 7 A February 1993. |
| 8 MR. CUNNINGHAM: Terrific. Thank you. I'll look at | 8 Q What did you do before February of 1993? |
| 9 those when we take a break. | 9 A I worked for a mortgage broker. |
| 10 MR. LITTLE: Okay. I think his notice of depo was | 10 Q Which mortgage broker? |
| 11 in there also. | 11 A Valley Heights Mortgage. |
| 12 MR. CUNNINGHAM: Okay. | 12 Q When did you start working with that company? |
| 13 Q Mr. Nese, who is your current employer? | 13 A I want to say around September of 1989. |
| 14 A ECC Capital Corporation. | 14 Q And what did you do before that? |
| 15 Q What do you do for that company? | 15 A I worked at -- I sold artwork wholesale. |
| 16 A I'm a director. | 16 Q What did you do before that? |
| 17 Q When did you begin working for that company? | 17 A I was enlisted in the army. |
| 18 A June 8th of this year. | 18 Q During what years did you serve in the army? |
| 19 Q Is ECC Capital affiliated in any way with New | 19 A From 19 -- I was enlisted from 1984 to 1987, and |
| 20 Century Financial Corporation? | 20 served for a total of 21 years between active duty and |
| 21 A No. | 21 guard and reserve. |
| 22 Q With whom were you employed before June 8, 2005? | 22 Q I see. Did you have any full-time employment |
| 23 A New Century Mortgage Corporation. | 23 before joining the army in 1984? |
| 24 Q When did you begin working for New Century | 24 A Oh, none worth describing. |
| 25 Mortgage? | 25 Q Okay. Did you attend college? |
| Page 9 | Page 11 |

| | |
|---|---|
| 1 A June of 2000. | 1 A Yes. |
| 2 Q Where did you work before joining New Century | 2 Q Where did you go to college? |
| 3 Mortgage? | 3 A Century University. |
| 4 A WMC Mortgage Corporation. | 4 Q And I take it you graduated? |
| 5 Q What did you do for that company? | 5 A Yes. |
| 6 A I was senior vice president responsible for | 6 Q What year did you graduate? |
| 7 E-commerce. | 7 A Well, I completed it over a period of time, so |
| 8 Q Is that company affiliated in any fashion with | 8 2002. |
| 9 New Century Financial? | 9 Q Okay. What was the nature of your degree? |
| 10 A No. | 10 A Business administration. |
| 11 Q When did you begin working for that company? | 11 Q Okay. Now that you have gone through your |
| 12 A That was in June of 1999. | 12 entire resume in response to my questions, I'd like to |
| 13 Q With whom did you work before that? | 13 drill down and focus on the time when you were with New |
| 14 A First Plus Financial. | 14 Century Mortgage which I think you told us began in |
| 15 Q What did you do for First Plus Financial? | 15 roughly June of 2000; is that right? |
| 16 A Director of telesales. | 16 A Correct. |
| 17 Q Is that company affiliated with New Century | 17 Q And continued on through June 8 of 2005? |
| 18 Mortgage? | 18 A Actually, my final day of employment was May |
| 19 A No. May I say that none of my previous | 19 31st. |
| 20 employers have or are currently affiliated with New | 20 Q Okay. What was the first title that you held at |
| 21 Century Mortgage. | 21 New Century Mortgage? |
| 22 Q Thank you. When did you begin working with that | 22 A Senior vice president, director of central |
| 23 company? | 23 operations. |
| 24 A In September of 1996. | 24 Q And during what years did you serve in that |
| 25 Q Where were you before that? | 25 capacity? |
| Page 10 | Page 12 |

3 (Pages 9 to 12)

1     A  It was only a period of a matter of a few months
2  as we were reorganizing the company, and I would say
3  after three months or so I became the director of
4  marketing for central operations.
5     Q  Okay.  Before you became the director of
6  marketing, what were your duties and responsibilities
7  just in general terms?
8     A  Basically reorganizing three of the businesses
9  that were currently in operation at the time.
10    Q  What were the three businesses?
11    A  The ones that I was involved with were Any
12 Loan.com, New Century Mortgage Corporation.  Their retail
13 division, branch division, and a recent acquisition of
14 New Century, which was Prime West Funding, which later
15 became central operations.
16    Q  And then you told us that after roughly three
17 months you became the director of marketing.
18       How did your duties and responsibilities change,
19 if at all?
20    A  They changed from primarily a reorganization
21 sort of restructuring role to responsibility for
22 generating leads for the central operations group.
23    Q  When you say leads, what do you mean?
24    A  Customers, potential customers.
25    Q  Okay.  Did your title change at all during the

1     Q  Okay.  Do you currently own stock in New Century
2  Financial Corp.?
3     A  Yes.
4     Q  Do you currently own stock options in that
5  corporation?
6     A  No.
7     Q  Are you expecting to receive a pension from that
8  corporation?
9     A  No.
10    Q  Mr. Nese, have you heard of a company called
11 fax.com?
12    A  Yes.
13    Q  When was the first time that you heard of
14 fax.com?
15    A  You know, my recollection is a little fuzzy, but
16 I would say maybe it was December of 2000 or some time --
17 it was December 2000 or 2001.  I don't recall.
18    Q  And that would have been if we look at the time
19 line of your employment while you were working at New
20 Century; is that correct?
21    A  Yes.
22    Q  So you didn't have any prior experience with
23 fax.com before you came to New Century?
24    A  No.
25    Q  How is it that you first came to encounter

1  remaining tenure with New Century?
2     A  Yes.
3     Q  When did it change?
4     A  It changed in, I believe January of 2001 -- I'm
5  sorry.  January of 2002.
6     Q  And how did it change?
7     A  I became chief marketing officer of the retail
8  division.
9     Q  How did your duties change?
10    A  Responsible for lead generation for the entire
11 retail organization.
12    Q  How long did you serve in that capacity?
13    A  Until January of -- I'm trying.  I want to be
14 accurate -- until January 2003.
15    Q  And what happened at that point?
16    A  I moved over to the production side.  That's the
17 actual origination of loans.
18    Q  Okay.
19    A  And I served as group vice president until my
20 departure.
21    Q  Okay.  In May of 2005?
22    A  Yes, May 31st.
23    Q  At any time did you serve as an officer of the
24 corporation?
25    A  During my entire tenure.

1  fax.com?
2     A  They were referred to me by a gentleman that --
3  who had worked for me in the past and now had his own
4  company.
5     Q  Who was that gentleman?
6     A  Mike Harrel.
7     Q  What did Mike Harrel --
8     A  H-a-r-r-e-l.
9     Q  What did Mr. Harrel say about fax.com?
10    A  He said that he was utilizing them for lead
11 generation efforts.
12    Q  What company was Mr. Harrel with?
13    A  His company has changed names.  I believe at the
14 time it was called Union Trust Mortgage, something to
15 that nature.
16    Q  Did he tell you anything else about fax.com?
17    A  He just said that it was an effective way for --
18 that he was generating leads.
19    Q  And after he made this referral to you, what did
20 you do, if anything?
21    A  I didn't do anything.
22    Q  How was it that you again encountered fax.com?
23    A  I was contacted by a sales person in the
24 organization.
25    Q  When was that?

1    A  I don't recall.
2    Q  Do you recall what position you were working in
3  at the time that you were contacted?
4    A  Director of marketing.
5    Q  Do you recall the name of the salesperson that
6  contacted you?
7    A  Yes.
8    Q  What was that person's name?
9    A  Frank Frapier, the last name spelled
10  F-r-a-p-i-e-r.
11    Q  Did he contact you by telephone?
12    A  Yes.
13    Q  What did he say to you?
14    A  He said that he was referred to me by Mike
15  Harrel.
16    Q  Did he say anything else?
17    A  He wanted to give a presentation on what he
18  thought he could do as it relates to lead generation.
19    Q  Did he, in fact, give you that presentation?
20    A  Verbally.
21    Q  How long did that take?
22    A  I don't recall.
23    Q  Did that take place in that very same telephone
24  conversation when he first contacted you?
25    A  I think it was a later telephone call.

