**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NEW CENTURY MORTGAGE CORP., | ) | CASE NO.  05C2370 |
| Plaintiff, | ) | |
| | ) | Judge Coar |
| vs. | ) | |
| | ) | **NEW CENTURY'S REPLY IN** |
| GREAT NORTHERN INSURANCE | ) | **SUPPORT OF ITS MOTION FOR** |
| COMPANY, FEDERAL INSURANCE | ) | **SUMMARY JUDGMENT** |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................................................. 1

II.     CHUBB'S FALSE ACCUSATIONS OF MISSTATEMENTS OF FACT ................. 2

    A.    Chubb's Misleading Arguments .......................................................................... 2

    B.    Chubb's Wrongful Attacks on the McCarthy Declaration ............................... 3

        1.    Ms. McCarthy Has Personal Knowledge of the Facts to Which
            She Testified ............................................................................................ 3

        2.    Chubb Merely Speculates that Ms. McCarthy Lacks Personal
            Knowledge .............................................................................................. 3

        3.    Mr. Nese's Testimony Does Not Contradict Ms. McCarthy ............... 4

        4.    Chubb Misleads This Court as to Mr. Nese's Testimony ..................... 4

III.    CHUBB IS OBLIGATED TO REIMBURSE THE ENTIRE SETTLEMENT .......... 6

    A.    A Duty To Settle Exists Under Illinois Law ...................................................... 6

    B.    NCMC Meets the Totality of the Circumstances Test Which Applies
        Because Chubb Consented to the Settlement .................................................... 7

    C.    *Capital Associates* is Not Controlling Because a State Appellate
        Decision Now Controls ....................................................................................... 9

    D.    Charitable Donations are "Damages" Pursuant to Illinois Law .................... 10

IV.     THE SETTLEMENT OF THE *BERNSTEIN* ACTION IS FOR COVERED
    DAMAGES ............................................................................................................ 10

    A.    The $1.95 Million Settlement is for Covered "Advertising Injury" ............... 10

        1.    Chubb's Arguments Ignore the *Swiderski* Decision .......................... 10

        2.    NCMC Is Not Required to Prove Each Claimant Received a
            Fax .......................................................................................................... 11

    B.    The "Prior Publication" Exclusion to Chubb's "Advertising Injury"
        Coverage Does NOT Apply ............................................................................... 11

        1.    Chubb Fails to Provide Any Admissible Evidence Supporting
            Chubb's "Prior Publication" Argument .............................................. 11

        2.    Chubb's Inadmissible Hearsay Is Insufficient to Excuse
            Chubb's Obligation to Reimburse the Settlement ............................... 12

3.    Chubb Fails to Provide Any Evidence or Argument That There Was An Injurious Publication Prior to Chubb's Policy........... 13

C.    The $1.95 Million Settlement is for Covered "Property Damage"................. 13

1.    Chubb Concedes "Property Damage" .................................................... 13

2.    Chubb's Argument That There Was No "Occurrence" Is Erroneous............................................................................................ 14

D.    No Exclusions to Chubb's "Property Damage" Coverage Apply ................. 14

V.    CONCLUSION ............................................................................................. 15

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Allstate Ins. Co. v. Menards, Inc.*,
    285 F.3d 630 (7th Cir. 2002) ............................................................................................9

*Bay Electric Supply, Inc. v. Travelers Lloyds Ins. Co.*,
    61 F. Supp. 2d 611 (S.D. Tex. 1999) ..............................................................................13

*Colby v. J.C. Penney Co., Inc.*,
    811 F.2d 1119 (7th Cir. 1987) ..........................................................................................9

*Doe v. R.R. Donnelley & Sons Co.*,
    42 F.3d 439 (7th Cir. (Ind.) 1994) ..................................................................................11

*Dogloo, Inc. v. Northern Ins. Co. of N.Y.*,
    907 F. Supp. 1383 (C.D. Cal. 1995) ..............................................................................13

*Forrest v. Beloit Corp.*,
    424 F.3d 344 (3d Cir. 2005).............................................................................................4

*Hyman v. Nationwide Mut. Ins. Co.*,
    304 F.3d 1179 (11th Cir. (Fla.) 2002)............................................................................12

*Maddox v. St. Paul Fire and Marine Insurance*,
    179 F. Supp. 2d 527 (W.D. Pa. 2001)............................................................................13

*P.J. Noyes v. American Motorists Ins. Co.*,
    855 F. Supp. 492 (D.N.H. 1994) ....................................................................................13

*Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*,
    407 F.3d 631 (4th Cir. 2005) ..........................................................................................14

### STATE CASES

*Central Illinois Light Co. v. Home Insurance*,
    213 Ill. 2d 141 (2004) .....................................................................................................10

*Darrough v. Glendale Heights Community Hosp.*,
    234 Ill. App. 3d 1055 (2d Dist. 1992)...............................................................................5

*Guillen v. Potomac Ins. Co. of Illinois*,
    203 Ill. 2d 141 (2003) ...........................................................................................2, 7, 8, 10

*Haddick v. Valor Ins.*,
   198 Ill. 2d 409 (2002) .................................................................................6

*Jostens, Inc. v. CNA Ins./Continental Cas. Co.*,
   403 N.W.2d 625 (Minn. 1987), *overruled on other grounds* ...........................10

*Kaufman v. ACS Systems, Inc.*,
   110 Cal. App. 4th 886 (2003) ......................................................................6

