KKM/mmt/371385                                                          2246-42-75-681

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NEW CENTURY MORTGAGE CORP., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GREAT NORTHERN INSURANCE COMPANY, FEDERAL INSURANCE COMPANY, )<br>)<br>Defendants. ) | Case No.: 05 C 2370<br><br>Judge: Coar<br><br>**DEFENDANTS GREAT NORTHERN'S AND FEDERAL'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

# **TABLE OF CONTENTS**

I. NCMC Was Not Exposed to An Excess Settlement and It, Therefore, Cannot Pursue a Duty To Settle Claim Even If It Had Properly Pleaded Such A Claim..................................................................1

II. NCMC Cannot Defeat Summary Judgment By Raising A Cause Of Action Which It Never Asserted In Its Complaint..............................2

III. As Great Northern and Federal Are Not Alleged To Have Breached the Duty To Defend, NCMC's Reliance Upon the *Flodine* Case Is Misguided.......................................................................3

IV. Great Northern and Federal Are Nor Relying Upon their Lack Of Consent for The Settlement As the Basis For Denying Coverage.................................................................................4

V. The Two-Part *Guillen* Test Advanced By Plaintiff Is Irrelevant to The Question of Whether The Settlement Is Actually Covered........................................................................................5

VI. The *Jostens* Case Does Not Convert NCMC $1 Million in Charitable Donations Into Covered Damages...............................................6

VII. The Decision of The Seventh Circuit in *American States* Is Binding Upon This Court Whereas the Decision of the Illinois Appellate Court In *Swiderksi* Is Not............................................ 8

VIII. The *American States* Case Is Not Distinguishable..........................................10

IX. The Seventh Circuit's Pronouncement That There Is No Coverage for "Property Damage" Arising Out of Unsolicited Fax Advertising Is Not Dicta..................................................12

X. Great Northern and Federal Have Met Their Burden of Proving That The Advertisement was First Transmitted Before the Relevant Policy Period.............................................................13

## **TABLE OF AUTHORITIES**

*Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630 (7th Cir. 2002)..........................................9

*American States Ins. Co. v. Capital Associates of Jackson County*,
392 F.3d 939 (7th Cir 2004).............................................................................................8-12

*Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119 (7th Cir. 1987).......................................8, 10

*Cramer v. Insurance Exchange Agency*, 675 N.E.2d 897 (Ill. 1996)...................................2, 3

*Crum & Forster Managers Corp. v. Resolution Trust Corporation*,
156 Ill.2d 384, 620 N.E.2d 1204 (1992).....................................................................................6

*Flodine v. State Farm Ins. Co.*, 2003 WL 1394977 (N.D. Ill 2003).........................................3

*Guillen v. Potomac Ins. Co. of Ill.*,
203 Ill.2d 141, 785 N.E.2d 1 (Ill. 2003)..................................................................................5, 6

*Halstead Terrace Nursing Center v. Scottsdale Ins. Co.*,
1997 WL 124263 (N.D. Ill. 1997)..............................................................................................1

*In re Ha 2003, Inc.*, 310 B.R. 710 (Bankr. N.D. Ill. 2004)........................................................4

*Jostens, Inc. v. CNA Ins./Cont. Cas. Co.*, 403 N.W.2d 625, 631
(Minn. 1987), *overruled on other grounds in Northern States
Power Co. v. Fidelity & Cas. Co.*, 523 N.W.2d 657 (Minn. 1994).......................................6, 7

*Manning v. Valor Ins. Co.*, 1999 WL 183765, (N.D. Ill. 1999)...............................................3

*Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982)................................................................4, 5

*Taco Bell Corp. v. Continental Cas. Co.*, 388 F.3d 1069
(7th Cir. 2004)..........................................................................................................................13

*Olson v. Paine, Weber, Jackson & Curtis*, 806 F.3d 731
(7th Cir. 1986).....................................................................................................................9, 10

*Outboard Marine Corp. v. Liberty Mutual Ins. Co.*,
154 Ill.2d 90, 607 N.E.2d 1204 (1992)......................................................................................6

*Valley Forge Ins. Co. v. Swiderski Electronics*, 834 N.E.2d 562
(Ill. App. 2nd Dist. 2005).....................................................................................................8-12

