KKM/mmt/371403　　　　　　　　　　　　　　　　2246-42-75-681

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NEW CENTURY MORTGAGE　　　　　)
CORP.,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　Case No.:  05 C 2370
　　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　　)　　Judge:  Coar
v.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　**DEFENDANTS' APPENDIX OF**
GREAT NORTHERN INSURANCE　　　)　　**UNPUBLISHED AUTHORITIES**
COMPANY, FEDERAL　　　　　　　　)　　**CITED IN REPLY MEMORANDUM**
INSURANCE COMPANY,　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　)
_____)

## UNPUBLISHED DECISIONS

1.  *Flodine v. State Farm Ins. Co.,* 2003 WL 1394977 (N.D. Ill 2003

2.  *Halstead Terrace Nursing Center v. Scottsdale Ins. Co.,* 1997 WL 124263 (N.D. Ill. 1997)

3.  *Manning v. Valor Ins. Co.*, 1999 WL 183765, (N.D. Ill. 1999)

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 2003 WL 1394977 (N.D.Ill.)

**(Cite as: 2003 WL 1394977 (N.D.Ill.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
Nancy FLODINE d/b/a Natural Wonders, Plaintiff,
v.
STATE FARM INSURANCE CO., et al.,
Defendants.
**No. 99 C 7466.**

March 19, 2003.

*MEMORANDUM OPINION AND ORDER*

GOTTSCHALL, J.

**\*1** Plaintiff Nancy Flodine, who manufactures and sells "Southwestern-style" arts and crafts under the business name Natural Wonders, was insured by State Farm Fire and Casualty Company ("State Farm") pursuant to a business liability insurance policy. Flodine was named as a third-party defendant by J.C. Penney Co., Inc. ("Penney") in a lawsuit brought by Native American Arts, Inc. ("NAA") entitled *Ho-Chunk Nation, et al. v. J.C. Penney Co.,* No. 98 C 3924 (N.D.Ill.) ("Penney litigation"). Flodine tendered to State Farm Penney's second amended third-party complaint ("SATPC") and State Farm denied coverage, asserting that the SATPC did not allege an "advertising injury" under the policy. After State Farm refused coverage, Flodine filed this declaratory judgment action seeking a determination that her insurance policy covered Penney's claims against her and that State Farm owed her duties of defense and indemnity with respect to the Penney litigation. On cross motions for judgment on the pleadings, this court held that State Farm had a duty to defend Flodine in the Penney litigation. Both parties now move for summary judgment on the issue of indemnity. For

the reasons explained below, plaintiff's motion for summary judgment is granted in part and denied in part. Defendant State Farm's motion for summary judgment is denied.

Background [FN1]

FN1. The facts identified are undisputed unless otherwise indicated. Plaintiff's motion to deem as admitted certain responses in defendant State Farm's response to NAA's statement of uncontested fact is denied. While the court has taken into consideration the arguments raised by both NAA and State Farm in determining the facts of this case, the court concludes that a fact-by-fact determination of the adequacy of State Farm's responses is not necessary here. The facts that NAA seeks to have deemed admitted do not help NAA cure the fatal flaw in their settlement analysis, as none of these facts detail the calculation of the settlement amount. *See* "Reasonableness of the Settlement" section below.

The Policy

State Farm refused to defend Flodine on the ground that the SATPC did not involve an "advertising injury" as defined in the insurance contract. The policy was issued to Nancy Flodine d/b/a Natural Wonders in Harlingen, Texas, by State Farm's Greeley, Colorado, division. (Def.'s Ans. and Aff. Def. to Compl. For Decl. J ., Ex. A.) Section II of the policy provides comprehensive business liability coverage for sums that Flodine becomes obligated to pay "as damages because of bodily injury, property damage, personal injury or advertising injury[.]" (*Id.* at 20.) According to the pertinent policy definition, "advertising injury" means an injury arising out a "misappropriation of advertising ideas or style of doing business." (Policy at 30.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2

Not Reported in F.Supp.2d, 2003 WL 1394977 (N.D.Ill.)

**(Cite as: 2003 WL 1394977 (N.D.Ill.))**

Regarding such injuries, the policy states that it applies only to "advertising injury caused by an occurrence committed in the coverage territory during the policy period," and that the "occurrence" (defined as "the commission of an offense, or a series of similar or related offenses, which results in personal injury or advertising injury") causing the advertising injury "must be committed in the course of advertising your goods, products, or services." (*Id.*)

The Penney Litigation and the Declaratory Judgment Action

In the Penney litigation, NAA sought compensatory and injunctive relief for Penney's violations of the Indian Arts & Crafts Act ("IACA"), 25 U.S.C. § 305 *et seq.,* the Illinois Consumer Fraud & Deceptive Business Practices Act ("Consumer Fraud Act"), 815 ILCS 505/2, and the Illinois Deceptive Trade Practices Act ("Deceptive Trade Practices Act"), 815 ILCS 505/2 . NAA claimed that Penney's advertising, marketing, display, offer for sale, and sale in its stores and catalogue of "Southwestern-style" arts and crafts products, including those made by Flodine, violated the IACA by falsely suggesting "that they are authentic Indian products made by a Native American." (Ho-Chunk/NAA Compl. ¶¶ 9-42; ¶ 51; Am. Compl. ¶¶ 2-10.) Many of the tags attached to the offending products contain the words "Indian" or "Native American," the names of specific Indian tribes, and/or traditional Indian-style artwork and drawings. (Ho-Chunk/NAA Compl. Exs. A through II; Am. Compl. Exs. A-1 through N-1.) NAA alleged both that the tags falsely stated or created the impression that the products were Indian-made, and that other products lacked any tag to distinguish them from authentic Indian-made products. (*See, e.g.,* Ho-Chunk/NAA Compl. ¶¶ 5, 44-55.) NAA also brought statutory unfair competition claims against Penney, alleging that Penney's activities injured them in both their capacity as sellers of competing goods and as purchasers of the goods from Penney.

**\*2** Penney, in turn, sued Flodine and other arts and crafts suppliers as third-party defendants. In its

SATPC, Penney alleged that Flodine and other suppliers breached both Penney's Wholesale Contract and Listing Sheet agreement and the implied warranty of merchantability, and violated the Consumer Fraud Act by misrepresenting the origin and nature of their goods and representing that the goods complied with all applicable laws. In addition to its direct claims against Flodine and other arts and crafts suppliers, Penney sought contribution from them under the IACA, the Consumer Fraud Act and the Deceptive Trade Practices Act for any liability Penney incurred to NAA on the underlying complaint.

In its SATPC, Penney alleged that the suppliers of the goods in question determined whether to attach tags to the goods and that the supplier and outside vendor representative (who purchased the goods for Penney) knew the origin and the producer of the goods, attached tags to the goods, and played a role in selecting the text or drawings included on tags attached to the goods. (SATPC ¶¶ 18-19 .) Penney's SATPC denied that Penney violated any law or breached any duty to NAA, but stated that if the court found it violated the IACA, Consumer Fraud Act, and/or the Deceptive Trade Practices Act, as alleged by NAA, then Flodine "is liable to J.C. Penney for all or part of [NAA]'s claim against" Penney. (*Id.* at ¶ 127.)

On July 2, 1999, the court dismissed with prejudice Penney's claim that the third-party defendant suppliers violated the Consumer Fraud Act as well as Penney's claim for contribution under the IACA. Ultimately, a settlement was reached between NAA and Penney and certain third-party defendants (but not Flodine). The terms of the settlement agreement included a payment of $1,000,000 to NAA, as well as assignments to NAA of Penney's rights against those third-party defendants who refused to settle, including Flodine. Further, NAA and Penney agreed to an allocation of settlement damages with respect to each non-settling third-party defendants. Of the $1,000,000 paid by Penney, $50,000 was attributed to Flodine's liability. Of the total amount paid by Penney (the $1,000,000 payment plus the value of the assignments), NAA and Penney determined that $2,160,000 would be attributed to Flodine as a fair

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 3

Not Reported in F.Supp.2d, 2003 WL 1394977 (N.D.Ill.)

**(Cite as: 2003 WL 1394977 (N.D.Ill.))**

settlement amount for her liability to Penney was $2,160,000.

Flodine filed the instant declaratory judgment action against State Farm on November 16, 1999 seeking a determination that State Farm owed Flodine a duty to defend and indemnify her. State Farm filed counterclaims against Flodine asking this court to find that it does not have a duty to indemnify Flodine.

