IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NEW CENTURY MORTGAGE CORP., | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) No. 05 C 2370 |
| GREAT NORTHERN INSURANCE COMPANY, FEDERAL INSURANCE COMPANY, | ) Judge Coar |
| Defendants. | ) |

**PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

NOW COMES the Plaintiff, NEW CENTURY MORTGAGE CORPORATION, ("NEW CENTURY") by and through its attorneys, and hereby requests leave to cite supplemental authority in opposition to Defendants' Motion for Summary Judgment and in support of its Motion for Summary Judgment. In support of this motion, New Century states as follows.

1. The parties have filed cross motions for summary judgment and the briefing on these motions has been completed.

2. On March 27, 2006, subsequent to the close of briefing on the cross motions for summary judgment, the United States Court of Appeals for the 10th Circuit issued a decision in *Park University Enterprises, Inc. v. American Casualty Company of Reading PA,* No. 04-3197 (10th Cir., March 27, 2006) holding that the insurer had an obligation to defend the insured for both property damage and advertising injury arising from a TCPA unsolicited fax class action. A copy of this decision is attached hereto as Exhibit 1.

WHEREFORE, New Century requests leave to cite the 10th Circuit's decision in *Park University Enterprises, Inc.* as supplemental authority in opposition to Defendant's motion for summary judgment and in support of its motion for summary judgment.

Respectfully submitted.
NEW CENTURY MORTGAGE CORPORATION

Dated: March 31, 2006

/s/ Bart T. Murphy
By one of its attorneys

David A. Gauntlett
Eric R. Little
GAUNTLETT & ASSOCIATES
18400 Von Karman, Suite 300
Irvine, CA 92612
Tel:   (949) 553-1010

Bart T. Murphy
WILDMAN, HARROLD, ALLEN & DIXON
2300 Cabot Drive, Suite 455
Lisle, IL 60532-3639
Tel: (630) 955-0555

# EXHIBIT 1

Westlaw.

--- F.3d ----  
--- F.3d ----, 2006 WL 766750 (C.A.10 (Kan.))  
(Cite as: --- F.3d ----)

Page 1

**H**
Only the Westlaw citation is currently available.
United States Court of Appeals, Tenth Circuit.
PARK UNIVERSITY ENTERPRISES, INC.,
Plaintiff-Appellee,
v.
AMERICAN CASUALTY COMPANY OF READING, PA, Defendant-Appellant.
No. 04-3197.

March 27, 2006.

Appeal from the United States District Court for the District of Kansas (D.C. No. 03-CV-2522-GTV).

Andrew Butz of Bonner Kiernan Trebach & Crociata, Washington, DC (William H. White, Jr. and Jeffrey M. Koonankeil of Bonner Kiernan Trebach & Crociata, Washington, DC; and Barry W. McCormick of McCormick, Adam & Long, Overland Park, KS, with him on the briefs), for Defendant-Appellant.
Thomas M. Van Camp of Van Camp, Meacham & Newman, PLLC, Pinehurst, NC (Heywood H. Davis of Dicus, Davis, Sands & Collins, PC, Kansas City, MO, with him on the brief), for Plaintiff-Appellee.

Before BRISCOE, SEYMOUR, and ANDERSON, Circuit Judges.
SEYMOUR, Circuit Judge.

*1 Park University Enterprises, Inc. (Park University) was sued in a state court class action by JC Hauling Company (JC Hauling) for alleged violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, a federal statute that bans unsolicited fax advertisements. Park University's insurer, American Casualty Company of Reading, Pa. (American), declined to provide any defense or coverage in the action. Park University filed this action seeking a declaratory judgment that American has a duty to defend it in the underlying state court suit. On cross-motions for partial judgment on the pleadings, the district court concluded that American does owe Park University a defense, Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa., 314 F.Supp.2d 1094 (D.Kan.2004), and certified that decision as final under Fed.R.Civ.P. 54(b). We affirm.[FN1]

FN1. American has filed a motion asking us to certify a variety of issues to the Kansas Supreme Court. American did not seek certification in the district court. "We generally will not certify questions to a state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court." Massengale v. Oklahoma Bd. of Examiners in Optometry, 30 F.3d 1325, 1331 (10th Cir.1994) (citing Armijo v. Ex Cam, Inc., 843 F.2d 406, 407 (10th Cir.1988)). Moreover, we are not persuaded the issues raised in this appeal present sufficiently novel or unsettled questions of Kansas State law. Accordingly, we deny American's request for certification.