Page 17

1    Q  Was anybody else involved in that telephone
2  call?
3    A  No.
4    Q  Did you ask any questions of Mr. Frapier in the
5  course of that telephone call?
6    A  I'm sure I did.
7    Q  Do you recall what you asked him?
8    A  No.
9    Q  Had he sent you any documentation in advance of
10  that telephone call?
11    A  No.
12    Q  Had you sent him any documentation?
13    A  No.
14    Q  Do you recall if you made any written memo or
15  note about the content of that conversation?
16    A  I don't recall.
17    Q  I take it that there was, then, a time after
18  that when you again encountered fax.com; is that correct?
19    A  Yes.
20    Q  When did that occur?
21    A  I don't recall the date specifically.  And I'm
22  not trying to be obscure or evasive, I just don't really
23  recall.
24    Q  Were you still serving as director of marketing?
25    A  Yes.  And maybe -- during my -- during the time

Page 18

1  with which I contacted or spoke with fax.com I served in
2  a marketing capacity.
3    Q  Okay.  Did fax.com contact you or did you
4  contact fax.com?
5    A  I believe they contacted me.
6    Q  Why did they contact you?
7    MR. LITTLE:  Objection.  Calls for speculation.  You
8  can answer, if you know.
9    THE WITNESS:  Well, to sell their services.
10  BY MR. CUNNINGHAM:
11    Q  Okay.  Did you talk to Mr. Frapier?
12    A  Yes.
13    Q  Did you talk to anybody else at that time at
14  fax.com?
15    A  Not at that time.
16    Q  Did he describe that?  You said they offered
17  their services?
18    A  Yes.
19    Q  And at that time did you agree to engage their
20  services?
21    A  I agreed to try it.
22    Q  Okay.  What was it that they offered you during
23  that telephone call?
24    A  Basically it was services related to lead
25  generation or customer acquisition.  And they would send

Page 19

1  faxes out and customers would call.
2    Q  By that time had they sent you any written
3  documentation about the nature of the services that they
4  provided?
5    A  I don't recall.
6    Q  And had you sent them anything by that time?
7    A  I don't think I would have sent them anything.
8    Q  Up until this point in time is Mr. Frapier the
9  only fax.com employee that you had dealt with?
10    A  Yes.
11    Q  And after you told them that you were willing to
12  try them, what happened next?
13    A  I believe he asked me about areas that we were
14  interested in doing business, and I provided him some of
15  those areas.
16    Q  What were those areas?
17    A  I don't recall.
18    Q  Can you recall generally?
19    A  Well, New Century lends in all 50 states.  And,
20  you know, I can't recall any specificity.  But it
21  was probably a list of, you know, a great number of
22  states.
23    Q  Okay.  Would you have provided him a written
24  list of the states that you were interested in?
25    A  No, I don't think so.  I believe we just had a

Page 20

5 (Pages 17 to 20)

1  telephone discussion.
2      Q  And what happened next?
3      A  I believe he came back with something as to, you
4  know, the numbers in certain states that he recommended.
5      Q  Did he do that in writing or by telephone?
6      A  I don't recall.
7      Q  What happened next?
8      A  We -- you know, we had, you know, various
9  discussions, and this is over some time.  And I think
10  it's important to put this into perspective.  This was a
11  dot in, you know -- I mean a pinhead on a map.  It was
12  just that small of a campaign.
13      So it's not something that we, you know,
14  primarily did.  I was focused on many other things at the
15  time.
16      Q  And eventually we're going to get into the
17  documents.  And I think that will help focus your memory
18  towards specific dates and specific issues.
19      But before I do that, I just want to get a
20  general time line from you as to how the relationship
21  with fax.com developed.
22      You've told us that they contacted you.  There
23  was some discussion of geographic areas.  They got back
24  to you about some numbers.
25      What happened next?

1      A  That was about it up until such time -- you
2  know, I believe they sent over an order or contract.
3      Q  Okay.  Did you conduct any investigation as to
4  fax.com?
5      A  When you say investigation, I'm not sure what
6  you mean there.
7      Q  Fair enough.  You told us that you had
8  previously received a referral from a colleague of yours.
9      A  Yes.
10      Q  Did you ask anybody else about fax.com?
11      A  No.
12      Q  Did you check out their website, if they had a
13  website?
14      A  No.
15      Q  Did you ask within the organization about
16  fax.com?
17      A  Within New Century?
18      Q  Correct.
19      A  No.
20      Q  Prior to this time had you ever engaged the
21  services of a fax broadcasting company?
22      A  No.
23      Q  Prior to this time had New Century, on its own,
24  engaged in fax broadcasting?
25      A  No.

1      Q  When you elected to try fax.com's services, did
2  you have to get authority from anyone else to do that?
3      A  Yes.
4      Q  Who did you have to get authority from?
5      A  Kirk Redding.
6      Q  Can you spell his last name?
7      A  R-e-d-d-i-n-g.
8      Q  What was Mr. Redding's position?
9      A  President of central operations.
10      Q  What did you tell Mr. Redding about fax.com?
11      A  I basically described their services, and the
12  experience that Mr. Harrel had with them.
13      Q  What did Mr. Redding say to you, if anything,
14  about fax.com?
15      A  You know, I don't recall.
16      Q  Do you recall if you provided him with anything
17  in writing before discussing this issue?
18      A  At the time?  I'm sorry.
19      Q  You said you had to go to Mr. Redding to get
20  authority to engage fax.com's services.
21      A  Yes.
22      Q  Did you do this in writing?
23      A  No.
24      Q  It was simply a conversation?
25      A  Yes.

1      Q  Was it in person or over the telephone?
2      A  In person.
3      Q  Was anyone else involved in that conversation?
4      A  No.
5      Q  And after that meeting I take it you received
6  authorization to engage fax.com?
7      A  I believe we received a contract.
8      Q  But Mr. Redding authorized you to engage
9  fax.com; is that correct?
10      A  Yes.
11      Q  Did he do so in writing?
12      A  No.
13      Q  Again, it was simply an in-person conversation?
14      A  Correct.
15      Q  And after that meeting did you document the
16  nature of that meeting in any fashion?
17      A  No.
18      Q  Do you know if he did?
19      A  I don't know.
20      Q  After you got authorization from Mr. Redding,
21  what happened next?
22      A  I believe they sent over a contract.
23      Q  Fair enough.
24      Mr. Nese, I'm going to hand to the court
25  reporter what will be marked as Exhibit number 1.  And I

1  will let the reporter mark that, and then I'll identify
2  it on the record.
3       (Defendant Exhibit 1 was marked for
4       identification by the court reporter.)
5  BY MR. CUNNINGHAM:
6       Q   Mr. Nese, I'm going to hand you a document that
7  has been marked as Exhibit number 1. This is a
8  three-page document. The first page bears the date March
9  14, 2002. And it appears to be a fax cover sheet from
10 fax.com to Frank Nese, and the next two pages consist of
11 an attachment that bears the title Fax Broadcasting
12 Agreement.
13      Why don't you take a minute to look at that.
14 You don't need to read through the contract unless you
15 want to or unless your counsel wants you to.
16      A   Well, if you're going ask me about a specific
17 portion, I'll read through it.
18      Q   How about I start with the general questions,
19 and if, in fact, you feel the need to read a specific
20 provision, by all means you're welcome to.
21      A   Very good.
22      Q   Let's start with the attachment. You would
23 agree that the title on that document is Fax Broadcasting
24 Agreement?
25      A   That's what it says.

Page 25

1       Q   And the date provided in the first sentence is
2  June 7, 2001; is that right?
3       A   Yes.
4       Q   Sitting here today, do you recall this document?
5       A   Do I recall seeing it?
6       Q   Yes.
7       A   Vaguely.
8       Q   Okay. On the second page there is a signature
9  at the bottom. Do you see that?
10      A   Yes.
11      Q   Is that your signature?
12      A   Yes.
13      Q   And on both pages there appears to be some
14 handwriting. Do you see that?
15      A   I do.
16      Q   Why don't we focus on the handwriting on the
17 first page of the attachment, which bears the Bates
18 number NCMC00023.
19      Do you see the handwritten words or other terms
20 as agreed?
21      A   Yes.
22      Q   Is that your handwriting?
23      A   Yes.
24      Q   And there's a notation of the word "agreed." Do
25 you see that?

Page 26

1       A   Yes.
2       Q   What is that notation?
3       A   My initials.
4       Q   On the second page there is another notation
5  which is identified as paragraph 14. Do you see that?
6       A   Yes.
7       Q   Again is that your handwriting?
8       A   Yes.
9       Q   And are those your initials at the end?
10      A   Yes.
11      Q   Is this the only fax broadcasting agreement that
12 you ever executed with fax.com?
13      A   Yes, that I'm aware of.
14      Q   Okay. You told us that at some point they sent
15 a contract over to you; is that right?
16      A   Yes.
17      Q   Is this, in fact, that contract?
18      A   It could be.
19      Q   Do you know that it is?
20      A   I would assume so.
21      Q   Okay. The handwritten notations reflect changes
22 to the agreement that you proposed; is that correct?
23      A   Yes.
24      Q   And is it your understanding that fax.com agreed
25 to your proposed changes?