*Northern States Power Co. v. Fidelity & Cas. Co.*,
   523 N.W.2d 657 (Minn. 1994).....................................................................10

*St. Michael's Orthodox Catholic Church v. Preferred Risk Mutual Ins. Co.*,
   146 Ill. App. 3d 107 (1986) .........................................................................11

*United States Gypsum Co. v. Admiral Ins. Co.*,
   268 Ill. App. 3d 598 (1994) ...........................................................................8

*Valley Forge Ins. Co. v. Swiderski Electronics, Inc.*,
   834 N.E.2d 562 (Ill. App. Ct. (2d Dist.) 2005) .................................................9

## FEDERAL RULES AND STATUTES

FED. R. EVID. 802.......................................................................................................11

47 U.S.C. § 227 (Telephone Consumer Protection Act) ...............................................1

## STATE STATUTES

CAL. BUS. & PROF. CODE § 17538.4 .............................................................................6

## I.    INTRODUCTION

Chubb must reimburse NCMC for the settlement in the *Bernstein* Action.  The *Bernstein* Complaint alleges claims for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").  **[SUF ¶¶6, 7, McCarthy Decl. ¶¶ 5-6 (Ex. "A")]** There is no dispute that Chubb had a defense duty, as Chubb conceded in writing in January 2004 that it owed a duty to defend the *Bernstein* Action. **[SUF ¶ 21, McCarthy Decl. ¶ 14 (Ex. "G")]**  The only facsimile transmission alleged in the *Bernstein* Action, and the only facsimile transmission of which there is **any** evidence, **only** occurred during Chubb's policy period. **[SUF ¶¶ 6,7, McCarthy Decl. ¶¶ 5-6 (Ex. "A")]** After Chubb refused to participate in any settlement of the *Bernstein* Action, Chubb conceded that any settlement by NCMC for $6 million or less was reasonable. **[SUF ¶ 42; Lowe Decl., ¶ 4 (Ex. "N")]** Subsequently, NCMC settled with Bernstein paying statutory damages under the TCPA. **[SUF ¶¶ 45-49]**

Chubb accuses NCMC of misstating facts when a review of the supporting evidence reveals that Chubb's accusations are not factually supported, its evidence contradicts Chubb's accusations, and its dispute is inconsequential to NCMC's motion.

Chubb implies that an indemnity standard applies to its obligation to pay a settlement. Illinois law is clear that NCMC need not prove it was actually liable for covered damages: **NCMC need merely show the settlement was made in response to a reasonable anticipation of personal liability for potentially covered claims.**  Regardless, NCMC can and has proven that Bernstein's TCPA claims are actually covered. The case upon which Chubb relies to excuse its breach of its contractual duties is not controlling authority as the Seventh Circuit must reverse its decision based upon a subsequent published Illinois appellate decision.

Chubb implies that its settlement duty is excused because Chubb – and only Chubb – contends that a facsimile similar to the one received by Bernstein and the settlement class was transmitted prior to the inception of Chubb's policy.  Bernstein did not make this allegation.  To the contrary, the only evidence Bernstein offered was of a fax first sent during Chubb's policy. **[SUF ¶¶ 6,7, McCarthy Decl. ¶¶ 5-6 (Ex. "A")]** Chubb supports its argument solely with inadmissible hearsay and speculation.

Chubb implies that its obligation to pay the entire settlement is excused because the portion of the settlement unclaimed by class members was donated to charity pursuant to the terms of the settlement.  The only case to address this issue held that a charitable donation as part

of the settlement was covered. Illinois courts concur that a settlement constitutes damages that an insured is legally obligated to pay. Regardless of how the settling plaintiffs chose to structure payment of the agreed settlement amount, NCMC was obligated to pay $1.95 million.

## II.    CHUBB'S FALSE ACCUSATIONS OF MISSTATEMENTS OF FACT

### A.    Chubb's Misleading Arguments

Central to Chubb's opposition is the spurious contention that NCMC has somehow misled this Court. In truth, no disputed material facts bar summary adjudication in New Century's favor.[1]

**First**, Chubb argues that it never admitted that the Bernstein Settlement was reasonable and necessary, pointing to the dicta in Chubb's Exhibit "A." Chubb admitted all NCMC's facts establishing the Bernstein Settlement's reasonableness and necessity, to which it offered no contrary evidence. At pages 5-6 of Chubb's Exhibit "A," it relies solely on an order in a dismissed case where the Minnesota state District Court accepted Chubb's frivolous argument that Chubb needed to depose Illinois class members and take other discovery of witnesses in Illinois. Despite Chubb's reliance on this order, it has taken no such discovery – at all. Chubb has not even argued that the Bernstein Settlement was unreasonable or unnecessary. This fact is therefore established, and this Court may adjudicate the Bernstein settlement was reasonable as a matter of law.

**Second**, relying on a Chancery Court decision in another action,[2] Chubb argues that Bernstein failed to allege "property damage." While the Bernstein Action may not have alleged a separate cause of action for "property damage" – a cause of action that does not exist under Illinois law as recognized by the Chancery Court decision cited by Chubb – Chubb does not dispute that the Bernstein Action contained allegations of "property damage," which the policy defines as "loss of use of tangible property which is not physically injured." **[SUF 10, 14]**

**Third**, Chubb's quibbles regarding its untimely reimbursement of NCMC's defense costs are immaterial to this action as NCMC has not sued for breach of the duty to defend.