#371389

I.  **NCMC Was Not Exposed to An Excess Settlement and It, Therefore, Cannot Pursue a Duty To Settle Claim Even If It Had Properly Pleaded Such A Claim.**

NCMC settled the underlying case for $1.95 million, which is well within the limits of the $21 million in coverage set forth in the defendants' policies. As this fact effectively eliminates any cause of action for bad faith failure to settle, NCMC now attempts to have this court focus not on the amount it actually paid, but on the $300 million it believes it would have paid had the case gone to trial. (NCMC Opp. Brief at 1). However, the critical question in a failure to settle case is whether the amount of liability actually incurred by the insured exceeds its policy limits. The question of potential liability is irrelevant to this primary question. In *Halstead Terrace Nursing Center v. Scottsdale Ins. Co.*, 1997 WL 124263 (N.D. Ill. 1997), the insurer refused to contribute more than its fair share to an underlying settlement because of a coverage dispute. The insured ultimately contributed its own money to settle the case, and then sued the insurer alleging breach of the duty to settle. The total settlement, however, did not exceed the limits in the policy in question. Because the amount of the settlement did not exceed limits, the court dismissed the duty to settle claim, reasoning:

> Here, under the facts alleged, because a settlement was reached with the estate within the insurance policy limits, Halstead was not exposed to liability in excess of the policy; thus a duty to settle claim does not exist. [Citing Cramer v. Insurance Exchange Agency, 675 N.E.2d 897 (Ill. 1996)].

*Id.* at 5. Like the insured in *Halstead Terrace*, NCMC is precluded from pursuing a duty to settle claim here because its liability is well within the defendants' limits. The only cause of action which NCMC can pursue is a cause of action regarding the duty to indemnify, which NCMC apparently has elected not to pursue in this case.

II. **NCMC Cannot Defeat Summary Judgment By Raising A Cause Of Action Which It Never Asserted In Its Complaint.**

In its opposition brief, NCMC asserts *for the first time* that Great Northern and Federal breached "the contractual duty of good faith and fair dealing implied in all contracts" and that this breach serves as the basis for their so-called "duty to settle" claim. (NCMC's Opp. Brief. at 1.) This should come as a great surprise to this Court inasmuch as NCMC has not asserted a cause of action for breach of the covenant of good faith and fair dealing in its complaint against the insurers. Indeed, the claims currently asserted in the operative complaint sound only in breach of contract, and the complaint is completely silent as to NCMC's newfound assertion that this coverage dispute has now been transmuted into a bad faith case. For this reason alone, plaintiff's entire motion for summary judgment should be denied.

NCMC attempts to obfuscate the omissions in its pleadings by suggesting that it is not presenting a bad faith action sounding in tort, but instead simply a bad faith action sounding in contract. However, regardless of what labels they attempt to attach to this eleventh-hour claim, neither version of the bad faith claim was asserted in the complaint, and NCMC clearly cannot now seek a judgment from Great Northern and Federal on a claim that has not been properly brought to issue. Perhaps more importantly, NCMC's attempt to distinguish bad faith sounding in contract from bad faith sounding in tort rests on a fundamental misunderstanding of Illinois law. NCMC's contentions in this regard assume that there is a common law cause of action in Illinois for bad faith which sounds in contract but not tort. However, no such cause of action exists in Illinois, and NCMC has not cited to any case which recognizes such a cause of action. In fact, in *Cramer v. Insurance Exchange Agency*, 675 N.E.2d 897 (Ill. 1996), the Illinois Supreme Court stated that the covenant of good faith in each contract "is used merely as a construction aid in determining the intent of the contracting parties." *Id.* at 903. The court

clearly did not stretch this "construction aid" into a cause of action. While there is certainly a cause of action in Illinois for bad faith failure to settle a covered claim when an insured suffers an excess verdict, this cause of action sounds in tort, and NCMC has disavowed such a tort action.