On March 1, 2001, this court determined that State Farm had a duty to defend Flodine in the SATPC under the "advertising injury" coverage provided by her insurance policy. *NAA v. State Farm Ins. Co.,* No. 99 C 7466, 2001 WL 204786, *6-11 (N.D.Ill. Mar. 1, 2001). In that opinion, this court reasoned that the claims relating to the IACA were analogous to claims for trademark or trade dress infringement because the IACA protects Indian sellers of arts and crafts by preventing non-Indians from exploiting the market value and goodwill associated with authentic, Indian-made products. *Id.* " '[P]assing off one's goods as those of another and trademark and trade dress infringement all constitute advertising injury because the offenses involve the wrongful use of marks, packaging, and/or other means by which competitors identify and promote their products to consumers." *Id.* at *7. The court found that the tags attached by Flodine to her products "functioned as mini-ads that were tied to the products, clearly promotional in nature yet distinct from the products themselves." *Id.* at *10. For these reasons, the court determined that State Farm had a duty to defend Flodine against Penney's third-party claims. Further, this court determined that certain policy exclusions did not bar coverage of any advertising injury that may have occurred. *Id.* at *12-13.

**\*3** While the motions for judgment on the pleadings were pending in this court, Penney's third-party claims against Flodine in the SATPC were dismissed without prejudice on July 12, 2000. At the time Flodine was dismissed from the Penney litigation, Flodine had not paid any money in judgment or settlement of the third-party claims. After the dismissal, NAA, as assignee of Penney's

third-party claims against Flodine, entered into settlement negotiations with Flodine. As a result, a settlement was reached between NAA and Flodine, whereby Flodine paid to NAA $500 and assigned to NAA her rights of indemnification against her insurer, State Farm. [FN2] As part of the settlement with NAA, Flodine agreed not to contest an action brought against her by NAA. On October 12, 2000, NAA sued Flodine (the "second lawsuit" or "NAA complaint"). As a related case, that lawsuit was assigned to Judge Kocoras, the same judge who had presided over the Penney litigation. The NAA complaint was based on the same transactions as the SATPC and sought recovery on three theories: (1) breach of contract; (2) breach of express warranty by delivering non-conforming goods; and (3) breach of the implied warranty of merchantability. Judge Kocoras approved the Flodine settlement and entered a consent judgment in favor of NAA for $2,160,000. The consent judgment mirrored the amount agreed to between NAA and Penney in their original settlement of the Penney litigation as Flodine's fair settlement amount. It is disputed whether State Farm had actual notice of the settlement between NAA and Flodine, as well as the second lawsuit. It is undisputed that neither NAA, as Flodine's assignee, nor Flodine provided State Farm with written notice of her settlement with NAA or the second lawsuit.

> FN2. Accordingly, NAA, as Flodine's assignee, was added as a plaintiff in this action.

Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) . The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Once the moving party shows that there is no genuine issue of material fact, the burden shifts to the nonmoving

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2003 WL 1394977 (N.D.Ill.)

**(Cite as: 2003 WL 1394977 (N.D.Ill.))**

party to designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).

Choice of Law

As a threshold matter, this court must determine which state's law applies to the insurance policy. The insurance contract at issue does not contain a choice-of-law provision. State Farm argues that the law of Colorado should govern this dispute, while NAA contends that Illinois law should apply. Because the court is persuaded that as to the effect of a breach of an insurer's duty to defend, the laws of Illinois and Colorado would produce different results, *compare Maneikes v. St. Paul Ins.,* 655 F.2d 818, 821 (7th Cir.1981) (an insurer who breaches its duty to defend is estopped from denying its duty to indemnify) *with Flannery v. Allstate Ins. Co.,* 49 F.Supp.2d 1223, 1228 (D.Co.1999) (rejecting the argument that insurer's breach of its duty to defend results in a breach of its duty to indemnify), the court must perform the necessary choice-of-law analysis.

*4 If there is a conflict between the laws potentially applicable to an action premised upon diversity of citizenship, federal district courts apply the choice-of-law principles of the forum state in determining which state's substantive law to apply. *Jupiter Aluminum Corp. v. Home Ins. Co.,* 225 F.3d 868, 873 (7th Cir.2000). Under Illinois choice-of-law rules, when the parties did not designate a choice of law in their contract, "insurance policy provisions are generally 'governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract." ' *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.,* 655 N.E.2d 842, 845 (Ill.1995) (quoting *Hofeld v. Nationwide Life Ins. Co.,* 322 N.E.2d 454 (Ill.1975) ). There are three states with a connection to the insurance policy at issue--Colorado, Texas and Illinois. Neither party argues that Texas law should apply and, thus, the court must balance the

*Lapham-Hinckey* factors as between Illinois and Colorado. For the following reasons, the court finds that the balance of the *Lapham-Hinckey* factors favors the application of Illinois law. [FN3]

> FN3. Further, the location of the underlying lawsuit may also be considered by the court in determining which state's law to apply. *Evangelical Lutheran Church,* 973 F.Supp. at 824 (stating that "where a declaratory judgment action is at issue, some Illinois cases also consider the location of the underlying lawsuit"). Here, the fact that the underlying lawsuit was filed in Illinois also supports the application of Illinois law.

The first factor--the location of the subject matter--clearly favors the application of Illinois law. "Where [insurance] policies cover an organization's conduct nationwide, ... the location of the insured risk is the place where the insured's liability actually arose[.]" *Evangelical Lutheran Church v. Atlantic Mutual Ins. Co.,* 973 F.Supp. 820, 824 (N.D.Ill.1997); *see also Western Am. Ins. Co. v. Moonlight Design, Inc.,* 95 F.Supp.2d 838, 841- 42 (N .D. Ill.2000) (stating that "Illinois case law provides that the location of the insured risk is the place where the insured's liability actually arises"). Applying these principles to this case, it is clear that Illinois is the location of the insured risk in this case. The policy covers liability stemming from advertising injuries in Illinois. The court rejects State Farm's argument that Flodine's liability arose during production and manufacture of her products. Rather, the liability at issue here arose when Flodine's products were advertised and sold. That liability arose in Illinois. Therefore, this first factor favors Illinois law.

The place-of-delivery factor favors the application of either Texas or Colorado law. State Farm issued the insurance policy to Flodine through its Greeley, Colorado office. (State Farm Statement of Undisputed Facts ("SF SUF") ¶ 4.) The initial policy was delivered to Flodine at her Colorado residence. Flodine subsequently moved and, as a result, the policies for the next two years were

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

Not Reported in F.Supp.2d, 2003 WL 1394977 (N.D.Ill.)

(Cite as: 2003 WL 1394977 (N.D.Ill.))

delivered to her new home in Texas. (NAA Statement of Undisputed Facts ("NAA SUF") ¶¶ 13, 16, 17; SF SUF ¶¶ 3, 6.) [FN4] As between Colorado and Illinois, this factor favors the application of Colorado law. However, the strength of this factor is diluted given the fact that the policy was delivered to Flodine in Texas for two of the three years applicable to this dispute.

> FN4. The pertinent time frame of this dispute is 1996 through 1998. (SF SUF ¶ 1.) The policy was first issued to Flodine in December 1995 and was then renewed in December 1996 and December 1997. ( *Id.*) The court rejects State Farm's suggestion that the court should not consider the policy signed in December 1997 because Flodine did not sell any products to Penney in 1998. Flodine's products may still have been for sale in Penney stores during 1998, even though they were purchased in 1996 or 1997. For this reason, the court finds the policy issued in December 1997 to be relevant to this analysis.

*5 The third factor--the domicile of the insured and the insurer--is a split between Illinois and Colorado. State Farm, an Illinois corporation with its principal place of business in Illinois, is clearly domiciled in Illinois. (NAA SUF at 2.) Flodine's domicile, at least for part of the pertinent period, was Colorado. (NAA SUF ¶¶ 13, 16, 17; SF SUF ¶ 2, 3.) As noted above, however, Flodine was domiciled in Colorado for only one year out of the three pertinent to this lawsuit. (*Id.*) The court finds that this factor favors both Illinois and Colorado law, but slightly favors the application of Illinois law in light of State Farm's strong ties to Illinois and Flodine's relocation to Texas.

The fourth factor concerns the place of the last act that gave rise to a valid contract. This factor favors the state where the policy is delivered and the premiums are paid. *Emerson Elec. Co. v.. Aetna Cas. & Sur. Co.* 319 Ill.App.3d 218, 233 (1st Dist.2001). State Farm issued the policy to Flodine through its Greeley, Colorado office. (SF SUF ¶

4.) The policy created as of December 1995 was delivered to Flodine in Colorado (NAA SUF ¶ 13; SF SUF ¶ 3) and this fact favors the application of Colorado law. The remaining policies, re-created on December 1996 and December 1997, were delivered to Flodine at her residence in Texas. (NAA SUF ¶ 17 .) This fact favors the application of Texas law. The record does not indicate where Flodine made her premium payments. Therefore, the court finds that the fourth factor is essentially a wash, favoring the application of Colorado law only slightly.

The place-of-performance factor favors the application of neither Colorado or Illinois law. Here, the claim for which Flodine seeks indemnification, based on the sale of her products to various Penney stores, would be paid to Flodine at her residence in Texas. Therefore, this factor is neutral as it favors neither Colorado nor Illinois.