I

The TCPA makes it "unlawful for any person ... to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(c). It defines an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." Id. § 227(a)(4). The act creates a private right of action that permits recipients of unwanted faxes to seek injunctions and damages, and allows courts to grant treble damages if they find a fax sender has acted "willfully or knowingly." Id. § 227(b)(3).

JC Hauling filed suit in Illinois state court alleging that Park University violated the TCPA when it sent an advertisement to JC Hauling's telephone fax machine in Illinois "without prior express invitation or permission." Aplt.App. at 81. It brought the suit as a class action consisting of "all individuals who received unsolicited advertisements" via fax from or on behalf of Park University. Id. JC Hauling sought an injunction and treble damages, contending that Park University's actions were "willful and knowing" and that it "knew or should have known that it did not have the prior express invitation or permission of Plaintiff and the other members of the Class to send the advertisements and knew or should have known that its actions constitute a violation of law." Id. at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

82-83. In response, Park University asserted that any fax advertisements it sent to JC Hauling were not unsolicited because Park University had an existing business relationship with JC Hauling or, in the alternative, it had prior express invitation or permission from JC Hauling to send the fax adverstisement. Specifically, Park University contended that any fax it had sent to JC Hauling was addressed to Patty Evansco, one if its employees, who had registered for one of Park University's seminars while acting in the scope of her employment and had supplied JC Hauling's fax number to Park University. Consequently, Park University denied intentionally violating the TCPA.

*2 Park University has a commercial general liability insurance policy with American and sought a defense and coverage upon JC Hauling's instigation of the state class action suit. American declined to provide either, prompting Park University to bring the instant action. Park University contends the insurance company owes it a defense under two different provisions of its policy: 1) "property damage" liability coverage; and 2) "advertising injury" liability coverage. [FN2]

> FN2. Park University also alleged various breach of contract claims and sought a declaration that American owed a duty to indemnify it in the state case. The district court held that such a declaration would be premature, Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa., 314 F.Supp.2d 1094, 1098 (D.Kan.2004), and these claims have not been raised on appeal.

The property damage provision of the policy states:
A. Bodily Injury and Property Damage Liability
1. Insuring Agreement
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.
b. *This insurance applies to "bodily injury" and "property damage" only if ... [t]he "bodily injury" or "property damage" is caused by an "occurrence".* ...

Id. at 68 (emphasis added). "Property damage" includes the "[l]oss of use of tangible property that is not physically injured...." Id. at 79. The policy defines an "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id. at 78. It does not, however, define the terms "loss of use" or "accident." Finally, the policy excludes coverage for " 'property damage' *expected or intended from the standpoint of the insured.*" Id. at 68 (emphasis added).

The advertising injury provision states in relevant part:
B. Personal and Advertising Injury Liability
1. Insuring Agreement
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

Id. at 71. The policy defines "advertising injury" as "injury, including consequential 'bodily injury', *arising out of ... [o]ral or written publication* of material that violates a person's right of privacy." Id. at 78 (emphasis added). The terms "oral or written publication" and "right of privacy" are not defined. The policy characterizes an "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters." Id. at 76.

Both parties moved for partial judgments on the pleadings pursuant to Fed.R.Civ.P. 12(c). The district court concluded that American has a duty to defend Park University in the state action under the property damage and the advertising injury provisions of the policy. Park Univ. Enters., 314 F.Supp. at 1111. We address each issue in turn.