Page 27

1       A   Yes.
2       Q   With whom were you discussing this contract with
3  at fax.com?
4       A   Mr. Frapier.
5       Q   Were you discussing this with anyone else?
6       A   Mr. Redding.
7       Q   Anyone else?
8       A   No.
9       Q   In June of 2001 did New Century have a legal
10 department?
11      A   I'm sure they did.
12      Q   Did you consult the legal department -- I'm
13 sorry. In June of 2001 did you consult the legal
14 department about this contract?
15      A   No.
16      MR. LITTLE: That's a yes-or-no question.
17      THE WITNESS: No.
18 BY MR. CUNNINGHAM:
19      Q   Who is Jeffrey Dupree?
20      A   I don't know.
21      Q   I'd like to direct your attention to paragraph
22 number 3. The heading of that paragraph is "Use of the
23 Services with Seller's Fax Data."
24      Do you see that?
25      A   Yes.

Page 28

7 (Pages 25 to 28)

1   Q  Do you recall if you used fax.com's fax data?
2   A  Yes.
3   Q  It's true, then, that you didn't provide fax
4  numbers to fax.com?
5   A  No, we did not.
6   Q  Okay.  You did not provide customer lists to
7  fax.com?
8   A  No.
9   Q  That was a poorly phrased question.
10      Is it true that you did not provide customer
11  lists to fax.com?
12   A  I thought that's what you asked me.  But we did
13  not provide customer lists to fax.com.
14   Q  Thank you.  Do you recall if anyone from fax.com
15  ever signed this agreement?
16   A  I don't recall.
17   Q  But it appears that you ultimately engaged
18  fax.com's services; is that correct?
19   A  Yes.
20   MR. LITTLE:  Just so we're clear.  Did Century
21  engage fax.com's services?
22   MR. CUNNINGHAM:  Correct.  That's what I meant.
23   Q  Let's look at the cover page of Exhibit number
24  1.  It's dated March 14 of 2002, correct?
25   A  Yes.

1  set up a separate file to contain documents regarding
2  fax.com?
3   A  I don't recall.
4   MR. CUNNINGHAM:  Number 2, please.
5      (Defendant Exhibit 2 was marked for
6      identification by the court reporter.)
7  BY MR. CUNNINGHAM:
8   Q  Mr. Nese, I have handed you a document that has
9  been marked as Exhibit number 2.  This is a two-page
10  document bearing the Bates numbers NCMC00030 through 31.
11  And I would ask you to take a second to look at that.
12      Have you had a chance to look at Exhibit number
13  2?
14   A  Yes.
15   Q  Do you recall ever having seen Exhibit number 2
16  before?
17   A  No.
18   Q  Do you recall that this is the type of document
19  that you would have received in conjunction with your
20  interaction with fax.com?
21   A  Yes.
22   Q  And is this a document that you would have
23  received on or around June 7, 2001?
24   MR. LITTLE:  Calls for speculation.
25   THE WITNESS:  I don't know.

1   Q  It's from Keri Valliere.  Do you recall who that
2  person is?
3   A  No.
4   Q  The text of the first and only paragraph says,
5  "Frank, I misunderstood what contract Frank was talking
6  about.  Here is the correct information please disregard
7  the previous fax."
8      Do you see that?
9   A  Yes.
10   Q  Do you recall what the previous fax was?
11   A  No.
12   Q  Do you recall why in March of 2002 you were
13  asking for the Fax Broadcasting Agreement that you
14  apparently had signed in June of 2001?
15   A  Possibly we didn't have a copy of it.  I don't
16  recall.
17   Q  Do you recall what you did with the contract
18  after you signed it?
19   A  I gave it to my assistant.
20   Q  And what was your assistant's name?
21   A  At that time it was Denny Bira.
22   Q  And what did Denny do with the agreement, if you
23  know?
24   A  I don't know.
25   Q  Do you know if you ever asked your assistant to

1  BY MR. CUNNINGHAM:
2   Q  Do you see the date in the bottom right-hand
3  corner of the document?
4   A  Yes,
5   Q  What is the date there?
6   A  June 7th, 2001.
7   Q  Do you have any reason to doubt that you
8  received this document, Exhibit number 2, on or about
9  June 7, 2001?
10   A  Yes.
11   Q  And what is the reason for that doubt?
12   A  I just don't recall.  I don't recall receiving
13  it on that specific day.
14   Q  Okay.  You're not affirmatively saying you
15  didn't get it, you're saying you don't know?  If that's
16  not correct, tell me that I'm wrong.
17   A  I don't know whether I received this or not.
18   Q  Fair enough.  In the table in the upper half of
19  Exhibit number 1 under the heading "special information,"
20  there is a reference to the "week of 6/11."  Do you see
21  that?
22   A  Yes.
23   Q  Do you believe that this was the first time that
24  you had engaged fax.com's services on behalf of New
25  Century?

1    MR. LITTLE: Objection. That assumes facts not in
2  evidence. He's already testified he doesn't recall
3  receiving the document.
4        You can go ahead and answer the question if you
5  understand it.
6    THE WITNESS: I'm sorry. Can you say that again?
7  BY MR. CUNNINGHAM:
8    Q   I think you indicated that you generally
9  recalled receiving Exhibit number 1?
10   A   I don't recall receiving the exhibit. I recall
11 this looking like a document that fax.com would use to
12 engage its services.
13   Q   And when you say yes, you're referring to
14 Exhibit number 2; is that right?
15   A   No, I'm referring to -- oh, yeah, Exhibit 2,
16 page 1.
17   Q   And a moment ago when we were talking about the
18 first exhibit that I showed you, I think you said that
19 you generally recognized Exhibit number 1, which is the
20 Fax Broadcasting Agreement; is that right?
21   A   Yes.
22   Q   And the date of that is June of 2001; is that
23 right?
24   A   Yes.
25   Q   What I'm trying to confirm is that you would not

Page 33

1  have retained fax.com's services on behalf of New Century
2  before the dates reflected in these documents?
3    A   That's fair to say.
4    Q   Okay. Getting back to the table in Exhibit
5  number 2, do you see the reference to 200,000 block
6  units?
7    A   Yes.
8    Q   Do you know what that refers to?
9    A   I believe it's the number of faxes that they
10 would send.
11   Q   Who suggested 200,000?
12   A   It was probably Mr. Rapier. And just to correct
13 something. I misspelled his name. It's actually,
14 F-r-a-p-p-i-e-r.
15   Q   Thank you. The table also includes some
16 references to rates. Do you see those?
17   A   Yes.
18   Q   Was there any negotiation of the rates to be
19 charged for fax.com's services?
20   A   Yes.
21   Q   Were you involved in those negotiations?
22   A   Yes.
23   Q   What do you remember about those negotiations?
24   A   I got the price much lower.
25   Q   How much lower?

Page 34

1    A   I don't recall.
2    MR. LITTLE: Good job.
3    THE WITNESS: That's your job as the marketing guy
4  to get the best price for the company.
5  BY MR. CUNNINGHAM:
6    Q   Certainly. And it looks like the price that you
7  got here was $15,000 for the first batch of faxes; is
8  that correct?
9    MR. LITTLE: Assumes facts not in evidence.
10   THE WITNESS: This is reflecting -- well, it says
11 that.
12 BY MR. CUNNINGHAM:
13   Q   It says $15,000?
14   A   Yes.
15   Q   Do you recall that $15,000 is roughly the amount
16 that you paid for the first batch of faxes?
17   MR. LITTLE: Assume facts not in evidence. It
18 assumes that there was money paid for -- it assumes there
19 was a first batch of faxes, and it assumes that there was
20 money paid.
21 BY MR. CUNNINGHAM:
22   Q   Sure. I'm sorry. Did you answer?
23   MR. LITTLE: Counsel, why don't rephrase your
24 question.
25 BY MR. CUNNINGHAM:

Page 35

1    Q   Okay. Do you recall that $15,000 was the amount
2  that you paid for the fax broadcasting services reflected
3  in Exhibit number 2?
4    A   No.
5    Q   What do you recall about the price that you
6  paid?
7    MR. LITTLE: Again, assumes facts not in evidence.
8  It presumes that there was money paid.
9  BY MR. CUNNINGHAM:
10   Q   You can answer.
11   A   I don't recall the $15,000 number. As I recall,
12 I was negotiating the rate per unit.
13   Q   Do you remember anything about the total price?
14   A   No.
15   Q   Did you have to get authority regarding price
16 from Mr. Redding?
17   A   Yes.
18   Q   Did that require a second conversation with
19 Mr. Redding?
20   A   Mr. Redding. And I reported to him. And we
21 were in the same building. And we had multiple
22 conversations. I don't recall if there was a second and
23 there was a third or how many.
24   Q   You had told us about your initial conversation
25 with Mr. Redding regarding fax.com in which he authorized