---

[1] *Guillen v. Potomac Ins. Co. of Illinois*, 203 Ill. 2d 141, 163 (2003) (acknowledging reasonableness could be determined as a matter of law on summary judgment, remanding to permit insurer opportunity to rebut insured's evidence).

[2] Chubb attempts to mislead this Court by asserting that its Exhibit "B" was decided in the *Bernstein* Action. The Chancery Court, at page 1 of the decision, specifically limited the decision to the "related cases as indicated on Exhibit 'A' attached." That exhibit, which appears at page 20 to Chubb's Exhibit "B," does **not** identify the *Bernstein* Action.

**Fourth**, Chubb's myopic focus on whether an "uncovered risk is the sole cause of damages" (Opp., p. 4) ignores that it admitted and never disputed its defense duty, thereby admitting the *Bernstein* Action alleged potentially covered damages at the time of settlement.

**Fifth**, Chubb contends that the settlement was not to settle NCMC's alleged TCPA violations, and that the settlement agreement does not allocate the settlement amount to the TCPA claim. Chubb ignores the fact that the settlement calls for a payment of the TCPA's statutory damages of $500 to each class member. Again, Chubb seeks to mislead.

**B.    Chubb's Wrongful Attacks on the McCarthy Declaration**

**1.    Ms. McCarthy Has Personal Knowledge of the Facts to Which She Testified**

In her declaration, Ms. McCarthy testified that she is the Senior Vice President and General Counsel for NCMC, that she supervises and manages litigation involving NCMC, and that she had personal knowledge of the facts stated therein. This is a more than sufficient foundation for the statements that "NCMC believed that the facsimile transmissions were welcomed or authorized under applicable law, including the TCPA" and "NCMC was told by Fax.com that it would only send faxes to welcomed recipients."

The challenged testimony concerns the knowledge and beliefs of a corporate entity. As Senior Vice President and General Counsel, Ms. McCarthy is clearly qualified to testify to such. She has so stated, and Chubb has proffered no contrary evidence.

**2.    Chubb Merely Speculates that Ms. McCarthy Lacks Personal Knowledge**

Chubb argues that Ms. McCarthy lacks personal knowledge because she "does not allege that she was involved in any fashion with Fax.com or in NCMC's decision to send unsolicited facsimiles . . . ." But this is wrong for two reasons. **First,** Ms. McCarthy does so allege when she states that she has personal knowledge of these facts. This alleged "lack" of testimony is insufficient to contradict the testimony that is proffered. **Second,** the fact that Ms. McCarthy does not go into further detail as to her activities and involvement simply does not contradict that she has the knowledge to which she testifies.

Moreover, Chubb did not depose Ms. McCarthy to determine her activities or the extent of her personal knowledge. Thus, it has no basis upon which to claim that she lacks the knowledge that she claims.

Finally, Chubb offers no evidence, only argument that Ms. McCarthy purportedly lacks

personal knowledge.   And Chubb's arguments are contradicted by Ms. McCarthy's sworn testimony.   As Senior Vice President and General Counsel, Ms. McCarthy can be expected to have personal knowledge of NCMC's beliefs and knowledge.   She has certified that she does. This foundation is sufficient to admit her statements.

### 3.    Mr. Nese's Testimony Does Not Contradict Ms. McCarthy

When asked about Ms. McCarthy's interactions with Fax.com, Frank Nese answered that he did not know or did not recall what her involvement was.   **[Chubb's Exhibit "B," Declaration of Frank Nese at 77:8-22]**   This, Chubb proclaims, "confirms that Ms. McCarthy did not participate in or observe the events in question."   But Mr. Nese's testimony does no such thing.

Instead, the fact that Mr. Nese does not know, or recall, what Ms. McCarthy did cannot controvert Ms. McCarthy's declaration.   *See Forrest v. Beloit Corp.*, 424 F.3d 344, 356 (3d Cir. 2005) (fact that a person does not know whether there were previous accidents does not prove existence of same).   Simply, Mr. Nese testified that he had no knowledge pertinent to whether Ms. McCarthy has personal knowledge as to the matters testified in her declaration.   Chubb had the opportunity to depose Ms. McCarthy on the basis of her personal knowledge, and elected not to do so.

### 4.    Chubb Misleads This Court as to Mr. Nese's Testimony

Chubb quotes a portion of Mr. Nese's testimony, arguing that Mr. Nese "contradicts NCMC's assertion that it believed the fax recipients were 'willing' recipients."   (Opp., p. 6). When Chubb interrogated Mr. Nese in detail on this topic, Mr. Nese testified that Fax.com represented to him that it had a list of facsimile numbers specifically directed to homeowners with credit blemishes, NCMC's target clients at that point in time:

> Q.    ... Is it true that you did not provide customer lists to [F]ax.com?
> A.    [W]e did not provide customer lists to [F]ax.com.
>       . . . .
> Q.    ... Was there a particular audience that you were attempting to target with this facsimile?
> A.    Homeowners.
> Q.    And your target audience any more specific than that?
> A.    People – New Century's customers typically have credit blemishes.   So people with credit blemishes, homeowners with credit blemishes.