The absence of any cases recognizing a cause of action for contractual bad faith (as opposed to tort bad faith) is likely the result of the preemption of such claims by section 155 of the Illinois Insurance Code (under which plaintiffs are not seeking relief in this case). The *Cramer* court noted "[s]imilarly, in conjunction with a breach of contract action, section 155 provides the remedy to policyholders for insurer misconduct that does not rise to the level of a well-established tort." *Cramer* at 804. Consequently, it appears that the only bad faith claims which were not preempted by section 155 are those sounding in tort (such as those involving failure to settle a covered claim which exposes the insured to an excess verdict), and contractual bad faith claims such as those presented in NCMC's opposition brief must have been preempted by section 155. *See e.g Manning v. Valor Ins. Co.*, 1999 WL 183765, page 2 (N.D. Ill. 1999)(explaining that the insured in a duty to settle case must allege independent tort claims against the insurer in order to escape the preemption of section 155.)

### III. As Great Northern and Federal Are Not Alleged To Have Breached the Duty To Defend, NCMC's Reliance Upon the *Flodine* Case Is Misguided.

NCMC relies upon *Flodine v. State Farm Ins. Co.*, 2003 WL 1394977 (N.D. Ill. 2003) to support the assertion that the insurers must pay for the $1.95 million settlement so long as NCMC can prove that it was responding to a reasonable anticipation of liability. (NCMC's Opp. Brief at 2.) NCMC fails to inform the court that in *Flodine*, the insurer had breached its duty to defend and was, therefore, estopped from raising any of its coverage defenses. *Id.* at 7-8. Thus, coverage for the settlement was simply **presumed** by the court, and the insurer could not raise all

3

of the coverage defenses that it could have raised if it had only defended the insured under reservation of rights. In the instant case, the insurers fully funded NCMC's independent defense pursuant to reservation of rights, and NCMC has not alleged breach of the duty to defend. Consequently, the Illinois estoppel doctrine has no bearing on this dispute, and Great Northern and Federal are entitled to assert their coverage defenses even if NCMC anticipated potential liability in the underlying case.

### IV.    Great Northern and Federal Are Not Relying Upon their Lack Of Consent for The Settlement As the Basis For Denying Coverage.

Section II.B and II.C of NCMC's brief are devoted to a lengthy discussion of why it feels it was not required to obtain Great Northern's and Federal's consent to the settlement. As the insurers are not contending that their lack of consent to the settlement serves as the basis for their motion for summary judgment, the inclusion of these arguments can only be intended to distract the court from the real issues in the case. With regard to the consent and voluntary payments cases cited by NCMC, Great Northern and Federal stress that the cases cited by NCMC do not stand for the proposition that an insured that is not required to obtain its insurer's consent to settle can transform an uncovered settlement into a covered settlement. In both the *In Re Ha 2003* case and the *Commonwealth Edison* cases cited by NCMC, the insurer was still permitted to argue to the court that the claim was not covered irrespective of the consent issue.

NCMC also relies upon several out-of-state cases to confuse the court into thinking that its settlement of the underlying suit effectively estops the insurers from raising their coverage defenses. However, none of the cases cited by NCMC preclude an insurer from raising its substantive coverage defense. For example, NCMC cites to *Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982), where the court held that the insured did not breach the cooperation clause by settling without the insurer's consent. However, to the extent that NCMC attempts to argue that

4

this case stands for the proposition that insurers cannot raise coverage defenses once an insured settles, NCMC is dead wrong. In fact, in *Miller*, the Minnesota Supreme Court found that an insurer's coverage defenses must be taken into consideration in determining whether the insurer must pay for a settlement. *Miller* at 733-734. The court should be aware that NCMC first attempted to raise its *Miller v Shugart* argument when this case was still venued in Minnesota state court. With regard to this argument, the Minnesota Judge wrote:

> Although not relevant to the Court's resolution of Defendants' threshold issue of *forum non conveniens*, the Court will make an additional observation on the merits of New Century's case. The Court believes that New Century brought suit in Minnesota because it believes Minnesota courts will apply what this Court believes is a misreading of the Minnesota Supreme Court's opinion in *Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982). The Court does not believe that any of the elements present in *Miller*, where the assignee was entitled to recover the amount of a reasonable stipulated judgment covered under the insurer's policy, are present in this case.

(A copy of the Minnesota court's opinion is attached to the Affidavit of Daniel J. Cunningham as Exhibit 1.)