The final factor, the state bearing a rational relationship to the general contract, favors the application of Illinois law. The fact that the claim and subsequent liability for which Flodine seeks indemnification arose in Illinois leads this court to conclude that Illinois bears a rational relationship to the insurance contract. State Farms argues that the act of placing the tags on the products caused the injury that lead to liability in this case. The court disagrees. What matters is not where the products were manufactured or where the tags were affixed, but rather where they were advertised and sold. The Penney litigation, brought by an Illinois corporation operating out of Illinois, alleged injuries suffered by NAA in Illinois. Because the advertising of certain products in Illinois led to Flodine's liability in the underlying case, Illinois is the state bearing the most rational relationship to the dispute. Accordingly, the court will apply Illinois law.

The Non-IACA Claims

A preliminary question exists as to whether, once the IACA contribution claim was dismissed, the remaining SATPC claims fell within the policy's coverage for "advertising injury." In its opinion of March 1, 2001, this court reasoned that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

Not Reported in F.Supp.2d, 2003 WL 1394977 (N.D.Ill.)

**(Cite as: 2003 WL 1394977 (N.D.Ill.))**

allegations in the underlying complaint "are analogous to claims for trademark or trade dress infringement." *Flodine,* 2001 WL 204786, at *6. Based on this analysis, and relying primarily on the IACA claim, this court held that the claims alleged against Flodine occurred in the course of advertising Flodine's products which constituted an "advertising injury" under the policy. *Id.* at *11. The court specifically reserved ruling on whether the non-IACA claims fell within the policy's coverage. State Farm argues that because the IACA contribution claim had been dismissed as against Flodine, the remaining "contractual" claims do not fall within the policy's coverage for "advertising injury."

*6 Having already determined that the facts supporting the IACA claim involve an advertising injury, the court now must determine if those same facts support the non-IACA claims. The court concludes that Flodine's marketing and selling of her products as Indian-made, i.e., the advertising of her products, also form the basis for the breach of implied warranty of merchantability and breach of contract claims. As this court has stated previously:

The legal theory of recovery does not appear to affect the analysis of whether, under the policy, the damages were attributable to an advertising injury caused by an occurrence in the course of advertising. The court's analysis of Penney's contribution claims, *see Flodine,* 2001 U.S. Dist. LEXIS 2204, at *18-37, applies with equal force to NAA's contract claims.... The operative nucleus of alleged facts is essentially the same in the Penney and NAA complaints.

*Flodine,* No. 99 C 7466, Mar. 4, 2002 Order at 5-6; *see also Flodine,* 2001 WL 204786, at *12 ("[T]he alleged breach [of contract] arose out of Flodine's false labeling and misrepresentation of the nature and origin of her goods (the advertising injury)[.]"). The court reiterates that position here. For the same reasons outlined more fully in the court's earlier opinion, the court concludes that all of the claims asserted against Flodine flow from the same advertising injury. [FN5] The fact that the IACA claim was no longer pending against Flodine does not change the essential nature of the controversy.

FN5. For a more comprehensive discussion of the court's reasoning, see *Flodine,* 2001 WL 204786, at *1-12.

Duty to Indemnify

When an insured tenders its defense to the insurer and the insurer believes it does not owe a duty to defend, the insurer must either proceed to defend the underlying action under a reservation of rights or seek a declaratory judgment that there is no duty to defend. *A. Kush & Assoc., Ltd. v. American States Ins.,* 927 F.2d 929, 934 (7th Cir.1991). Failure to take either of these actions may result in the insurer being estopped from raising policy-based defenses in any action brought by the insured. *Id.* It is undisputed that after receiving notice of the SATPC, State Farm did not defend under a reservation of rights or file suit seeking a declaration of the rights of the parties. Moreover, under Illinois law, an insurer who breaches its duty to defend an insured is estopped from denying its duty to indemnify. *Employers Ins. Co. of Wausau v. Ehlco,* 186 Ill.2d 127, 150-51 (Ill.1999). Because this court has already found that State Farm owed Flodine a defense in the SATPC (both as to the IACA and non-IACA claims), the question before the court now is whether State Farm has a duty to indemnify Flodine as a result of the settlement, and whether or not the filing of the second lawsuit has some effect on that duty.

NAA, as the assignee of Flodine, argues that it deserves indemnification for the settlement arising out of the SATPC, and that the second lawsuit was merely a "procedural tool" for implementing the settlement. (Pl.'s Memo. in Support of Sum. Judg. 9 .) In other words, even if there had been no second lawsuit, NAA argues that State Farm would have a duty to indemnify as a result of the settlement alone. NAA concludes that because this court has already found that the SATPC claims fell within the "advertising injury" coverage of the policy, it should find that the settlement of the SATPC, which led to the judgment in the second lawsuit, must be indemnified by State Farm. NAA also argues that because State Farm breached its duty to indemnify Flodine, Flodine is excused from not notifying State

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7

Not Reported in F.Supp.2d, 2003 WL 1394977 (N.D.Ill.)

**(Cite as: 2003 WL 1394977 (N.D.Ill.))**

Farm of the settlement and seeking its consent prior to entering into the settlement agreement. *Platinum Technology, Inc. v. Federal Ins. Co.,* 282 F.3d 927, 931 (7th Cir.2002).

**\*7** Alternatively, NAA argues that even if the court evaluates the second lawsuit independently as a second occurrence, State Farm still has a duty to indemnify. While the complaint filed in the second lawsuit did not contain identical claims as the SATPC, it included by incorporation the claims contained with the SATPC. Because of this overlap, NAA argues that the second lawsuit was co-extensive with the SATPC and that State Farm's initial denial of coverage excused Flodine from providing notice in the second lawsuit.

Despite its acknowledgment that it neither defended Flodine under a reservation of rights nor sought a declaratory judgment, State Farm argues that it should not be estopped from asserting policy-based defenses in this case. First, State Farms argues that because Flodine did not pay any money to Penney in the Penney litigation, State Farm has no indemnification obligation in that action. According to State Farm, this court determined only that it had a duty to defend Flodine under the SATPC, and when the SATPC was dismissed against Flodine, any claim for indemnification disappeared. Furthermore, because Flodine settled when there were no claims pending against her, State Farm reasons that she was not settling the third-party claims in the SATPC and, therefore, State Farm has no duty to indemnify her. State Farms contends that the settlement agreement could not have included a claim for contribution under IACA, because that claim had already been dismissed in the Penney litigation, i.e., Penney could not have assigned a claim that had already been dismissed. State Farm concludes that, without the IACA contribution claim, there no longer were any claims relating to an "advertising injury" against Flodine, and State Farm therefore has no duty to indemnify such claims.

As to the second lawsuit NAA filed against Flodine (after settling with Flodine), State Farm argues that it was a completely new occurrence for which State

Farm was entitled to separate notice. State Farm contends that the lack of notice unfairly deprived it of the opportunity to defend Flodine before the consent judgment was entered in that case. [FN6]

> FN6. State Farm argues that it had no duty to defend (let alone indemnify) Flodine for the claims in the second lawsuit because the claims in that case were strictly contractual, and did not involve an "advertising injury." The court rejects this argument for the reasons stated previously, *supra* at p. 11-12.

The court does not view the dismissal *without prejudice* of the SATPC claims against Flodine as the end of the controversy between Flodine and Penney. In light of the potential liability facing Flodine, the court believes that the settlement entered into by Flodine and NAA was intended to settle an actual (and still viable) dispute between them. Because the court has already determined that the non-IACA claims, which were viable claims against Flodine at the time of her settlement, also fell within coverage for "advertising injury," State Farm had a duty to indemnify Flodine for the settlement of those claims even though State Farm was unaware of the settlement. Because State Farm breached its duty to defend Flodine with respect to the IACA and non-IACA claims, it cannot now rely on the policy defense that Flodine was required to seek State Farm's consent prior to the settlement. *Platinum Technology,* 282 F.3d at 931 (citing *Ins. Co. of the State of Pa. v. Protective Ins. Co.,* 227 Ill.App.3d 360 (1992)). For this reason, State Farm has a duty to indemnify NAA for the Flodine settlement.

**\*8** As to the second lawsuit, the court declines to decide whether it is part of Flodine's settlement or a new occurrence under the policy. Either way, the outcome is the same and Flodine is excused from having failed to notify State Farm of the second lawsuit. Assuming that the second lawsuit was merely the culmination of the Flodine/NAA settlement, Flodine had no duty to submit a second notice to State Farm when the second lawsuit was filed, as that filing was not a second "occurrence"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 8

Not Reported in F.Supp.2d, 2003 WL 1394977 (N.D.Ill.)

**(Cite as: 2003 WL 1394977 (N.D.Ill.))**

but rather a continuation of the settlement of the SATPC. The court finds the situation here to be analogous to a party dismissing its third-party claims against another party and filing direct claims against them. Under Illinois law, when a third-party defendant becomes a primary defendant in a direct action the insured need not provide notice of the new action to the insurer where the insurer has already denied coverage. *Domas v. Fidelity and Cas. Co. of N.Y.,* 113 Ill.App.2d 22, 27 (1969). By means of the second lawsuit, Flodine went from being a third-party defendant to being a direct defendant. The court finds the second lawsuit to be a continuation of the SATPC, akin to a third-party plaintiff suing a third-party defendant directly in a new action. Thus, Flodine is excused from providing notice based on the second lawsuit.