II

*3 We review a district court's grant of a motion for judgment on the pleadings *de novo,* using the same standard that applies to a Rule 12(b)(6) motion. *See Aspenwood Inv. Co. v. Martinez, 355 F .3d 1256, 1259 (10th Cir.2004).* So doing, we accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same. Judgment on the pleadings should not be granted "unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir.2000). As with our practice for motions to dismiss under Rule 12(b)(6), documents attached to the pleadings are exhibits and are to be considered in our review of the district court's grant of Park University's Rule 12(c) motion. *See* Hall v. Bellmon, 935 F.2d 1106, 1112 (10th Cir.1991); Fed.R.Civ.P. 10(c).

Our primary task is to construe the insurance policy between Park University and American. Because this case arises under our diversity jurisdiction, we apply Kansas' choice-of-law principles. Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d 1523, 1532 (10th Cir.1996). "Kansas follows the general rule that the law of the state where the insurance contract is made controls." Safeco Ins. Co. of Am. v. Allen, 941 P.2d 1365, 1372 (Kan.1997). The policy in this case was made for Park University in Kansas and was delivered to it there. As a result, we apply Kansas law. Like any other contract, the language of an insurance policy is construed to give effect to the intention of the parties. Catholic Diocese of Dodge City v. Raymer, 840 P.2d 456, 459 (Kan.1992). If a policy is unambiguous, the intention of the parties and the meaning of the contract are determined from the instrument itself. Wolfgang v. Mid-Am. Motorsports, Inc., 111 F.3d 1515, 1524 (10th Cir.1997) (applying Kansas law). Under Kansas law, the test for determining the meaning of an insurance policy's language is what a reasonable person in the position of the policyholder would understand the language to mean. *See* Farm Bureau Mut. Ins. Co. v. Horinek, 660 P.2d 1374, 1378 (Kan.1983). Moreover, the duty to defend under an insurance policy is not necessarily coextensive with the duty to indemnify. Spivey v. Safeco Ins. Co., 865 P.2d 182, 188 (Kan.1993). Rather, an insurer's duty to defend arises "whenever there is a 'potential of liability' under the policy." *Id.; see also* State Farm Fire & Cas. Co. v. Finney, 770 P.2d 460, 466 (Kan.1989). "The insurer determines if there is a potential of liability under the policy by examining the allegations in the complaint or petition *and considering any facts brought to its attention or which it could reasonably discover.*" Spivey, 865 P.2d at 188 (emphasis added). With these principles in mind, we turn to the policy provisions.

### A. Property Damage

*4 Under the property damage provision at issue here, a duty to defend arises if a plaintiff contends that "loss of use of tangible property" was caused by an "occurrence." American agrees that sending an unsolicited fax can result in "loss of use of tangible property." Here, JC Hauling lost the use of its fax machine, ink, and paper. *See* Missouri ex rel. Nixon v. Am. Blast Fax, Inc., 323 F.3d 649, 654-55 (8th Cir.2003) (discussing TCPA legislative history identifying the range of harms created by junk faxes). American nevertheless maintains that this loss of use was not caused by an occurrence because the loss of use damages were inflicted intentionally by Park University and were therefore not the result of an accident within the meaning of the policy. It also argues that Kansas public policy prohibits its coverage for non-fortuitous loss or damage, so that the loss would be excluded under the policy's intentional act exclusion even if it could be deemed an occurrence. We are not persuaded by these arguments.

In determining for insurance purposes whether the damages resulting from an insured's acts were accidental and therefore an occurrence under a policy, the state of Kansas follows the natural and probable consequences test. Under this test, an insured's intent to injure can be inferred if the resulting injury, *from the standpoint of the insured,* is the natural and probable consequence of the act ultimately causing the injury. Harris v. Richards, 867 P.2d 325, 327-28 (Kan.1994). A finding of specific intent to injure is not necessary. Id. at 328. Alternatively, even if an act itself is intentional, it may result in an unintended injury. Spruill Motors, Inc. v. Universal Underwriters Ins. Co., 512 P.2d 403, 408 (Kan.1973) (duty to defend where intentional wrongful taking of truck resulted in unintentional injury); *see also* State Farm Fire & Cas. Co. v. Falley, 926 P.2d 664, 668 (Kan.Ct.App.1996). Therefore, when determining whether an insurer is required to defend an insured under a policy barring coverage for intentional injuries, the courts must examine, from the standpoint of the insured, whether the injury for which insurance coverage is being sought is the natural and probable consequence of the insured's act.