Page 36

9 (Pages 33 to 36)

1   you to engage their services.
2       With regard to price, was price discussed in
3   that initial conversation, or was it at a subsequent
4   time?
5       A  I don't recall.
6       Q  Turning to the next page of Exhibit number 2,
7   have you seen that page before?
8       A  Yes.
9       Q  Is that the fax that you, in fact, engaged
10  fax.com to transmit?
11      A  Yes.
12      Q  And is this the fax that you engaged them to
13  transmit in June of 2001?
14      MR. LITTLE:  Objection.  Assume facts not in
15  evidence.  He hasn't testified that anything was faxed in
16  June 2001.
17      MR. CUNNINGHAM:  That's what I'm asking you, is this
18  the fax.
19      MR. LITTLE:  No.  You haven't ask him whether
20  anything was faxed in 2001.
21  BY MR. CUNNINGHAM:
22      Q  Was this the contract -- I'm sorry.  Was this
23  the fax that you engaged fax.com to transmit in 2001?
24      MR. LITTLE:  Again, assumes facts not in evidence.
25  BY MR. CUNNINGHAM:

                    Page 37

1       Q  You can answer.
2       A  I'm sorry.  Maybe we can just go back.
3       Q  Certainly.  You entered into a contract with
4   fax.com in 2001.  We've established that.
5       A  Yes.
6       Q  Is this the facsimile that you asked them to
7   transmit on your behalf?
8       A  This is a copy of what they prepared.
9       Q  Okay.  And is this what they prepared in 2001?
10      A  I don't recall.
11      MR. LITTLE:  Objection.  Calls for speculation.
12  BY MR. CUNNINGHAM:
13      Q  Do you know when this page was prepared?
14      A  No.
15      Q  What role, if any, did you play in the
16  preparation of this document?
17      A  Providing copy points and information related to
18  customer base.
19      Q  Did you provide the words that are reflected in
20  this page?
21      A  No.
22      Q  Who provided the words?
23      A  Fax.com.
24      Q  Who at fax.com did that?
25      A  I don't know.

                    Page 38

1       Q  Did you have to sign off on the words that they
2   eventually provided to you?
3       A  I don't recall.
4       Q  Who provided the images that are reflected on
5   this document?  And by images, I'm distinguishing the
6   words.
7       A  The graphics you're referring to?
8       Q  Exactly.
9       A  Fax.com.
10      Q  Did you have to approve the graphics that are on
11  this page?
12      A  I'm sorry.
13      Q  I think you just told us that the graphics were
14  provided by fax.com; is that correct?
15      A  Yes.
16      Q  Did you have to consent to the use of those
17  graphics?
18      A  Yes.
19      Q  Did you have to get Mr. Redding's approval for
20  the words and graphics contained on this page?
21      A  Yes.
22      Q  And did he, in fact, sign off on the use of
23  these words and graphics?
24      A  He approved them.
25      Q  Do you know if any written documentation was

                    Page 39

1   made reflecting that approval?
2       A  I don't know.
3       Q  At the bottom of the page there's some
4   handwriting that says New Century Mortgage and then
5   there's a date.
6       A  Yes.
7       Q  Is that your handwriting?
8       A  No.
9       Q  Do you know whose handwriting that is?
10      A  No.
11      Q  Mr. Nese, do you recall that shortly after you
12  signed the contract with fax.com that they, in fact,
13  provided you with fax broadcasting services?
14      A  No.
15      Q  What do you recall about when fax.com first
16  provided New Century Mortgage with fax broadcasting
17  services?
18      A  I would say it was -- I mean the only fax
19  services I recall are the ones that happened in February.
20      Q  Okay.  The document that we've been looking at
21  purports to suggest -- or strike that.
22      The document that we've been looking at is dated
23  June of 2001; is that right?
24      A  Yes.
25      Q  And the contract that you signed was July of

                    Page 40

Esquire Deposition Services
949.440.7000

1  2001; is that correct?
2      A  Yes.
3      Q  Is it your testimony that there was some delay
4  in time before fax transmission services were actually
5  engaged?
6      A  Yes.
7      Q  And why did that delay occur?
8      A  Well, again, this was very, very -- this was
9  very small in the context of, you know, operating a
10  marketing department.  And, you know, usually the reason
11  for the delays are just because you don't have people to
12  get everything lined up.  We were working on other things
13  at the time.
14      And you're right about, you know, about seeing
15  the document, because as you can see here, this says
16  6/11.
17      Q  Right.
18      A  And then down below it says 6/13, so, you know,
19  there's a difference.  So possibly, you know, they were
20  going back and forth about --
21      MR. LITTLE:  Okay.  We're not going to ask you to
22  speculate.
23      THE WITNESS:  I don't know.
24  BY MR. CUNNINGHAM:
25      Q  Mr. Nese, you agree that the first page

*Page 41*

1  indicates the week of 6/11; is that correct?
2      A  Yes.
3      Q  And the handwriting at the bottom refers to a
4  more specific date which is 6/13; is that correct?
5      A  Yes.
6      Q  And you would agree that June 13th is during the
7  week of June 11th?
8      A  Yes, but I didn't sign the document.
9      Q  I understand that.  We're going to move on
10  temporarily to Exhibit number 3.
11      (Defendant Exhibit 3 was marked for
12      identification by the court reporter.)
13  BY MR. CUNNINGHAM:
14      Q  Exhibit number 3 is a one-page document bearing
15  the title "Accounts Payable Check Request."  And the
16  Bates number is NCMC00029.
17      Please take a look at that.
18      Have you had a chance to look at this document?
19      A  Yes.
20      Q  And you would agree that it's an accounts
21  payable check request?
22      A  Yes.
23      Q  Is this the type of document that you completed
24  in the regular course of business at New Century
25  Mortgage?

*Page 42*

1      A  Yes.
2      Q  It was your job to fill out documents like this?
3      A  No.
4      Q  But you did it nonetheless?
5      A  I didn't fill the document out.
6      Q  Okay.  Who filled out the document?
7      A  Jo Beth Montoya.
8      Q  And do you know who that is?
9      A  Yes.
10      Q  Who is Joe Beth Montoya?
11      A  Joe Beth Montoya reported to Kirk.
12      Q  Tell us Kirk's last name?
13      A  Redding.
14      Q  Okay.  What was Joe Beth Montoya's position?
15      A  She did a number of things.  But managing
16  accounts payable and HR were her primary
17  responsibilities.
18      Q  Does this document bear your signature?
19      A  Yes.
20      Q  And it says that at the time that you signed
21  this you were the senior vice president; is that right?
22      A  Yes.
23      Q  And what's the date of this document?
24      A  6/8/01.
25      Q  June 8th of 2001?

*Page 43*

1      A  Yes.
2      Q  In this document you were asking -- you were
3  asking your company to issue a check in the amount of
4  $15,000 to fax.com; is that correct?
5      A  Yes.
6      Q  Why was it that on June 8th of 2001 you asked
7  your company to issue a check for $15,000 to fax.com?
8      A  As I recall, they had to be paid in advance.
9      Q  For what?
10      A  For their services.
11      Q  So you paid them in June?
12      A  I don't know.
13      Q  I'm sorry.  You paid them in June of 2001 for
14  their fax broadcasting services?
15      A  I don't know.
16      Q  Why then would you have been issuing a document
17  such as this?
18      A  Well, we may have prepared the document and not
19  elected to proceed with their services, so --
20      Q  Are you saying that that is, in fact, what
21  happened?
22      A  I don't know.
23      Q  You don't know if they were paid in June of
24  2001?
25      A  I don't know.

*Page 44*

11 (Pages 41 to 44)

1    Q   You don't know if they performed fax services in
2  June of 2001?
3    A   I don't know.
4    Q   Okay.  Do you know if they performed fax
5  services at any point in 2001?
6    A   I don't know.
7    Q   Do you see that the document indicates that the
8  check was needed by June 11th, 2001?
9    A   Yes.
10    Q   Do you recall why the check was needed by June
11  11th, 2001?
12    A   I don't recall.
13    Q   You agree that $15,000 is the amount that was
14  previously indicated in Exhibit number 2; is that
15  correct?
16    A   Yes.
17    Q   Getting back to Exhibit number 2, we were
18  talking about the words and graphics on the fax.
19        In the middle of the document it indicates a
20  telephone number, which is 800 205-9422.
21        Do you see that?
22    A   Yes.
23    Q   Is that a phone number that you provided to
24  fax.com?
25    A   I don't know.