**[Chubb's Ex. "B," Nese Depo, pp. 28-29, 52-53]**

Mr. Nese also testified that Fax.com and its attorney both represented to Mr. Nese that the facsimiles would not violate the TCPA:

Q.    Did you ever come to learn that someone at New Century Mortgage Company was interested in the constitutionality of the the Telephone Consumer Protection Act.
A.    ... [I]n discussions with Mr. Frappier [of Fax.com,]... I asked about this. And as a matter of fact, we were on one occasion, we were on a call with an attorney from his company [Fax.com,] and somebody represented themselves as being a compliance officer. And I asked them about this.
      . . . .
Q.    What did you ask them about this?
A.    ... **[H]e basically assured us that this was ... okay to do.**
Q.    Was that before or after you signed the contract.
A.    Before.
      . . . .
Q.    After hearing that information did you contact the legal department at New Century Mortgage to ask them about this issue?
A.    No. Because they [F]ax.com, told us if we had anybody complaining, if we had any complaints, just to refer them to [F]ax.com.
      . . . .
Q.    Did they tell you that in writing or verbally?
A.    Verbally.
      . . . .
Q.    Was that the only time that that comment was made to you?
A.    ... [T]hey had made that representation on several occasions.
MR. LITTLE:  Since you are using the indefinite pronoun, tell him what that representation is. That representation, I don't know what it is.
THE WITNESS:  ...**That if we had – that if there was ever was a problem with a customer or somebody complained, to refer them to [F]ax.com.**

*(Id.* **at 70-72 (emphasis added).)**

Notably, the passage quoted by Chubb (Opp., p. 6) did not ask Mr. Nese whether he (or NCMC) believed the recipients of the Bernstein facsimile were willing recipients; instead, **Chubb interrogated Mr. Nese on how recipients of the facsimile could remove themselves from Fax.com's list of willing recipients.**

While Chubb places great emphasis on the existence of an opt-out telephone number on the Bernstein facsimile, the legal significance Chubb attempts to place on that number is contrary to the witness' testimony. Chubb would have this Court believe that the mere presence of an opt-out telephone number on the Bernstein facsimile irrefutably establishes that the facsimile was knowingly sent to recipients who did not want to receive the facsimile. But Mr. Nese's testimony does not support that conclusion and Chubb presents no factual or legal support for its assertion.[3] To the contrary, Mr. Nese testifies that the opt-out telephone number was a means for

---

[3]*Darrough v. Glendale Heights Community Hosp.*, 234 Ill. App. 3d 1055, 1062 (2d Dist. 1992) (A court may not construe inferences that are in direct contradiction to the undisputed facts.).

facsimile recipients to remove their number from Fax.com's existing database, a database which Fax.com represented to Mr. Nese did not violate the TCPA and was directed to NCMC's target clientele.

Chubb's entire unsupported argument, however, ignores that at the time the Bernstein facsimile was transmitted, California law required Fax.com to provide this opt-out information on every facsimile to avoid liability for an erroneous transmission. CAL. BUS. & PROF. CODE § 17538.4. *See also Kaufman v. ACS Systems, Inc.,* 110 Cal. App. 4th 886, 899-904 (2003) discussing the history of the statute through its August 2002 repeal. Fax.com, located in California, was merely complying with California law in effect at that time when it included the opt-out information on the facsimile.

## III.    CHUBB IS OBLIGATED TO REIMBURSE THE ENTIRE SETTLEMENT

### A.    A Duty To Settle Exists Under Illinois Law

An insurer has a duty to settle claims against its insured where a settlement demand within policy limits is made and there is a reasonable probability of liability against the insured for an amount in excess of policy limits:

> The duty of an insurance provider to settle arises when a claim has been made against the insured and there is a reasonable probability of recovery in excess of policy limits and a reasonable probability of a finding of liability against the insured. . . . [T]his duty also does not arise until a third party demands settlement with policy limits.

*Haddick v. Valor Ins.*, 198 Ill. 2d 409, 417 (2002) (citations omitted).

Here, NCMC has provided undisputed facts showing there was a reasonable probability that it would be found liable for faxing unsolicited advertisements. NCMC has also presented undisputed evidence demonstrating that there was a reasonable probability that the plaintiffs would recover an amount in excess of the policy limits and that the plaintiffs made a demand within Chubb's policy limits. **Chubb has presented no contrary evidence.**

The Illinois Supreme Court explains that the duty to settle emanates from the insurers duty to act in good faith in responding to settlement demands. *Id.* at 414. The Court explains that "the basis for the duty to settle is the insurer's exclusive control over settlement negotiations and defense of litigation. This exclusive control, however, necessarily results in a conflict of interest between the insurance provider and its insured." *Id.* at 414-415 (citations omitted). In these conflict cases, the law imposes a duty to settle in good faith on the insurer. *Id.* at 415. A contrary result would allow insurers to control litigation against their insureds in a manner that

could expose policyholders to damages in excess of policy limits without consequence. Chubb should not be allowed to benefit from its relinquishment of its duty to settle where NCMC has presented undisputed evidence of its probable exposure and Chubb's consent.

**B.    NCMC Meets the Totality of the Circumstances Test Which Applies Because Chubb Consented to the Settlement**

An insured may settle with its insurer's consent and avoid the need to prove a breach of the duty to defend in its claim to recover the settlement payment.

> Guillen acknowledges the general rule which holds that, in the absence of a breach of the duty to defend, an insured must obtain the consent of the insurer before settling with an injured plaintiff.

*Guillen*, 203 Ill. 2d at 149.

Chubb refused to settle the claim against NCMC asserting there was no potential for coverage even though Chubb had agreed to defend on that very basis. Because NCMC faced a reasonable probability of being found liable for an amount far in excess of policy limits, NCMC obtained Chubb's consent to settle.