V.   **The Two-Part *Guillen* Test Advanced By Plaintiff Is Irrelevant to The Question of Whether The Settlement Is Actually Covered.**

NCMC dedicates much of its brief to an analysis of the two-part test identified in *Guillen v. Potomac Ins. Co. of Ill.*, 203 Ill.2d 141, 785 N.E.2d 1 (Ill. 2003) for determining whether an insurer ***that has breached its duty to defend*** must indemnify an insured for a settlement that an insured entered without the insurer's consent. The test imposed in *Guillen* requires that an insurer that has breached its duty to defend must indemnify the insured for the settlement as long as the insured can prove that (a) its decision to settle was reasonable and that (b) the amount paid was also reasonable. *Id.* at 363. In *Guillen*, the court considered only these two issues, and not any substantive coverage defenses because the insurer had breached its duty to defend and was therefore estopped from raising any defenses to coverage.

5

While *Guillen* is certainly instructive as to how a court should proceed when the insurer has breached its duty to defend and is therefore estopped from raising its coverage defenses, that case can have no bearing on the instant dispute. Great Northern and Federal have not breached any duty to defend, and NCMC has not asserted that they have. As they have not breached the duty to defend, Great Northern and Federal are not estopped from raising their coverage defenses to deny coverage. In the absence of a breach of the duty to defend and application of the estoppel doctrine, the *Guillen* two-part test is not determinative of the question of whether the insurer must indemnify the insured for the underlying settlement. As such, NCMC's attempt to focus this Court's attention primarily upon the alleged reasonableness of their settlement is misguided. The appropriate approach is to consider whether NCMC has met its burden of proving that the damages paid in the settlement fall within the scope of coverage afforded in the policies, and, if so, whether the insurers have met their burden of proving that any exclusions bar coverage. *Crum & Forster Managers Corp.*, 156 Ill.2d 384, 398, 620 N.E.2d 1073, 1081; *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill.2d 90, 127, 607 N.E.2d 1204, 1221 (1992).

VI.  **The *Jostens* Case Does Not Convert NCMC $1 Million in Charitable Donations Into Covered Damages.**

NCMC relies upon *Jostens, Inc. v. CNA Ins./Cont. Cas. Co.*, 403 N.W.2d 625, 631 (Minn. 1987), *overruled on other grounds in Northern States Power Co. v. Fidelity & Cas. Co.*, 523 N.W.2d 657 (Minn. 1994) to support its contention that its charitable donations are covered under the policies. In *Jostens*, the insured paid roughly $2.3 million into a settlement fund in order to settle a class action suit involving claims for discrimination. After agreeing that the insurer was entitled to assert its coverage defenses even if the settlement was deemed reasonable, the court specifically segregated uncovered portions of the settlement from covered portions. An

issue arose as to whether the insurer was required to pay $100,000 of the $2.3 million settlement which the settlement agreement allocated for use as a scholarship fund **for the class members and their children.** After concluding that the $100,000 scholarship fund was attributable to injury suffered during the insurer's policy period, the court found that the insurer must pay for the scholarship fund.

NCMC's reliance upon *Jostens* is misplaced because the scholarship fund at issue is substantially different than the charitable donations at issue in this case. In *Jostens*, the insured actually paid $2.3 million into a settlement fund, and then a small portion of that money was distributed to a scholarship fund. Most significantly, the scholarship fund was for members of the class and their children. Thus, the $100,000 amount paid would serve to compensate the class members for covered injuries. In the instant case, the charitable contribution was not made into the settlement fund and than redistributed. Rather, the $1 million which NCMC paid went directly to the various charities and never spent a second in the settlement fund. Thus, NCMC will no doubt assert a tax deduction for the very amounts it now seeks to win from this court. More importantly, however, the recipients of NCMC's charitable donations have nothing to do with the claim at issue. The charitable donations were not made to class members or their children and were not made in order to benefit those people. Rather, they were paid directly to charities of NCMC's own choosing. The charities appear to be an amalgamation of organizations completely unrelated to the class members or the injuries allegedly suffered in the *Bernstein* case. Clearly, unlike a scholarship provided to a class member, a charitable donation made to third parties unconnected to the dispute cannot be said to compensate a class member for his injuries. Thus, even under *Jostens*, the $1 million in charitable (and tax deductible) donations made directly by NCMC cannot be construed as covered damages under the policies at issue.