Even if the court were to assume that the second lawsuit was a new occurrence, Flodine still would be excused from the policy's notice requirement because State Farm had already denied coverage on the SATPC, which involved the same claims and the same nucleus of facts. The court finds the analysis in *NL Industries, Inc. v. Commercial Union Insurance Co.,* 926 F.Supp. 446 (D.N.J.1996) to be instructive here. In that case, three cases based on lead paint poisoning were brought against NL Industries, who, after providing notice to its insurer, was denied coverage. *Id.* at 455-56. Then, four more cases were filed against NL Industries. *Id.* The court excused NL Industries from the notice requirement for the four later-filed cases based on the insurer's prior denial of coverage for the first three. *Id.* at 456 ("A repudiation of liability by the insurer on the ground that the loss is not covered operates as a waiver of the notice requirements of the insurance contract and other conditions precedent"); 13 Williston on Contracts § 39:39 at 672-82 (4th ed.1990) (explaining that the performance of a condition is excused when it is obvious that the other party is not going to keep its promise to perform whether or not the condition is fulfilled). The claims in the SATPC and the second lawsuit, while not identical, were based on the same nucleus of facts involving Flodine's sale and advertising of her products. The court rejects State Farm's argument that the SATPC (involving

Penney/NAA and Flodine as a third-party defendant) and the second lawsuit (involving NAA and Flodine as a direct defendant) involved "different parties" and "different (albeit related) allegations." Even if the second lawsuit were a new action, it so closely mirrored the allegations in the SATPC that State Farm's denial of coverage excused Flodine from providing notice in the second lawsuit. *See NL Industries,* 926 F.Supp. at 455-56.

Exclusions and Policy Defenses

**\*9** State Farm argues that even if the court finds that it had a duty to indemnify Flodine for the claims relating to the Flodine products, State Farm should be excused from indemnification because of violations of Exclusions 16 and 17. In addition, State Farm argues that it does not have a duty to indemnify Flodine because she failed to provide notice of the second lawsuit and failed to obtain State Farm's consent before settling. The court finds that in light of State Farm's breach of its duty to defend, it is estopped from arguing any policy defenses. *Platinum Technology,* 282 F.3d at 931 (citing *Ins. Co. of the State of Pa. v. Protective Ins. Co.,* 227 Ill.App.3d 360 (1992)); *Int'l Envir. Corp. v. Nat'l Union Fire Ins. Co.,* 843 F.Supp. 1218, 1225 (N.D.Ill.1993) (citing *Waste Management,* 144 Ill.2d at 178).

Reasonableness of the Settlement

Having found that State Farm has a duty to indemnify NAA, the court must now evaluate the settlement. [FN7] In cases where there has been a breach by the insurer of its duty to defend and the insured has reached a settlement agreement, there often is a concern the insured has no incentive to contest liability or damages with the injured plaintiff. *Guillen v. Potomac Ins. Co.,* No. 92056, 2003 WL 164690, *12 (Ill. Jan. 24, 2003). A countervailing concern is that an insured will be deterred from entering into a settlement agreement if it will be required to offer full proof of damages in order to be reimbursed. *United States Gypsum Co. v. Admiral Ins. Co.,* 268 Ill.App.3d 598, 625 (1994). Courts have resolved these concerns by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 1394977 (N.D.Ill.)

**(Cite as: 2003 WL 1394977 (N.D.Ill.))**

establishing the general rule that an insurer will be liable for the full amount of an insured's settlement, as long as that settlement was made in reasonable anticipation of personal liability and the settled amount was reasonable, even though the insurer was not provided notice of the settlement. *Id.* at 637; *Westamerica Mortgage Co. v. Tri-County Reports, Inc.,* 670 F.Supp. 819, 821 (N.D.Ill.1987). An insured who settles without notice to the insurer need not prove that it was in fact liable in the principal action, but "need prove only that, by settling, he was responding to a reasonable anticipation of personal liability rather than acting as a mere volunteer." *St. Paul Fire and Marine Ins. Co. v. Michelin Tire Co.,* 12 Ill.App.3d 165, 169 (1st Dist.1973); *see also Illinois Tool Works Inc. v. Home Indem. Co.,* 24 F.Supp.2d 851, 854 (N.D.Ill.1998). To support its argument that the settlement was made in reasonable anticipation of personal liability, NAA argues that Flodine faced substantial liability as a result of the products she sold to Penney. According to NAA, it was prepared to prove allegations that the products sold by Flodine to Penney were marketed and advertised to falsely suggest that the products were produced by Native American Indians. NAA claims that because Flodine faced possible liability of $1000 per day per product under the IACA, her total liability could amount to over $5,500,000. Recognizing that no claims were currently pending against Flodine at the time of the settlement, NAA argues that Flodine faced the threat that the SATPC claims, which had been dismissed without prejudice, would be reinstated if settlement discussions fell through. NAA argues that the fact that Flodine's maximum coverage of $4,600,000 was higher than the amount of the settlement also supports the reasonableness of the settlement. Further, NAA argues that Flodine consulted with her attorney, Tara Moran, in assessing Penney's case against her.

> FN7. The parties agree that Illinois law applies to the issues surrounding the validity of the settlement.

**\*10** State Farm argues that Flodine faced no real liability at the time of her settlement with NAA because the SATPC had been dismissed. For the

reasons explained above, the court rejects that argument. State Farm also urges this court to reject the settlement amount as unreasonable because Flodine's own money (except the $500 she paid to NAA) was never really at risk. State Farm argues that because Flodine was basically negotiating with State Farm's money, she had no incentive to contest liability or reach a fair settlement. The settlement amount, State Farms asserts, was the product of collusion and fraud.

The court recognizes, as other courts have, State Farm's concern regarding the possibility of collusion in the type of settlement agreement at issue in this case. *Guillen,* 2003 WL 164690, at \*12; C. Wood, *Assignments of Rights and Covenants Not to Execute in Insurance Litigation,* 75 Tex. L.Rev. 1373, 1385-87 (1997) ("neither party [to the settlement agreement] is motivated to seriously negotiate over issues of damages and liability because the end goal is to structure the deal so that the carrier, a nonparty to the agreement, pays"). However, such risk of collusion is lessened by requiring the insured to prove that the settlement it reached was reasonable. *Guillen,* 2003 WL 164690, at \* 12. The "litmus test" for deciding whether a settlement was reasonable is "what a reasonably prudent person in the position of the [insured] would have settled for on the merits of plaintiff's claim." *Id.* (citing *Miller v. Shugart,* 316 N.W.2d 729, 735 (Minn.1982)). Further, the burden of proving reasonableness is the plaintiff's. *Id.* "We note that the burden of proving reasonableness is properly placed upon the plaintiff both out of fairness, since the plaintiff was the one who agreed to the settlement, and out of practicality, since, as between the plaintiff and the insurer, the plaintiff will have better access to the facts bearing upon the reasonableness of the settlement." *Id.* at \*13.

The first question here is whether or not Flodine's anticipation of liability was reasonable. The court cannot ignore the reality that NAA had viable claims against Flodine at the time of the settlement. *See United States Gypsum,* 268 Ill.App.3d at 637 (insured need only show potential liability on the facts known to the insured at the time of settlement). The court is convinced that Flodine

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 10

Not Reported in F.Supp.2d, 2003 WL 1394977 (N.D.Ill.)

**(Cite as: 2003 WL 1394977 (N.D.Ill.))**

faced a real threat of liability. Her own records showed that she sold products to Penney stores that represented or suggested that they were Indian-made, when indeed they were not. In their papers, State Farm "does not dispute that Flodine believed she faced some third party liability to Penney." (State Farm Resp. to NAA's Mot. for Summ. J. at 15.) State Farm has provided this court with no reason to conclude that Flodine was unreasonable in her anticipation of liability. The court does not believe that Flodine acted as a "mere volunteer" in settling with NAA.

*11 Having found that Flodine was reasonable in her anticipation of liability, the court must now determine whether the settlement amount agreed to by Flodine was reasonable. NAA argues that in light of Flodine's potential damages of over $5,500,000 under the IACA, her agreement to settle for $2,160,000 was reasonable. NAA relies on the affidavit of NAA's attorney, Michael Mullen, to support its argument that negotiations surrounding the Penney settlement (where the $2,160,000 figure was first arrived at) were made in good faith and at arms length. State Farm's allegations concerning the self-serving nature of the negotiations both between NAA and Penney (in settling the Penney litigation) and Flodine and NAA (in negotiating Flodine's settlement) raise legitimate concerns. The court is further troubled by the fact that NAA argues on behalf of a damages calculation based on the IACA. The claim for contribution under the IACA against Flodine was dismissed in the Penney litigation. It therefore was not assigned to NAA as part of the settlement of the Penney litigation. To the extent NAA argues that that same claim was reinstated in the second lawsuit by the language including all the claims from the original SATPC, it makes no sense for this court to base a finding of the reasonableness of the settlement on an already-dismissed claim. [FN8] Finally, NAA argues that the "settlement discount" of $3,340,000 (Flodine's total exposure minus the final settlement amount) represents the amount that Flodine would have been liable to NAA based on a *direct* claim under the IACA. NAA never brought any direct claims against Flodine and yet is now asking the court to bless the reasonableness of a settlement calculated

exclusively under the rubric of a IACA claim.