The district court held there was a possible occurrence under the policy because the alleged property damage may have been an accident and not the natural and probable consequence of Park University's intentional fax transmission. In arguing to the contrary, American cited case law supporting the general proposition that intent to injure can be inferred from an intentional act because the resulting injury was the natural and probable consequence of the act. *See, e.g.,* Harris, 867 P.2d at 328 (no occurrence under policy where insured fired shots

into vehicle knowing it was occupied and as a result one occupant was killed and the other severely injured); *Spivey,* 865 P.2d at 186 (applying Missouri law similar to that in Kansas and finding no coverage where insured could expect injury from intentionally threatening co-employee with weapons, firing a gun at her, and forcing her to perform sexual acts); *see also Bell v. Tilton,* 674 P.2d 468, 475-77 (Kan.1983) (no duty to indemnify where one could infer intent to injure from insured's intent to hit playmate with pellet from BB gun). The district court distinguished these cases as inapposite, because their egregious facts clearly supported an inference under the natural and probable consequences test that by the insureds' intentional acts they also intended to cause injury. *Park Univ. Enters.,* 314 F.Supp.2d at 1104. The court declined to draw the same inference from Park University's intentional fax transmission, reasoning that the recipient of a fax is not injured by the loss of paper and use of its fax machine if he or she welcomes or solicits the fax. Thus, because Park University believed it was transmitting a fax to a recipient who wished to receive it (whether mistaken or not), one could not conclude it intended to injure the recipient. *Id.* at 1105. Consequently, the alleged injury was potentially an occurrence within the meaning of the policy, requiring American to defend Park University. *Id.* Under this reasoning, the court also rejected American's arguments that the damages were non-fortuitous, *see Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.,* 71 P.3d 1097, 1134-35 (Kan.2003) (non-fortuity is a defense to policy providing coverage for accidents), and that the policy's exclusion for "expected or intended injury" should apply. *Park Univ. Enters.,* 314 F.Supp.2d at 1105-06.

*5 On appeal, Park University does not dispute that it intentionally sent a fax. Instead, it reasserts its claim that it did not intend to *injure* the fax recipient because it believed the fax was solicited, either as part of an existing business relationship or through prior express invitation or permission. We agree with the district court that the distinction under Kansas law between intent to act and intent to injure is dispositive in this case. *See Spruill Motors,* 512 P.2d at 408. Significantly, the policy provides the intent to injure must be inferred from the "standpoint of the insured." Aplt.App. at 68; *see Harris,* 867 P.2d at 328-29. When Park University sent the fax to JC Hauling, it thought it had permission to do so. Hence, from its standpoint, any resulting use of JC Hauling's fax machine, paper, and toner could not have resulted in injury because Park University thought the fax was welcome. Unlike intentionally firing a gun into an occupied car as in *Harris* or intentionally firing a gun at an employee and forcing her to perform sexual acts as in *Spivey,* neither of which is even arguably a welcome act, JC Hauling's injury cannot be deemed the natural and probable consequence of Park University's act in sending the fax when Park University thought JC Hauling welcomed the transmission. If Park University intentionally sent a *solicited* fax, one cannot infer it intended to injure the recipients anymore than one can infer from the intentional taking of someone's truck that the driver's subsequent accidental injury of the victim was intentional, as in *Spruill Motors.*