Page 45

1    Q   Do you know who provided that to fax.com, if
2  anyone?
3    A   I don't know.
4    Q   Do you recall if that is a phone number
5  established by New Century Mortgage Corporation?
6    A   I don't know.
7    Q   Is it possible that it wasn't a New Century
8  number?
9    A   I don't think so.
10    Q   Okay.  Was this facsimile sent in conjunction
11  with a larger advertising campaign?
12    MR. LITTLE:  Objection.  Assumes facts not in
13  evidence.  Assumes that this was sent.
14    THE WITNESS:  I don't know.
15  BY MR. CUNNINGHAM:
16    Q   Do you recall if you ever engaged other types of
17  advertising which reflects the services advertised in
18  this fax?  That was a bad question.  Let me start that
19  over.
20    A   Okay.
21    Q   In the course of advertising your company's
22  products or services, is there ever an occasion when you
23  engage different media at the same time to advertise the
24  same service or product?
25    A   Yes.

Page 46

1    Q   And was there ever a time when you utilized fax
2  advertising along with advertising on some other medium?
3    A   Doing them in conjunction with one another?
4    Q   Correct.
5    A   No.
6    Q   Okay.  So this would not have been done in
7  conjunction with, for example, a newspaper advertisement?
8    A   It would not have been.
9    Q   Or a television advertisement?
10    A   It would not have been.
11    Q   Or a direct mail advertisement?
12    A   It would not have been.
13    Q   And you seem certain that it would not have
14  been.  Why is that?
15    A   Because it was so small, and we were just
16  testing.
17    Q   Okay.  In order -- strike that.
18        Was it your responsibility to make sure that
19  there was somebody available to answer this phone number
20  if anybody called?
21    A   Yes.
22    Q   And how did you go about fulfilling that
23  responsibility?
24    A   Well, we had a group of customer service
25  representatives that answered all calls from all

Page 47

1  marketing channels.
2    Q   Where were they located?
3    A   At 340 Commerce Center, Irvine.
4    Q   And this is a telephone number that would have
5  directed the caller to that center; is that correct?
6    A   It should have.
7    Q   Is this the only phone number that would have
8  directed the caller to that center?
9    A   No.
10    Q   Did New Century have many different telephone
11  numbers?
12    A   Yes.
13    Q   And did it have many different 800 telephone
14  numbers?
15    A   Yes.
16    Q   Why was that?
17    A   So you could track the results of a particular
18  campaign and know the reason why the customer was
19  calling.
20    Q   Why would you want to track the results of a
21  particular campaign?
22    A   To determine if it worked or not.
23    Q   Is this a phone number that was used only in
24  conjunction with facsimile advertising?
25    A   I don't know.

Page 48

12 (Pages 45 to 48)

1    Q  Who would know that?
2    A  I don't know.  Because at the time we had many
3  800 numbers, and we would frequently recycle them.  And I
4  just don't know.
5    MR. LITTLE:  If you don't know, you don't know.  You
6  don't have to explain it.
7  BY MR. CUNNINGHAM:
8    Q  Would you ever get a report reflecting the
9  number of calls made to a particular 800 number?
10    A  No.  I may have.  But I look at our calls in
11  aggregate.
12    Q  How would you go about doing that?
13    A  Looking on the phone system.
14    Q  This is something you were able to do by
15  computer; is that correct?
16    A  Yes.
17    Q  And if you had wanted to, would you have been
18  able to determine how many telephone calls were made to
19  this phone number?
20    A  If I wanted to.
21    Q  And would you also have been able to determine
22  the date that those calls were made?
23    A  Yes.
24    Q  What else could you determine?
25    A  Average talk time.  There's a variety of call

Page 49

1  center statistics, and I'll be happy to go through them.
2    Q  Please do.
3    A  Number of calls, agents answered, average time
4  of call, number of rings before answered, number of rings
5  no answer is when it rings to an agent and they don't
6  pick it up.  Number of extended calls, the number of
7  telephone calls directly to that person's direct line.
8  Number of outbound calls made.  Those are generally the
9  sort of things I would look at.
10    Q  Fair enough.
11    A  Oh, number of abandoned calls.  That's the most
12  important one.
13    Q  What is an abandoned call?
14    A  That is when a caller, they're on hold, and they
15  hang up before speaking to an agent.
16    Q  Okay.  And you just gave us a list of different
17  types of information that you could obtain.
18      Could you obtain that information for each 800
19  number that New Century Mortgage maintained?
20    A  We didn't have the system set up that way.
21    Q  Okay.  How was the system set up?
22    A  The system was set up to route from a variety of
23  800 numbers to a group of agents that would answer the
24  telephone.  And then, you know, it just reviews
25  operations.  It would look at our statistics in

Page 50

1  aggregate, not necessarily on, you know, a particular 800
2  number.
3    Q  How would you go about judging the effectiveness
4  of a particular advertising campaign?
5    A  Take the amount of money that we spent for the
6  campaign, divide it by the number of calls produced by
7  that source.
8    Q  Do you know if that type of analysis was ever
9  conducted with regard to a fax advertising campaign?
10    A  I don't know.  I don't know.
11    Q  If I wanted to determine if such an analysis had
12  been made, how would you go about doing that?
13    A  Well, again, you know, at the time the marketing
14  department was, you know, quite immature.  We weren't
15  sophisticated as you might think.
16      So when I say I looked at the calls in
17  aggregate, I would just look at the total amount of money
18  that we spent divided by the amount of marketing calls
19  generated and that gets you a cost per call.
20      And if it's acceptable, great.  If it's not,
21  then that's why you test various different things.
22    Q  Okay.  Was there a particular audience that you
23  were attempting to target with this facsimile?
24    A  Homeowners.
25    Q  And was your target audience any more specific

Page 51

1  than that?
2    A  People -- New Century's customers typically have
3  credit blemishes.  So people with credit blemishes,
4  homeowners with credit blemishes.
5    Q  Okay.  Did you tell fax.com that that is the
6  target audience that you wanted to receive the fax?
7    A  Yes.
8    Q  What else did you tell them about the target
9  audience?
10    A  I didn't have to tell him very much more because
11  he was familiar with the mortgage business.
12    Q  Okay.  But was there anything else that you told
13  him?
14    A  I don't recall.
15    Q  How was it that he was familiar with the
16  mortgage business?
17    A  He didn't work for Mr. Harrel.  He referred him
18  to me.
19    Q  I see.  And you're referring to Mr. Frappier?
20    A  Frappier, yes.
21    Q  Okay.  Is it true that you were not trying to
22  target just your prior customers with this advertisement?
23    A  That's true.
24    Q  Did Mr. Frappier tell you how he would go about
25  targeting homeowners with credit blemishes?

Page 52

13 (Pages 49 to 52)

1    A  I don't recall.

2    Q  Did you ask him how he knew what numbers to fax
3  this advertisement to?

4    A  No.

5    Q  Did you ask him how many fax numbers he was
6  capable of transmitting to?

7    A  Yes.

8    Q  What did you ask him about that issue?

9    A  I asked him that exact question.

10    Q  And what did he say?

11    A  Tens of millions.  I don't recall the exact
12  number.  But it was in the tens of millions.

13    Q  And did he offer you any explanation as to how
14  he could narrow the tens of millions down to the people
15  who are homeowners who have credit blemishes?

16    A  No.

17    Q  Did you say anything to him about the types of
18  people that you would like not to receive this facsimile?

19    A  I don't recall.

20    Q  Towards the bottom of the page there's a
21  sentence that says "To have your number removed from our
22  database, please call our automated toll-free center at
23  800-443-6728."

24    Do you see that reference?

25    A  Yes.

Page 53

1    Q  Is that phone number a New Century Mortgage
2  phone number?

3    A  No.

4    Q  Is that a fax.com phone number?

5    A  I believe so.

6    Q  Why do you believe that?

7    A  Because the number, if someone wanted to opt out
8  of fax.com's database, they had to call fax.com.

9    Q  Why was this sentence included in the fax?

10    A  So if people didn't want to, if people didn't
11  want to receive them, they could opt out.

12    Q  Did you have an understanding at the time that
13  the advertisement was faxed that people might not want to
14  receive them?

15    A  I don't know.

16    Q  Did you understand at the time that that's why
17  that sentence was included in your advertisement?

18    A  I assume so.

19    Q  Okay.  Why is it that someone might not have
20  wanted to receive a facsimile like this?

21    A  For the same reasons that people opt out of, you
22  know, being telemarketed.  They don't want a
23  solicitation.  They don't want a call at dinner time.

24    Q  You understood that at the time that you were
25  engaging fax.com to perform services for you; is that

Page 54

1  correct?