Chubb erroneously claims that NCMC's position is that Chubb is barred from asserting any defenses to coverage. To the contrary, NCMC simply requests that the court apply the test set forth in *Guillen* where the insurer breached the duty to defend and where insurer consent was obtained. In such circumstances, the *Guillen* court made clear that it will liberally construe the term "legally obligated to pay" in favor of the insured.

> [T]he prevailing view is that a liberal construction of the words "legally obligated to pay" in favor of the insured is appropriate, once the insurer has breached the duty to defend. We agree with the majority view regarding construction given the "legally obligated to pay" language.

*Id.* at 161. The court found that the liberal construction would apply to settlements where the insured agrees to the settlement amount but assigns its rights under the policy. In such cases the risk of collusion and fraud is avoided by requiring proof that the settlement was reasonable.

> As a majority of courts have recognized, the risk of collusion and fraud can be lessened in cases such as those at bar, if not avoided altogether, **by placing a requirement upon the plaintiff to prove that the settlement it reached with the insured was reasonable before that settlement can have any binding effect upon the insurer.**

*Id.* at 163 (emphasis added).

Here, no risk of collusion or fraud exists. NCMC paid the settlement amount agreed to with plaintiffs knowing Chubb refused to pay any portion of the settlement. Unlike the plaintiff

in *Guillen*, NCMC does not have the benefit of the estoppel doctrine to counter Chubb's claimed coverage defenses and NCMC has never raised that issue. In order to confuse the issues, Chubb asserts that NCMC seeks imposition of estoppel without any reference to such an argument. NCMC, however, simply applies the rationale of the *Guillen* court, which adopts a "totality of the circumstances" test in evaluating whether the settlement entered into with plaintiffs was reasonable.

**Chubb conflates the issue of a reasonable settlement with the non-asserted issue of breach of the defense duty by raising allegations of estoppel** because Chubb has no other recourse because it has no evidence to prove the settlement was unreasonable. Nor can Chubb prove that any of its policy exclusions apply to eliminate its coverage obligations. Chubb makes these assertions based upon its narrow reading of the *Guillen* decision. While *Guillen* addressed circumstances where the insurer breached its duty to defend, the task of determining what constitutes a reasonable settlement and whether that reasonable settlement is for damages the insured is "legally obligated to pay" is not limited to situations where the insurer breached the duty to defend.

In *Guillen*, the insured did not obtain the insurer's consent to settle (*id.* at 144), so the settlement had no binding effect on the insurer unless it had breached the duty to defend.

> Guillen acknowledges the general rule which holds that, in the absence of a breach of the duty to defend, an insured must obtain the consent of the insurer before settling with an injured plaintiff. Guillen concedes that **in this case**, if Potomac did not breach its duty to defend the Ortizes, then the Ortizes' decision to settle with Guillen has no binding effect upon Potomac.

*Id.* at 149 (citations omitted; emphasis added). An Illinois appellate court, addressing the evidence necessary to prove the reasonableness of a settlement, found that the question usually does not arise where the insurer has breached its defense duty.

> We note at this juncture that the question regarding the sufficiency of Gypsum's evidence of property damage so as to invoke coverage would ordinarily not be confronted here where all primary and one excess carrier were found to have breached their duty to defend.

*United States Gypsum Co. v. Admiral Ins. Co.*, 268 Ill. App. 3d 598, 621 (1994). Conversely, where the insurer has not breached its duty to defend but has consented to settlement, the insurer must pay for the settlement where the insured proves its decision to settle was prudent and that the amount agreed to is reasonable based upon the merits of plaintiffs' claims. *Guillen*, 203 Ill. 2d at 163. NCMC has met its burden and Chubb does not contend otherwise.

**C.    *Capital Associates* is Not Controlling Because a State Appellate Decision Now Controls**

Federal courts should give great weight to the holdings of intermediate state appellate courts in the absence of a binding decision from the state's highest court. *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002):

> [I]n the absence of prevailing authority from the state's highest court, federal courts ought to give great weight to the holdings of the state's intermediate appellate courts and ought to deviate from those holdings only when there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court.

Moreover, the district court may refuse to follow a decision of the Court of Appeals where the district court is convinced the appellate court will reverse itself given the opportunity. *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1123 (7th Cir. 1987).

Here, the Seventh Circuit Court of Appeals rendered its decision in *Capital Associates* before either the Illinois Supreme Court or an intermediate Illinois appellate court could decide whether TCPA claims fall within the "advertising injury" coverage of a general liability policy. Now, an Illinois appellate court has opined that, pursuant to Illinois insurance coverage law, claims alleging violation of the TCPA potentially fall within the "advertising injury" provisions of a general liability policy like that at issue here. *Valley Forge Ins. Co. v. Swiderski Electronics, Inc.*, 834 N.E.2d 562 (Ill. App. Ct. (2d Dist.) 2005).

Specifically, the appellate court found that the offense of "violation of a person's right of privacy" was implicated by allegations claiming transmittal of unsolicited fax advertisements in violation of the TCPA. *Swiderski*, 834 N.E.2d at 575 ("Because a reasonable person would understand 'privacy' to mean the right to be left alone, the sending of unsolicited fax advertising falls potentially within the scope of coverage under the terms of the advertising injury provision." (citation omitted)). Thus, pursuant to Illinois coverage law, "privacy" has a much broader meaning as understood by a reasonable person than was found by the Seventh Circuit. Given the great weight this decision must be given, it is likely the Seventh Circuit would reverse its decision in *Capital Associates*, allowing this Court to follow the well reasoned *Swiderski* decision. There is no indication the Supreme Court would take a different view of this issue than did the *Swiderski* court. Additionally, Chubb's agreement to defend NCMC shows that its understanding of its coverage obligations was consistent with the *Swiderski* court's findings.