The *Jostens* court also stressed that in order to be covered under the policy, the scholarship fund must be attributable to injury occurring during the policy period. *Jostens* at 631. In the instant case, NCMC has made no showing that its donations are attributable to the defendants' policy period—February 3, 2002 to February 3, 2003. There is nothing in the settlement agreement or in any of NCMC's briefs which establishes that all such donations are intended to redress injury caused during that twelve-month period. In fact, the settlement agreement specifically states that it redresses injuries occurring during a span of seven years— from April 4, 1997 through the date of the agreement. (Cunningham Affidavit, Exhibit 10, page 3.) As the insurers' policy period occupies only $1/7^{th}$ of those years, the court logically cannot assume that the donations were attributable only to the twelve-month period covered by the policies.

### VII.   The Decision of The Seventh Circuit in *American States* Is Binding Upon This Court Whereas the Decision of the Illinois Appellate Court in *Swiderksi* Is Not.

NCMC correctly asserts that in cases where jurisdiction rests upon diversity of citizenship, federal courts apply the substantive law of the state in which the court sits. This assertion, however, does not resolve any critical issue in this case. The issue here is not whether the court is bound by Illinois substantive law, which the insurers readily concede. Instead, the issue for this court is: What is the substantive law of Illinois as stated by our state's highest tribunal. In resolving this issue of law, as with any other issue of law, this court must follow the pronouncements of the Seventh Circuit, so long as they are on point. By now it should be undisputed that a decision of a superior court in a unitary court system (such as the federal system) binds the inferior court. *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1123 (7th Cir. 1987). The Seventh Circuit determined in *American States v. Capital Associates*[1] that the

---

[1] *American States v. Capital Associates of Jackson County, Inc.*, 392 F.3d 939 (7th Cir. 2004).

Supreme Court of Illinois has not addressed issues concerning coverage for unsolicited fax advertising claims, and, consistent with the *Erie* Doctrine, predicted how that court would resolve these issues. *See, e.g. Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 636 (7th Cir. 2002)(*"Erie* itself appears to have contemplated that the duty of the federal court, sitting in diversity, is to determine the content of state law as the highest court of the state would interpret it.") The Seventh Circuit ultimately concluded that insurers do not owe duties to defend or indemnify claims arising out of unsolicited fax advertising because such claims do not involve "advertising injury" and because any "property damage" caused by the faxing was not covered because it was necessarily expected or intended. This decision effectively resolved for the many federal trial judges in this circuit the question of how the Illinois Supreme Court would resolve insurance claims involving unsolicited fax advertising.

After the Seventh Circuit predicted how the Illinois Supreme Court will resolve these issues, the Illinois appellate court for the Second District issued its decision in the *Swiderski* case finding that an insurer owes a duty to defend because unsolicited advertising claims may fall within the coverage for "advertising injury."[2] The *Swiderski* case did not address the duty to indemnify (the issue in the instant case) and did not address the question of whether coverage is barred for any "property damage" because it is necessarily expected or intended.

NCMC now essentially asks this court to overrule the Seventh Circuit's prediction of how the Illinois Supreme Court will resolve these issues based merely upon reliance on a lone state appellate court decision. There is no authority for the proposition that a district court can reject the controlling precedent of its circuit court simply because of a newly released decision from a state appellate court. A lower court ordinarily has no authority to reject a doctrine developed by a higher court. *Olson v. Paine, Weber, Jackson & Curtis*, 806 F.2d 731, 734 (7th