FN8. In its Reply Brief in Support of its Motion for Summary Judgment, NAA now argues that a claim for indemnification, originally pled in the SATPC via its contribution claim, survived the assignment from Penney to NAA. Assuming this is the case, this may provide NAA with a basis for defending its calculation of damages under the IACA. Nevertheless, NAA has failed to provide this court with the facts necessary to determine whether $2,160,000 was reasonable as a matter of law.

NAA points to an April 26, 2000 letter from Flodine to NAA's attorney, Michael Mullen, as support for the reasonableness of this settlement amount. That document lists only the 15 types of products sold by Flodine to Penney, the amount of sales, and total number of Flodine's products sold by Penney from 1996-98. The IACA calculates damages based on the number of products per day. Even assuming NAA could convince the court that damages should be calculated under the IACA, the court would, at a minimum, need to know how many days each individual product sat on a shelf before it was sold in order to calculate Flodine's maximum exposure. Without this data, the court cannot determine the reasonableness of the settlement amount ultimately arrived at. The court acknowledges that while an insured does not have to prove all of its own damages to justify a settlement, the party propounding the settlement must provide this court with adequate information to assess its reasonableness.

The court concludes that it cannot make a determination of whether $2,160,000 was a reasonable settlement based on the non-IACA claims brought against Flodine. [FN9] NAA fails to provide the court with the evidence or facts needed to evaluate the settlement amount. Taken in the light most favorable to State Farm, NAA fails to establish that there is no genuine issue of material fact on this point. There is an issue of material fact as to what damages Flodine faced as a result of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 1394977 (N.D.Ill.)

**(Cite as: 2003 WL 1394977 (N.D.Ill.))**

claims brought against her by Penney and as to whether Flodine's settlement amount is reasonable in light of those potential damages. For this reason, the court grants NAA's motion as to whether Flodine faced a reasonable anticipation of liability, and denies NAA's motion on the issue of whether Flodine's settlement amount was reasonable. State Farm's motion for summary judgment is denied.

> FN9. State Farm argues that Penney could not assign more than it had, and thus Flodine's liability and right of indemnification are capped at $50,000 (the amount allocated to Flodine in the $1,000,000 payment from Penney to NAA). This argument fails because it does not take into account the valuable assignment to NAA by Penney against the non-settling third parties, including Flodine. *Westamerica,* 670 F.Supp. at 822, n. 2 (rejecting argument that indemnification should be capped at $10,000 because that amount did not include the value of the assignment).

Michael Mullen's Affidavit

**\*12** State Farm has moved this court to strike the affidavit submitted by NAA's counsel, Michael Mullen, concerning his involvement and description of the settlement of the Penney litigation as well as Flodine's settlement with NAA. NAA attempted to rely on Mr. Mullen's affidavit to support the reasonableness of both settlements. State Farm argues that it is improper for Mr. Mullen to be both attorney and witness. *Jones v. City of Chicago,* 610 F.Supp. 350, 354 (N.D.Ill.1984). State Farm further argues that Mr. Mullen is the "only person who can testify as to how the 'settlement amounts' in the various settlement agreements were purportedly determined." (State Farm Mot. to Strike the Aff. of Michael P. Mullen at 2.) Because this court is denying NAA's motion for summary judgment as to the reasonableness of the settlement, State Farm's motion is denied as moot. NAA must realize, however, that it will be required to put forward a case regarding the reasonableness of the settlement here. It will have to decide whether to put Mr.

Mullen on the stand as a witness, and find new counsel, or retain Mr. Mullen as counsel and present this evidence another way. NAA claims that it has other such sources. It will need to call upon those other sources if it intends to keep Mr. Mullen as counsel. To be clear, Mr. Mullen will not be permitted to both act as NAA's counsel and take the stand as a witness supporting the reasonableness of the settlement. At the parties' next status date, NAA shall inform the court of which option it intends to pursue.

Not Reported in F.Supp.2d, 2003 WL 1394977 (N.D.Ill.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 124263 (N.D.Ill.)

(Cite as: 1997 WL 124263 (N.D.Ill.))

Page 1

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois.
HALSTEAD TERRACE NURSING CENTER,
INC., Plaintiff,
v.
SCOTTSDALE INSURANCE COMPANY,
Defendant.
**No. 96 C 5902.**

March 17, 1997.

*MEMORANDUM OPINION AND ORDER*

MAROVICH, Judge.

**\*1** Plaintiff Halstead Terrace Nursing Center, Inc. ("Halstead"), filed a two-count Complaint against Defendant Scottsdale Insurance Company ("Scottsdale") after Scottsdale and Halstead settled a lawsuit with a third party. Count I of the Complaint alleges that Scottsdale breached its insurance contract with Halstead by failing to cover all damages within the policy limits. Count II alleges that Scottsdale breached its duty of good faith in settling the claim and seeks compensatory damages, punitive damages and attorney's fees. Pursuant to Fed.R.Civ.P. 12(b)(6), Scottsdale moves to dismiss. For the reasons stated below, the Court denies Scottsdale's motion.

*BACKGROUND* [FN1]

Halstead is a nursing home located in Chicago, Illinois. Scottsdale is an Ohio corporation with its principal place of business in Scottsdale, Arizona. Prior to August 1991, Halstead entered into an insurance contract with Scottsdale, whereby Scottsdale agreed to insure Halstead for liability

resulting from bodily injury suffered by Halstead residents at the nursing home in an amount up to $500,000 and granted Scottsdale complete control over the negotiation and litigation of claims against Halstead. The parties further agreed under the insurance contract that Scottsdale could settle any suit "as [Scottsdale] deems expedient" and that Scottsdale was not responsible for paying punitive damages in claims covered by the contract.

In August 1991, Estelle Ford ("Ms.Ford") was a resident of Halstead. At dinnertime on August 23, 1991, Ms. Ford was noted as missing. The Halstead staff searched for Ms. Ford, but they were unable to find her for four days. Finally, on August 27, 1991, Ms. Ford was found in a facility elevator. The elevator was operational but the stop switch had been activated. Conscious but unable to speak, Ms. Ford was taken to an area hospital where she died on August 31, 1991.

Ms. Ford's estate and brother (collectively "the estate"), brought suit against Halstead alleging wrongful death ("wrongful death suit"), *res ipsa loquitur* and a survival action pursuant to the Nursing Home Care Act, 210 ILCS § 45/1-101, which sought treble damages. Pursuant to the insurance contract, Scottsdale began representing Halstead in the action and assumed control of the defense. The case was set for trial in June 1994.

The estate named several expert witnesses to testify at trial in the wrongful death suit. The medical examiner who performed the autopsy on Ms. Ford believed that Halstead's failure to find Ms. Ford for several days was a significant contributing factor in her death. An expert on nursing home standards held the opinion that Halstead deviated from the standard of care in failing properly to supervise Ms. Ford. Halstead was unable to obtain an expert who could testify that Halstead's supervision of Ms. Ford met the standard of care.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 2

Not Reported in F.Supp., 1997 WL 124263 (N.D.Ill.)

**(Cite as: 1997 WL 124263 (N.D.Ill.))**

Prior to trial, the estate made a settlement demand of $750,000, a demand Scottsdale refused to accept. On June 3, 1994, Scottsdale's counsel informed Halstead's counsel that he believed that this was a case of liability and that challenging liability would "probably make the matter worse." Thus, he requested Halstead's permission to admit liability to the jury and concede negligence, but suggested contesting the case on the issues of proximate cause and damages. He noted that damages awarded pursuant to the Survival Act count would be trebled and costs and attorney's fees would be awarded as well.

**\*2** During pretrial negotiations, the trial judge advised Scottsdale that the case could settle for $500,000. Scottsdale offered to settle for $150,000. Following pretrial negotiations, the estate lowered its settlement demand to $500,000, but Scottsdale again offered $150,000. On June 7 and 8, 1994, Halstead's corporate counsel demanded that Scottsdale settle the litigation within the $500,000 policy limit, but Scottsdale again refused to settle for that amount.

On or about June 13, 1994, Scottsdale informed Halstead that it considered treble damages to be punitive in nature and thus, that it would refuse to cover any treble or punitive damage portion of a judgment entered against Halstead because the insurance contract did not cover punitive damages. Although Scottsdale admitted that the law was unclear on the issue of whether treble damages are punitive in nature, it informed Halstead that Scottsdale was comfortable making the action a "test case" on the issue in the event a trebled judgment was awarded. On June 17, 1994, Halstead's counsel again requested Scottsdale to settle the action within the policy limits; Scottsdale offered $150,000.