This case is distinguishable from two other federal circuit court cases holding that property damage insurance provisions did not require a duty to defend in TCPA cases. *See Resource Bankshares Corp. v. St. Paul Mercury Ins.,* 407 F.3d 631 (4th Cir.2005), *cert. denied,* 126 S.Ct. 568 (2005); *Am. States Ins. Co. v. Capital Assocs. of Jackson County, Inc.,* 392 F.3d 939 (7th Cir.2004). Contrary to the present case, where the question of Park University's intent to cause injury to those it sent faxes lies at the heart of the underlying controversy, the intentional nature of the alleged injuries in *American States* appears to have been wholly undisputed. *See* 392 F.3d at 943. Moreover, the underlying state complaint here alleged both intentional and negligent conduct: Park University "*knew or should have known* that it did not have the prior express invitation or permission of Plaintiff ... to send the advertisements and *knew or should have known* that its actions constitute a violation of law." Aplt.App. at 82-83 (emphasis added). In *American States,* the court focused its brief analysis regarding the property damage insurance clause solely on intentional conduct. 392 F.3d at 943. Because an occurrence could result from *negligent* conduct on the part of Park University, any need for analysis of whether intentional conduct and injury occurred is obviated. *See, e.g., Fidelity & Deposit Co. of Md. v. Hartford Cas. Ins. Co.,* 189 F.Supp.2d 1212, 1218 (D.Kan.2002) (noting that natural and probable consequences test has not been applied to allegations of negligent conduct by an insured).

*6 In *Resource Bankshares,* 407 F.3d at 638, the plaintiff argued that although it did send a fax, "it only intended to fax ads to recipients who actually wanted them, and only did otherwise inadvertently." The plaintiff cited the district court's published opinion from the instant case in support of its argument that a TCPA violation could be accidental. *Id.* The court pointed out that the TCPA defines "unsolicited advertisement" as one that " 'is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

transmitted to any person without that person's *prior express invitation or permission.*' 47 U.S.C. § 227(a)(4) (2003) (emphasis added)." *Id.* Because the plaintiff there failed to present any evidence "that would cause a reasonable person to mistakenly believe that they had received prior express consent to send their fax ads," the *Resource Bankshares* court decided against it on summary judgment. *Id.* at 639. We stand in a different posture here because we are reviewing the district court's judgment on the pleadings. In so doing, we are permitted to treat exhibits attached to a complaint as part of the pleadings. *Indus. Constructors Corp. v. U.S. Bureau of Reclamation,* 15 F.3d 963, 964-65 (10th Cir.1994) (citation omitted). Park University's assertions that its actions were in fact solicited are clearly expressed in its answer in the state court action, which in turn was attached to the complaint in this case. Aplt.App. at 159, 160-161, 162, 163. [FN3] *Resources Bankshares* is thus inapposite.

> FN3. As noted above, Park University affirmatively asserted in its response to the underlying complaint that the fax was addressed to an employee of JC Hauling who had registered for one of Park University's seminars while acting in the scope of her employment, and who had supplied her employer's fax number.

In conclusion, under the minimal potential of liability standard of Kansas law, *see Finney,* 770 P.2d at 466, we conclude that an occurrence was possible under the insurance contract, and that American must provide a defense to Park University pursuant to the property damage provision. For similar reasons, as detailed by the district court, *see Park Univ. Enters., 314 F.Supp.2d at 1105-06,* we are not persuaded by American's related claims of non-fortuity and exclusion under the policy.

### B. Advertising Injury

The advertising injury provision of the insurance policy covers injuries "arising out of ... [o]ral or written publication of material that violates a person's right of privacy." Aplt.App. at 78. As noted above, the terms "oral or written publication" and "right of privacy" are not defined. The parties dispute the meaning of these terms and whether such terms are implicated by a violation of the TCPA. [FN4]

> FN4. We reject out of hand American's argument that there can be no coverage here because the named plaintiff in the underlying suit, JC Hauling, is a corporation, and corporations cannot claim a right to privacy. *See Am. States Ins. Co. v. Capital Assocs. of Jackson County, Inc.,* 392 F.3d 939, 942 (7th Cir.2004). American conveniently ignores that the offending fax in question was sent to Patty Evansco, an individual and employee of JC Hauling. Moreover, the complaint in the underlying class action suit seeks redress for a group of individuals who have allegedly suffered TCPA violations as a result of Park University's faxing activities. Even the court in *American States* acknowledged "the class of junk-fax recipients may include real rather than artificial people." *Id.* Likewise, several courts that have addressed TCPA invasion of privacy claims have implicitly rejected the merits of American's argument by acknowledging such actions even where the named plaintiffs were corporate or business entities rather than natural persons. *See e.g., Resource Bankshares Corp. v. St. Paul Mercury Ins.,* 407 F.3d 631 (4th Cir.2005) (complaining plaintiff in underlying class action was law firm); *Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.,* 401 F.3d 876 (8th Cir.2005) (plaintiff was computer business); *W. Rim Inv. Advisors, Inc. v. Gulf Ins. Co.,* 269 F.Supp.2d 836 (N.D. Texas 2003) (plaintiff was group of businesses), *aff'd,* 96 Fed. Appx. 960 (5th Cir.2004).