2    A  I'm sorry.  I'm just not sure where we're going.
3  I understand some people don't want to receive certain
4  types of advertising.

5    Q  And you understood that at the time that you
6  were engaging fax.com; is that correct?

7    A  Yes.

8    Q  You understood that some people might not want
9  to receive an advertisement over their facsimile machine;
10  is that correct?

11    A  As I understand some people don't want to
12  receive a piece of mail in their mailbox.

13    Q  Does that mean yes?

14    A  Yes.

15    Q  Okay.  Do you know if you made any revisions to
16  the fax advertisement in question?

17    A  I don't recall.

18    Q  Was anybody else involved in approving the words
19  and images reflected here?

20    A  Myself and Mr. Redding.

21    Q  Anybody else?

22    A  No.

23    Q  Do you recall what input, if any, Mr. Redding
24  offered?

25    A  I don't recall specifically.

Page 55

1    Q  Did you discuss this document -- strike that.

2    MR. CUNNINGHAM:  Number 4.

3    (Defendant Exhibit 4 was marked for

4    identification by the court reporter.)

5  BY MR. CUNNINGHAM:

6    Q  Mr. Nese, I've handed you what has been marked
7  as Exhibit number 4, which is a document bearing the
8  title, "Artwork Layout Approval."  And I would ask you to
9  take a look at that.

10    A  Okay.

11    Q  Have you seen this document before?

12    A  I don't recall.

13    Q  Does this document bear your signature?

14    A  Yes.

15    Q  And the signature is next to the date, February
16  15 of 2002; is that right?

17    A  Yes.

18    Q  Next to the word "artwork description," someone
19  has written in "same ad."  Do you see that?

20    A  Yes.

21    Q  Is that your handwriting?

22    A  No.

23    Q  Whose handwriting is that?

24    A  I don't know.

25    Q  And that notation is also dated February 15 of

Page 56

14 (Pages 53 to 56)

1  2002; is that right?
2    A  Yes.
3    Q  Do you know what the reference to "same ad"
4  meant in March of 2002?
5    A  I have no idea.
6    Q  Below that there is a handwritten notation,
7  "Approved subject to 800 number being operational."
8      Do you see that?
9    A  Yes.
10   Q  Is that your handwriting?
11   A  Yes.
12   Q  That's your handwriting, but you don't think the
13  handwriting above that is yours?
14   A  The handwriting above it is definitely not.  I
15  print in all capitals.
16   Q  Okay.  What does "Approved subject to 800 number
17  being operational" mean?
18   A  That means we would have had to test the 800
19  number to make sure that the calls would come through to
20  the call center.
21   Q  And this was the 800 number that you were
22  setting up; is that right?
23   A  I wasn't setting it up.
24   Q  Your company was?
25   A  Yes.

Page 57

1  briefly take a look at that.
2    A  Okay.
3      (Defendant Exhibit 5 was marked for
4      identification by the court reporter.)
5  BY MR. CUNNINGHMAM:
6    Q  My only question about this one is that your
7  signature?
8    A  Yes.
9    Q  Thank you.
10     (Defendant Exhibit 6 was marked for
11     identification by the court reporter.)
12  BY MR. CUNNINGHAM:
13   Q  Now, I'm handing you Exhibit number 6.  This is
14  a one-page document bearing the Bates number NCMC00025,
15  and I would ask you to take a look at that.
16   A  Okay.
17   Q  Have you ever seen that document before?
18   A  I don't recall.
19   Q  Is there anything unique about the cities
20  identified in the left-hand column that would allow you
21  to tell us what this document was used for?
22   A  The only unique thing is that all the cities are
23  in California.
24   Q  Was there a times when you engaged in an
25  advertising campaign that focused only on cities in

Page 59

1    Q  At the top of the document it indicate that it's
2  from Anthony.
3    A  It does.
4    Q  Do you know who Anthony was?
5    A  No.
6    Q  In February of 2002, how did fax.com know what
7  advertisement to fax on your behalf?
8    A  I don't know.
9    Q  Is it possible that they had already received a
10  fax advertisement from you by then?
11   A  No.  I think it's possible that --
12  MR. LITTLE:  It's a yes-or-no question.
13  THE WITNESS:  I'm sorry.  Ask it again.
14  MR. CUNNINGHAM:  Can you read that back, please?
15     (Record read.)
16  THE WITNESS:  I don't know.
17  MR. LITTLE:  Counsel, can we go off the record for a
18  second?
19  MR. CUNNINGHAM:  You bet.
20     (Discussion off the record.)
21     (Recess taken.)
22  MR. CUNNINGHAM:  Back on the record.
23  MR. CUNNINGHAM:  Mr. Nese, I've handed you Exhibit
24  number 5, which is a document bearing the title, "Fax
25  Broadcasting Sales Order."  And I would ask you to

Page 58

1  California?
2    A  At all time we try to generate business from
3  California as a state in whole, not a particular city.
4    Q  So you never would have -- strike that.
5      Would you ever focus specifically only on
6  California?
7    A  No.
8    Q  Okay.  There are some numbers written on the
9  right-hand side.  Is that your handwriting?
10   A  Yes.
11   Q  Do you know what those numbers represent?
12   A  No.
13   Q  Do you know what MSA stands for?
14   A  That is a Metropolitan Statistical Area.
15   Q  Do MSAs have any particular importance in the
16  marketing business?
17   A  Yes.
18   Q  What is that importance?
19   A  An MSA description is just a designator for a
20  particular area.
21     From a marketing perspective the country is
22  divvied up into these MSAs.  And some of which you see
23  there.
24   Q  Okay.
25  //

Page 60

15 (Pages 57 to 60)

1    (Defendant Exhibit 7 was marked for
2    identification by the court reporter.)
3 BY MR. CUNNINGHAM:
4    Q  Mr. Nese, Exhibit Number 7 is a multi-page
5 exhibit.  The first page has the caption from the case
6 Paul Bernstein versus New Century Mortgage Corporation in
7 Cook County, Illinois.
8       You're welcome to page through it, but I'm going
9 to ask you a specific question about something on page 3.
10    A  Okay.
11    Q  Just by way of background, Mr. Nese, I'll inform
12 you that this is a document that New Century's attorneys
13 submitted in a related litigation in Cook County,
14 Illinois.
15       In this type of document your company was
16 answering questions posed by the opposing party.  And
17 there's a reference at the bottom of the page, where the
18 document says, "Without waiving this objection, New
19 Century produces copies of the front of the checks it
20 issued to pay for two of the orders it placed with
21 Fax.com and investigation continues as to the check
22 issued to pay for the first order."
23       Do you see that reference?
24    A  Yes.
25    Q  Were you involved in the investigation for the

1    And, for the record, I'll state that the
2 attachment to this is a letter from the office of the
3 attorney general from the state of Florida to New Century
4 Mortgage Company.
5       Have you seen either of these two documents
6 before?
7    A  I don't recall.
8    Q  Do you recall ever being told that the office of
9 the attorney general of the state of Florida had asserted
10 a complaint about fax advertising activities?
11    A  No.
12    Q  Is it true that on the first page you are
13 indicated as a cc recipient of this document?
14    A  Yes.
15    Q  Do you know you were included as a cc recipient?
16    MR. LITTLE:  Objection.  Calls for speculation.
17    THE WITNESS:  I don't know.
18 BY MR. CUNNINGHAM:
19    Q  Who was Joseph Waltuch?
20    A  One of our attorneys, one of New Century's
21 attorneys.
22    Q  Did you ever talk to Joseph Waltuch about fax
23 advertising?
24    MR. LITTLE:  This is a yes-or-no question.
25    THE WITNESS:  I don't recall.

1 check used for the first order?
2    A  I don't recall.
3    Q  Do you recall who was involved in that
4 investigation?
5    A  No.  It would probably be someone in accounts
6 payable.
7    Q  Okay.  Do you recall if the check for the first
8 order was ever found?
9    A  I don't even know that there was a first order.
10 I don't know.
11    Q  Have you seen this document before?
12    A  I don't recall.
13    Q  Okay.  The document says there was a first
14 order, right?
15    MR. LITTLE:  The document speaks for itself.  This
16 is a discovery response in another action.
17       Mr. Nese has already testified that he hasn't
18 seen the document before.
19       (Defendant Exhibit 8 was marked for
20       identification by the court reporter.)
21 BY MR. CUNNINGHAM:
22    Q  Exhibit number 8 is a two-page exhibit.  The
23 first page of which is a letter from Joseph Waltuch,
24 W-a-l-t-u-c-h of New Century Mortgage, to Robert Buchner,
25 B-u-c-h-n-e-r.