NCMC has proved that the settlement with plaintiffs was for damages resulting from the TCPA violation which damages fall within the Chubb policies' "advertising injury" provisions. It is undisputed that the settlement reached between NCMC and plaintiffs was for violation of the TCPA. Each plaintiff was to be compensated the amount of $500, the exact amount allowed under the statute. Since allegations of violation of the TCPA fall within the scope of coverage, evidence showing the probability of an actual violation necessarily supports a finding that the damages for this violation fall within Chubb's "advertising injury" coverage.

**D.      Charitable Donations are "Damages" Pursuant to Illinois Law**

Chubb complains that, because $1 million of the settlement funds were unclaimed by class members and ultimately paid to charities pursuant to the settlement agreement's Cy Pres provision, the Cy Pres portion of the settlement is "Not Covered Damages." **Chubb ignores the fact that the $1 million is part of the settlement payment to plaintiffs** and that the settlement agreement provides these funds were first paid to the claims administrator so that they could be distributed to class members for covered damages.

Regardless, the Illinois Supreme Court has broadly held that "damages" in a general liability policy includes monies paid in settlement. *Central Illinois Light Co. v. Home Insurance*, 213 Ill. 2d 141, 161-62 (2004). The only case to address this issue specifically held that a charitable donation as part of the settlement was covered. *Jostens, Inc. v. CNA Ins./Continental Cas. Co.*, 403 N.W.2d 625, 631 (Minn. 1987), *overruled on other grounds* in *Northern States Power Co. v. Fidelity & Cas. Co.*, 523 N.W.2d 657 (Minn. 1994). Thus, it does not matter that the $1 million in unclaimed funds was ultimately forwarded to charities as these funds were monies NCMC was legally obligated to pay pursuant to the settlement agreement and are covered under applicable Illinois law. *Guillen*, 203 Ill. 2d at 158-59 ("[I]f the payment obligation is not limited by an assignment, the settlement agreement would create a legal obligation on the part of the insured to pay damages.").

**IV.    THE SETTLEMENT OF THE *BERNSTEIN* ACTION IS FOR COVERED DAMAGES**

**A.      The $1.95 Million Settlement is for Covered "Advertising Injury"**

**1.      Chubb's Arguments Ignore the *Swiderski* Decision**

Other than its reliance on *Capital Associates*, discussed in Section III.A. above, Chubb's opposition offers no argument attempting to address NCMC's facts and law establishing that the $1.95 million settlement was for covered "advertising injury." Chubb **fails to even mention the**

*Swiderski* **decision in its opposition.** As a result, NCMC incorporates by reference its arguments set forth at pages 10-12 of its Opening Brief, and at pages 9-12 of its Opposition Brief.

2.      **NCMC Is Not Required to Prove Each Claimant Received a Fax**

At page 13 of its Opposition, Chubb argues that in order to establish Chubb's breach of its settlement duty, NCMC must prove each claimant in the class received his or her facsimile during the policy period. For this proposition, Chubb relies on *St. Michael's Orthodox Catholic Church v. Preferred Risk Mutual Ins. Co.*, 146 Ill. App. 3d 107 (1986). That decision, however, is limited to a first party claim for progressive water damage to the policyholder's church, and says nothing about an insurer's duty to reimburse a policyholder's settlement with a third party. The holdings to the contrary of Chubb's proposition in *Flodine*, *HA 2000,* and *Commonwealth Edison*, discussed at pages 2-4 of NCMC's Opposition, are therefore controlling.

Moreover, in *St. Michael's*, the policyholder failed to provide any evidence of a first party property loss during the policy period. As discussed in Section II.A. above, the **only** evidence here of "property damage" or "advertising injury" is during the Chubb policy. As a result, were the decision applicable, *St. Michael's* compels finding Chubb breached its duty to settle.

**B.**      **The "Prior Publication" Exclusion to Chubb's "Advertising Injury" Coverage Does NOT Apply**

      **1.**      **Chubb Fails to Provide Any Admissible Evidence Supporting Chubb's "Prior Publication" Argument**

The declaration of Daniel Cunningham fails to authenticate documents "A" through "U" to Chubb's Exhibit 4, rendering these documents – the only purported "evidence" upon which Chubb bases its "prior publication" argument – inadmissible. Importantly, on each occasion Chubb relies upon one of these documents in Chubb's Statement of Facts, Chubb relies upon the document for the truth of the matter stated in the document. FED. R. EVID. 802. Many of the statements upon which Chubb relies are multiple hearsay, as the documents repeat or contain allegations. Yet Chubb relies on the purported truth of these allegations repeatedly in its Statement of Facts. As a result, these documents are inadmissible hearsay.[4]

---

[4] *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. (Ind.) 1994) ("[T]he nonmoving party . . . must demonstrate that there is admissible evidence that will support its position.").

Chubb argues that the Release in the Bernstein Class Action settlement agreement establishes a "prior publication." **Critically, the Release does not evidence a single publication prior to policy inception, let alone a publication of the advertisement at issue in the *Bernstein* Action.** Instead, the settlement agreement merely contains a Release of all known or unknown claims within the applicable statute of limitations, and that the settlement agreement is not an admission of any of the alleged acts.