9

Cir. 1986). NCMC relies upon *Colby, supra,* for the proposition that this court is not bound to follow the decision of the Seventh Circuit if it is powerfully convinced that the Seventh Circuit will overrule it at the first opportunity. (NCMC's Opp. Brief at 8.) However, a comparison of the Seventh Circuit's ruling in *American States* to the Second District's decision in *Swiderski* belies the suggestion that this court should be powerfully convinced that the Seventh Circuit will overrule *American States* at the first opportunity. In *Swiderski,* the court employed the very analytical framework which the Seventh Circuit specifically rejected as improper. The Seventh Circuit specifically found that courts which have found a duty to defend under "advertising injury" coverage have failed to recognize the critical distinction between secrecy and seclusion. *American States* at 4. As the *Swiderski* court made the same mistake as the cases specifically rejected by the Seventh Circuit, this court can hardly be "powerfully convinced" that the Seventh Circuit will alter its position as to how the Illinois Supreme Court ultimately will rule. The chances of the Seventh Circuit overruling *American States* in the absence of guidance from the Illinois Supreme Court are quite remote, particularly considering that it concluded its analysis of the duty to defend issue in *American States* by stating:

> So clear is this that American States need not provide a defense to the suit, even though Illinois (whose law applies) requires insurers to defend when coverage is a close issue, whether or not the policy would provide indemnity. (Citations omitted.) This issue is not close.

Id. at 5. As the Seventh Circuit concluded that the issue is not even "close," this court should not be "powerfully convinced" that the Seventh Circuit will overrule *American States*.

### VIII. The *American States* Case Is Not Distinguishable.

The *Bernstein* action is virtually identical to the underlying suit in *American States* in that both suits sought to establish a class action on behalf of all recipients of unsolicited faxes.

---

[2] *Valley Forge Ins. Co. v. Swiderski Electronics*, 834 N.E.2d 562 (Ill. App. 2nd Dist. 2005)

NCMC attempts to distinguish *American States* based on the fact that the named plaintiff in that case was a business whereas the named plaintiff in *Bernstein* was an individual. NCMC has failed to proffer any evidence that Mr. Bernstein received his fax at home in his capacity as an individual rather than at his law office in his capacity as an attorney. However, even if it had provided such evidence, NCMC's proposed distinguishing factor is irrelevant because **both** the underlying class action in *American States* and the *Bernstein* class action sought relief not just on behalf of the named plaintiffs, but also on behalf of "all recipients" of the fax transmission. Thus, just like the *Bernstein* case, the underlying case in American States alleged transmission of unauthorized facsimiles to numerous **persons and entities**. The court need only review the now reversed decision of the district court in *American States* to see that the underlying suit sought relief on behalf of both individuals and entities. *American States v. Capital Associates*, 2003 WL 23278656, page 6 (S.D. Ill. 2003). The class at issue in *American States* was, therefore, no different than the class at issue in this case.

Even if the class in *American States* included only business entities and the class in *Bernstein* included only individuals, coverage would still not be available to either class. The Seventh Circuit specifically found that its ruling applies not just to claims asserted by business entities but also to claims asserted by individuals. *American States* at 4. ("The class of junk-fax recipients may include real rather than artificial people, however, so we cannot stop yet."). Consequently, NCMC's attempt to distinguish *American States* based upon its unsupported allegation that Paul Bernstein received the fax in his capacity as an individual is unavailing.

NCMC next contends that the *American States* case created an exception for claims involving alleged automated transmissions of faxes to numerous recipients. (NCMC's Opp. Brief at 10.) However, the court created no such exception. While the Seventh Circuit indeed

11

queried as to whether "...automated faxes to hundreds of recipients could be deemed a form of publication..." it went on in the very next clause of that sentence to reject coverage for such mass transmissions when it stated "...but this would be irrelevant to the seclusion interest." *Id.* at 943. Indeed, the court went on to conclude that an advertising injury clause "...does not cover the normal consequences of junk advertising faxes." *Id.*

IX. **The Seventh Circuit's Pronouncement That There Is No Coverage for "Property Damage" Arising Out of Unsolicited Fax Advertising Is Not Dicta.**

In addition to determining that coverage was not available under the "advertising injury" coverage, the Seventh Circuit also determined that coverage was also not available for any "property damage." As the *Swiderski* case did not address this issue, NCMC's only argument against application of the *American States* case is that the Seventh Circuit's discussion of this issue is dicta. Nothing could be further from the truth. Having determined that coverage was not available under the "advertising injury" coverage, the court logically had to consider whether coverage was available under any other section of the policy. The mere fact that the circuit court provided a comprehensive analysis of all critical issues, whereas the district court did not, does not render the Seventh Circuits discussion of the "property damage" issue dicta. Indeed, the "property damage" discussion is a critical element of the court's holding and reasoning.