Shortly after trial began, the parties agreed to settle the suit for $400,000. Even though the policy limit exceeded the settlement figure, Scottsdale refused to pay more than $225,000 toward settlement. Halstead alleges that, as a result of Scottsdale's refusal to fully comply with the contract and its "potentially enormous exposure," Halstead

was coerced into paying the remaining balance of the settlement. Consequently, Halstead issued a check in the amount of $175,000 payable to Scottsdale's attorneys' client trust account.

In Count I, Halstead seeks compensatory damages for breach of contract, alleging that Scottsdale breached the insurance contract by failing to cover the full amount of the settlement even though the total amount was within the policy and, through "coercion and duress," forced Halstead to contribute $175,000. In Count II, Halstead alleges that Scottsdale breached the duty it owed to Halstead to use good faith and fair dealing in resolving the suit and that Scottsdale's conduct amounts to "unreasonable and vexatious" behavior.

*DISCUSSION*

In considering a motion to dismiss, the court accepts as true all well-pleaded allegations of the complaint, and resolves all ambiguities in favor of the plaintiff. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 418 (7th Cir.1994); *Early v. Bankers Life & Cas. Co.,* 959 F.2d 75, 79 (7th Cir.1992). Thus, the court should not dismiss a cause of action unless the movant demonstrates that the plaintiff can prove no set of facts in support of a claim entitling the plaintiff to relief. *McNeil v. Lane,* 16 F.3d 123, 124 (7th Cir.1993); *Ross v. Creighton Univ.,* 957 F.2d 410, 413 (7thCir.1992).

In general, the federal rules do not require detailed fact pleading. *Early,* 959 F.2d at 79. The primary function of a complaint is to merely notify a defendant of the plaintiff's claim. *Orthmann v. Apple River Campground, Inc.,* 757 F.2d 909, 915 (7th Cir.1985). Nonetheless, a complaint which merely recites bare legal conclusions will not survive a motion to dismiss. *Illinois v. Roland,* 812 F.Supp. 855, 862 (N.D.Ill.1993). "Although mere vagueness or lack of detail alone does not constitute sufficient grounds to dismiss a complaint, the absence of facts to support a claim renders the allegations mere legal conclusions subject to dismissal." *Id.*

I. *Count I*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3

Not Reported in F.Supp., 1997 WL 124263 (N.D.Ill.)

**(Cite as: 1997 WL 124263 (N.D.Ill.))**

**\*3** In seeking to dismiss Halstead's breach of contract claim--count I--, Scottsdale argues, as its only grounds for dismissal, that because Halstead voluntarily contributed $175,000 to the settlement agreement with the estate, the voluntary payment doctrine precludes Halstead from recovering the money it paid. Halstead, not surprisingly, disagrees that its contribution to the settlement was voluntary.

Pursuant to the voluntary payment doctrine, money voluntarily paid under a claim of right by one who has knowledge of the relevant facts cannot be recovered by the payor on the ground that the claim was illegal. *Kanter & Eisenberg v. Madison Assocs.,* 116 Ill.2d 506, 512, 508 N.E.2d 1053, 1055 (Ill.1987). Absent fraud, coercion or mistake of fact, monies paid under a claim of right to payment but under a mistake of law are not recoverable. *Smith v. Prime Cable of Chicago,* 276 Ill.App.3d 843, 848, 658 N.E.2d 1325, 1330 (Ill.App.Ct.1995) , *appeal denied,* 166 Ill.2d 554 (Ill.1996). In order to "negate the applicability of the voluntary payment doctrine, one must show not only that the claim asserted was unlawful but also that payment was not voluntary, but that there was some necessity which amounted to compulsion." *Smith,* 276 Ill.App.3d at 848, 658 N.E.2d at 1330 (citing *Illinois Glass Co. v. Chicago Tele. Co.,* 234 Ill. 535, 541, 85 N.E. 200, 201 (Ill.1908)). If the payment was made as a result of compulsion or duress, it is stripped of its voluntary character. *Arra v. First State Bank & Trust Company of Franklin Park,* 250 Ill.App.3d 403, 408, 621 N.E.2d 128, 132 (Ill.App.Ct.1993).

"The kind of duress necessary to establish payment under compulsion has been expanded over the years." *Smith,* 276 Ill.App.3d at 848, 658 N.E.2d at 1330.

> At the common law duress meant duress only of person, and nothing short of a reasonable apprehension of imminent danger to life, limb, or liberty sufficed as a basis for an action to recover money paid. The doctrine gradually became extended, however, to recognize duress of property as a sort of moral duress, which, equally with duress of person, entitled one to recover

money paid under its influence. Today, the ancient doctrine of duress of person (later of goods) has been much relaxed, and extended to admit of compulsion of business and circumstances.

*Id.* (citations omitted). Under the broader and more liberal definition of duress, recovery of payment can occur where a person is compelled to make payment of money which the demanding party had no right to receive and the payment is made to prevent injury to himself, his business or his property. *See Schlossberg v. E.L. Trendel & Assocs. Inc.,* 63 Ill.App.3d 939, 942-43, 380 N.E.2d 950, 953 (Ill.App.Ct.1978). The issue of duress and compulsory payment generally is one of fact to be judged in light of all the circumstances surrounding a given transaction. *Smith,* 276 Ill.App.3d at 850, 658 N.E.2d at 1331.

Here, Halstead asserts that its Complaint sets forth sufficient allegations of payment under compulsion and/or duress so as to negate the operation of the voluntary payment doctrine. According to Halstead, as a result of Scottsdale's refusal to cover the full settlement amount, Halstead was subjected to "enormous potential liability" in excess of the policy limits, and effectively, had no choice but to contribute to the settlement agreement. Under the insurance contract in effect at the time of Ms. Ford's injuries, Scottsdale agreed to insure Halstead for liability from bodily injury in an amount up to $500,000. Yet, says Halstead, despite the fact that Scottsdale believed that Halstead would ultimately be found liable for Ms. Ford's death and that Halstead faced potential treble damages under the survival count, Scottsdale refused to contribute more than $225,000 to the estate's settlement demand of $400,000, thereby forcing Halstead to contribute the $175,000 difference in order to avoid a potentially massive judgment against it. Thus, Halstead contends, as a result of Scottsdale's tactics, Halstead's contribution was not, in fact, "voluntary" or merely an informed "business decision"--as Scottsdale claims--, but rather, a product of compulsion and duress.

**\*4** Although this Court has concerns regarding the relevance of the voluntary payment doctrine to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 4

Not Reported in F.Supp., 1997 WL 124263 (N.D.Ill.)

**(Cite as: 1997 WL 124263 (N.D.Ill.))**

facts of this case, [FN2] assuming for the purposes of this motion that the doctrine may be applicable, the Court finds that Halstead has sufficiently alleged that its settlement contribution was not made voluntarily. When money is paid to avoid "disastrous effects to business," the payment may be considered involuntary and the money may be recovered. *See Chicago & Eastern Illinois Railway Co. v. Miller*, 309 Ill. 257, 257, 140 N.E. 823, 824 (Ill.1918); *Kanter & Eisenberg*, 116 Ill.2d 506, 508 N.E.2d 1053 (involuntary payment where non-payment would result in disastrous effects to business); *Ross v. City of Geneva*, 71 Ill.2d 27, 373 N.E.2d 1342 (Ill.1978) (involuntary payment where made to avoid termination of electricity to commercial users); *Getto v. City of Chicago*, 86 Ill.2d 39, 426 N.E.2d 844 (Ill.1981) (payment under compulsion to avoid threat of loss of telephone service); *Edward P. Allison Co. v. Village of Dolton*, 24 Ill.2d 233, 181 N.E.2d 151 (Ill.1962) (business duress based on severe penalties and threats of work stoppage); *Illinois Glass*, 234 Ill. 535, 85 N.E. 200 (business duress where threats to shut off telephone service) In circumstances where duress is unjustly exerted, "it need only be sufficient to influence the apprehensions and conduct of a prudent business man." *Benzoline Motor Fuel Co. v. Bollinger*, 353 Ill. 600, 607, 187 N.E. 657, 660 (Ill.1993).

In the present case, Halstead has sufficiently alleged enough facts to support its claim that was compelled to contribute to the settlement to avoid disastrous effects to its business: Scottsdale was willing to admit liability to the jury because "an attempt to disclaim liability will probably make the matter worse"; Halstead's potential exposure if it proceeded to trial was significant; a treble damages award could lead to further litigation and possibly would not be covered by the insurance policy; the process of pursuing the wrongful death litigation through trial would have had a "disruptive effect on the personnel of Halstead"; and Scottsdale refused to settle within the policy limits. Taken together, and viewed in the light most favorable to Halstead, this Court finds that the Complaint sufficiently alleges that Halstead's contribution to the settlement was not voluntary but the product of business duress

and/or compulsion. Accordingly, Scottsdale's motion to dismiss Count I is denied.