As we observed above, the Kansas courts have acknowledged that because

standard insurance polic[ies] are predetermined by the insurance carrier itself and, long in advance of the individual insurance sale ... [,] the law, in its concern for even-handed fairness, has attempted to minimize the imbalance between insurer and insured, so far as that is possible, by means of a rule that in the event of ambiguity or conflict in the policy provisions a policy of insurance is to be construed strictly against the insurer and in favor of the insured.

*7 *Gowing v. Great Plains Mut. Ins. Co.,* 483 P.2d 1072, 1074-75 (Kan.1971). Where an ambiguity arises, the test for determining the meaning of an insurance policy's language focuses not on what "the insurer intend[ed] the [policy] to mean, but what a reasonable person in the position of the insured

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would have understood [it] to mean." _Casey v. Aetna Cas. & Sur. Co., 470 P.2d 821, 826 (Kan.1970);_ see also _Farm Bureau Mut. Ins. Co., 660 P.2d at 1378; Gowing, 483 P.2d at 1075._

Courts have noted the term "privacy" can be interpreted in multiple ways and be used to mean either secrecy or seclusion. See _Resource Bankshares Corp., 407 F.3d at 639-40 & n. 9; Am. States Ins. Co., 392 F.3d at 941._
"Privacy" is a word with many connotations. The two principal meanings are secrecy and seclusion, each of which has multiple shadings. See _Restatement (Second) of Torts § 652 (1977);_ Richard S. Murphy, _Property Rights as Personal Information,_ 84 Geo. L.J. 2381 (1996). A person who wants to conceal a criminal conviction, bankruptcy, or love affair from friends or business relations asserts a claim to privacy in the sense of secrecy. A person who wants to stop solicitors from ringing his doorbell and peddling vacuum cleaners at 9 p.m. asserts a claim to privacy in the sense of seclusion.

_Id._ American argues that at most the TCPA allows recovery for injuries arising from an invasion of privacy in the form of seclusion, whereas the policy at issue here only provides coverage for an invasion of privacy in the form of secrecy. American's basic thesis is that the policy, by virtue of its language detailing that a personal privacy violation might occur when material is published, implicitly defines the violation as the disclosure of secrets rather than the invasion of one's seclusion. Despite the lack of any specific definitions in the policy supporting this position, American reasons the term "publish" requires that material or information be disseminated to a third party. From this, it contends the term "privacy" must relate to secrets rather than seclusion, because dissemination of information to a third party that violates a person's right to privacy mirrors the tort of defamation and the invasion of secrecy interests. American further argues that the receipt of an unsolicited fax cannot violate a secrecy interest because no offensive material is being transmitted to a third party. According to American, therefore, even if this case presents a violation of privacy in the sense of seclusion, the policy it issued to Park University only provides coverage for secrecy violations.

American's argument is not entirely unreasonable and at least two circuit courts have ruled accordingly in similar situations. See _Resource Bankshares Corp., 407 F.3d at 641-42; Am. States Ins. Co., 392 F.3d at 943._ [FN5] We are convinced by countervailing case law in three other circuits, however, that the policy American issued to Park University, defined by a reasonable person in the position of the insured, provides coverage for TCPA violations. See _Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc., 401 F.3d 876 (8th Cir.2005); Hooters of Augusta, Inc. v. Am. Global Ins. Co., No. 04-11077, 2005 WL 3292089 (11th Cir. Dec. 6, 2005)_ (unpub.), aff'g _Hooters of Augusta, Inc. v. Am. Global Ins. Co., 272 F.Supp.2d 1365 (S.D.Ga.2003); W. Rim Inv. Advisors, Inc. v. Gulf Ins. Co., No. 03-10707, 2004 WL 1160165 (5th Cir. May 19, 2004)_ (unpub.), aff'g _W. Rim Inv. Advisors Inc. v. Gulf Ins. Co., 269 F.Supp.2d 836, 847 (N.D.Tex.2003)._ [FN6]