1 BY MR. CUNNINGHAM:
2    Q  Okay.  Were you ever involved in any
3 communication with the attorney general of the state of
4 Florida regarding fax advertising?
5    A  No.
6    Q  Did anybody ever ask you if New Century Mortgage
7 faxed advertisement within the state of Florida?
8    A  I don't recall.
9    Q  The cover letter is not dated.  The attachment
10 is May 29 of 2002.
11    A  That's what it says.
12    Q  I'm curious as to when the first time was that
13 you heard of a complaint asserted against New Century
14 Mortgage Company regarding the receipt of a fax
15 advertisement.
16    MR. LITTLE:  Assumes facts not in evidence.  Assumes
17 he's heard of any complaint.
18    THE WITNESS:  I don't recall.
19 BY MR. CUNNINGHAM:
20    Q  Have you ever heard of a complaint asserted
21 against New Century regarding fax advertising?
22    A  Yes.
23    Q  When was the first time that you heard of that?
24    A  Well, with the Bernstein case.
25    Q  The filing of the Paul Bernstein action?

| | |
|---|---|
| 1    A  Yes. | 1    A  Yes. |
| 2    Q  Before the Bernstein action, had you heard of | 2    Q  How did you know it wasn't working? |
| 3  any complaints asserted by recipients of fax | 3    A  We didn't have any loans from it. |
| 4  advertisements? | 4    Q  How do you know you didn't have any loans from |
| 5    A  I don't recall. | 5  it? |
| 6    Q  In the second paragraph of the letter the author | 6    A  Well, we'd have a report that would show |
| 7  indicates the particular facsimile in question was | 7  where -- which sources various loans came from.  You |
| 8  erroneously sent to that company, and we have taken | 8  know, unlike other businesses, you know, the mortgage |
| 9  measures to correct this situation so that it will not | 9  business, the sales cycle is 30 to 60 days.  So we don't |
| 10  occur again. | 10  know for some time whether something has worked or not. |
| 11      Do you see that reference? | 11    Q  Okay.  But you had access to some data which |
| 12    A  Yes. | 12  would allow you, if your contact was created by virtue of |
| 13    Q  Do you know how New Century Mortgage Corporation | 13  fax advertising? |
| 14  determined that the fax in question was erroneously sent? | 14    A  Yes. |
| 15    A  No. | 15    Q  Do you know at what point it was that you |
| 16    Q  Do you know who made that determination? | 16  concluded that this fax advertising was not working? |
| 17    A  I don't. | 17    A  I don't recall. |
| 18    Q  And it wasn't you; is that correct? | 18    Q  Do you know if New Century sold any loans at all |
| 19    A  I don't know. | 19  as a result of the fax advertising campaign? |
| 20    Q  The sentence also says, "We have taken measures | 20    A  I don't recall. |
| 21  to correct this situation."  Do you see that? | 21      (Defendant Exhibit 9 was marked for |
| 22    A  Yes. | 22      identification by the court reporter.) |
| 23    Q  Do you recall what those measures were? | 23  BY MR. CUNNINGHAM: |
| 24    A  No, I didn't prepare this. | 24    Q  Exhibit number 9 is a multi-page exhibit.  The |
| 25    Q  Recognizing that you didn't prepare the letter, | 25  first page of which is a letter dated July 1, 2002 from |
| Page 65 | Page 67 |
| 1  did there come a time when New Century Mortgage | 1  Andrew L. Quiat, Q-u-i-a-t, to New Century Mortgage |
| 2  Corporation took measures to correct the transmission of | 2  Corporation. |
| 3  fax advertisements? | 3      Have you ever seen Exhibit number 9 before? |
| 4    A  I'm sorry.  Maybe I'm just not getting it.  I | 4    A  I don't recall. |
| 5  don't know if they did or if they didn't.  I have no | 5    Q  Did you ever come to learn that an attorney by |
| 6  idea. | 6  the name of Andrew L. Quiat had asserted a complaint |
| 7    Q  Okay.  There never came a time when you received | 7  against New Century Mortgage Corporation? |
| 8  a directive from above telling you to cease and desist | 8    A  No. |
| 9  all fax advertising activities? | 9    Q  Do you recall ever hearing that someone in |
| 10    A  As I recall, I mean we just didn't do it because | 10  Colorado had asserted a complaint against New Century |
| 11  it didn't work very well.  At some later time I think a | 11  Mortgage Corporation regarding fax advertising? |
| 12  directive did come down that did say that, but by that | 12    A  No. |
| 13  time we weren't doing it. | 13      (Defendant Exhibit 10 was marked for |
| 14    Q  Do you know when that directive came down? | 14      identification by the court reporter.) |
| 15    A  I don't recall. | 15  BY MR. CUNNINGHAM: |
| 16    Q  Do you know from whom that directive came? | 16    Q  The next exhibit is Exhibit number 10, which is |
| 17    A  I don't recall. | 17  a letter from Joseph L. Waltuch of New Century to Andrew |
| 18    Q  Did that directive come in writing? | 18  L. Quiat. |
| 19    A  I don't recall, because we weren't doing it.  So | 19    A  Would you like me to read it?  Or if you're |
| 20  that's why, you know, a lot of this stuff -- again, this | 20  going to ask me something about it, then I'll read it. |
| 21  was so small. | 21    Q  You are indicated on the second page as being a |
| 22    Q  Did you ever discuss that directive with anyone? | 22  bcc.  And I'm going to ask you if you know why you were |
| 23    A  I don't recall. | 23  indicated as a bcc? |
| 24    Q  You said that the fax advertising wasn't | 24    A  I don't know. |
| 25  working; is that correct? | 25    Q  Do you recall ever discussing the claim asserted |
| Page 66 | Page 68 |

17 (Pages 65 to 68)

1 by Andrew Quiat with Joseph L. Waltuch?
2    A  No.
3    Q  Do you ever recall discussing any fax blasting
4 claims with Joseph L. Waltuch?
5    A  I don't recall.
6    Q  There is a paragraph in the document that starts
7 with the words, "I am sure." That has to do with the
8 constitutionality of the Telephone Consumer Protection
9 Act."
10      First of all, just by way of foundation, let me
11 ask you, have you ever heard of the Telephone Consumer
12 Protection Act?
13    A  Yes, I've heard of it.
14    Q  You are not an attorney; is that correct?
15    A  That's correct.
16    Q  You have never been to law school; is that
17 correct?
18    A  That's correct.
19    Q  When did you first hear of the Telephone
20 Consumer Protection Act?
21    A  I don't recall when it first was.
22    Q  Was it when you were working at New Century
23 Mortgage Company?
24    A  I don't recall. It may well have been before
25 that, I don't recall.

Page 69

1 involved in that discussion?
2    A  I don't recall.
3    Q  And you said Mr. Frappier was involved in that
4 discussion?
5    A  Yes.
6    Q  Was there anyone else from New Century involved
7 in that discussion?
8    A  No.
9    Q  After having that discussion did you make any
10 written documentation of the substance of the discussion?
11    A  No. But I remember him bringing something like
12 that up.
13    Q  Which of the two gentlemen?
14    MR. LITTLE: Let the record indicate he's pointing
15 to Exhibit 10, and the paragraph that you're referring
16 to about unconstitutional. He used the indefinite pronoun.
17    MR. CUNNINGHAM: Thank you.
18    Q  Which of the two gentlemen on the other end of
19 the phone call brought up this issue of
20 constitutionality?
21    A  It was Mr. Frappier, and then the other two
22 gentlemen sort of confirmed it.
23    Q  After hearing that information did you contact
24 the legal department at New Century Mortgage to ask them
25 about that issue?

Page 71

1    Q  Did you ever come to learn that someone at New
2 Century Mortgage Company was interested in the
3 constitutionality of the Telephone Consumer Protection
4 Act?
5    A  Well, it's funny that you mention that. Because
6 I do recall this. Because in discussions with
7 Mr. Frappier, you know, I asked him about this. And as a
8 matter of fact, we were on one occasion, we were on a
9 call with an attorney from his company, and somebody
10 represented themselves as being a compliance officer.
11 And I asked them about this.
12    MR. LITTLE: Let him ask the question.
13    THE WITNESS: Okay. I'm sorry.
14 BY MR. CUNNINGHAM:
15    Q  What did you ask them about this?
16    MR. LITTLE: See, that's what happens when you go
17 on.
18    THE WITNESS: Well, actually, I didn't ask him. You
19 know, he basically assured us that this was, you know --
20 you know, this was okay to do.
21 BY MR. CUNNINGHAM:
22    Q  Was this before or after you signed the contract
23 with fax.com?
24    A  Before.
25    Q  What was the name of the attorney that was

Page 70

1    A  No. Because they, fax.com, told us if we had
2 anybody complaining, if we had any complaints, just to
3 refer them to fax.com.
4    Q  When did they tell you that?
5    A  I don't recall the specific date.
6    Q  Did they tell you that in writing or verbally?
7    A  Verbally.
8    Q  Who was it that told you that?
9    A  Mr. Frappier.
10    Q  Was anyone else involved in the discussion in
11 which they told you that?
12    A  I don't recall.
13    Q  After hearing of that comment, did you make any
14 written documentation reflecting that comment?
15    A  No. I just kept it in the back of my mind.
16    Q  Was that the only time that that comment was
17 made to you?
18    A  I don't recall. You know, I mean they had made
19 that representation on several occasions.
20    MR. LITTLE: Since you're using the indefinite
21 pronoun, tell him what the representation is. That
22 representation, I don't know what it is.
23    THE WITNESS: I'm sorry. That if we had -- that if
24 there was ever a problem with a customer or somebody
25 complained, to refer them to fax.com.