Contrary to Chubb's argument, the admissible evidence Chubb offered in support of Chubb's Opposition establishes that there is no evidence of a "prior publication": Chubb's own interrogation of Frank Nese establishes this fact.

> Q.    What do you recall about when fax.com first provided New Century Mortgage with fax broadcasting services?
> A.    I would say it was – **I mean the only fax services I recall are the ones that happened in February [2002].**
>       . . . .
> Q.    You don't know if [Fax.com] performed fax services in June of 2001?
> A.    I don't know.
> Q.    Okay. Do you know if they performed fax services at any point in 2001?
> A.    I don't know. [Emphasis added.]

**[Nese Depo., Ex. B to Chubb's rule 56.1(b)(3)(A) Statement, pp. 40-41, 44-45]**

Contrary to Chubb's arguments, Mr. Nese did not testify to any publication of the Bernstein facsimile prior to Chubb's policy period. Instead, Mr. Nese – NCMC's person overseeing the facsimile transmissions – testified that he had no knowledge of any facsimile transmission prior to the February 2002 Bernstein facsimile.

### 2.    Chubb's Inadmissible Hearsay Is Insufficient to Excuse Chubb's Obligation to Reimburse the Settlement

Chubb's failure to provide admissible evidence of any publication of the Bernstein advertisement prior to the inception of Chubb's policy – Chubb relies solely on unfounded accusations and inadmissible hearsay – is no different than the tactic **rejected** by the court in *Hyman v. Nationwide Mut. Ins. Co.*, 304 F.3d 1179, 1194 n.12 (11th Cir. (Fla.) 2002):

> [Nationwide] relies on testimony by one of Double R's customers that it was "more than likely" that the advertisements ran in 1989 or 1990, a statement by Double R's principal, Warren Levenson, that the first advertisement "probably" was published in 1989 or 1990, and testimony by one of the owners of Inter-Global that he knew about the advertisement "at some point before the end of 1990."

Accordingly, the *Hyman* court instructed the District Court to enter judgment in the insured's favor, obligating the insurer to pay the entire jury verdict. Similarly, Chubb relies on

inadmissible hearsay which speculates as to whether there were faxes prior to policy inception. Chubb, like the insurer in *Hyman*, fails to provide any proof, let alone admissible evidence. As a result, pursuant to *Hyman*, Chubb has failed to meet its burden of proof on the "prior publication" exclusion.

### 3.    Chubb Fails to Provide Any Evidence or Argument That There Was An Injurious Publication Prior to Chubb's Policy

Chubb fails to show that the purported publication prior to Chubb's policy was somehow **injurious**. While the case law interpreting the prior publication exclusion is numerous and varied, the case law is consistent that the insurer must establish that for the prior publication to excuse the insurer's obligations, the insurer must establish that the publication was **injurious.** *Maddox v. St. Paul Fire and Marine Insurance*, 179 F. Supp. 2d 527, 530 (W.D. Pa. 2001) ("[A] reasonable person in the position of the insured would understand the exception to mean that an advertising injury is only excluded when there was a wrongful publication prior to the policy period . . . ."); *Bay Electric Supply, Inc. v. Travelers Lloyds Ins. Co.*, 61 F. Supp. 2d 611, 619-20 (S.D. Tex. 1999) (holding that the prior publication exclusion did not apply even though one of the plaintiffs sold circuit breakers prior to the policy period because the circuit breaker's trademark was not registered until after the policy period and the prior sale was not actionable/infringing); *Dogloo, Inc. v. Northern Ins. Co. of N.Y.*, 907 F. Supp. 1383, 1391 (C.D. Cal. 1995) (publication exclusion not triggered without evidence that the prior publication was injurious); *P.J. Noyes v. American Motorists Ins. Co.*, 855 F. Supp. 492, 497 (D.N.H. 1994) (prior publication exclusion does not apply based on non-infringing publications of trademark prior to policy period). By failing to establish an injurious publication prior to policy inception, Chubb has failed to meet its burden.

### C.    The $1.95 Million Settlement is for Covered "Property Damage"

### 1.    Chubb Concedes "Property Damage"

Chubb's moving and opposition briefs do not dispute that the *Bernstein* Action sought damages for "property damage." The Bernstein plaintiffs claim "loss of use of tangible property that is not physically injured," falling within the definition of "property damage" in Chubb's policies. Instead, Chubb argues that the Bernstein class: (1) failed to allege a cause of action for property damage; and (2) that there was no "occurrence" resulting in "property damage."

Chubb's Exhibit "A" references a dismissal of a property damage cause of action.  Chubb falsely insinuates that the *Bernstein* court ruled Bernstein could not allege damages because of property damage in the *Bernstein* Action.  To the contrary, the *Whiting* court[5] stated:

> COUNT IV – PROPERTY DAMAGE.  Property damage is to this Court's understanding an element of a form of intentional or negligent tortius [*sic*] conduct.  It is not an independent tort.  This Count will be dismissed with prejudice."

(Chubb's Exhibit "A," p. 19.)

As discussed in Section II.A. above, Bernstein undisputedly alleged "property damage" resulting in damages: a form of negligent conduct under Illinois law.  **[SUF 10]**  As discussed in the succeeding section, the *Bernstein* Action alleged an "occurrence."