Moreover, NCMC has not presented any admissible evidence to meet its burden of proving that any "property damage" arose out of an "occurrence." While its submits the conclusory statements of one of NCMC's attorneys (Monica McCarthy), those statements are clearly not based on personal knowledge and the court should strike the offending paragraphs of Ms. McCarthy's affidavit. To that end, defendants have submitted a motion to strike which specifically addresses this issue.

X.  **Great Northern and Federal Have Met Their Burden of Proving That The Advertisement was First Transmitted Before the Relevant Policy Period.**

The policies specifically exclude coverage for claims arising out of "publication of material whose first publication took place before the beginning of the policy period." This exclusion is often referred to as the prior acts or prior publication exclusion, and the Seventh Circuit has acknowledged that it would bar coverage when the advertisement published before the policy period is the same as the advertisement published during the policy period. *Taco Bell Corp. v. Continental Cas. Co.*, 388 F.3d 1069, 1073 (7th Cir. 2004)(explaining that the prior publication exclusion would have barred coverage if the advertisement broadcast prior to the policy period was identical to the advertisement broadcast during the policy period). Thus, if the advertisement in question was first faxed prior to February 3, 2002, the insurers cannot owe coverage for any portion of the settlement.

The only objection that NCMC raises to application of this exclusion is the incorrect assertion that the insurers have not provided any admissible evidence that any faxes were transmitted prior to the policy period. Quite to the contrary, the insurers have provided ample admissible evidence that the advertisement was first faxed prior to February 3, 2002. [See Cunningham Affidavit at ¶ 6 and ¶ 7, Exh's. 4 and 5, Plaintiff's Response to RFA's 6, 8, 9, 66, 67, 69, 70, 71 and 72 and Plaintiff's Response to Interrogatory No. 21]. Included in this evidence are:

- NCMC's admission that it contracted for transmission of the fax on June 7, 2001. (Plaintiff's Response to RFA 6-9)
- A June 4, 2004, email from NCMC's counsel admitting that there were three orders placed with Fax.com, the first of which was dated "6/01". (Plaintiff's Response to RFAs 71 and 72.)
- NCMC's statement in an interrogatory that it has been advised that the fax was allegedly transmitted 200,000 between February 3, 2001 and February 2, 2002.
- The underlying settlement agreement which compensates claimants for faxes sent after **April 4, 1997**. (Cunningham Affidavit, Exhibit 10, page 3.)

13

NCMC makes the specious objection that the documents referenced above are not authentic. However, in response to request for admission No. 9, NCMC specifically admits that a true and accurate copy of the June 7, 2001 Fax Broadcasting Agreement has been attached as Exhibit C. Also, in NCMC's response to request for admission No. 72, NCMC specifically admits that that a true and correct copy of the June 4, 2004 email from its counsel has been attached as Exhibit P. As these documents include admissions by NCMC, they are not hearsay. They are also admissible business records produced by NCMC. Of course, NCMC's spurious objections as to the authenticity of its own documents would not apply to the interrogatory admission regarding the 200,000 transmissions prior to the policy period. In addition to being incorrect, NCMC's assertion that its own interrogatory response is inadmissible hearsay is ironic in that NCMC has relied upon similar allegations in its attempt to meet its burden of proving that there was an offense committed during the policy period.

WHEREFORE, for the reasons set forth herein, Great Northern and Federal respectfully request that this Court grant defendants' motion for summary judgment and declare that Great Northern and Federal do not owe an indemnity obligation to NCMC under the policies at issue for money paid in the underlying settlement.

> GREAT NORTHERN INSURANCE COMPANY
> FEDERAL INSURANCE COMPANY
>
> By: /s/ *Daniel J. Cunningham*
> One of their Attorneys

Daniel J. Cunningham
Kathy Karaboyas Malamis
TRESSLER, SODERSTROM, MALONEY & PRIESS
Sears Tower, 22nd Floor
233 South Wacker Drive
Chicago, Illinois 60606-6308