II. *COUNT II*

Count II of the Complaint--entitled "Bad Faith-215 ILCS § 5/155"--, alleges that Scottsdale owed Halstead a duty to use good faith and fair dealing in settling the claim and to protect Halstead's interests where their respective interests became divergent, that Scottsdale breached its duty by failing to cover the full amount of the settlement--which fell within the policy limits--, and that Scottsdale's conduct was unreasonable and vexatious. Scottsdale seeks to dismiss Count II on the grounds that § 155 of the Illinois Insurance Code preempts common law bad faith claims. Recently, the Illinois Supreme Court addressed the scope of § 155's preemptive force and put to rest much of the confusion that had existed among the appellate and federal courts arising from the interaction of the statute and the tort of bad faith and fair dealing. *Cramer v. Insurance Exchange Agency*, 1996 WL 616221 (Ill. Oct. 24, 1996). Section 155 provides, in relevant part, as follows:

*5 § 155. Attorney fees. (1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $25,000;

(c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

This section provides an extracontractual remedy to policyholders whose insurer's refusal to pay a claim under a policy is vexatious and unreasonable. *Id.* (citing *Kush v. American States Ins. Co.*, 853

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 5

Not Reported in F.Supp., 1997 WL 124263 (N.D.Ill.)

**(Cite as: 1997 WL 124263 (N.D.Ill.))**

F.2d 1380, 1385 (7th Cir.1988)). Before the statute was enacted, a policyholder's only recourse was to pursue a breach of contract action to receive the policy proceeds. In enacting the statute, the legislature expanded a plaintiff's remedy for unreasonable and vexatious behavior to include reasonable attorney's fees, and a limited penalty, as well as the amount due under the policy, *Cramer,* 1996 WL 616221, at *5.

After considering the interaction of § 155 with tort law, the *Cramer* court found that claims of insurer misconduct based on a separate and independent tort, such as common law fraud or a "duty to settle" claim, are not preempted by § 155. *Id.* at *6; *see also National Union Fire Ins. Co. v. Continental Ill. Corp.,* 673 F.Supp. 267 (N.D.Ill.1987) (§ 155 does not preempt unreasonable refusal to settle claims against insured). On the other hand, the court held that "mere allegations of bad faith or unreasonable and vexatious conduct", without more, are insufficient to constitute a separate and independent tort. *Cramer,* 1996 WL 616221, at *7. The court declined to recognize a separate tort of implied good faith and fair dealing, reasoning that § 155 already provides a remedy designed to protect policyholders from insurer misconduct where an insurer refuses to pay on the policy. *Id.*

In this case, it is not entirely clear from the Complaint whether Halstead is attempting to seek damages under § 155 for Scottsdale's alleged vexatious and unreasonable refusal to pay on the policy, or to allege some form of common law breach of good faith claim. Although Halstead asserts in its Opposition Memorandum that they are seeking "various forms of relief pursuant to § 155" (Pl.'s Opp. Mem. at 6), Halstead cites "duty to settle" cases in support of Count II in its brief and may even attempt to allege a duty to settle claim in Count II of the Complaint. Even construing the facts alleged in Halstead's favor, however, Halstead cannot, and does not, allege a breach of a "duty to settle."

*6 In cases where a liability insurer has assumed the policyholder's defense under the policy, the law recognizes that an insurer must give its insured's

interests at least equal consideration with its own where the recovery may exceed policy limits. Where an insurer fails to settle a case within policy limits through fraud, negligence or bad faith, this duty is breached and "the insurer may be held liable for the full amount of a judgment against the policyholder, regardless of the policy limits." *Cramer,* 1996 WL 616221, at *7; *see Mid-America Bank & Trust Co. v. Commercial Union Ins. Co.,* 224 Ill.App.3d 1083, 1087, 587 N.E.2d 81 (Ill.App.Ct.1992); *National Union,* 673 F.Supp. 267; *Scroggins v. Allstate Ins, Co.,* 74 Ill.App.3d 1027, 1029, 393 N.E.2d 718 (1979).

Here, under the facts alleged, because a settlement was reached with the estate within the insurance policy limits, Halstead was not exposed to liability in excess of the policy; thus, a duty to settle claim does not exist. *See Cramer,* 1996 WL 616221; *National Union,* 673 F.Supp. 267. Therefore, the Court concludes that Count II cannot, and does not, state a separate and independent tort action but, instead, seek only to recover extracontractual remedies provided by § 155 for Scottsdale's allegedly misconduct with respect to the settlement of Halstead's claim under the policy.

In order to eliminate any future confusion as to the exact nature of the claims before this Court, the Court directs Halstead to replead its Complaint in one of two ways: (1) eliminate Count II, and request appropriate § 155 damages as part of Count I's prayer for relief; or (2) amend Count II to state only a " § 155 claim" for extracontractual damages arising from Scottsdale's alleged vexatious and unreasonable breach of the insurance contract.

*CONCLUSION*

For the foregoing reasons, Scottsdale's motion to dismiss Counts I and II is denied. Halstead is granted leave to amend its Complaint in conformance with this Court's Order.

> FN1. For the purposes of this motion to dismiss, the Court accepts as true all allegations set forth by Halstead in the Complaint. *See Gray v. County of Dane,* 854 F.2d 179, 182 (7th Cir.1988).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 6

Not Reported in F.Supp., 1997 WL 124263 (N.D.Ill.)

**(Cite as: 1997 WL 124263 (N.D.Ill.))**

> FN2. While neither party has raised the issue, the Court has doubts as to whether the voluntary payment doctrine even applies to the present case. In the cases cited by the parties, the voluntary payment defense has been asserted in two-party situations where the plaintiff is seeking to recover money it paid to the defendant who has demanded payment under a claim of right to the money, such as where a plaintiff pays a disputed bill for services supplied by the defendant and the defendant then asserts that the voluntary payment doctrine precludes recovery. In contrast, the present case involves a three-party situation where the party with the "claim of right", and to whom the payment was actually made, is a third party--Ms. Ford's estate; here, Halstead is not seeking to recover the money paid to that party. Nonetheless, because the Court finds that, for purposes of the motion to dismiss, Halstead has sufficiently alleged that the $175,000 contribution was not made voluntarily, the Court need not, and does not, resolve its concerns regarding the applicability of the voluntary payment doctrine here.

Not Reported in F.Supp., 1997 WL 124263 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 1:96cv05902  (Docket)
                      (Sep. 13, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1

Not Reported in F.Supp.2d, 1999 WL 183765 (N.D.Ill.)

**(Cite as: 1999 WL 183765 (N.D.Ill.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
Kenneth A. MANNING, Plaintiff,
v.
VALOR INSURANCE, Defendant.
**No. 98 C 3318.**

March 25, 1999.

MEMORANDUM OPINION AND ORDER

PLUNKETT, District J.

*1 Kenneth Manning, Trustee for the Bankruptcy
Estate of Adrian Al'Amin, has sued Valor Insurance
Company ("Valor") for its alleged bad faith failure
to settle a tort claim against Al'Amin (Count I) and
for its negligence in failing to settle the claim
(Count II). The case is before the Court on Valor's
Fed.R.Civ.P. 12(b)(6) motion to dismiss the first
amended complaint ("Complaint") [FN1] and on
Manning's motion to strike Valor's affirmative
defenses. For the reasons set forth below, Valor's
motion to dismiss is denied and Manning's motion
to strike is granted.

> FN1. After Manning failed to file his reply
> brief on January 8, 1999, the Court granted
> him an extension to February 17, 1999.
> That date came and went, and to date, no
> reply brief has been filed. Thus, the Court
> has ruled without the benefit of a reply.
> Because Manning did not file a reply brief,
> disregarded the briefing schedule, and
> failed to keep the Court apprised of
> whether or not a reply brief was

forthcoming, the Court *sua sponte* issues
sanctions in the amount of $100 which
Manning shall pay to the Clerk of the
Court within thirty days of the date of this
Memorandum Opinion and Order.

Facts

On July 10, 1993, Al'Amin was involved in a car
accident that injured Jacqueline Moore-Whiting and
killed her daughter Jasma Whiting. (Compl.¶ 6.)
At the time, Al'Amin had an auto insurance policy
with Valor's predecessor, Hallberg Direct
Insurance. (*Id.* ¶ 7.) That policy had a per
occurrence limit of $40,000. (*Id.* ¶ 8.)

From February 17, 1994 through early 1997,
Whiting's counsel made repeated demands upon
Valor for the full policy limit of $40,000. (*Id.* ¶¶
9, 11.) Valor refused to tender the full policy limit,
instead offering to pay $20,000, the per person
policy limit. (*Id.* ¶¶ 10-11.)