FN5. The court in _Resource Bankshares_ examined a policy with language distinct from the policy language at issue here. _Resource Bankshares Corp., 407 F.3d at 634_ (policy provided coverage for damages arising from "_[m]aking known to_ any person or organization written or spoken material that violates a person's right of privacy." (emphasis added)). Hence, the court's determination that this language did not provide coverage for an invasion of seclusion claim under the TCPA is not determinative of the issue here.

FN6. The Eleventh Circuit affirmed the district court in _Hooters v. Augusta, Inc. v. Am. Global Ins. Co., No. 04-11077, 2005 WL 3292089 (11th Cir. Dec. 6, 2005),_ in a lengthy unpublished opinion which we find persuasive and helpful to our analysis. See Tenth Cir. R. 36.3(B). The Fifth Circuit affirmed in _W. Rim Inv. Advisors, Inc. v. Gulf Ins. Co., No. 03-10707, 2004 WL 1160165 (5th Cir. May 19, 2004),_ stating only that "the court finds no reversible error of fact or law and affirms for essentially the reasons stated by the district court." _Id._ at **1. We therefore look to the district court opinion in _Western Rim_ as descriptive of the Fifth Circuit's determination.

*8 Courts have consistently held the TCPA protects a species of privacy interest in the sense of seclusion. "Looking at how Congress described unsolicited fax advertisements, it is clear that Congress viewed violations of the Act as 'private nuisances' and 'invasions of privacy' under ordinary, lay meanings of these phrases ." _Universal Underwriters Ins., 401 F.3d at 881; see also Resource Bankshares Corp., 407 F.3d at 639_ ("the harm occasioned by unsolicited

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

faxes involves protection of some sort of 'privacy' " and class action seeking redress of TCPA harms addresses "seclusion privacy"); *Am. States Ins. Co., 392 F.3d at 942* (TCPA promotes "interest in seclusion"); *Hooters, 272 F.Supp.2d at 1373* ("the TCPA provides that no one is to be harassed with advertisement faxes unless he specifically solicits them"); *W. Rim Inv. Advisors Inc., 269 F.Supp.2d at 847* (purpose of TCPA "is to protect the privacy of individuals from receiving unsolicited faxed advertisements); *Prime TV, LLC v. Travelers Ins. Co., 223 F.Supp.2d 744, 752-53 (M.D.N.C.2002)* ("TCPA was enacted to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home ..." (quotations and citations omitted)).

The district court in the instant case ruled accordingly. *Park Univ. Enters., 314 F.Supp.2d at 1109* ("Congress ... sought to address the right of facsimile recipients to be left alone"). Applying Kansas law requiring it to interpret the policy as viewed by a reasonable person in the position of the insured, the district court also was of the view that the policy term "privacy" could be understood to include the right to seclusion. "The plain and ordinary meaning of privacy includes the right to be left alone, unburdened by unsolicited facsimiles." *Id. at 1109-10* (following *Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc., 300 F.Supp.2d 888, 895 (D.Mo.2004); Hooters of Augusta, Inc., 272 F.Supp.2d at 1372*). Contrary to American's arguments otherwise, the court further concluded the term "publication" could be read by a reasonable person in the position of insured, in the absence of any definition to the contrary in the insurance contract, to mean either the transmittal of material to a third party or the simple transmittal of material to a recipient. Viewing the term "publication" as ambiguous, the court construed the policy against American pursuant to Kansas law, and held that the policy protects seclusion interests.