Page 72

18 (Pages 69 to 72)

1  BY MR. CUNNINGHAM:
2      Q  And did there come a time when you, in fact,
3  referred a customer to fax.com?
4      A  I did not.
5      Q  Did anyone?
6      A  I don't know.
7      Q  I'd like you to refer back to Exhibit number 1.
8  The attachment is the Fax Broadcasting Agreement; is that
9  right?
10         I'm sorry.  Can you please turn to the
11  attachment to Exhibit number 1 which is this Fax
12  Broadcasting Agreement, and can you turn to paragraph
13  number 11.  Do you see that?
14     A  Yes.
15     Q  The heading for paragraph number 11 is "Legal
16  Issues re Fax Broadcasting."  Do you see that?
17     A  Yes.
18     Q  And the first sentence says, "Buyer acknowledges
19  that Buyer is aware that Seller's faxing of Buyer's
20  commercial messages," and then there's a space,
21  "advertisements on behalf of Buyer presents significant
22  legal issues and risks."  Do you see that sentence?
23     A  Yes.
24     Q  And the next sentence says, "Buyer acknowledges
25  that Seller has made no representations, promises or

Page 73

1  assurances to Buyer in this regard."  Do you see that
2  clause in the sentence?
3      A  Yes.
4      Q  And the next sentence says, "And Buyer has had
5  the opportunity to consult with its own legal counsel
6  with respect to the federal Telephone Consumer Protection
7  Act and applicable state law regarding transmissions by
8  fax of unsolicited commercial messages/advertisements and
9  the risks attended thereto."
10         Do you see that?
11     A  Yes.
12     Q  And you were an officer of the company at the
13  time that you signed this document; is that correct?
14     A  Yes.
15     Q  Okay.  Did you, in fact, consult with your own
16  legal counsel at the time that you signed this document?
17     A  No.
18         (Defendant Exhibit 11 was marked for
19         identification by the court reporter.)
20  BY MR. CUNNINGHAM:
21     Q  Exhibit number 11 is a multi-page document
22  bearing the date August 13, 2002.  Its a letter from the
23  Federal Communications Commission to New Century Mortgage
24  Corporation.
25         You don't have to read the whole thing unless

Page 74

1  you absolutely want to.
2      Q  My first question is going to be:  Have you ever
3  seen this document before?
4      A  No.
5      Q  Did you ever come to learn that the Federal
6  Communications Commission had issued a citation and a
7  letter of inquiry to New Century Mortgage Corporation?
8      A  No, I don't recall.
9      Q  Did you ever come to learn that the FCC was
10  looking into New Century's fax advertising activities?
11     A  I don't recall.
12     Q  Did you ever see any internal memoranda
13  discussing the investigation by the FCC?
14     A  I don't recall.
15         (Defendant Exhibit 12 was marked for
16         identification by the court reporter.)
17  BY MR. CUNNINGHAM:
18     Q  Number 12 is a multi-page exhibit from the law
19  firm of Morrison & Foerster to Kirk Schroeder,
20  S-c-h-r-o-e-d-e-r of the Federal Communications
21  Commission.
22         Mr. Nese, my question for you is going to be:
23  Have you ever seen this document before?
24     A  I don't recall -- oh, I have.
25     Q  Okay.  Did you see this document when you were

Page 75

1  preparing for this deposition?
2      A  Yes.
3      Q  Before that, did you have a recollection of ever
4  having seen this document before?
5      A  No.
6      Q  Do you recall ever dealing with the attorney of
7  Morrison & Foerster personally?
8      A  What's his name?
9      Q  His name is Chalres H. Kennedy according to the
10  last page of the document.
11     A  No, I don't even know who that is.
12     Q  Okay.  Mr. Nese, do you know someone by the name
13  of Monica McCarthy?
14     A  Yes.
15     Q  When was the first the time that you met Monica
16  McCarthy?
17     A  I don't recall the first time.
18     Q  Was she an employee of New Century Mortgage
19  Corporation?
20     A  Yes.
21     Q  What position did she hold when you first met
22  her?
23     A  She was one of our attorneys in the legal
24  department.
25     Q  Do you know when she started with the company?

Page 76

19 (Pages 73 to 76)

1   A  No.
2   Q  Was she there when you began with the company?
3   A  I don't recall.  It was in a different location.
4   Q  Okay.  Did you ever go to her while you were
5  negotiating with fax.com to talk to her about fax
6  advertising activities?
7   A  No.
8   Q  At any time during your interaction with
9  fax.com, was Monica McCarthy involved?
10   A  I don't know.
11   Q  Did she ever participate in a telephone call
12  with you and fax.com?
13   A  I don't recall.
14   Q  Did she ever participate in a meeting with you
15  and fax.com?
16   A  No.
17   Q  Did she ever approve any correspondence with
18  fax.com?
19   MR. LITTLE:  Objection.  Calls for speculation.
20  BY MR. CUNNINGHAM:
21   Q  That you know of?
22   A  I don't know.
23   Q  Did you ever go to her to approve of a
24  particular advertisement transmitted by fax.com?
25   A  No.

Page 77

1   Q  Did you ever talk to her about your intentions
2  in arranging for fax advertising?
3   A  No.
4   MR. CUNNINGHAM:  That's it for the documents.
5   Give me one second just to review my notes.  I
6  think we're about to wrap up.
7   Mr. Nese, earlier we talked about the phone
8  number at the bottom of the advertisement that a
9  recipient could call to get their name taken off the
10  list.
11   A  Yes.
12   Q  Do you know if anybody, in fact, called in to be
13  taken off the list of fax numbers?
14   A  I don't know.
15   MR. CUNNINGHAM:  Mr. Nese, that's all I have for
16  you.
17   Thank you very much.  Your counsel may have
18  questions.
19   MR. LITTLE:  No.
20   MR. CUNNINGHAM:  I think we're done.
21   Thank you.
22   (There was a discussion off the
23  record whereby it was agreed that the
24  original deposition would be sent to
25  Mr. Little, and that counsel for Tressler

Page 78

1  Soderstrom, Maloney & Priess would be
2  requesting an expedited receipt of the
3  transcript by Monday, September 26, 2005.)
4  //
5  //
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 79

1
2
3
4
5
6
7
8
9
10   I, FRANK NESE, do hereby declare under
11  penalty of perjury that I have read the foregoing
12  transcript of my deposition; that I have made such
13  corrections as noted herein, in ink, initialed by me, or
14  attached hereto; that my testimony as contained herein,
15  as corrected, is true and correct.
16  EXECUTED this _____ day of _____,
17  20_____, at _____, _____,
          (City)     (State)
18
19
20   _____
    FRANK NESE
    Volume 1
21
22
23
24
25

Page 80

20 (Pages 77 to 80)

1   STATE OF CALIFORNIA        )
                               :ss
2   COUNTY OF LOS ANGELES        )

3

4       I, the undersigned, a Certified Shorthand
5   Reporter of the State of California, do hereby certify:
6       That the foregoing proceedings were taken
7   before me at the time and place herein set forth; that
8   any witnesses in the foregoing proceedings, prior to
9   testifying, were placed under oath; that a verbatim
10  record of the proceedings was made by me using machine
11  shorthand which was thereafter transcribed under my
12  direction; further, that the foregoing is an accurate
13  transcription thereof.
14      I further certify that I am neither
15  financially interested in the action nor a relative or
16  employee of any attorney of any of the parties.
17      IN WITNESS WHEREOF, I have this date
18  subscribed my name.

19

20  Dated: _____

21

22

23         _____
           GREGORY F. BENSON
24         CSR No. 7793

25

             Page 81

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
             Page 82

21 (Pages 81 to 82)