### 2.    Chubb's Argument That There Was No "Occurrence" Is Erroneous

As discussed in Section II.B. above, there is no factual basis for Chubb's "No 'Occurrence'" argument: to the contrary, Chubb's interrogation of Mr. Nese establishes that Fax.com had a list of fax recipients specific to NCMC's target clientele, and that Fax.com had ensured the proposed transmissions would not violate the TCPA.

Chubb also argues that the *Capital Associates* decision establishes that facsimile transmissions cannot be an "occurrence" as a matter of law.  As set forth at pages 12-14 of NCMC's Opposition Brief, Chubb's argument is not supported by Illinois law, and in the case on which Chubb relies, *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 638 (4th Cir. 2005), the court makes clear that it would find an "occurrence" based on the facts of this case.  As discussed in Section II.B.4. above, Mr. Nese's testimony establishes that Fax.com assured NCMC that the facsimile transmissions would not violate the TCPA, and that Fax.com had a list of facsimile numbers specifically directed to homeowners with credit blemishes, NCMC's target clients at that point in time.  (Chubb's Ex. "A"; Nese Depo, pp. 28-29, 52-53, 70-72)  Simply, NCMC has presented undisputed "evidence that would cause a reasonable person to mistakenly believe that [Fax.com] had received prior express consent to send their fax ads." *Resource Bankshares*, 407 F.3d at 638.

### D.    No Exclusions to Chubb's "Property Damage" Coverage Apply

---

[5]As discussed in Section II above, Chubb's exhibit "B" is not from the *Bernstein* Action, nor is the *Bernstein* Action listed as one of the cases subject to the order.

Neither Chubb's moving papers nor Chubb's opposition papers argue any exclusion to Chubb's property damage coverage excuses Chubb's duties.  The only exclusion Chubb does argue is the "prior publication" exclusion, which by its terms does not apply to Chubb's "property damage" coverage.  As a result, no exclusions excuse Chubb's duties under the "property damage" coverage.

## V.     CONCLUSION

NCMC has established the Bernstein facsimile was transmitted during the policy period and there is no evidence of any transmission prior to policy inception.  Chubb acknowledged its defense duty, refused to contribute to any settlement, and gave its consent to NCMC to settle with the Bernstein class for an amount up to $6 million.

Illinois law provides an insurer has a duty to settle, and that duty includes reasonable settlements, regardless of whether the policyholder proves it was actually liable to the plaintiff. NCMC has established that the Bernstein settlement was for "advertising injury" and "property damage" under Illinois law, and that the payment class members received was for the $500 damage allowed by the TCPA.

Chubb's opposition provides no admissible evidence to the contrary, and it relies on the *Capital Associates* decision without even distinguishing the subsequent Illinois appellate court decision in *Swiderski*.  Chubb fails to even acknowledge that the facts of this case fall within express exceptions to the *Capital Associates* decision.

NCMC respectfully requests this Court grant NCMC's Motion for Summary Judgment, deny Chubb's Motion for Summary Judgment, and order Chubb to reimburse NCMC for its $1.95 million settlement payment to the underlying class plaintiffs.

Dated: _____, 2005      **NEW CENTURY MORTGAGE**
                                  **CORPORATION**

                                  By:    s/Eric R. Little
                                         _____
                                         One of Their Attorneys

Bart T. Murphy, Esq.                     David A. Gauntlett
WILDMAN, HARROLD, ALLEN                  Eric R. Little
  & DIXON LLP                            Joseph S. McMillen
2300 Cabot Drive, Suite 455              GAUNTLETT & ASSOCIATES
Lisle, IL  60532-3639                    18400 Von Karman, Suite 300
Tel:    (630) 955-0555                   Irvine, CA  92612
Fax:    (630) 955-0662                   Tel:    (949) 553-1010
                                         Fax:    (949) 553-2050

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NEW CENTURY MORTGAGE CORP., ) | CASE NO. 05C2370 |
| ) | |
| Plaintiff, ) | Judge Coar |
| v. ) | |
| ) | |
| GREAT NORTHERN INSURANCE ) | |
| COMPANY, FEDERAL INSURANCE ) | |
| COMPANY, ) | |
| Defendants. ) | |
| ) | |

## CERTIFICATE OF SERVICE

    I hereby certify that on November 10, 2005, I electronically filed NEW CENTURY'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using CM/EFC System which will send notification of such filing(s) to the following:

Daniel J. Cunningham
Kathy Karaboyas, Malamis
TRESSLER, SODERSTROM, MALONEY & PRIESS
Sears Tower, 22nd Floor
233 S. Wacker Drive
Chicago, IL 60606-6399
**Phone:      (312) 627-4000**
**Fax:      (312) 627-171**

                                    NEW CENTURY INSURANCE COMPANY

                                    By:      /s/  Eric R. Little
                                    One of Their Attorneys

Bart T. Murphy, Esq. (IL Bar 6181178)      David A. Gauntlett, Esq.
WILDMAN, HARROLD, ALLEN                Eric R. Little, Esq.
& DIXON LLP                              James A. Lowe, Esq.
2300 Cabot Dr., Ste. 455                 GAUNTLETT & ASSOCIATES
Lisle, IL 60532                          18400 Von Karman, Suite 300
**Tel: (630) 955-0555**               Irvine, CA 92612
**Fax: (630)955-0662**               **Tel (949) 553-1010**
                                    **Fax (949) 553-2050**

                    Attorneys for Plaintiffs