Following a bench trial, on March 12, 1997,
judgment was entered against Al'Amin and in favor
of Whiting for $420,000. (*Id.* ¶ 12.) On August 14,
1997, a declaratory judgment was entered against
Valor and in favor of Whiting declaring that the
$40,000 per occurrence policy limit was due to
Whiting. (*Id.* ¶ 14.) Despite the declaratory
judgment, Valor has continued to refuse to tender
the policy limit to Whiting. (*Id.* ¶ 15.) Whiting
has, therefore, sought to recover the $420,000
judgment from Al'Amin, forcing him to file Chapter
7 bankruptcy. (*Id.* ¶ 16.)

Discussion

*Motion to Dismiss*

On a Rule 12(b)(6) motion to dismiss, the Court
accepts as true all well-pleaded factual allegations
of the complaint, drawing all reasonable inferences
in plaintiff's favor. *Midwest Grinding Co. v.. Spitz,*
976 F.2d 1016, 1019 (7th Cir.1992). No claim will

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2

Not Reported in F.Supp.2d, 1999 WL 183765 (N.D.Ill.)

**(Cite as: 1999 WL 183765 (N.D.Ill.))**

be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

Valor claims that section 155 of the Illinois Insurance Code preempts the tort claims Manning asserts against it in this action. In relevant part, that section provides:

In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $25,000;

(c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

215 Ill.Comp.Stat. 5/155. Valor claims that section 155 preempts any tort claims against an insurer that are based on conduct prohibited by the statute. (Def's Mem. Law Supp. Mot. Dismiss at 4-5.)

In *Cramer v. Insurance Exchg. Agency,* 174 Ill.2d 513, 675 N.E.2d 897, 221 Ill.Dec. 473 (1996), the Illinois Supreme Court squarely refuted Valor's claim. After noting that section 155 "provides an extracontractual remedy to an action on an [insurance] policy," the court held that it "does not preempt a claim of insurer misconduct based on a separate and independent tort." *Id.,* 174 Ill.2d at 523, 530, 675 N.E.2d at 902, 905-06, 221 Ill.Dec. at 478, 481-82. Thus, if Manning can allege independent tort claims against Valor, they are not preempted by section 155.

Illinois recognizes both bad faith and negligent refusal to settle claims like those asserted by Manning. [FN2] *See, e.g., Mid-America Bank & Trust Co. v. Commercial Union Ins. Co.,* 224 Ill.App.3d 1083, 1087, 587 N.E.2d 81, 84, 167 Ill.Dec. 199, 202 (1st Dist.1992) ("A cause of action against an insurer exists if the insurer's refusal to settle a claim within the policy limits amounts to negligence, or bad faith ...."). To state such claims, Manning must allege that Valor had a duty to negotiate a settlement of Whiting's claim in good faith, that Valor breached that duty by failing to settle, though it knew there was a high probability that a judgment would be entered against Al'Amin in excess of the policy limits, and that Valor's conduct constituted bad faith or negligence. *Phelan v. State Farm Mut. Auto. Ins. Co.,* 114 Ill.App.3d 96, 104, 448 N.E.2d 579, 584-85, 69 Ill.Dec. 861, 866-67 (1st Dist.1983). Manning's claims contain the requisite allegations. Because Manning has stated independent tort claims against Valor, they are not preempted by section 155.

FN2. The *Cramer* court did not, as Valor contends, reject the bad faith claim Manning asserts in Count I. Though the court rejected the notion that an insured could sue its insurer for bad faith refusal to pay a claim, it explicitly stated that an insurer may be sued in tort for its bad faith refusal to settle a claim asserted against the insured by a third-party. *Id.,* 174 Ill.2d at 524-27, 675 N.E.2d at 903-04, 221 Ill.Dec. at 479-80. In Count I, Manning alleges that Valor breached its duty to settle the claim asserted against Al'Amin by Whiting, a permissible bad faith claim.

**\*2** Even if the tort claims themselves are not preempted, Valor claims that section 155 preempts Manning's requests for punitive and emotional distress damages. Valor's contention, however, rests on a trio of federal court cases that were decided before the Illinois Supreme Court decided *Cramer.* In light of that decision, *Kush v. American States Ins. Co.,* 853 F.2d 1380 (7th Cir.1988) and *Anderson v. Mutual of Omaha Ins. Co.,* 594

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 183765 (N.D.Ill.)

**(Cite as: 1999 WL 183765 (N.D.Ill.))**

F.Supp. 726 (S.D.Ill.1984), which hold that tort claims for intentional infliction of emotional distress that are based on conduct prohibited by section 155 are preempted by it, are no longer good law. The third case, *KNS Cos., Inc. v. Federal Ins. Co.,* 866 F.Supp. 1121 (N.D.Ill.1994) remains viable, but its holding, that punitive damage awards for breaches of the contractual covenant of good faith and fair dealing are preempted by section 155, has no application to Manning's tort claims. Valor's motion to strike Manning's requests for emotional distress and punitive damages is, therefore, denied.

Valor's next argument is that Manning's claims are not tort claims, but an improper attempt to assert a private right of action under the Illinois Unfair Claim Practices Act, 215 ILL. COMP. STAT. §§ 5/154.6-5/154.8. We disagree. The conduct of which Manning complains may indeed violate the statute, which can only be enforced by the Director of Insurance. *Id.* But Manning is not suing under the statute, he is suing in tort. He does not, as Valor seems to argue, lose his ability to pursue his tort claims simply because Valor's alleged actions also support other causes of action. Because Manning is not asserting claims under the Unfair Claim Practices Act, Valor's motion to dismiss on that ground is denied.

Valor's last argument is that the allegations in paragraphs 20(b) and 20(d) of Count I and 20(b) and 20(e) of Count II should be stricken. Rule 12 permits us to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed.R.Civ.P. 12(f). Valor claims that the paragraphs numbered 20(b) in Counts I and II, both of which allege that Valor failed to advise Al'Amin of the conflict of interest arising from the probability of an excess verdict, must be stricken because they are irrelevant. Once again, we disagree. In negotiating settlements of excess claims, an insurer is required to "give the interest of the insured consideration at least equal to its own," a difficult task when the interests of the insurer and the insured conflict. *Mid-America,* 224 Ill.App.3d 1083, 1087, 587 N.E.2d 81, 84, 167 Ill.Dec. 199, 202. Consequently, when a conflict arises, the insured is entitled to

retain independent counsel, paid for by the insurer. *Mobil Oil Corp. v. Maryland Cas. Co.,* 288 Ill.App.3d 743, 756, 681 N.E.2d 552, 561, 224 Ill.Dec. 237, 246 (1st Dist.1997). Though concealing a conflict does not necessarily constitute a breach of the duty to negotiate in good faith, the fact of concealment, if true, makes it more likely than not that the duty was breached--the definition of relevance. Fed.R.Evid. 401. Valor's motion to strike the allegations of the two paragraphs numbered 20(b) is denied.

**\*3** Valor also asks that we strike the allegations in paragraphs 20(d) and 20(e) because they lack specificity. As an initial matter, lack of specificity is grounds for a more definite statement, not for a motion to strike. *See* Fed.R.Civ.P. 12(e), (f). Construing Valor's request as a motion for a more definite statement, however, does him no good. A more definite statement is required only when a complaint is so vague that a defendant cannot reasonably fashion a response to it. *Antonelli v. Askew,* No. 95 C 3007, 1996 WL 131177, at \*2 (N.D.Ill. March 21, 1996). The allegations of which Valor complains do not meet this standard. Paragraphs 20(d) and 20(e), respectively, state: "Valor otherwise negotiated in bad faith and put its interest above those of its insured, Adrian Al'Amin" and "Valor was otherwise negligent in negotiating a settlement of the lawsuit." These paragraphs fairly apprise Valor that Manning believes it acted negligently or in bad faith in its settlement negotiations with Whiting. That is all that federal notice pleading standards require them to do. *Jackson v. Marion County,* 66 F.3d 151, 154 (7th Cir.1995) (noting that plaintiff may plead conclusions provided they give defendant minimal notice of the claims asserted against him). Valor's motion for a more definite statement is, therefore, denied.

*Motion to Strike Affirmative Defenses*

Rule 12 permits the Court to strike any "insufficient defense" from any pleading. Fed.R.Civ.P. 12(f). Valor's two affirmative defenses are that Manning's claims are preempted by section 155 of the Illinois Insurance Code and that they are

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 1999 WL 183765 (N.D.Ill.)

**(Cite as: 1999 WL 183765 (N.D.Ill.))**

an impermissible attempt to bring a private cause of action under the Illinois Unfair Claim Practices Act. For the reasons set forth above, the Court holds that these two defenses are insufficient as a matter of law. Accordingly, Manning's motion to strike Valor's affirmative defenses is granted.

Conclusion

For the reasons stated above, defendant's motion to dismiss is denied and plaintiff's motion to strike defendant's affirmative defenses is granted.

Not Reported in F.Supp.2d, 1999 WL 183765 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

- 1:98CV03318  (Docket)

(May. 29, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.