We find no fault with the district court's ruling. As noted above, the court correctly determined that in layman's terms, "[t]he plain and ordinary meaning of privacy includes the right to be left alone." *Id.* at 1110. Certainly, the insurer could impose a more restrictive, technical and legal definition to the term "privacy" following that of the classic tort of invasion of secrecy interests or defamation. *See, e.g., Resource Bankshares, 407 F.3d at 641; Am. States Ins. Co., 392 F.3d at 941-42*. Such an approach, however, would construe the language of the contract from the vantage of an insurer or an attorney, rather than the insured. American failed to provide specific terms in the policy to narrow the scope of privacy interest violations for which it intended to provide coverage, and we decline to permit it to do so now. *Accord Universal Underwriters Ins. Co., 401 F.3d at 882; Hooters of Augusta, Inc., 2005 WL 3292089 at *3; W. Rim Inv. Advisors, 269 F.Supp.2d at 847; Prime TV, LLC, 223 F.Supp.2d at 752-53 & n. 5*.

*9 We likewise agree with the district court's broad construction of the term "publication" in favor of Park University. Random House defines publication, in part, as "the act of bringing before the public; announcement." Random House Unabridged Dictionary 1563 (2d ed.1987). Similarly, the Oxford English Dictionary defines the term as "the action of making something generally known; public declaration or announcement." New Shorter Oxford English Dictionary 2405 (1993). Reading the terms in the policy from the vantage point of the insured, rather than an insurer or lawyer, *Gowing, 483 P.2d at 1074-75; Casey, 470 P.2d at 826,* it is entirely reasonable to define publication as making something generally known. By faxing advertisements to the class of plaintiffs as alleged in the underlying state court complaint, Park University effectively published material in this broader sense, i.e., communicated information generally, which undermined the recipients' rights to be left alone. *Accord Hooters of Augusta, Inc., 2005 WL 3292089 at *5; W. Rim Inv. Advisors, Inc., 269 F.Supp.2d at 846-47; Prime TV, LLC, 223 F.Supp.2d at 752-53*.

Of course, as with the term "privacy," the word publication can be defined in the limited manner advocated by American. Thus, Random House states the *legal* definition for the term "publish" means "to communicate (in a defamatory statement) to some person or persons other than the person defamed." Random House Unabridged Dictionary 1563. The Oxford English Dictionary's *legal* definition for publication reads: "Notification of communication to a third party or to a limited number of people regarded as representing the public." New Shorter Oxford English Dictionary 2405. To give the term this narrow, technical reading would depart from the definition a reasonable person in the position of an insured might give the word. As noted above, we are precluded by Kansas law from construing the term "publication" so narrowly in this insurance policy when a reasonable person could view the term more broadly. [FN7]

FN7. In this regard, we find American's

reliance on *MGM, Inc. v. Liberty Mutual Ins. Co.*, 855 P.2d 77 (Kan.1993), as support for its definition of publication, to be largely inapposite. First, *MGM, Inc.* did not address any form of advertising injury or coverage for the same. Second, the injury at issue in *MGM, Inc.*, is more focused on a violation of secrecy, rather than a violation of seclusion. *Id.* at 78 (employer secretly taped employees' private conversations). Finally, the court's conclusion that there was no privacy violation because the employer in *MGM, Inc.* did not disseminate to *anyone* the private information he had secretly obtained from his employees, *id.* at 79, does not aid in fleshing out the proper definition for the term "publish," and how that term is used in a seclusion setting.

In conclusion, we agree with the district court that when the policy is strictly construed against American and in favor of Park University, a TCPA invasion of seclusion claim might be covered by the policy's advertising injury provisions. The transmission of an allegedly unsolicited fax can constitute a publishing act, while receiving the same can result in an invasion of privacy. An asserted TCPA violation easily dovetails, therefore, with the language in the insurance policy. Similarly, in agreement with the district court's reasoning, *see Park Univ. Enters.*, 314 F.Supp.2d at 1110, and relying on our earlier analysis as to whether there was an occurrence under the policy, we reject American's allied argument regarding non-fortuitous advertising injuries. Consequently, the district court correctly determined that American has a duty to defend Park University in the underlying TCPA action.

*10 We AFFIRM.

C.A.10 (Kan.),2006.
Park University Enterprises, Inc. v. American Cas. Co. Of Reading, PA
--- F.3d ----, 2006 WL 766750 (C.A.10 (Kan.))

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.